IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | |
| KABONI SAVAGE | : | NO. 07-550-03 |
| ROBERT MERRITT | : | NO. 07-550-04 |
| STEVEN NORTHINGTON | : | NO. 07-550-05 |
| KIDADA SAVAGE | : | NO. 07-550-06 |

**SURRICK, J.**                                                               **JUNE  25 , 2012**

**MEMORANDUM**

   Presently before the Court is Defendant Kaboni Savage's Motion to Transfer Venue

Outside of the Eastern District of Pennsylvania.  (ECF No. 376.)  For the following reasons,

Defendant's Motion will be denied without prejudice.

**I.  BACKGROUND[1]**

   On May 9, 2012, a federal grand jury returned a seventeen-count Fourth Superseding

Indictment ("Indictment") charging Defendant Kaboni Savage ("Savage") with conspiracy to

participate in the affairs of a racketeering ("RICO") enterprise, in violation of 18 U.S.C. §

1962(d) (Count 1), twelve counts of murder in aid of racketeering, in violation of 18 U.S.C. §

1959(a)(1) (Counts 2-7, 10-15), tampering with a witness, in violation of 18 U.S.C. § 1512(a)

(Count 8), conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. §

1959(a)(5) (Count 9), retaliating against a witness, in violation of 18 U.S.C. § 1513(a) (Count

---

[1] The factual background of this case is more fully set forth in our June 1, 2012
Memorandum and Order denying Defendant Kaboni Savage's Motion to Dismiss the Indictment
on Double Jeopardy Grounds and Motion to Dismiss Count Nine of the Third Superseding
Indictment on Double Jeopardy Grounds.  (*See* ECF Nos. 507, 508.)

16), and using fire to commit a felony, in violation of 18 U.S.C. § 844(h)(1) (Count 17).  (Fourth Superseding Indictment ("Indictment"), ECF No. 480.)[2]  Savage was charged, along with three co-defendants, Steven Northington, Robert Merritt, and Kidada Savage, his sister ("Kidada").  Defendant Lamont Lewis was also charged in the First Superseding Indictment.  The charges against Lewis were disposed of by guilty plea on April 21, 2011.  On March 14, 2011, the Government filed a notice of intent to seek the death penalty against Savage, Merritt and Northington.  (ECF Nos. 196, 197, 198.)  The Government does not seek the death penalty against Kidada.

On October 9, 2004, six people, including four children, died as a result of arson at a home located at 3256 North Sixth Street, Philadelphia, Pennsylvania.  (Def.'s Mot. 1, ECF No. 376.)  The Indictment alleges that Savage and Kidada solicited and ordered Lewis and Merritt to set fire to the home of Eugene Coleman, a former associate of Savage.  (Indictment 21-23.)  Savage believed that Coleman was cooperating with the Government and planned to testify against Savage in his 2005 federal drug conspiracy trial.[3]  The firebombing took the lives of Coleman's mother, infant son, three other relatives and a family friend.  The Government intends to show at trial that the firebombing was ordered by Savage in order to intimidate Coleman and prevent him from testifying against him at the 2005 drug conspiracy trial.

---

[2] The First Superseding Indictment was filed on April 8, 2009.  (ECF No. 51.)  The Second Superseding Indictment was filed on June 22, 2011.  (ECF No. 229.)  The Third Superseding Indictment was filed on September 7, 2011.  (ECF No. 284.)

[3] Savage, Northington and four other co-defendants not charged in the instant Indictment were prosecuted in the 2005 drug conspiracy case before the Honorable Mary A. McLaughlin.  After a seven-week trial, Savage was found guilty of conspiracy to manufacture and distribute cocaine, money laundering, firearms possession, witness retaliation and other crimes.  Coleman testified at that trial.  Savage received a sentence of thirty years in prison on these convictions.

By Order dated June 29, 2011, the deadline to file pretrial motions in this case was set for February 21, 2012.  (ECF No. 239.)  Approximately sixty-two pretrial motions were filed by the parties.  On February 21, 2012, Savage filed a Motion to Transfer Venue Outside of the Eastern District of Pennsylvania.  (Def.'s Mot.)  The Government filed a Response in opposition to the Motion on April 11, 2012.  (Gov't's Resp., ECF No. 460.)  A hearing was held on the pretrial motions on June 11 and 12, 2012.  At that hearing, the parties advised the Court that they did not wish to present evidence or oral argument on this Motion, and the Motion was submitted on the pleadings.  Trial of Defendants is scheduled for September 10, 2012.

