IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | |
| KABONI SAVAGE | : | No. 07-550-03 |

**SURRICK, J.**                                                                                                        **JANUARY 31, 2013**

## MEMORANDUM

Presently before the Court is Defendant Kaboni Savage's Motion to Compel the Production of *Brady*, *Giglio* and *Napue* Discovery (ECF No. 753). For the following reasons, Defendant's Motion will be granted in part and denied in part.

**I.    BACKGROUND**[1]

On May 9, 2012, a federal grand jury returned a seventeen-count Fourth Superseding Indictment (the "Indictment") charging Defendant Kaboni Savage with: conspiracy to participate in the affairs of a racketeering ("RICO") enterprise, in violation of 18 U.S.C. § 1962(d) (Count 1); twelve counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Counts 2-7, 10-15); conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Count 9); retaliating against a witness, in violation of 18 U.S.C. § 1513(a) (Count 16); and using fire to commit a felony, in violation of 18 U.S.C. § 844(h)(1) (Count 17). (Fourth Superseding Indictment, ECF No. 480.)[2] Savage was charged along with three co-defendants, Steven Northington, Robert Merritt, and his sister, Kidada Savage. Lamont

---

[1] The factual background of this case is more fully set forth in our June 1, 2012 Memorandum and Order denying Defendant Kaboni Savage's Motion to Dismiss the Indictment on Double Jeopardy Grounds and Motion to Dismiss Count Nine of the Third Superseding Indictment on Double Jeopardy Grounds. (*See* ECF Nos. 507, 508.)

[2] Count 8 has been dismissed pursuant to an agreement between Defendants and the Government. (ECF No. 855.)

Lewis was also charged in the First Superseding Indictment. The charges against Lewis were disposed of by guilty plea on April 21, 2011. On March 14, 2011, the Government filed a notice of intent to seek the death penalty against Savage, Merritt and Northington. (ECF Nos. 196, 197, 198.) The Government does not seek the death penalty against Kidada Savage.

On October 9, 2004, six people, including four children, died as a result of arson at a home located at 3256 North Sixth Street, Philadelphia, Pennsylvania. (Def.'s Mot. 1, ECF No. 376.) The Fourth Superseding Indictment alleges that Defendant and Kidada Savage solicited and ordered Lewis and Merritt to set fire to the home of Eugene Coleman, a former associate of Defendant. (Fourth Superseding Indictment 21-23.) Savage believed that Coleman was cooperating with the Government and planned to testify against Savage in his 2005 drug conspiracy trial.[3] The firebombing took the lives of Coleman's mother, infant son, and four other relatives. The Government intends to show at trial that the firebombing was ordered by Defendant in order to intimidate Coleman and prevent him from testifying against him at the 2005 drug conspiracy trial.

On November 21, 2012, Defendant filed a Motion to Compel the Production of *Brady*, *Giglio* and *Napue* Discovery. (Def.'s Mot., ECF No. 753.)[4][5] The Government filed a response

---

[3] Defendant, Northington, and four other co-defendants not charged in the instant Indictment were prosecuted in the 2005 federal drug conspiracy case. After a seven-week trial, Savage was found guilty of conspiracy to manufacture and distribute cocaine, money laundering, firearms possession, witness retaliation and other crimes. Coleman testified at that trial. Defendant received a sentence of thirty years in prison on these convictions.

[4] On On February 21, 2012, Defendant filed a Motion to Compel the Production of Non-Jencks Act Discovery. (ECF No. 394.) Defendant attached a letter dated November 14, 2011 to this Motion. (*Id*. Ex. A.) Defendant attached this same letter as Exhibit A to the instant Motion. (Def.'s Mot. Ex. A.) We do not address the discovery requested in Exhibit A in this Memorandum.

