IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | |
| KABONI SAVAGE | : | NO. 07-550-03 |
| ROBERT MERRITT | : | NO. 07-550-04 |
| STEVEN NORTHINGTON | : | NO. 07-550-05 |
| KIDADA SAVAGE | : | NO. 07-550-06 |

**SURRICK, J.** FEBRUARY 1, 2013

## MEMORANDUM

Presently before the Court is the Government's Motion to Admit Tape Recordings (ECF No. 554). For the following reasons, the Government's Motion will be granted.

**I. BACKGROUND[1]**

On May 9, 2012,[2] a federal grand jury returned a seventeen-count Fourth Superseding Indictment (the "Indictment") charging Defendant Kaboni Savage with: conspiracy to participate in the affairs of a racketeering ("RICO") enterprise, in violation of 18 U.S.C. § 1962(d) (Count 1); twelve counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Counts 2-7, 10-15); conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Count 9); retaliating against a witness, in violation of 18 U.S.C. § 1513(a) (Count

---

[1] The factual background of this case is more fully set forth in our June 1, 2012 Memorandum and Order denying Defendant Kaboni Savage's Motion to Dismiss the Indictment on Double Jeopardy Grounds and Motion to Dismiss Count Nine of the Third Superseding Indictment on Double Jeopardy Grounds. (*See* ECF Nos. 507, 508.)

[2] The First Superseding Indictment was filed on April 8, 2009. (ECF No. 51.) The Second Superseding Indictment was filed on June 22, 2011. (ECF No. 229.) The Third Superseding Indictment was filed on September 7, 2011. (ECF No. 284.)

16); and using fire to commit a felony, in violation of 18 U.S.C. § 844(h)(1) (Count 17). (Fourth Superseding Indictment, ECF No. 480.)³ Savage was charged along with three co-defendants, Steven Northington, Robert Merritt, and his sister, Kidada Savage. Lamont Lewis was also charged in the First Superseding Indictment. The charges against Lewis were disposed of by guilty plea on April 21, 2011. On March 14, 2011, the Government filed a notice of intent to seek the death penalty against Kaboni Savage, Merritt, and Northington. (ECF Nos. 196, 197, 198.)

On October 9, 2004, six people, including four children, died as a result of arson at a home located at 3256 North Sixth Street, Philadelphia, Pennsylvania. (Def.'s Mot. 1, ECF No. 376.) The Indictment alleges that Kaboni Savage and Kidada Savage solicited and ordered Lewis and Merritt to set fire to the home of Eugene Coleman, a former associate of Savage. (Indictment 21-23.) Kaboni Savage believed that Coleman was cooperating with the Government and planned to testify against Savage in his 2005 federal drug conspiracy trial.⁴ The firebombing took the lives of Coleman's mother, infant son, and four other relatives. The Government intends to show at trial that the firebombing was ordered by Kaboni Savage in order to intimidate Coleman and prevent him from testifying against him at the 2005 drug conspiracy trial.

---

³ On December 20, 2012, we entered an Order dismissing Count 8 of the Indictment, upon agreement between the parties. (*See* ECF No. 855.)

⁴ Savage, Northington, and four other co-defendants not charged in the instant Indictment were prosecuted in a 2005 federal drug conspiracy case. After a seven-week trial, Savage was found guilty of conspiracy to manufacture and distribute cocaine, money laundering, firearms possession, witness retaliation and other crimes. Coleman testified at that trial. Savage received a sentence of thirty years in prison on these convictions.

On July 27, 2012, the Government filed a Motion to Admit Tape Recordings. (Gov't's Mot., ECF No. 554.) Merritt filed a Response on August 21, 2012. (Def.'s Resp., ECF No. 577.) On September 10, 2012, the Government filed a Reply to Defendant Merritt's Opposition to the Government's Motion to Admit Tape Recordings. (Gov't's Reply, ECF No. 594.) We held a *Starks* hearing on the Government's Motion on October 22, 2012. (Min. Entry, ECF No. 675.) At that hearing, the parties presented additional argument on the Motion.