## II.   DISCUSSION

Savage requests that the Court transfer venue of this case to another district.  He argues that "extensive media coverage" surrounding the case has permeated the juror pool in this District such that "it will be impossible to seat an impartial jury."  (Def.'s Mot. 1.)  In support of his Motion, Savage submits 129 news articles covering a seven-year time period.  (*Id.* at Ex. A.) The articles were published on dates ranging from April 14, 2004 to June 23, 2011.  They were published in local Philadelphia newspapers, and were republished online at www.philly.com and www.lexis.com.  (*Id.*)  The news articles report on events such as the October 9, 2004 arson-murders of the Coleman family, the 2005 drug conspiracy case and the instant case.  Savage contends that the news reports contain prejudicial statements, such as statements allegedly made by law enforcement officers, by the United States Attorney's Office, and by Savage himself.  The statements reportedly made by Savage were intercepted during court-ordered wiretaps at the

3

Federal Detention Center ("FDC") in Philadelphia.[4]  Savage also submits a DVD containing approximately forty-six television news reports covering the October 9, 2004 arson-murders of the Coleman family.[5]  Savage argues that the television and newspaper news coverage constitutes "such unprecedented pretrial publicity," and creates "a trial atmosphere utterly corrupted by press coverage."  (Def.'s Mot. 7 (quoting *Skilling v. United States*, 130 S. Ct. 2896, 2914 (2010)).)

The Government responds that the publicity this case has received is not so prejudicial as to justify a change of venue.  Specifically, the Government argues that it is impossible for the entire pool of eligible jurors to be prejudiced against Savage given the size and characteristics of the Eastern District of Pennsylvania.  The Government further argues the media reports are factually based, not unduly inflammatory, and were published long enough ago that it is unlikely that a pool of possible jurors would be tainted by them.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."  U.S. Const. amend. VI.  The Supreme Court has stated that due process requires that a defendant be guaranteed the right to "a trial by an impartial jury free from outside influences."  *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966).  By

---

[4] The alleged prejudicial statements include:  "Deputy Police Commissioner Richard Ross described Savage as 'pure evil' at a news conference last month announcing the Indictment," "[Savage is d]escribed by acting U.S. Attorney Laurie Magid as the leader of 'perhaps the most violent drug gang ever seen in the city of Philadelphia,'" "At his sentencing hearing, Mark Ehlers, the federal prosecutor in the case, said he had never seen a defendant 'as vicious, vindictive and hateful as Kaboni Savage.'"  (Def.'s Mot. 6.)  The articles also quote Savage as stating "no witness, no crime" and in relation to the Coleman family murders, "[t]hey shoulda, you know . . . took him . . . got him some barbeque sauce and poured it on them."  (*Id.*)

[5] The DVD was submitted as a supplemental exhibit to the Motion at the June 12, 2012 hearing and was marked as Defendant's Hearing Exhibit 18.

constitutional design, criminal trials are held in the district where the offense occurred.  *See* U.S.

Const. art. III, § 2, cl. 3 ("The trial of all crimes . . . shall be held in the State where the said

crimes shall have been committed."); U.S. Const. amend. VI (stating that criminal trials are to be

conducted "by an impartial jury of the State and district where the crime shall have been

committed"); *see also* Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the

government must prosecute an offense in a district where the offense was committed.").  This

venue rule yields only "if extraordinary local prejudice will prevent a fair trial."  *Skilling*, 130 S.

Ct. at 2913.

      Federal Rule of Criminal Procedure 21(a) governs motions to transfer venue.  Rule 21(a)

instructs that, "[u]pon the defendant's motion, the court must transfer the proceeding against that

defendant to another district if the court is satisfied that so great a prejudice against the defendant

exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

Fed. R. Crim. P. 21(a).  The decision to grant or deny a motion to change venue is committed to

the sound discretion of the district court.  *Martin v. Warden, Huntingdon State Corr. Inst.*, 653

F.2d 799, 804 (3d Cir. 1981).  Defendants carry a "heavy burden" when moving to transfer venue

under Rule 21(a).  *United States v. Smith*, No. 05-428, 2006 U.S. Dist. LEXIS 35391, at *2

(M.D. Pa. Feb. 8, 2006) (citation omitted).  Moreover, with change of venue claims based upon

pretrial publicity, a distinction is drawn between presumed prejudice and actual prejudice.