[5] Defendant attached to the instant Motion Exhibit B, a letter dated August 17, 2012, and Exhibit C, a letter dated November 2, 2012. In an attempt to determine what discovery issues were still outstanding, we sent a letter to counsel requesting that they advise the Court as to what

on December 10, 2012. (Gov't's Resp., ECF No. 795.) We held hearings on December 17, 2012, and January 14, 2013 on Defendant's Motion. (Min. Entries, ECF Nos. 840, 905.)

**II. DISCUSSION**

Defendant requests disclosure of the identities of confidential informants who are referenced in fifteen separate Federal Bureau of Investigation ("FBI") 302 reports. (Def.'s Mot. Ex. D.) Defendant argues that the information these sources provide constitutes *Brady*, *Giglio*, and *Napue* evidence, and therefore the production of the names of these individuals is required. (Def.'s Mot. 2.) The Government maintains that disclosure of the confidential sources' identities is privileged under *Roviaro v. United States*, 353 U.S. 53, 62 (1957). (Gov't's Resp. 10.) At the January 14 hearing, the Government submitted the 302 Reports to the Court with the names of the confidential informants redacted. (Jan. 14, 2013 Hr'g Tr. 201-02 (on file with Court).)[6]

**A. Legal Standard**

The Supreme Court in *Roviaro v. United States* recognized the Government's privilege to withhold from disclosure the identity of confidential informants. 353 U.S. at 59. However, the Court held that this privilege was not without limitations. *Id.* at 59-60. "Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60-61.

The first step in determining the necessity of disclosure is to "ascertain what need, if any, the defendant has alleged for disclosure." *United States v. Jiles*, 658 F.2d 194, 197 (3d Cir. 1981). A defendant has the burden to establish the specific need for disclosure. *Id.* "A

---

issues remain unresolved with respect to those exhibits. We have yet to receive a response to that letter. Accordingly, we will not address the discovery requested in either Exhibit B or C.
    [6] The FBI 302 Reports submitted by the Government at the January 14, 2013 hearing are on file with the Court.

defendant who merely hopes (without showing a likelihood) that disclosure will lead to evidence . . . has not shown that disclosure will be 'relevant and helpful to the defense . . . or is essential to a fair determination' of the case." *United States v. Brown*, 3 F.3d 673, 679 (3d Cir. 1993); *United States v. Bazzano*, 712 F.2d 826, 839 (3d Cir. 1983) ("[M]ere speculation as to the usefulness of the informant's testimony to the defendant is insufficient to justify disclosure of his identity.") (internal quotation marks omitted); *United States v. Robles*, 814 F. Supp. 1233, 1240 (E.D. Pa. 1993) ("The defendant must indicate some concrete circumstances that might justify overcoming both the public interest in encouraging the flow of information [from informants to law enforcement] and the informant's private interest in his [or her] own safety.") (internal quotation marks omitted).

Once the defendant provides a specific need for disclosure, the court must then "balance[] the public interest in protecting the flow of information against the individual's right to prepare his defense." *Jiles*, 658 F.2d at 196 (citing *Roviaro*, 353 U.S. at 62). As part of its inquiry, the court should consider "the crime charged, the possible defense, the possible significance of the informer's testimony, and other relevant factors." *Id.* The Third Circuit determined that disclosure of an informant's identity was required when: "(1) the possible testimony was highly relevant; (2) it might have disclosed an entrapment; (3) it might have thrown doubt upon the defendant's identity; and (4) the informer was the sole participant other than the accused, in the transaction charged." *Id*. at 198-99.

As part of this balancing test, the court should also consider the possible risk of harm to the informant if their identity is revealed. *See id.* at 198. Where disclosure will jeopardize the personal safety of the informant, and the informant's prospective testimony is not exculpatory, courts should ordinarily not order disclosure. *See United States v. Edelin*, 128 F. Supp. 2d 23,

33-34 (D.D.C. 2001) (citing *United States v. Pelton,* 578 F.2d 701, 797-08 (8th Cir. 1978)). However, the risk to the informant "cannot justify a deprivation of [a defendant's] right to a fair trial, [but] it does require close scrutiny of [a defendant's] need to have his counsel meet with the informant." *Jiles*, 658 F.2d at 198. "The Government's assertion of danger to the informant should 'not be disregarded lightly.'" *United States v. Harrison*, No. 04-768, 2005 WL 840377, at *5 (E.D. Pa. Apr. 12, 2005) (quoting *United States v. Almodovar*, No 96-71, 1996 WL 700267, at *7 (D.Del. Nov. 26, 1996.) Ultimately, the trial court is afforded substantial deference in assessing on a case-by-case basis the necessity of disclosure. *Brown*, 3 F.3d at 679.