The Government asks the Court to find that the offered recordings and transcripts are authentic and accurate. (Gov't's Mot. 1-2.) Specifically, the Government asserts that it has satisfied the admission requirements articulated in *United States v. Starks*, 515 F.2d 112 (3d Cir. 1975), that: (1) the recording devices used were capable of accurately recording the conversations; (2) the operators of the recording devices were competent; (3) the tape recordings are authentic and correct; (4) there have been no changes in, additions to, or deletions from the tape recordings; (5) the tape recordings have been properly preserved; (6) the speakers on the tape recordings are properly identified; (7) the conversations were lawfully intercepted either as recordings freely and voluntarily consented to, or were recordings pursuant to applications made and orders issued under 18 U.S.C. § 2518(9); and (8) the transcripts of the tape recordings accurately represent the conversations on the tape recordings and accurately identify the speakers and parties to the tape recorded conversation. (Gov't's Mot. 1-2.)

In *Starks*, the Third Circuit Court of Appeals held that "the burden is on the government 'to produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings.'" *Starks*, 515 F.2d at 121 (quoting *United States v. Knohl*, 379 F.2d 427, 440 (2d Cir. 1967)); *see also* Fed R. Evid. 901 ("To satisfy the requirement of

authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.").[5] In attempting to admit such recordings, "[w]hen a colorable attack is made as to a tape's authenticity and accuracy, the burden on those issues shifts to the party offering the tape, and the better rule requires that party to prove its chain of custody." *Starks*, 515 F.2d at 122.

The parties raise two issues with regard to the admissibility of the recordings the Government seeks to introduce into evidence at trial. First, Defendant Merritt objects to the admission of recordings from January 5, 2005 at the Special Housing Unit ("SHU") of the Federal Detention Center ("FDC") in Philadelphia, Pennsylvania. (Def.'s Resp. 8.) Second, the Government noted that it may introduce up to 500 conversations at trial and that after collaboration between the parties, portions of particular transcripts remain in dispute. (Oct. 22, 2012 Hr'g Tr. 3-4 (on file with Court).)

At the *Starks* hearing, Special Agent Kevin Lewis, the case agent for the investigation into the Kaboni Savage Organization ("KSO") testified with regard to the audio recordings and transcripts generated by the Government. In doing so, he described the different types of recordings the Government obtained during the investigation of the KSO, including: (1) "prison calls" or telephone calls made by inmates in the FDC in Philadelphia and the United States

---

[5] There has been uncertainty as to whether Congress' adoption of the Federal Rules of Evidence and, specifically Rule 901, abrogated *Starks*. *See United States v. Ureste-Meza*, No. 12-96, 2012 WL 5334590, at *5 (M.D Pa. Oct. 26, 2012) (listing cases addressing conflict between *Starks* and Rule 901). In *United States v. Toler*, 444 F. App'x 561, 564 n.4 (3d Cir. 2011), the Third Circuit found that it "need not comment on the relationship between *Starks* and Rule 901," as the Government satisfied the higher *Starks* standard. As in *Toler*, we conclude that the Government has met the higher *Starks* standard.

Penitentiary ("USP") in Atlanta[6]; (2) "body wires" or phone recordings involving confidential witnesses; (3) "consensual body wires" or recordings made in person with a witness using a concealed recorder; (4) wiretaps or "bugs" of the visiting room and visiting booths at the FDC, Kaboni Savage's prison cell, the SHU, and the cellular telephones of Kaboni Savage, Kidada Savage, Gerald Thomas, and Wendell Mason; and (5) prior trial testimony of Kaboni Savage and Kidada savage. (*Id.* at 6-22; Gov't's Mot. 5.)[7] The primary sources of the recordings the Government intends to introduce at trial involve the prison calls, consensual recordings, and recordings originating from testimony of Defendants under oath in prior judicial proceedings. (Gov't's Mot. 4-5.)

Special Agent Lewis provided testimony about the equipment and individuals involved in intercepting communications and the manner by which transcripts were generated and reviewed. Specifically, he noted that the equipment included a system called VoiceBox, which allowed for live-monitoring of calls as they were made. (*Id.* at 23.) If calls were pertinent, they were recorded and preserved in a Magneto optical disc. (*Id.* at 24.) If the calls were deemed non-pertinent, they were not recorded, and monitors would perform spot-checks to determine if the conversations became pertinent. (*Id.*) The recordings could not be altered or deleted. (*Id.* at 24-25.) Once recorded, the conversations were stored on high capacity disks in the VoiceBox

---

[6] Special Agent Lewis testified that inmates are advised that prison calls are recorded by way of written signs posted at the FDC and audio messages before the call. (Oct. 22 Hr'g Tr. 7-8; *see* Gov't's Ex. 102.)