*Murphy v. Florida*, 421 U.S. 794, 798 (1975); *see also Hetzel v. Lamas*, 630 F. Supp. 2d 563,

570 (E.D. Pa. 2009).

A.      **Presumed Prejudice**

In certain cases, a court may presume prejudice to the defendant.  "Presumed prejudice" arises when "media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process."  *Rock v. Zimmerman*, 959 F.2d 1237, 1252 (3d Cir. 1992); *see also Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007) ("Presumptive prejudice from pretrial publicity occurs where an inflammatory, circus-like atmosphere pervades both the courthouse and the surrounding community.").  A court may transfer venue under these circumstances without examining the attitudes of those that served on the jury.  *Rock*, 959 F.2d at 1252.  Cases where prejudice is presumed, however, are "exceedingly rare."  *Id.* at 1253.  In order for a court to presume prejudice, "the community and media reaction . . . must have been so hostile and so pervasive as to make it apparent that even the most careful voir dire process would be unable to assure an impartial jury."  *Id.*; *Hetzel*, 630 F. Supp. 2d at 570 (same); *see also Rock*, 959 F.2d at 1253 (describing presumed prejudice to be a "showing of an utterly corrupt trial atmosphere").

Savage's presumed prejudice argument rests largely on the sheer number of news articles and television broadcasts that discuss him and the charges alleged against him.  However, this is insufficient since "prominence does not necessarily produce prejudice, and jury impartiality . . . does not require ignorance."  *Skilling*, 130 S. Ct. at 2914-15.  Rather, when determining whether prejudice may be presumed based upon pretrial publicity, courts look to the following factors:

(i) the size and characteristics of the community;

(ii) the general content of the news coverage (including facts such as whether the stories referenced the defendant's confession or other similarly blatantly prejudicial information, whether the news account was factual and objective versus sensational,

6

inflammatory, or slanted toward the prosecution, and whether the stories focus on the defendant personally as opposed to the crime itself);

(iii) the timing of the media coverage relative to the commencement of the trial; and

(iv) whether there was any media interference with actual courtroom proceedings.

*United States v. Diehl-Armstrong*, 739 F. Supp. 2d 786, 793 (W.D. Pa. 2010) (internal citations omitted).

### 1.    *Size and Characteristics of the Community*

One factor that we must consider in determining whether prejudice may be presumed is the size and makeup of the pool from which the jury will be drawn.  *Skilling*, 130 S. Ct. at 2915; *Diehl-Armstrong*, 739 F. Supp. 2d at 793.  In *Skilling*, a former Enron executive was charged with engaging in a scheme to deceive investors about Enron's true financial performance, securities fraud, wire fraud, insider trading and making false representations to auditors.  *Skilling*, 130 S. Ct. at 2908.  Enron, which ultimately collapsed into bankruptcy, was based in Houston, which was also the venue of the trial.  *Id.* at 2907.  The defendant in *Skilling* attempted to move venue outside of Houston based on extensive pretrial publicity.  The Supreme Court affirmed the denial of this request.  The Court determined that the district had 4.5 million eligible jurors and concluded that "given this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain."  *Id.* at 2915.  The Supreme Court's conclusion in *Skilling* is equally applicable to the instant case.

According to the 2010 United States Census, the jury pool from which this Court pulls potential jurors comprises approximately 5.5 million people.[6]  The jury pool in this case is even

---

[6] *See* U.S. Census Bureau 2010, State and County Quick Facts, http://quickfacts.census.gov/qfd/index.html (last visited June 21, 2012).  This number was

larger than the jury pool in the *Skilling* case.  Moreover, since potential jurors come from nine

counties comprising the Eastern District of Pennsylvania, some urban and some rural, the jury

pool is certainly diverse.  Savage's assertion at this juncture that it would be impossible to find

twelve impartial jurors is without merit.  *See Skilling*, 130 S. Ct. at 2915; *compare Mu'Min v.