It is important to note the relationship between the Government's privilege under *Roviaro* and the disclosure obligations pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. In *Brady*, the Supreme Court held that the suppression of "evidence favorable to an accused upon request violates due process where evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Similarly, the prosecution is required to turn over impeachment evidence to the defense — that is, evidence relating to a witnesses' credibility. *United States v. Friedman*, 658 F.3d 342, 357 (3d Cir. 2011) (citing *United States v. Giglio*, 405 U.S. 150, 154 (1972)). For purposes of *Brady* and *Giglio*, evidence is only material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

As other federal courts have concluded, the privilege of the government under *Roviaro* does not abrogate the Government's duties under *Brady*. *McLawhorn v. State of N.C.*, 484 F.2d 1, 8 (4th Cir. 1973) (concluding that the prosecution discharges its duties under *Giglio* and *Brady* if it discloses the informant's identities); *Edelin*, 128 F. Supp. 2d at 33 ("The [*Roviaro*] privilege

is appropriately used here if the government otherwise complies with *Brady v. Maryland* and other applicable cases protecting the interests of the defendants."); *United States v. Beltran-Palafox*, No. 09-40022-01, 2010 WL 1408590, at *7 (D. Kan. Mar. 31, 2010) (same).[7] In describing the interplay between *Roviaro* and *Brady*, one court concluded that the "*Roviaro* obligation is not that the government turn over exculpatory evidence (an obligation already defined by *Brady*), but that the government provide a defendant with information about the identity of an informant, which may be the means to obtain further exculpatory evidence from that person." *United States v. LaRouche Campaign*, 695 F. Supp. 1290, 1307 (D. Mass. 1988).

**B.** **Specific Requests**

Initially, we note that for a majority of the confidential informants requested here, Defendant fails to establish the degree to which these informants will be helpful to his defense. In Exhibit D, Defendant provides a summary of each of the FBI 302 Reports, but offers no representation as to how each informant's testimony is relevant to his defense. (Def.'s Mot. Ex. D.) At the hearings, Defendant explained how six of the confidential informants could be useful to his defense. (*See* Dec. 17, 2012 Hr'g Tr. 145-177 (on file with Court); Jan. 14 Hr'g Tr. 190-204.) Since Defendant has failed to meet the burden of establishing the specific need for disclosure for the balance of the confidential informants, we must deny Defendant's requests as to those informants, and limit our discussion to the six informants Defendant specifically identified as relevant and useful to the defense.[8]

---

[7] The Government has represented to the Court on several occasions that it has fulfilled its obligations under *Brady* and *Giglio* in this case.

[8] Defendant attempted to provide a specific need for disclosure for Request One, Two, Four, Five, Twelve, and Thirteen. With regard to the remaining confidential informants in the 302 Reports Defendant simply made a broad, general statement that they are *Brady* and *Giglio* material to which Defendant is entitled.

In Request One of Exhibit D, Defendant seeks the identity of a confidential informant who was sent by Clayton Adams to speak with Lamont Lewis, who was at that time incarcerated at Curran-Fromhold Correctional Facility. (Def.'s Mot. Ex. D.) During that conversation, Lewis allegedly told the source that the victims of the firebombing "fried like Bar-B-Q chicken . . . and they was screaming." (May 18, 2007 FBI 302 Report.) Defendant argues that this statement would be useful to impeach Lewis regarding his previous grand jury testimony where he stated that he was shocked to learn that people were present in the home when he set the fire. (Jan. 14 Hr'g Tr. 194-96.) The Government responds that Lewis has never denied knowing that people were present in the home. A review of the grand jury testimony reveals that Lewis testified that he knew that people were present in the home, but that he was surprised to learn that children were present in the home. (*See* May 18, 2011 Grand Jury Tr. 73, 107-08 (on file with Court).)