[7] The Government contends that Kaboni Savage and Kidada Savage testified at prior proceedings in which court staff recorded their testimony and generated transcripts. (Gov't's Mot. 14-15.) Special Agent Lewis was present for the testimony of both Defendants. (Oct. 22 Hr'g Tr. 44; Gov't's Mot. 15.)

5

System. (*Id.* at 24.) The calls were compiled on the disks, of which there are two copies that were sealed with the federal judge that approved the Title III wiretap at the conclusion of the wiretap. (*Id.*)

Special Agent Lewis testified that he later listened to recordings of conversations he had live monitored and did not notice any discrepancies. (*Id.* at 10, 25.) By live monitoring conversations and listening to recordings obtained thereafter, Special Agent Lewis was able to identify Defendants' and other participants' voices based on personal interactions with them and from hearing them on the wiretaps. (*Id.* at 12, 42.) With regard to the transcripts of the various recordings, Special Agent Lewis and his partner prepared the transcripts and later compared the transcripts to the recordings after dozens of listens to ensure that they were fair and accurate representations. (*Id.* at 12-14, 31, 33, 35-36, 39.) These same procedures were followed for each of the different types of recordings the Government seeks to admit, including prison calls involving Kaboni Savage, the January 5, 2005 cell block wiretaps, and the wiretap recordings from the cellular phone taps. (*Id.* at 14, 39-42, 49-50.)

## II.     DISCUSSION

### A.     Authenticity of the Recordings

#### 1. *Starks and Federal Rule of Evidence 901*

In *Starks*, the Third Circuit determined the steps required for the Government to lay a proper foundation for the admission of tape recordings. *United States v. Perez*, No. 94-0192, 1996 WL 4080, at *3 (E.D. Pa. Jan. 3, 1996) (citing *Starks*, 515 F.2d at 112). The Government must show, by clear and convincing evidence, that: (1) the recording device was capable of taking the conversations; (2) the operator of the device was competent to do so; (3) the

recordings are authentic and correct; (4) there were no changes, additions, or deletions made in the recording; (5) the recordings were properly preserved; (6) the speakers on the recordings are identified; and (7) the consenting party to the recording, if any, freely and voluntarily consented to the recording of the conversations. *Starks*, 515 F.2d at 112 & n.11; *see also United States v. Flood*, No. 2004-36, 2007 WL 1366782, at *1 (W.D. Pa. May 8, 2007).

During the *Starks* hearing, the Government presented testimony from Special Agent Lewis as to each and every element described above. Special Agent Lewis was a credible witness. Considering each factor in turn, we conclude that the Government has satisfied the standards articulated in *Starks*. As to the first factor, Special Agent Lewis testified that the equipment and systems utilized by the authorities were capable of recording conversations. For the prison calls, Special Agent Lewis testified that the internal telephone system records calls. (Oct. 22 Hr'g Tr. 6.) Inmates had PIN numbers, which were entered prior to each call and permitted them to contact outside callers. (*Id.*) Special Agent Lewis was familiar with these prison phone systems, as they are used in most investigations. (*Id.* at 7.) As to the competency of the operator, the second factor, Special Agent Lewis testified that he and his partner, Tom Zielinski, were personally involved in live monitoring the conversations, listening to the recordings, and later reviewing the transcripts that were generated in conjunction with the recordings. (*Id.* at 125-26.) The Government has satisfied the second *Starks* factor. Special Agent Lewis testified that he confirmed the transcripts after repeated listening. In addition, during the *Starks* hearing, the Government indicated that they had made revisions to the transcripts based on input from defense counsel. (*Id.* at 4.) In light of these facts, we find that

7

the Government has satisfied the third *Starks* factor that the recordings are authentic and correct.[8] With regard to the fourth factor, Special Agent Lewis provided testimony that the technology involved in recording the conversations, through the VoiceBox System, did not permit any edits, additions, or deletions. We are satisfied that the Government has met the fourth *Starks* factor.