Virginia*, 500 U.S. 415, 429 (1991) (in capital case, determining that no presumption of prejudice

was created in light of the size of the "metropolitan Washington [D.C.] statistical area, which has

a population of over 3 million"), *with Rideau v. Louisiana*, 373 U.S. 723, 724-25 (1963) (finding

presumed prejudice when murder was committed in a rural parish with a total population of

150,000).  Accordingly, this factor weighs against a finding that prejudice may be presumed.

### 2.    General Content of the News Coverage

Another factor we must consider is the general content of the pretrial news coverage.  For

this factor, we must consider whether the news reports contained a "confession or other blatantly

prejudicial information of the type readers or viewers could not reasonably be expected to shut

from sight."  *Skilling*, 130 S. Ct. at 2916.  The Third Circuit has stated that "[p]retrial publicity

exposure will not automatically taint a juror."  *Martin*, 653 F.2d at 804.  In evaluating this factor,

courts must keep in mind that "in the era of modern communications, it is nearly impossible to

find a juror who has not been exposed to some measure of information regarding a highly

publicized case."  *Knapp v. Leonardo*, 46 F.3d 170, 176 (2d Cir. 1995); *see also Martin*, 653

---

calculated by taking the sum of the populations for each of the nine counties that comprise the
Eastern District of Pennsylvania:  Berks, Bucks, Chester, Delaware, Lancaster, Lehigh,
Montgomery, Northampton and Philadelphia.  *See id.*; *see also* 28 U.S.C. § 118(a) ("The Eastern
District comprises the counties of Berks, Bucks, Chester, Delaware, Lancaster, Lehigh,
Montgomery, Northampton, and Philadelphia.").

F.2d at 806 ("The Constitution does not guarantee trial by jurors totally oblivious to events unfolding from day to day in the community in which they live.").

We have reviewed the 129 news articles and the forty-six television reports submitted by Savage.  Among other things, Savage was coined a "drug kingpin," "pure evil," and "vicious, vindictive and hateful."  (Def.'s Mot. 6 & Ex. A.)  The news stories included quotes of intercepted statements made by Savage himself, such as "no witness no crime," "[w]ithout the witnesses, you don't have no case," "[t]hem rats . . . they got to pay," "[t]hat's all I think about . . . they kids, they moms," "[m]y war is with the rats . . . I'm a hunt every last one bitch that I can, and kill 'em," "[t]hat's all I dream about. . . . I wanna erase his whole family tree," "I dream of killing [witnesses'] kids . . . cutting their heads off," and "I ain't got no regrets for nothing I did." (Def.'s Mot. Ex. A.)  One article reports that, after the Coleman murders, "Savage was heard on a secretly recorded prison tape joking about the murders and belittling the victims."  (*Id.*)

Although these news stories do not reflect well on Savage, they do not contain confessions or other information that is so blatantly prejudicial that a change in venue is justified. The statements made by Savage are no doubt disturbing and exhibit Savage's anger and hostility, but they are not confessions to the crimes alleged.  Moreover, most of the news stories are predominantly factual in nature in that they report about the Coleman murders, updates in the 2005 drug conspiracy case or the instant case.  The forty-six television news stories all cover the October 9, 2004 arson at Coleman's home.  All of the television reports were aired within one week of the October 9th arson.  The stories include information about the six victims and report that law enforcement had ruled it a homicide.  At least a few of the stories mention Savage as a possible suspect.  The newspaper articles also discuss the Coleman murders.  In addition, they

report about Savage's 2005 drug conspiracy case, including his arrest, arraignment, trial and

sentencing.  With respect to the instant case, the news articles report about Savage's arrest and

arraignment, subsequent superseding indictments filed, Savage's issues with his attorneys and the

special administrative measures placed on him in prison, the Government's filing of notices of

intent to seek the death penalty against Savage, Northington and Merritt, and suspicions that co-

defendants have pleaded guilty.  The highly factual nature of the media coverage, coupled with

the fact that the news stories contain no confessions by Defendants, weigh against a finding of

presumed prejudice.  *See United States v. Lindh*, 212 F. Supp. 2d 541, 549 (E.D. Va. 2002)

(finding no presumption of prejudice where extensive national pretrial coverage, which included

"opinions . . . specifically designed to inflame or persuade readers," was on the whole, factual

rather than inflammatory).