Defendant has not demonstrated that the information provided by this source will be helpful to his defense. Defendant has failed to show that this informant would provide impeachment evidence with respect to Lewis's previous statements about the fireboming. Lewis admitted to firebombing the Coleman home in his grand jury testimony. (*Id.* at 89-93.) He also admitted to the grand jury that he knew that people would be home. (*Id.* at 73, 107-08.) The information he relayed to this informant is consistent with his previous statements, and therefore Defendant has failed to show that the informant's testimony would be relevant to his defense.

In Request Two of Exhibit D, Defendant also seeks the identity of the source who "discussed Tybius Flowers' organization at 8th and Butler and the source of cocaine for Carlton Brown as Gerald Thomas." (Def.'s Mot. 2.) Contrary to Defendant's summary of this Report, the source never mentions Carlton Brown. (June 11, 2002 FBI 302 Report.) Rather, the informant states that her ex-husband, Colantonio Brown, also known as "Nook," was the

lieutenant in the Tybius Flowers's drug organization. (*Id*.) She identified the main suppliers for the Flowers organization as "unknown Dominicans." (*Id*.) She also stated that Colantonio Brown supplied or purchased cocaine from a black male known as "Bub." (*Id*.)[9] At the hearing on December 17, 2012, Defendant explained that the information provided by this confidential informant contradicts Eugene Coleman's 302 reports which indicate that Defendant was the drug supplier for 8th and Butler. (Dec. 17 Hr'g Tr. 148.)

Setting aside the apparent confusion as to the identity of Colantonio Brown, it is not clear how the information provided by the informant would be helpful or relevant to the defense. We have no information regarding the 302 Reports for Eugene Coleman to which Defendant is referring. They were not provided to the Court. We cannot determine whether this confidential informant would contradict or dispute information provided in those 302 Reports without knowing what information those reports contain. Defendant has not shown a specific need for disclosure of this informant's identity.

In both Request Four and Five of Exhibit D, Defendant requests the identity of the source that establishes "Pumpkin," also known as Ronald Walston, as the cocaine supplier for Lamont Smith. (Def.'s Mot. Ex. D.) Defendant maintains that the information provided by this informant contradicts the Government's assertion that Lamont Smith supplied cocaine to Defendant, and that Defendant was then supplying the corner that Walston was supplying. (Jan. 14 Hr'g Tr. 193-94.) Defendant argues that this information can impeach Lamont Smith and "impeach the government's theory that [Defendant] was supplying the corners in and around 2000 and 2001." (*Id.* at 194.) Both Reports indicate that Walston supplied cocaine to Lamont Russell, also known as Lamont Smith. (Feb. 21, 2001, Feb. 23, 2001 FBI 302 Reports.) The

---

[9] Bub was identified as Gerald Thomas in the Fourth Superseding Indictment. (Fourth Superseding Indictment 10.)

Government responds that the Lamont Smith referred to in these two FBI 302 Reports, is not the same Lamont Smith that the Government will call to testify at trial. (Jan. 14 Hr'g Tr. 199.)

Assuming the Government's representations to be true, there are evidently two different people who use the name Lamont Smith. Since the one that the Government intends to call as a witness is not the one referred to in Requests Four and Five, Defendant has not established that the information provided by this informant is useful to his defense.