The Government has also satisfied the fifth *Starks* factor. Special Agent Lewis described the Magneto optical disk storage system within the VoiceBox system. The calls that were recorded were dumped into a disk on the storage system and two copies were produced. Those copies were brought to the federal courthouse at the conclusion of the wiretap authorization period and were sealed with the Title III approving Judge. (*Id.* at 24.) Addressing the uncontested seventh *Starks* factor before the contested sixth, we conclude that the conversations elicited were made voluntarily and in good faith. With regard to consensual body wires and one-party consent recordings, the Third Circuit has established that "it does not violate an individual's constitutional or statutory privacy interests to introduce at a criminal trial tape recordings of his private conversations if the other party to those conversations voluntarily consented to their recording." *United States v. Kelly*, 708 F.2d 121, 125 (3d Cir. 1983). Here, Special Agent Lewis testified that the prisoners were made aware that their calls were being recorded by signs posted at the FDC and audio messages. (Oct. 22 Hr'g Tr. 7-8.) Recordings obtained pursuant to consensual body wires involved consenting parties. The remainder of the recordings involved court-authorized wiretaps. (*See* Gov't's Mot. 4.)

    2.    *Identification of Merritt as Speaker on January 5, 2005 Recordings*

---

[8] We address specific disputes about the accuracy of particular transcripts *infra*.

The only challenge to the *Starks* factors offered by Defendants involves the sixth factor. Merritt claims that the Government has failed to properly identify him on the January 5, 2005 recordings. (Def.'s Resp. 2-4.) Defendant argues that the device employed to record the January 5, 2005 conversations produced a poor recording, which resulted in the Government transcribing most of the lines attributed to Merritt as "unintelligible." (*Id.* at 2.) To bolster his argument that the Government has failed to properly identify Merritt on the January 5, 2005 recording, Defendant relies on portions of the transcript where Savage and Bey say that they do not recognize the inmate being brought into the SHU. (*Id.* at n.3.) Special Agent Lewis testified that the transcripts from the January 5, 2005 recordings were fair and accurate representations. (Oct. 22 Hr'g Tr. 82-83.)

The burden for identifying a speaker on a recording differs from the burden for the admission of tape recordings generally. "[T]he Government's burden in identifying the speaker in recorded conversations is relatively minimal." *United States v. Stillis*, No. 04-680, 2006 WL 1737496, at *2 (E.D. Pa. June 22, 2006) (citing *United States v. Bush*, 405 F.3d 909, 919 (10th Cir. 2005)). Under Rules 901(a) and 104(b), "[t]he government need only produce evidence sufficient to convince a reasonable jury by a preponderance of the evidence that defendant is the speaker in order to permit a jury to hear the tape recording." *United States v. Tubbs*, No. 89-498, 1990 WL 27365, at *3 (E.D. Pa. Mar. 12, 1990); *see also United States v. Nieves*, No. 97-46, 1997 WL 430995, at *1 (E.D. Pa. July 16, 2007) (finding that testimony of DEA Special Agent and cooperating witness sufficiently proved that defendant spoke on the recording).

Moreover, voice identification on a recording may be established by circumstantial evidence surrounding the call. *United States v. Alper*, 449 F.2d 1223, 1229 (3d Cir. 1971) ("[I]t

9

is well settled that telephone calls may be authenticated by circumstantial evidence as well as by direct recognition of the person calling."); *see also United States v. Addonizio*, 451 F.2d 49, 71 (3d Cir. 1971) (citing VII Wigmore, on Evidence, § 2155(1)(b)); *United States v. Console*, 13 F.3d 641, 661 (3d Cir. 1993) ("'[A] document or telephone conversation may be shown to have emanated from a particular person by virtue of its disclosing knowledge of facts known peculiarly to him.'") quoting Fed. R. Evid. 901 advisory committee note ex. (4)). Federal Rule of Evidence 901 permits authentication or identification of an item of evidence by testimony of a witness with knowledge or opinions about a voice "heard firsthand or through mechanical or electronic transmission or recording — based on hearing the voice at any time under circumstances that connect it with the alleged speaker." Fed. R. Evid. 901(b)(1), (5).