        The statements made by law enforcement officers describing Savage as "pure evil" and

"vicious, vindictive and hateful" are arguably inflammatory.  However, those statements were

made as long ago as April 2009 and March 2011, a year and a half to three years before the trial

is scheduled to begin.  As discussed below, the time that has elapsed between these statements

and the start of trial weighs against a finding of presumed prejudice.  *See infra* at Section II.A.3;

*see also Flamer v. Delaware*, 68 F.3d 736, 755 (3d Cir. 1995) (finding no presumption of

prejudice where there was a lapse of eight months between the last newspaper story and the start

of jury selection).

        Savage's reliance on *Irvin v. Dowd*, 366 U.S. 717 (1961), and *Rideau v. Louisiana*, 373

U.S. 723 (1963), is misplaced.  Both of those cases are easily distinguished from this case.  In

*Irvin*, the Supreme Court reversed the defendant's conviction and remanded the case to the

district court after finding that extensive pretrial publicity had denied the defendant due process of law. *Irvin*, 366 U.S. at 727-28. The defendant's confession to six murders was given considerable media attention in the small community such that the court found a "pattern of deep and bitter prejudice." *Id.* at 726-27. In addition, after reviewing the voir dire transcripts, the Court determined that two-thirds of the jury had "admit[ted], before hearing any testimony, to possessing a belief in [the defendant's] guilt." *Id.* at 728. In *Rideau*, the Supreme Court again determined that it was a denial of due process to deny a defendant's requested change of venue. 373 U.S. at 726. Like the defendant in *Irvin*, the defendant's confession in *Rideau* received considerable media attention. Moreover, an in-depth interview with law enforcement which showed the defendant confessing to the robbery, kidnapping and killing, and providing vivid details of his crimes was repeatedly broadcast on television. *Id.* at 724-25. With a potential jury pool of 150,000, of whom at least one-third had seen the broadcast, *id.* at 726, the defendant's confession "was likely imprinted indelibly in the mind of anyone who watched it," *Skilling*, 130 S. Ct. at 2916.

The news reports and television stories in the instant case contain no confessions by Savage or by any other Defendant. Accordingly, this factor also weighs against finding a presumption of prejudice. *See Skilling*, 130 S. Ct. at 2916 ("[A]lthough news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight.").

3.      *Timing of the Media Coverage*

The timing of the media coverage in relation to the start of trial is another factor to consider in determining whether presumed prejudice is present. "Potential prejudice can be

dissipated if there is a large lapse in time between the widespread publicity and the trial." *Hetzel*, 630 F. Supp. 2d at 570.  In *Murphy v. Florida*, the Supreme Court determined that media coverage about the petitioner's crimes was not prejudicial because the articles were published seven months prior to jury selection.  421 U.S. at 802.  In *Skilling v. United States*, the Supreme Court observed a time lapse of four years between Enron's bankruptcy and the defendant's trial. 130 S. Ct. at 2916.  There had been periodic news coverage throughout this time period. However, "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.*  In *Rock v. Zimmerman*, the Third Circuit observed that there was "extensive adverse publicity and community interest" surrounding the defendant's murder case; however, the media attention occurred four years prior to the jury selection.  959 F.2d at 1253. The Court determined that no presumption of prejudice existed that necessitated a change of venue.  *Id.*

By the time the trial commences in this case, it will have been almost eight years since the Coleman family murders, seven years since the drug conspiracy trial, and over three years since the first indictment was returned in the instant case.  All of the television reports submitted by Savage were aired within one week of the October 9, 2004 firebombing.  The majority of the newspaper articles submitted by Savage were published in 2004 and 2005 and discuss the firebombing and the 2005 drug conspiracy trial.  (*See* Def.'s Mot. Ex. A (including seventy-five articles dated in 2004 and 2005).)[7]  Only eight articles submitted were published in each of 2010

---

[7] The following lists the number of articles by year that were submitted by Savage:

| | | | | | |
|---|---|---|---|---|---|
| 2004 | (28) | 2007 | (8) | 2010 | (8) |
| 2005 | (47) | 2008 | (4) | 2011 | (8) |
| 2006 | (11) | 2009 | (15) | 2012 | (0) |

and 2011, and none of the articles submitted were published in 2012.  The most recent article submitted was published on June 29, 2011.  By the time trial starts, it will be over a year since this case has received any media attention.  Indeed, we were unable to locate any media coverage, newspaper articles or television broadcasts on the pretrial hearing that took place on June 11 and 12, 2012.