In Request Twelve of Exhibit D, Defendant seeks the identity of an informant who believes that Lamont Smith and William Cartwright, also known as "Boo," were responsible for the murder of Mansur Abdullah, also known as "Shafiq." Defendant is charged with the murder of Abdullah. (Fourth Superseding Indictment 33.) Defendant argues that the informant's statement constitutes *Brady* material. (Dec. 17 Hr'g Tr. 148-49; Jan.14 Hr'g Tr. 192-93.) The Government contends that the information provided by this source is "hearsay that cannot be tracked to any particular individual. It's just word on the street that this person related to the agents." (Jan. 14 Hr'g Tr. 200.)

Defendant has established a specific need for the disclosure in this instance. Based on this 302 Report, the confidential informant may be able to provide exculpatory evidence with respect to the Abdullah murder. If the informant does in fact have exculpatory evidence regarding the Abdullah murder this could certainly be important to the defense. However, it is not clear from the Report what if any information the informant has, nor does the Report identify the source of his apparent knowledge. We also note that while the Government has not articulated a specific danger in disclosing the identity of this informant, we recognize that there are legitimate concerns about the personal safety of informants in this case based on the allegations of witness intimidation and violence in the Indictment. There is also the more

9

general concern that disclosure of an informant's identity will "deter future witnesses from stepping forward." *Jiles*, 658 F.2d at 198.

In light of these concerns, we conclude that an *in camera* interview with the informant may be the best way to proceed at this juncture. The Third Circuit has recognized that *in camera* questioning of an informant "enables the court to view with a keener perspective the factual circumstances upon which it must rule and attaches to the court's ruling a more abiding sense of fairness than could otherwise have been realized." *United States v. Jackson*, 384 F.2d 825, 827 (3d Cir. 1967); *see also, United States v. Balduino-Solano*, 268 F. App'x 200, 203 (3d Cir. 2008) ("We reiterate our advice in *Jackson* that district courts would do well to consider *in camera* questioning of confidential informants when balancing law enforcement interests and a defendant's due process rights."). When the informant is produced for *in camera* questioning by the Court, we will be in a better position to determine what if any knowledge the informant has with respect to the Abdullah murder.

Finally, in Request Thirteen of Exhibit D, Defendant seeks disclosure of the identity of the informant from an FBI 302 Report dated October 30, 1998. The informant stated that Paul King offered to give the informant $35,000 to ensure that the source would not testify as an eyewitness in the murder trial of Ronnie Johnson, former leader of the Ram Squad drug trafficking organization. (Oct. 30, 1998 FBI 302 Report.) The source also stated that Paul King paid a black male known as "Rusty" to kill Ronnie Johnson. (*Id*.) Defendant mistakenly identifies the confidential informant as stating that Paul Daniels tried to pay someone $35,000 to kill Ronnie Johnson. (Jan. 14 Hr'g Tr. 196-97.) The source never mentions Daniels, and never states that the $35,000 sum of money was paid for the murder of Ronnie Johnson. Defendant argues that the informant's information is relevant because if Daniels testifies at trial, Defendant

would like to inquire what benefit he has received from the Government for his cooperation, and why he has not been "prosecuted for plotting somebody's death." (*Id*. at 197.)

The significance of the informant's testimony to Defendant's ability to prepare his defense is quite limited. First, it is unclear that this source was referring to Daniels, as the Report only mentions Paul King. Moreover, the statements provided by this informant do not indicate that he possesses possible exculpatory or impeachment evidence. Rather, Defendant argues that the informant may have information useful to cross-examine Daniels on his alleged bias as a cooperating Government witness. Defendant does not establish the likelihood that disclosure will lead to evidence. Defendant assumes that because Daniels is not being prosecuted for murder then Daniels must have received leniency from the Government for his cooperation in this case. This is sheer speculation. Moreover, if Daniels does testify at trial, Defendant can cross examine him with regard to any deal that Daniels may have received as a result of his cooperation with the Government. Defendant has failed to show a specific need for disclosure that outweighs the Government's interest in keeping this informant's identity confidential.

## III. CONCLUSION

For the foregoing reasons, Defendant's Motion will granted in part, and denied in part. An appropriate Order will follow.

**BY THE COURT:**

*/s/R. Barclay Surrick*
**U.S. District Judge**