Here, Special Agent Lewis testified that he was familiar with Merritt's voice from approximately ten conversations with him. (Oct. 22 Hr'g Tr. 12). After Merritt was arrested on January 5, 2005, Special Agent Lewis personally spoke with him about cooperating in their investigation. (*Id.* at 86-87, 114.) Upon listening to the January 5, 2005 recordings, Special Agent Lewis recognized Merritt's voice. (*Id.* at 66-67.) In addition, the identification of Merritt as one of the speakers on the recording obtained from a wiretap in Savage's cell comports with Merritt's intentional placement in a cell near Kaboni Savage in order to facilitate a conversation between the two. (*Id.* at 85-86, 90.) Special Agent Lewis provided ample testimony with regard to the Kaboni Savage cell block wiretap and the arrangement of the prisoners in the SHU. (*Id.* at 50-52; *see also* Gov't's Exs. 13, 13A, 110-122.)[9] The Inmate History documentation provided

---

[9] Special Agent Lewis described the Kaboni Savage cell block wiretap as a bug placed inside access space next to the cell's toilet. (Oct. 22 Hr'g Tr. 52.) The vent between cells 812 and 813 allowed for free-flowing conversation that was captured on the bug. (*Id.*)

by the Bureau of Prisons reflected that Savage, Bey, and Merritt were incarcerated in cells 812, 813, and 811 on January 5, 2005. (*See* Gov't's Exs. 14-16; Oct. 22 Hr'g Tr. 53-54.)[10]

Finally, considered in context, the nature of the communications between Kaboni Savage, Bey, and Merritt are consistent with the identification of Merritt as the new prisoner entering the FDC. In the recordings from January 5, 2005, Kaboni Savage is apprised of a new prisoner coming to the SHU. After initially not recognizing the new inmate (Merritt), Savage tells Bey that he does know him. (*See* Gov't's Ex. 10.) Savage and Merritt then communicate through Bey about Merritt's arrest on a gun charge,[11] Savage offered Merritt supplies and assistance, the Defendants warned each other about federal officials' attempts to obtain cooperation, and Merritt said that they were placed near each other to foster communication. (*See* Gov't's Exs. 10-12; Oct. 22 Hr'g Tr. 68, 82.)[12] In addition, the transcript reflects Bey describing Merritt being moved from one cell to another, which is consistent with the Bureau of Prisons' records indicating that Merritt was moved. (*See* Gov't's Ex. 12 ("They switching cells."); *see also* Gov't's Ex. 16 (reflecting that Merritt was moved from cell 811 to 826 on January 5, 2005.)

---

[10] Merritt was originally placed in cell 801 while he was being processed, was subsequently moved to cell 811, and then was placed in cell 826. (Oct. 22 Hr'g Tr. 54-55.)

[11] Adding further credence to Special Agent Lewis's identification of Merritt as one of the speakers, Bey tells Savage that the new inmate said he was "caught [ ] with a jawn" meaning he was picked up by authorities on a gun charge. (Oct. 22 Hr'g Tr. 68.) Merritt was arrested on January 5, 2005 on a gun charge.

[12] Special Agent Lewis testified about the process of "fishing" or sending food, letters, or other items to other inmates in the SHU. (*Id.* at 70, 72-76.) "Fishing" letters between Bey and Merritt was possible on January 5, 2005 because the inmates were temporarily housed in nearby cells.

Considered together, the evidence is sufficient to convince a reasonable jury by a preponderance of the evidence that Merritt is the speaker on the January 5, 2005. Accordingly, the Government has satisfied its burden under *Starks* and Rule 901.

   2.   *Federal Rule of Evidence 401*

Defendant argues that the January 5, 2005 recordings are irrelevant. (Def.'s Resp. 8.) "Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401. To establish that proffered evidence is relevant, "[a]ll that is needed is some showing of proper relevance,'" and "the burden is not onerous." *United States v. Ligambi*, No. 09-0496, 2012 WL 3815261, at *13 (E.D. Pa. Sept. 4, 2012) (quoting *United States v. Sampson*, 980 F.2d 883, 888 (3d Cir. 1992)).

The January 5, 2005 recordings are clearly relevant. The recordings reflect discussion between Savage, Bey, and Merritt about Merritt's arrest, overtures of cooperation with federal officials, other individuals under investigation, including Lamont Lewis, offers of assistance from Savage to Merritt, and federal officials' investigation of the arson murders. (*See* Gov't's Exs. 11-12.) These discussions make the existence of the charged RICO conspiracy more probable. The evidence at issue clearly has a proper purpose and is relevant.