Media coverage in this case began to decline precipitously in 2006-2007 and has been nearly absent in the last year, despite important events such as the pretrial hearing.  Accordingly, this factor also weighs against a finding of presumed prejudice.  *See Skilling,* 130 S. Ct. at 2916; *Rock*, 959 F.2d at 1252 (finding no presumption of prejudice when extensive adverse publicity and community interest occurred four years prior to trial, and the record did not reveal a "barrage of inflammatory publicity immediately prior to [defendant's] trial"); *Hetzel v. Lamas*, 372 F. App'x 280, 284 (3d Cir. 2010) (finding that pretrial publicity did not warrant a change of venue where time between media attention and trial was just over a year); *Flamer*, 68 F.3d at 755 ("It is also significant that there was a lapse of eight months between the publication of the last newspaper story on which [the defendant] relied . . . and the start of jury selection."); *see also Patton v. Yount*, 467 U.S. 1025, 1035 (1984) (explaining that, although potential jurors may remember the crime, "[i]t is not unusual that one's recollection of the fact that a notorious crime was committed lingers long after the feels of revulsion that create prejudice have passed").

4.    *Media Interference*

The final factor for the Court's consideration of presumed prejudice is the extent to which there has been media interference with actual courtroom proceedings.  *Skilling*, 130 S. Ct. at 2915; *Diehl-Armstrong*, 739 F. Supp. 2d at 793.  This trial has not started yet.  However, if the

13

recent pretrial hearing, which was free from any media interference, is any indication of how the trial will proceed, we have no doubt that the trial will "maintain[] the dignity, decorum, and solemnity that is befitting of a criminal trial."  *Diehl-Armstrong*, 739 F. Supp. 2d at 806.

Accordingly, we are satisfied that the community and media reaction to this case and to Defendant has not "been so hostile and so pervasive as to make it apparent that even the most careful voir dire process would be unable to assure an impartial jury."  *Rock*, 959 F.2d at 1253. A presumption of prejudice has not been shown, and a change of venue outside the Eastern District of Pennsylvania is not justified at this time.

### B.    Actual Prejudice

In the absence of presumed prejudice, a defendant may demonstrate that his right to an impartial jury has been violated by a showing actual prejudice.  This requires a defendant to show that those who served on his jury could not reach an impartial verdict based solely on the evidence presented at trial.  *Stevens v. Beard*, 501 F. Supp. 2d 671, 726 (W.D. Pa. 2010) (citing *Patton*, 467 U.S. at 1035; *Rock*, 959 F.2d at 1253).  As the Third Circuit has stated, "[t]he fact that jury members may have been exposed to press reports or other community reaction concerning the case and even the fact that they may have formed a tentative opinion based on that exposure will not establish a constitutional violation if the trial court has found, with record support, that each of the jurors was able to put aside extrinsic influences."  *Rock*, 959 F.2d at 1253.

A court faced with pretrial motions to transfer venue on the grounds of actual prejudice should defer ruling on this aspect of the motion until after voir dire has been completed.  *See, e.g.*, *Diehl-Armstrong*, 739 F. Supp. 2d at 807 (finding no presumption of prejudice and deferring

14

ruling on actual prejudice until after voir dire); *United States v. Harrison*, No. 06-146, 2008 U.S.

Dist. LEXIS 44348, at *13 (E.D. La. June 4, 2008) (denying pretrial venue motion based on

actual prejudice without prejudice).  We will conduct a careful examination of potential jurors to

assure the impartiality of the selected jury.  A detailed jury questionnaire will be utilized prior to

the start of jury selection.  Since voir dire has not yet begun, Savage's motion to transfer venue

on the basis of actual prejudice is premature.  If prejudice actually exists, it will be revealed at

voir dire.  If, after voir dire is completed, Savage's concerns about impartiality continue, he may

renew his Motion on the issue of actual prejudice.

## III.    CONCLUSION

For the foregoing reasons, Defendant Kaboni Savage's Motion to Transfer Venue Outside

of the Eastern District of Pennsylvania is denied without prejudice.

An appropriate Order will follow.

**BY THE COURT:**

**_____**

**R. BARCLAY SURRICK, J.**

15