   3.   *Federal Rule of Evidence 403*

Defendant argues in his response that the recordings should also be excluded based on a Rule 403 analysis because their "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." (Def.'s Resp. 7 (citing Fed. R. Evid. 403).) In particular, Defendant contends that the January 5, 2005 recordings contain

12

profanity and sexually offensive language and attribute conduct to Merritt, which would constitute inadmissible hearsay. (*Id.*)[13] "Most relevant evidence is, by its very nature, prejudicial . . . that evidence must be unfairly prejudicial to be excluded." *United States v. Dill*, No. 11-26, 2011 WL 6042387, at *2 (S.D. Ind. Dec. 3, 2011) (quoting *United States v. Thomas*, 321 F.3d 627, 629 (7th Cir. 2003)). "[W]hen evidence is highly probative, even a large risk of unfair prejudice may be tolerable." *United States v. Cross*, 308 F.3d 308, 323 (3d Cir. 2002).

We are satisfied that the probative value of the January 5, 2005 recordings is not outweighed by the potential for unfair prejudice. As discussed above, the evidence at issue here is highly probative of the existence of the charged RICO conspiracy. The profane and sexually offensive nature of the language used is not highly inflammatory nor is it likely to substantially prejudice Defendant. *See United States v. Andreas*, 23 F. Supp. 2d 835, 845 (N.D. Ill. 1998) (denying the defendant's Rule 403 motion to exclude or edit tapes on the ground that, in part, the profane language on tapes to be admitted at trial was not substantially prejudicial and would, at least in one instance, provide context to the defendant's statements).

### B. Accuracy of the Transcripts

At the *Starks* hearing, the Government played numerous portions of recordings that they intend to introduce at trial. Special Agent Lewis provided testimony that he and his partner, Tom Zielinski, were personally involved in live monitoring the conversations, listening to the recordings, and later reviewing the transcripts that were generated. (*Id.* at 125-26.) They listened to the recordings dozens of times to confirm the language used during the conversations. While

---

[13] We address Defendant's hearsay argument more fully in our Memorandum and Order denying Defendant Merritt's motion to exclude evidence of the cell block conversations. (*See* ECF Nos. 886, 887.)

the recordings were played at the *Starks* hearing, the Court reviewed transcripts provided by the Government. After the recordings were played, Special Agent Lewis provided context for the conversation and explained his understanding of the statements made by the participants on the tapes. When questioned on cross-examination, Special Agent Lewis confirmed that he could hear and understand the responses indicated in the transcript. (*Id.* at 99.) At the *Starks* hearing, Defendant objected to the Government's interpretation of certain conversations.[14]

Following the *Starks* hearing, we once again listened to the disputed portions of the various transcripts. Upon listening several times, we conclude that, in all occasions but one, the Government's interpretation of the recordings is fair and accurate. With regard to Savage's challenge to the Government's Exhibit 1 introduced at the *Starks* hearing,[15] we agree with Savage's interpretation of the transcript and the Government shall alter their proposed transcript in accordance with defense counsel's interpretation of the recording. Although the Government may provide copies of the transcripts to jurors, we shall advise the jurors that the transcripts are not evidence and are merely listening aids for the recordings. *See United States v. DiSalvo*, 34 F.3d 1204, 1220 (3d Cir. 1994).

At the *Starks* hearing, Kidada Savage objected to labeling portions of the transcripts "non-pertinent." She suggested the replacement label of "conversation not transcribed." (Oct. 22

---

[14] Savage has made six challenges to the Government's transcription of various recordings. (*See* Oct. 22 Hr'g Tr. 99-110 (citing challenges to Gov't's Exs. 1-4, 6, 8, 10.)
    With regard to Government's Exhibit 8, Defendants would like to play a lead-in portion to the recording that the Government does not believe is missing or misleading. (Oct. 22 Hr'g Tr. 48.) The Government does not object to the Defendants playing the portion and the parties expressed confidence that they could resolve this issue separately. (*Id.*)

[15] The Government's Exhibit 1 was a recording from the Gerald Thomas wiretap from December 15, 2000. (*See* Gov't's Ex. 1.)

Hr'g Tr. 112.) We conclude that the term "non-pertinent" is appropriate and not prejudicial to Defendants.

## III. CONCLUSION

For the foregoing reasons, the Government's Motion to Admit Tape Recordings (ECF No. 554) will be granted.

An appropriate Order will follow.

**BY THE COURT:**


*/s/R. Barclay Surrick*
**U.S. District Judge**