IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 07-550 |
| KABONI SAVAGE | : | |
| ROBERT MERRITT | : | |
| STEVEN NORTHINGTON | : | |
| KIDADA SAVAGE | : | |

**SURRICK, J.**                                                       **APRIL  2 , 2013**

## MEMORANDUM

Presently before the Court are Defendant Kaboni Savage's Motion to Suppress

Intercepted Wire and Oral Communications (ECF No. 386), Supplemental Motion to Suppress

Intercepted Wire and Oral Communications and Request for a *Franks* Hearing – SHU (ECF No.

500), and Supplemental Motion to Suppress Intercepted Wire and Oral Communications and

Request for *Franks* Hearing – Landline (ECF No. 501).  For the following reasons, Defendant's

Motions are denied.[1]

I.      **BACKGROUND**

        A.      **Factual Background**

        On May 9, 2012, a federal grand jury returned a seventeen-count Fourth Superseding

Indictment ("Indictment") charging Defendant Kaboni Savage with conspiracy to participate in

the affairs of a racketeering ("RICO") enterprise, in violation of 18 U.S.C. § 1962(d) (Count 1),

twelve counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Counts 2-

---

[1] An Order was entered on February 1, 2013 denying Defendant's Motions.  (*See* ECF No.
1051.)  This Memorandum memorializes the reasons for that denial.

7, 10-15), tampering with a witness, in violation of 18 U.S.C. § 1512(a) (Count 8)[2], conspiracy

to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Count 9),

retaliating against a witness, in violation of 18 U.S.C. § 1513(a) (Count 16), and using fire to

commit a felony, in violation of 18 U.S.C. § 844(h)(1) (Count 17).  (Indictment, ECF No. 480.)

Savage was charged, along with three co-defendants, Steven Northington, Robert Merritt, and his

sister, Kidada Savage.  Defendant Lamont Lewis was also charged in the First Superseding

Indictment.  The charges against Lewis were disposed of by guilty plea on April 21, 2011.[3]  On

March 14, 2011, the Government filed a notice of intent to seek the death penalty against

Savage, Merritt and Northington.  (ECF Nos. 196, 197, 198.)  The Government is not seeking the

death penalty against Kidada Savage.

In February of 2005, a grand jury returned a twenty-four count Second Superseding

Indictment (the "2005 Indictment") against Defendant, Northington, and four co-defendants not

named in the instant Indictment.  *See United States v. Savage*, No. 04-269 (E.D. Pa.), at ECF No.

448.[4]  The 2005 Indictment charged Defendant, Northington, and four co-conspirators, including

Gerald Thomas, with conspiracy to manufacture and distribute cocaine and with other crimes.

*Id*.  Defendant and Thomas were alleged to have supervised, managed and organized a drug

trafficking enterprise referred to as the "Thomas-Savage Organization."  *Id*.  The enterprise

operated in and around Philadelphia, obtained large quantities of drugs, supplied the drugs to co-

[2] Count 8 was dismissed pursuant to an agreement between Defendants and the Government.
(*See* ECF No. 855.)

[3] All Defendants are charged in the RICO conspiracy count (Count 1).  In addition, Northington
is charged in Counts 5 and 7.  Merritt is charged in Counts 9 and 10-17.  Kidada is charged in
Counts 10-17.  (Indictment.)

[4] Originally, Savage and Northington were charged with eighteen other defendants.  *See Savage*,
No. 04-269, at ECF No. 13.  Fourteen of those defendants entered pleas of guilty before the
Second Superseding Indictment was returned.

conspirators for distribution, and collected the proceeds. *Id.* Savage and Northington were both found guilty of the drug conspiracy, and sentenced for that and other crimes. *See Savage*, No. 04-269, at ECF Nos. 847, 896.

The charges against Defendant in the instant Indictment relate to a long-standing RICO conspiracy involving drug trafficking, murder, and witness intimidation.[5] The Government alleges that all four Defendants were members of a regional criminal organization based in North Philadelphia and referred to as the Kaboni Savage Organization ("KSO"). From late 1997 through April 2010, this racketeering enterprise conspired and agreed to distribute large quantities of controlled substances, to commit murder and arson, and to tamper with, and retaliate against, witnesses who had testified, or were about to testify, against the racketeering enterprise or its members. In addition to its drug trafficking activities, it is alleged that the KSO was committed to maintaining, preserving, protecting and expanding its power, territory, and profits by tampering with and retaliating against Government witnesses and their families through the use of threats, intimidation, violence, and murder. Six of the twelve murder counts charged in the instant Indictment relate to the alleged firebombing of the home of Eugene Coleman, a former associate of Defendant. Suspicious that Coleman was cooperating with the Government, Defendant, together with his sister, allegedly solicited and ordered Lamont Lewis

---

[5] We previously determined that the instant Indictment for RICO conspiracy and the 2005 indictment for drug conspiracy do not present double jeopardy concerns. (*See* Double Jeopardy Mem., ECF No. 507; *see also* Double Jeopardy Order, ECF No. 508.) On June 1, 2012, we denied Defendant's Motion to Dismiss the Indictment on Double Jeopardy Grounds and Motion to Dismiss Count Nine of the Third Superseding Indictment on Double Jeopardy Grounds. (*Id.*) We held that, consistent with Third Circuit precedent, Defendant's rights were not violated when he was charged with being a part of a RICO conspiracy after having already been prosecuted for, and found guilty of, conspiracy to manufacture and distribute cocaine. (Double Jeopardy Mem. 13.) In addition, we determined that the use of the prior drug conspiracy as evidence of the existence of a racketeering enterprise in support of the charged RICO conspiracy was not inconsistent with the double jeopardy clause. (*Id.* (citing *United States v. Grayson*, 795 F.2d 278, 283 (3d Cir. 1986)).)

and Merritt to set fire to Coleman's home.  The firebombing took the lives of Coleman's mother, infant son, and four other relatives.  The Government intends to show at trial that the firebombing was ordered by Defendant in order to intimidate Coleman and prevent him from testifying against Defendant at the 2005 drug conspiracy trial.

### B.    The Wiretap Orders

During the course of investigating the Thomas-Savage Organization and the KSO, the Government obtained court authorizations to intercept wire and oral communications of Defendant and many of his co-conspirators pursuant to Title III of the Omnibus Crime Control and Safety Street Act of 1968, 18 U.S.C. §§ 2510, *et seq*. ("Title III").  Defendant seeks to suppress evidence obtained pursuant to six of the seven Title III Orders.[6]

On September 26, 2000, United States District Court Judge Eduardo Robreno entered Order No. 00-2006, which authorized the interception of wire communications of Gerald Thomas, Defendant, and others, occurring on the cellular telephone of Gerald Thomas (the "Thomas Title III Order").  (Def.'s Mot. Ex. A.)  The application for this interception (the "Thomas Title III Application") contains a ninety-three page, sworn affidavit of Special Agent Kevin Lewis (the "Thomas Title III Affidavit").  (*Id*.)  Judge Robreno reauthorized the Thomas Title III Order by entering extension orders on four occasions:  November 2, 2000 (first extension); December 1, 2000 (second extension); January 5, 2001 (third extension); and February 5, 2001 (fourth extension).[7]  (Def.'s Mot. Exs. A(1), A(2), A(3) & A(4).)

---

[6] Defendant does not seek to suppress evidence obtained pursuant to Order No. 00-2006-01, which authorized the interception of wire communications on Wendell Mason's home telephone line.  (Gov't's Resp. 2.)

[7] Each Title III Order and Extension Order permits interception of communications for a period of thirty days or until the objectives of the order have been obtained.  (June 11, 2012 Hr'g Tr. 24 (on file with Court).)

On March 16, 2001, Judge Robreno entered Order No. 00-2006-02, which authorized the interception of wire communications of Defendant and others occurring on the cellular telephone subscribed to the name Horace Lacey, but used by Defendant (the "Savage Title III Order"). (Def.'s Mot. Ex. B.) The application for this interception (the "Savage Title III Application") contains a sixty-four page, sworn affidavit of Special Agent Lewis (the "Savage Title III Affidavit"). (*Id.*) After eight days of monitoring the communications pursuant to this Order, Defendant was taken to the hospital after being shot. (Def.'s Mot. 3; June 11 Hr'g Tr. 38.) Shortly thereafter, Defendant was taken into custody for violating the conditions of his house arrest. (June 11 Hr'g Tr. 38.) When Defendant ceased using the cellular phone while in custody, the Government terminated the wiretap. (*Id.*)

On October 13, 2004, United States District Court Judge James McGirr Kelly entered Order No. 04-2006, which authorized the interception of oral communications of Defendant and others, including Defendant's mother, sister and girlfriend, within the restricted visiting area of the Special Housing Unit ("SHU") at the Federal Detention Center ("FDC") in Philadelphia, Pennsylvania (the "SHU Visiting Room Title III Order"). (Def.'s Mot. Ex. C.) The Order was entered four days after the home of Eugene Coleman was firebombed. The application for this interception (the "SHU Visiting Room Title III Application") contains a thirty-two page, sworn affidavit of Special Agent Lewis (the "SHU Visiting Room Title III Affidavit"). (*Id.*) On December 2, 2004, United States District Court Judge Michael M. Baylson entered an extension order for the SHU Visiting Room Title III Order. (*Id.* at Ex. C(1).)

On October 16, 2004, Judge Baylson entered Order No. 04-2006-01, which authorized the interception of oral communications of Defendant and others within Defendant's prison cell and surrounding access spaces located within the SHU at the FDC (the "SHU Cell Block Title III

Order").  (*Id*. at Ex. D.)  The application for this interception (the "SHU Cell Block Title III Application") contains a forty-three page, sworn affidavit of Special Agent Lewis (the "SHU Cell Block Title III Affidavit").  (*Id*.)  On December 7, 2004, Judge Baylson entered an extension order for the SHU Cell Block Title III Order.  (*Id*. at Ex. D(1).)

On February 18, 2005, Judge Baylson entered Order No. 04-2006-02, which authorized the interception of wire communications of Defendant and others, including co-conspirators and Defendant's family members, occurring on a telephone located at the FDC adjacent to Defendant's prison cell (the "Legal Line Title III Order").  (Gov't's Ex. 1 at 04-2006-2.)[8]  The telephone was designated by the FDC to be used by Defendant to make calls to his attorneys. (Gov't's Ex. 1 at 04-2006-02.)  Unlike other outgoing calls at the FDC, "legal calls" are not monitored by FDC officials.  (*Id*.)  A wiretap order was sought on this landline telephone because it was believed that when Defendant made legal calls to his attorney, his attorney would forward or transfer the call to Defendant's family members, who would in turn forward the call to Defendant's criminal associates.  (*Id*.)  The application for this wiretap interception (the "Legal Line Title III Application") contains a seventy-five page, sworn affidavit of Special Agent Lewis (the "Legal Line Title III Affidavit").  (*Id*.)

On April 12, 2005, Judge Baylson entered Order No. 04-2006-03, which authorized the interception of wire communications of Defendant, Kidada Savage, their mother, Barbara Savage, and others, occurring on two cellular telephones:  one belonging to Kidada Savage and one belonging Barbara Savage (the "Kidada Title III Order").  (Def.'s Mot. Ex. E.)  The application for this interception (the "Kidada Title III Application") contains an eighty-eight

---

[8] Government's Exhibit 1 was submitted at the June 11 suppression hearing.  Defendant was not in possession of this Title III application at the time he filed the Motion and thus did not attach it as an exhibit.

page, sworn affidavit of Special Agent Lewis (the "Kidada Title III Affidavit"). (*Id*.) On May

20, 2005, Judge Baylson entered an extension order on the Kidada Title III Order. (*Id*. at Ex. E

(1).)

### C. Procedural History

On February 21, 2012, Defendant filed a Motion to Suppress Intercepted Wire and Oral

Communications (Def.'s Mot., ECF No. 386), together with a supporting Memorandum of Law

(Def.'s Br., ECF No. 386). The Title III Applications, Affidavits, and Orders were included as

exhibits to the Motion. (*See* ECF No. 421 (on file with Court).) The Government filed a

Response to Defendant's Motion on April 2, 2012. (Gov't's Resp., ECF No. 447.) On May 30,

2012, Defendant filed two supplemental motions: (1) the Supplemental Motion to Suppress

Intercepted Wire and Oral Communications and Request for *Franks* Hearing – SHU (Def.'s

Supp. Mot. SHU, ECF No. 500); and (2) the Supplemental Motion to Suppress Intercepted Wire

and Oral Communications and Request for *Franks* Hearing – LANDLINE (Def.'s Supp. Mot.

Landline, ECF No. 501).

A suppression hearing was held on June 11 and 12, 2012. (Min. Entries, ECF No. 516

and 519.) At the hearing, the Government presented testimony from Kevin Lewis, a Special

Agent with the Federal Bureau of Investigation ("FBI"). (June 11 Hr'g Tr. 10.) Special Agent

Lewis has been a case agent for the FBI investigation into the KSO for the past thirteen years.

(*Id*.) As the case agent, Special Agent Lewis was heavily involved in the Title III Applications

related to investigating Defendant, Gerald Thomas, and other co-conspirators. (*Id*. at 11-12.)

Special Agent Lewis personally prepared, signed, and swore to all of the Title III Affidavits that

are at issue in Defendant's Motions to Suppress. (*Id*. at 17.) A review of those Title III

Affidavits reveal that Special Agent Lewis interviewed numerous cooperating informants and

cooperating witnesses, conducted surveillance at various locations, and obtained information from other case agents, the Bureau of Prisons, and police departments.  Special Agent Lewis has extensive knowledge about the KSO, the Thomas-Savage Organization, and the network of individuals generally involved in distributing drugs throughout areas of Philadelphia.  Special Agent Lewis's testimony at the June suppression hearing was very credible.

On June 15, 2012, Defendant filed a supplemental Memorandum of Law in Support of His Motion to Suppress Title III Interceptions – 04-2006-00, 04-2006-01, 04-2006-02 – Obtained at Various Locations at the Federal Detention Center in Philadelphia, Pennsylvania, Between October 13, 2004 and February 2005.  (Def.'s Supp. Br., ECF No. 531.)

## II. DISCUSSION

Defendant seeks to suppress the oral and wire communications intercepted by the Government pursuant to these six Title III Orders:  Thomas Title III Order (No. 00-2006); the Savage Title III Order (No. 00-2006-02); the SHU Visiting Room Title III Order (No. 04-2006); the SHU Cell Block Title III Order (04-2006-01); the Legal Line Title III Order (No. 04-2006-02); and the Kidada Title III Order (No. 04-2006-03).

The interception of oral and wire communications is governed by Title III, which requires that the Government obtain judicial authorization before undertaking electronic surveillance.  18 U.S.C. § 2516.  The requirements for an application for authorization to intercept oral, wire, or electronic communications are set forth in Title III.  Generally, an applicant must set forth:  (a) the names and identities of the law enforcement officers making and authorizing the application; (b) "a full and complete statement of the facts and circumstances relied upon by the applicant, to justify . . . that an order should be issued"; (c) "a full and complete statement as to whether or not other investigative procedure have been tried and failed or why they reasonably appear to be

unlikely to succeed if tried or to be too dangerous"; (d) the length of time for which the interception of communication is required; (e) "a full and complete statement of the facts concerning all previous applications known"; and (f) "where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception." 18 U.S.C. § 2518(1).

Upon review of an application, a judge may issue an order authorizing the interception of wire, oral or electronic communications if the application establishes the following:

> (a) . . . probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in . . . 18 U.S.C. § 2516;
> (b) . . . probable cause for belief that the particular communications concerning that offense will be obtained through such interception;
> (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; [and]
> (d) . . . probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense . . . .

18 U.S.C. § 2518(3).

Defendant makes numerous arguments in support of his Motions to Suppress, most of which are bare legal conclusions that simply restate verbatim the statutory requirements for obtaining authorization to intercept electronic communications and fail to reference any deficiencies in the Applications. The arguments for which Defendant provides no support or citation border on frivolous and could be dismissed on this basis alone. However, in light of the nature of the charges in this case, and the gravity of the decision to be made in a penalty phase, if one is required, we will consider and address each of Defendant's arguments. Defendant raises the following arguments in support of his contention that the Title III Applications, including supporting affidavits and orders, are facially insufficient:

1. The Title III Applications fail to demonstrate the requisite necessity in that they fail to establish that all other investigative techniques had been tried and failed, or were unlikely to succeed. (Def.'s Mot. 6-7; Def.'s Br. 9-10.)

2. The Title III Applications fail to demonstrate probable cause to believe that the oral and wire communications would be criminal in nature. (Def.'s Mot. 8; Def.'s Br. 5-6.)

3. The Title III Applications fail to properly define the period of time necessary to achieve the objective of intercepting communications. (Def.'s Mot. 9; Def.'s Br. 8.)

4. The Title III Applications fail to properly recite the prior interception history for applications related to Defendant. (Def.'s Mot. 9.)

5. The Title III Applications fail to include a description of the type of communications sought to be intercepted, and the nature and location of the facilities from which the communications would be intercepted. (*Id.*)

6. The Title III Applications failed to identify the appropriate statutory predicate offenses for which authorization of oral and wire communications may be sought. (*Id.* at 10; Def.'s Br. 10.)

7. The Title III Applications for re-authorization of intercepted wire and oral communications failed to provide a "statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results." (Def.'s Br. 6-7 (quoting 18 U.S.C. § 2518(1)(f)).)

In addition to these attacks, Defendant argues that the Government failed to comply with the Title III Orders. Specifically, Defendant raises the following arguments:

1. The Government failed to properly monitor and minimize oral and wire communications. (Def.'s Mot. 9; Def.'s Br. 10.)

2. The Government failed to timely produce progress reports to the authorizing judge. (Def.'s Mot. 10.)

3. The Government failed to preserve or seal the intercepted oral and wire communications. (*Id.*; Def.'s Br. 10.)

Defendant also requests an order compelling the Government to produce additional discovery related to the Title III Orders. Specifically, Defendant requests: (1) the Affidavit associated with the Legal Line Title III Order (No. 04-2006-02); (2) the Government's policies

and procedures related to recording and preserving intercepted wire and oral communications; (3) documents relating to the minimization of communications, including monitoring documents defining minimization, detailed line sheets or call summary information indicating the number of calls designated as pertinent, minimized or intercepted.  (Def.'s Mot. 17-18; Def.'s Br. 11.)

Finally, Defendant requests a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).  In support of this request, Defendant argues that the Title III Affidavits contain material false statements and omissions and that he is entitled to an evidentiary hearing to explore the extent of those misrepresentations.  (Def.'s Mot. 11-17; Def.'s Br. 12-17; Def.'s Supp. Mot. SHU 2-4; Def.'s Supp. Mot. Landline 2-4; Def.'s Supp. Br. 4-6.)[9]

## A.      The Necessity Requirement

Defendant argues that the Title III Affidavits failed to make the requisite showing of necessity.  Defendant does not point to any particular Title III Affidavit or explain specifically how the Affidavits lack an adequate showing of necessity.  Instead, Defendant argues generally that the Government failed to explain how the investigative resources already at its disposal, which included the use of numerous confidential informants, cooperating witnesses, and surveillance, were not sufficient to meet the objectives of the investigation.  (Def.'s Mot. 7; Def.'s Br. 10.)

---

[9] Defendant also argues that he is an "aggrieved person" as defined by Title III and therefore has standing to seek suppression of the evidence obtained pursuant to the Title III Orders.  (Def.'s Mot. 5-6.)  The Government does not raise the issue of standing in its Response, and does not dispute that Defendant has standing to seek suppression of the evidence.  An "aggrieved person" is defined as a "person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."  18 U.S.C. § 2510(11). Defendant was listed as a potential interceptee on each of the Title III Applications.  Defendant's oral and wire communications were intercepted as a result of execution of the Title III Orders. Defendant is an "aggrieved person," and has standing to raise the arguments in the Motions.  18 U.S.C. § 2518(10)(a).

As recited above, an application for authorization for the interception of oral, wire, or electronic communications must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  Referred to as the necessity requirement, this section of Title III is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."  *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974).  In other words, it ensures that wiretaps are "used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications."  *United States v. Giordano*, 416 U.S. 505, 515 (1974).

The Government's burden to establish the necessity of interception is not onerous:

> We have characterized the [G]overnment's burden of proof for showing compliance with the necessity requirement as not great.  The Government's burden is minimal because we have adopted a pragmatic approach toward the necessity requirement, and will test the Government's showing in a practical and commonsense fashion.  Thus, the government need not prove to a certainty that normal investigative techniques will not succeed, but rather need only show that such techniques reasonably appear to be unlikely to succeed if tried.  The Government must fully explain, however, the basis for such a conclusion.  We have concluded that the Government has satisfied its burden if it shows a factual predicate sufficient to inform the judge why other methods of investigation are not sufficient.

*United States v. Heilman*, 377 F. App'x 157, 175 (3d Cir. 2010) (internal citations and quotation marks omitted); *see also United States v. Vento*, 533 F.2d 838, 850 (3d Cir. 1976); *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir. 1975).  The Government is not required to exhaust all other investigative procedures before resorting to Title III surveillance.  *United States v. Williams*, 124 F.3d 411, 418 (3d Cir. 1997).  In determining whether this requirement has been

satisfied, a court "may properly take into account affirmations which are founded in part upon the experience of specially trained agents." *Id*.

Title III interceptions are often sought to aid investigations into large scale conspiracies, including RICO conspiracies. *See, e.g.*, *Heilman*, 377 F. App'x at 174-75; *United States v. Gray*, 521 F.3d 514, 528 (6th Cir. 2008); *United States v. Luong*, 215 F. App'x 639, 645-46 (9th Cir. 2006); *United States v. Miller*, 116 F.3d 641, 660 (2d Cir. 1997); *United States v. London*, 66 F.3d 1227, 1232 (1st Cir. 1995); *United States v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991); *United States v. Van Horn*, 789 F.2d 1492, 1497-98 (11th Cir. 1986); *Vento*, 533 F.2d at 850; *Armocida*, 515 F.2d at 35; *United States v. Coles*, No. 05-440, 2007 U.S. Dist. LEXIS 74571, at *9-14 (E.D. Pa. Oct. 4, 2007). Unlike other crimes which "come[] to an end upon the capture of the criminal," conspiracies present "special dangers" that provide the Government with "more leeway in its investigative methods." *United States v. McGuire*, 307 F.3d 1192, 1197-98 (9th Cir. 2002); *see also Armocida*, 515 F.2d at 38 (upholding the district court's necessity finding, and observing that "[a]lthough the government has actual knowledge of a conspiracy and evidence sufficient to prosecute one of the conspirators, it is unrealistic to require the termination of an investigation before the entire scope of the narcotics distribution network is uncovered and the identity of its participants learned"). Indeed, "[i]n the proper circumstances, the instrumentalities of Title III may be employed to discover the full extent of crimes and conspiracies." *Vento*, 533 F.2d at 850.

Here, each of the Title III Affidavits explained that an objective of the requested interceptions was obtaining information about the nature, scope, and participants of a large scale conspiracy. The Affidavits provided a comprehensive and detailed explanation as to why other investigatory techniques had been tried and failed, were unlikely to succeed, or were too

dangerous to employ.  (*See* Thomas Title III Affidavit 80-90; Savage Title III Affidavit 48-61;

SHU Visiting Room Affidavit 27-30; SHU Cell Block Affidavit 36-41; Legal Line Title III

Affidavit 66-73; Kidada Title III Affidavit 76-86.)  The affiant, Special Agent Lewis, described

at length the traditional investigative methods that had been tried and failed to meet the

objective, such as interviews with confidential informants and cooperating witnesses, physical

surveillance, execution of search warrants, and the use of pen registers, caller identification

devises, and telephone toll records.  The Affidavits further explained why certain methods, such

as the use of undercover agents and grand jury subpoenas, and interviews of drug associates were

unlikely to succeed or too dangerous to employ.  Each explanation given for a particular method

was tailored to the specific facts of the investigation.  For example, undercover agents would be

unable to penetrate the very secretive and dangerous drug trafficking organization.  Interviews of

confidential informants and cooperating witnesses, although beneficial to discover some

information, proved unsuccessful in revealing the full scope of the drug trafficking organization.

Confidential informants refused to testify.  The review of pen registers and caller identification

devises were unable to identify the substance of conversations.  Finally, continued physical

surveillance risked detection and was not useful in identifying the members of the organization.

We are satisfied that the Government met its burden in establishing the necessity for

intercepting oral and wire communications.  *See, e.g.*, *Armocida*, 515 F.2d at 38 (affidavit was

"clearly sufficient" to support necessity finding where it contained a history of methods utilized

and reasons why each method failed, and stated that surveillance was too easily noticeable, and

that informants would not testify); *Vento*, 533 F.2d at 850 (finding an adequate showing that

other methods of investigative techniques were unlikely to succeed where informants refused to

testify and prolonged surveillance was impossible based on the facts). Defendant's argument is without merit.

### B.    Probable Cause

Defendant also argues that the Title III Affidavits fail to establish probable cause to believe that the communications would be criminal in nature. (Def.'s Mot. 8; Def.'s Br. 5-6.) Defendant points to only one example of an Affidavit—the Savage Title III Affidavit—that he contends lacks probable cause. (Def.'s Br. 6.)

Under Title III, a judge may authorize the interception of oral, wire, or electronic communications if "there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter." 18 U.S.C. § 2518(3)(a).[10] The probable cause standard applied to Title III applications is the same as that used to obtain ordinary search warrants. *See United States v. Tehfe*, 722 F.2d 1114, 1118 (3d Cir. 1983). "[P]robable cause is determined by the totality of the circumstances and only requires a probability, not a *prima facie* showing, of criminal activity." *United States v. Forte*, 684 F. Supp. 1288, 1290 (E.D. Pa. 1988) (citing *Illinois v. Gates*, 462 U.S. 213, 235 (1983)). The probable cause determination made by the authorizing judge is entitled to deference and "should be upheld so long as there is a substantial basis supporting the initial finding of probable cause." *Id.* When reviewing an application for authorization under Title III, a reviewing court may consider and give weight to "the factual inferences drawn by the law enforcement officer." *United States v. Arvizu*, 534 U.S. 266, 277 (2002); *see also United States v. Hoffman*, 832 F.2d 1299, 1306 (1st Cir. 1987) (observing that the court may consider the

---

[10] The statutory predicate offenses found in Section 2516 of Title III include witness retaliation, conspiracy, and violence in aid of racketeering. 18 U.S.C. § 2516. The Title III Affidavits cite these predicate offenses.

experience of agents contributing to the affidavit when assessing whether probable cause exists in a Title III application).

Defendant's only argument is that, with respect to the Savage Title III Affidavit, the Government recites "boilerplate language to suggest that moving Defendant was an active participant in the [Gerald Thomas Organization]" and that the Affidavit completely lacks a factual basis to support the conclusion that Defendant supplied large amounts of cocaine to the organization. (Def.'s Br. 6.) Defendant's argument wholly ignores the factual allegations set forth in the Savage Title III Affidavit. For example, the Affidavit reveals that when Defendant was arrested in Maple Shade, New Jersey, law enforcement observed drug processing and packaging materials. (Savage Title III Affidavit 17-18.) Intercepted telephone conversations from a prior Title III authorization revealed that Defendant was a principal supplier for co-conspirator Gerald Thomas. (*Id*. at 19, 21.) Information disclosed from confidential informants and confirmed by electronic surveillance showed that Defendant had been supplied large amounts of cocaine from at least four different sources. (*Id*. at 21.) Information connecting Defendant to drug distribution was provided by two confidential informants and by co-conspirators Eugene Coleman and Kareem Bluntly. (*Id*. at 22-34.) Coleman and Bluntly, two close associates of Defendant, had begun to cooperate with the Government and then terminated their cooperation. (*Id*. at 22.) Among other things, Coleman told law enforcement, that Defendant supplied cocaine to Gerald Thomas, also known as "Bub". (*Id*. at 31.)

The Title Savage III Affidavit clearly sets forth probable cause to believe that the communications intercepted on Defendant's cellular telephone would be criminal in nature. *See Armocida*, 515 F.2d at 36 (determining that Title III affidavit that relied primarily on information from confidential informant supported probable cause finding). In addition, our review of the

other Title III Affidavits reveals that each Title III Application was approved based on a proper finding of probable cause in compliance with 18 U.S.C. § 2518(3)(a). (*See, e.g.*, Gerald Thomas Title III Affidavit 6-80; SHU Visiting Room Title III Affidavit 13-27; SHU Cell Block Title III Affidavit 15-36; Legal Line Title III Affidavit 24-66; Kidada Title III Affidavit 22-76.) Defendant's argument that probable cause is lacking is without merit.[11]

### C. Period of Time Necessary to Achieve Objectives

Next, Defendant argues that the Government failed to define the period of time necessary to achieve the objectives of intercepting oral and wire communications. (Def.'s Mot. 9.) Specifically, Defendant contends that the period of time defined by the Government was "overly broad, poorly defined, and produced without basis in fact." (*Id*.) Defendant claims that without any guidance on when the communications were to cease, the Government was permitted to "conduct endless interception of wire and oral communications of [Defendant] and his co-conspirators." (Def.'s Br. 8.) Defendant does not cite to one example from the six Title III Applications at issue in his Motions.

Title III requires that every application for authorization to intercept wire, oral, or electronic communications contain:

> [A] statement of the period of time for which the interception is required to be maintained. If the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts

---

[11] Defendant asserts that the good faith exception to the Fourth Amendment exclusionary rule, as articulated in *United States v. Leon*, 468 U.S. 897 (1984), does not apply to Title III applications. (Def.'s Mot. 12.) The Third Circuit has not yet determined whether the good faith exception applies to wiretap applications. *See Heilman*, 377 F. App'x at 185 n.21 ("We have never addressed whether *Leon's* good faith exception applies to wiretaps, but other circuits are split on this issue."). We conclude that the Title III Affidavits at issue in Defendant's Motions established probable cause. We need not address the question of whether the good faith exception applies here.

establishing probable cause to believe that additional communications of the same type will occur thereafter.

18 U.S.C. § 2518(1)(d). The Third Circuit has interpreted this language as "requiring automatic termination upon interception of the first sought communication or the achievement of the interception's objection unless the judge finds probable cause to justify continued surveillance." *United States v. Cafero*, 473 F.2d 489, 496 (3d Cir. 1973).

Each of the Title III Affidavits contains language requesting that the monitoring not terminate upon interception of the first relevant communication, but continue until the objective of the request is obtained, up to a period of thirty days. The Savage Title III Affidavit, for example, requests that the interception not terminate "until communications are intercepted which fully reveal the scope of the criminal enterprises, including the identities of all participants, their places and methods of operation, and the various criminal activities in which they are engaged, which are in furtherance of the enterprises." (Savage Title III Affidavit 63.)[12] This period of time for interception was requested because "the nature of the drug trafficking organization is such that it involves a protracted and continuing course of conduct involving a large number of individuals who perform diverse functions." (Savage Title III Affidavit 62-63.)

The Affidavits describe an extensive network of co-conspirators engaged in large scale narcotics distribution, money laundering, and violence that spanned two decades. The enterprise involved numerous individuals with varying roles in the enterprise. The Affidavits clearly established probable cause to justify continued interception of communications after the first relevant communication was obtained. *See United States v. Carrazana*, 921 F.2d 1557, 1566 (11th Cir. 1991) (finding "abundant probable cause" for continued interception of

---

[12] The other five Title III Affidavits contain similar language. (*See, e.g.*, Thomas Title III Affidavit 91-92; SHU Visiting Room Title III Affidavit 4-5; SHU Cell Block Title III Affidavit 5; Legal Line Title III Affidavit 8-9; Kidada Title III Affidavit 7.)

communications where the wiretap affidavit alleged the existence of a complex, continuing narcotics conspiracy involving many persons, each performing specialized tasks within the criminal organization"); *United States v. Steinberg*, 525 F.2d 1126, 1131 (2d Cir. 1975) (observing that Title III affidavit established cause to support interception of communications after the first related conversation, and stating that "the very scope of the operations described in the affidavit made it highly likely that numerous narcotics-related communications would take place in the future"). Defendant's argument that the Government failed to sufficiently define the time period necessary to intercept the communications is without merit.

### D. Prior Interception History

Defendant also argues that the Government failed to properly and completely recite all prior interception history in all of the Title III Applications. (Def.'s Mot. 10.) Title III requires that each application for the interception of oral or wire communications contain:

> [A] full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept . . . wire, oral, or electronic communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such applications.

18 U.S.C. § 2518(1)(e). This argument in support of suppression is easily rejected. Each of the Title III Affidavits submitted in support of the applications clearly list prior Title III interceptions related to Defendant and the other individuals whose communications were sought.[13] Defendant does not allege the occurrence of any Title III interceptions that were not included in the

---

[13] The Thomas Title III Affidavit states that a search of FBI records revealed that no prior interceptions had been sought with respect to the individuals named as interceptees in the application. (Thomas Title III Affidavit 5.) The Affidavit also discloses the prior history of interceptions related to co-conspirators referenced in the Affidavit. (*Id*.) The other Title III Affidavits disclose a comprehensive history of prior interceptions, including the ones that are subject to Defendant's Motions. (*See* Savage Title III Affidavit 9-16; SHU Visiting Room Title III Affidavit 5-9; SHU Cell Block Title III Affidavit 5-12; Legal Line Title III Affidavit 9-21; Kidada Title III Affidavit 7-18.)

Affidavits. The Title III Applications and supporting Affidavits recited prior interception histories in full compliance with 18 U.S.C. § 2518(1)(e).

**E.      Description of Types of Communications and Nature and Location of Facilities**

Next, Defendant contends that the Title III applications failed to include a description of the types of communications sought to be intercepted, as well as the nature and location of the facilities from which the communications would emanate. (Def.'s Mot. 10.) Title III requires that applications for the interception of wire and oral communication contain:

> [A] full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including . . . (ii) . . . a particular description of the nature and location of the facilities from which or the place where the communication to be intercepted, [and] (iii) a particular description of the type of communications sought to be intercepted . . . .

18 U.S.C. § 2518(1)(b).

Here, the descriptions in the Title III Affidavits of the types of communications targeted for interception are more than sufficient. Each Affidavit explained that either wire or oral communications would be sought. The communications were expected to consist of: (a) "discussions concerning the continuing conduct, financing, managing, supervising or directing of all or part of the illegal drug trafficking organization, which will reveal the identities of the participants of the organization" (Thomas Title III Affidavit 5); (b) information related to "the planning and control of the drug trafficking business, the collection of drug payments and debts related to the drug distribution activity, the use and disposition of drug proceeds" (*id.*); (c) information related to "the manner in which the named interceptees . . . participate in the specified federal offenses . . . the places of operation, and the full nature of the criminal enterprise" (SHU Visiting Room Title III Affidavit 5); and (d) "information and orders related to

20

intimidation and retaliation schemes against witnesses cooperating with the government" (Legal Line Title III Affidavit 8).

The Title III Affidavits also sufficiently described the nature and location of the facilities from which the communications would emanate. The Affidavits submitted for the interception of telephone communications provided information about the telephone, the telephone number assigned to the account, the subscriber, and the subscriber's use of the telephone. (*See* Thomas Title III Affidavit 5; Savage Title III Affidavit 7-8.) With regard to the interception of oral communications, the Affidavits included a description of the listening device or "bug" that would be used and the dimensions of the room or cell in which the device would be placed. (SHU Visiting Room Title III Affidavit 4; SHU Cell Block Affidavit 4.)

Courts analyzing affidavits with far less detail about the types and locations of communications have determined that the descriptions are sufficient. *See United States v. Williams*, 45 F.3d 1481, 1485 (10th Cir. 1995) (holding that the Title III order satisfied the requirement of 18 U.S.C. § 2518(1)(b) where it listed the phone numbers to be intercepted and the crimes suspected); *United States v. Spillone*, 879 F.2d 514, 518 (9th Cir. 1989) (finding description sufficient where order stated that communications would concern racketeering activities involving murder and extortion); *United States v. McCafferty*, 772 F. Supp. 2d 863, 868-69 (N.D. Ohio 2011) (finding the specificity requirement met where order states that wire communications were expected reveal the manner, scope, and extent of conspiracy to commit Hobbs Act violations). The Government has satisfied its burden under 18 U.S.C. § 2518(1)(b).

### F. Identification of Statutory Predicate Offenses

Another basis for suppression is the allegation that the Title III Affidavits failed to set forth the appropriate statutorily mandated offenses for which interception was being sought.

(Def.'s Mot. 10.) Defendant argues in the alternative that the Government identified and sought communications to support non-predicate offenses. (*Id.*) Again, Defendant fails to point to any particular Affidavit and asserts bare legal conclusions without any support.

Interceptions under Title III may only be sought for specified classes of crimes. These crimes are enumerated in 18 U.S.C. § 2516. "The purpose of the statute is to permit the use of wiretaps as an investigative technique in combatting inherently serious crimes and those typically involving elements of organized crime." *United States v. Frederickson*, 581 F.2d 711, 715 (8th Cir. 1978).

Here, each Title III Affidavit sets forth offenses alleged to have been committed by the interceptees, including: distribution of controlled substances and possession of controlled substances with the intent to distribution, in violation of 21 U.S.C. § 841(a)(1); conspiracy to distribute controlled substances, in violation 21 U.S.C. § 846; money laundering, in violation of 18 U.S.C. § 1956, 1957; violence in aid of racketeering, in violation of 18 U.S.C. § 1959; tampering with a witness, victim or informant, in violation of 18 U.S.C. § 1512; retaliating against a witness, victim, or informant, in violation of 18 U.S.C. § 1513; federal firearms offenses, in violation of 18 U.S.C. §§ 922(g), 924(c); kidnapping, in violation of 18 U.S.C. § 1201; use of a communication facility to facilitate a drug trafficking offense, in violation of 21 U.S.C. § 843(b); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). (*See* Thomas Title III Affidavit 3; Savage Title III Affidavit 5; SHU Visiting Room Title III Affidavit 2; SHU Cell Block Title III Affidavit 2; Legal Line Title III Affidavit 3; Kidada Title III Affidavit 3.)

The offenses listed in the Title III Affidavits include offenses that are enumerated in 18 U.S.C. § 2516, including kidnapping, commission of violent crimes in aid of racketeering,

retaliation against a witness, tampering with a witness, money laundering, firearms offenses, and conspiracy. *See* 18 U.S.C. § 2516. Moreover, simply because the Title III Affidavits may have referenced non-enumerated offenses in addition to enumerated offenses does not invalidate the Title III Orders. *See United States v. Smart*, 278 F.3d 1168, 1173 (10th Cir. 2002) ("It does not follow from these rules that where investigators suspect both enumerated and non-enumerated offenses wiretaps are impermissible."). Defendant's argument that the Title III Affidavits failed to set forth the statutorily mandated offenses must be rejected. The Government has fully complied with 18 U.S.C. § 2516.

### G. Re-Authorization Applications

Defendant also contends that the Government failed to satisfy the requirements set forth in Title III when seeking re-authorization of the Title III Orders. (Def.'s Br. 6-7.) Specifically, Defendant argues that the re-authorization applications failed to provide a "statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results," in violation of 18 U.S.C. § 2518(1)(f). (*Id.* (quoting 18 U.S.C. § 2518(1)(f)).) This argument is disingenuous. Each of the applications for re-authorization clearly set forth a description of the information obtained from the initial authorized interception. (*See* Def.'s Mot. Ex. A(1) at 12-48, Ex. A(2) at 11-29, Ex. A(3) at 12-34, Ex. A(4) 14-34, Ex. C(1) at 19-25, Ex. D(1) at 18-55.)

### H. Monitoring and Minimization of Oral and Wire Communications

Defendant next argues that the Government failed to properly monitor and minimize communications intercepted pursuant to the Title III Orders. (Def.'s Br. 10.) Section 2518(5) of Title III requires that the orders authorizing the interception of wire, oral or electronic communications contain a provision stating that the interception "shall be conducted in such a

way as to minimize the interception of communications not otherwise subject to the interception." 18 U.S.C. § 2518(5).

Each Title III Affidavit and Order contained detailed minimization instructions.[14] These instructions were provided to all agents and authorized representations that participated in the monitoring of oral or wire communications. (June 11 Hr'g Tr. 18-19; *see also* Gov't's Ex. 1.) The monitoring agents were also instructed by the United States Attorney's office about the proper minimization procedures, including the need to minimize privileged and non-pertinent communications. (June 11 Hr'g Tr. 18.) The procedure used for the minimization of oral communications differed from the procedure used for wire communications. With respect to wire communications, telephone calls lasting more than two minutes were subject to minimization if the call related to non-pertinent matters. (*Id*. at 29-20.) Once a call was minimized, the agent was permitted to "spot-check" the conversation to determine whether it had become criminal in nature. (*Id*. at 20-21) Oral communications pursuant to the SHU Visiting Room Title III Order and SHU Cell Block Title III Order were not subject to the two-minute duration limitation. Once interceptions were deemed non-pertinent, they were minimized, subject to reasonable spot-checking. (*Id*. at 21-22.) Statistics on the number of interceptions that were recorded and minimized with respect to each Title III Order were provided to the authorizing judge in each of the ten-day progress reports. (*Id*. at 25.) The Government's minimization procedures and monitoring efforts complied with Title III.

## I.     Production of Progress Reports

Another argument offered in support of suppressing the Title III interceptions is that the Government failed to produce progress reports to the issuing judge. Title III states that an order

---

[14] Minimization refers to the termination of the recording of an intercepted communication. (June 11 Hr'g Tr. 20.)

authorizing interception "may require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective." 18 U.S.C. § 2518(6). The Title III Orders required the Government to provide the issuing judge with a progress report every ten (10) days during monitoring. (*See, e.g.*, Savage Title III Order 11.) During the suppression hearing, Special Agent Lewis testified that progress reports were provided to the issuing judge pursuant to each of the Title III Orders. (June 11 Hr'g Tr. 25.) Defendant's argument is rejected.

**J.      Preservation and Sealing of Oral and Wire Communications**

Defendant's argument that the Government failed to preserve and seal the intercepted communications is equally unavailing. Section 2518(8)(a) of Title III provides that "[i]mmediately upon the expiration of the period of the order, or extensions thereof, [the recording of the contents of any wire, oral, or electronic communication] shall be made available to the judge issuing such order and sealed under his directions." 18 U.S.C. § 2518(8)(a). That section further provides that the recordings "shall not be destroyed except upon an order of the issuing or denying judge and in any event shall be kept for ten years." *Id.*

Special Agent Lewis testified that after each of the interception time periods, unless there was a court-ordered extension, all recordings were sealed. (June 11 Hr'g Tr. 26.) If there was an overlap between an interception and the re-authorized extension, the Government would continue recording until the monitoring terminated. (*Id.* at 26-27.) After being placed under seal, each of the recordings together with any documents, were preserved under seal for a period of ten years. (*Id.* at 27.) The Government's procedure for sealing and preserving the interceptions complied with Title III.

**K.      Discovery Requests**

Defendant requests the Court to compel the Government to provide additional discovery related to the Title III interceptions.  Specifically, Defendant requests:  (1) the Affidavit associated with the Legal Line Title III Application; (2) the Government's policies and procedures related to recording and preserving intercepted wire and oral communications; and (3) documents relating to the minimization of communications, including monitoring documents defining minimization, detailed line sheets or call summary information indicating the number of calls designed as pertinent, minimized or intercepted.  The Government advises that it obtained all of the requested items and provided them to Defendant, with the exception of one request.  (Gov't Resp. 3.)  The Government did not provide Defendant with the "policies and procedures" for preserving intercepted communications.  Defendant fails to explain why he needs this information.  The Government argues that this information is not relevant to the issues in this case.  We agree.  Defendant's request to compel production of policies and procedures related to preserving intercepted communications is denied.

**L.      Alleged Misstatements and Omissions and Request for a *Franks* Hearing**

Finally, Defendant argues that the Title III Affidavits contained material omissions and misrepresentations that were made intentionally or with reckless disregard for the truth.  (Def.'s Mot. 13-14; Def.'s Br. 14; Def.'s Supp Mot. SHU 4; Def.'s Supp. Mot. Landline 5; Def.'s Supp. Br. 4-5.)  As a result of the alleged omissions and misrepresentations, Defendant requests that the Court suppress the evidence obtained pursuant to the Title III interceptions, or in the alternative, conduct a *Franks* hearing to determine the validity of the Title III Affidavits.  (Def.'s Br. 16-17.) Defendant claims that the Government:  (1) misrepresented the relationship between Defendant and co-conspirator Tybius Flowers (Def.'s Mot. 14.); (2) misstated that Defendant was the

principal source of cocaine for co-conspirator Gerald Thomas (*id*. at 14-15); (3) withheld from the issuing judge information about Defendant's periods of incarceration during relevant time periods described in the Affidavits (*id*. at 14-17); (4) alleged in the Affidavits stale information obtained from co-conspirator Eugene Coleman (*id*. at 15); and (5) mischaracterized and misrepresented the content of an October 8, 2004 telephone call between Defendant and co-conspirator Lamont Lewis (Def.'s Supp. Mot. SHU 3-4; Def.'s Supp. Mot. Landline 3-4; Def.'s Supp. Br. 2-3, 5).

### 1. *Legal Standard for Permitting a* Franks *Hearing*

In *Franks*, the Supreme Court determined that, upon an appropriate showing, a criminal defendant has the right at an evidentiary hearing to challenge the truthfulness of statements made in an affidavit establishing probable cause. *Franks*, 438 U.S. at 155-56. This right has been extended to defendants challenging statements or omissions contained in applications for the interception of oral, wire, and electronic communications under Title III. *See Heilman*, 377 F. App'x at 177 (citing cases). In *Franks*, the Court defined a defendant's burden in showing entitlement to an evidentiary hearing. The Court stated that:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Franks*, 438 U.S. at 155-56. To make a substantial preliminary showing, a defendant must raise "allegations of deliberate falsehood or of reckless disregard for the truth." *Id.* at 171. Statements or assertions contained in an affidavit of probable cause "are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting." *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000). Omissions from an affidavit of probable

cause "are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge want to know." *Id*.

To meet this preliminary threshold, a defendant "must present more than conclusory statements that the affidavit contains false statements or omissions." *Heilman*, 377 F. App'x at 177. In order to obtain a *Franks* hearing, the defendant must provide an offer of proof or explain why such offer of proof is absent. *Franks*, 438 U.S. at 171; *see also United States v. Yusef*, 461 F.3d 374, 383 n.8 (3d Cir. 2006) ("In order to make this preliminary showing, the defendant cannot rest on mere conclusory allegations or a mere desire to cross-examine, but rather must present an offer of proof contradicting the affidavit.") (internal quotation marks omitted). "Sworn affidavits or reliable statements from witnesses are examples of offers of proof sufficient to satisfy the substantial preliminary showing." *Heilman*, 377 F. App'x at 177 (citing *Franks*, 438 U.S. at 471, *Yusef*, 461 F.3d at 383 n.8).[15]

### 2. Defendant's Relationship with Tybius Flowers

In support of his request for a *Franks* hearing, Defendant argues that the Government misrepresented his relationship with Tybius Flowers by describing them as "business partners who controlled the sale of cocaine at 8th and Butler Streets in Philadelphia, PA." (Def.'s Mot. 14 (quoting Savage Title III Affidavit 23).) The information was provided to Special Agent Lewis by CI-1 in December 1999 and was included in the Affidavit. (Savage Title III Affidavit 23; *see*

---

[15] If a defendant provides sufficient proof and obtains a *Franks* hearing, he or she must ultimately prove by a preponderance of the evidence that the affiant's statements were material to a finding of probable cause and were made knowingly and intentionally, or with reckless disregard for the truth. *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997) (citing *Franks*, 438 U.S. at 171-72). If a defendant meets this burden, "the Fourth Amendment requires that . . . the fruits of the search [must be] excluded to the same extent as if probable cause was lacking on the face of the affidavit." *United States v. Frost*, 999 F.2d 737, 743 (3d Cir. 1993) (quoting *Franks*, 438 U.S. at 155-56).

*also* June 11 Hr'g Tr. 29.)  Special Agent Lewis testified that at the time he obtained this information from CI-1 and at the time he submitted the Affidavit containing the statement, he believed the information was accurate.  (June 11 Hr'g Tr. 29-30.)  Special Agent Lewis now knows, after twelve years of investigating the KSO, that Defendant and Flowers were more like "rivals" who competed as boxers and as drug dealers.  (*Id*. at 30.)

Defendant contends that it was implausible for the Government to not realize the inaccuracy of CI-1's characterization of the relationship since Flowers began cooperating with Government around the time that the Savage Title III Affidavit was submitted for approval. However, Special Agent Lewis confirmed that when that Affidavit was approved on March 16, 2001, he was not in possession of any information that contradicted CI-1's statements.  (*Id*. at 73.)  Special Agent Lewis also testified that he was not aware that Flowers began cooperating with the Philadelphia Police Department until late 2001, early 2002, which was after the Affidavit had been approved.  (*Id*. at 73-74.)  The representation in the Affidavit about Defendant's relationship with Flowers was based on what Special Agent Lewis believed to be credible information from CI-1.  That CI-1's information was later discovered to be inaccurate is of no consequence since a preliminary substantial showing must establish an intentional or reckless statement on the part of the affiant, not of an informant.  *Franks*, 438 U.S. at 171. Defendant has not provided any evidence that Special Agent Lewis intentionally or recklessly mischaracterized the relationship.  Accordingly, Defendant has not made a preliminary substantial showing that he is entitled to a *Franks* hearing on this basis.

### 3. *Defendant as a Drug Supplier to Gerald Thomas*

Defendant also claims that the Government "grossly overstates" Defendant's role in supplying cocaine to co-conspirator Gerald Thomas.  (Def.'s Mot. 15.)  Specifically, Defendant

points to the Savage Title III Affidavit and the allegation contained therein that "[i]ntercepted telephone conversations from the Court-authorized electronic surveillance of THOMAS' cellular telephone have established that SAVAGE is currently one of THOMAS' principal sources of cocaine." (*Id*. at 14-15 (quoting Savage Title III Affidavit 21).) Simply because Thomas may have been receiving cocaine from other sources does not necessarily mean that the statement in the Affidavit was a mischaracterization. Moreover, Special Agent Lewis testified that when he included the information in the Affidavit, he believed it was accurate. (June 11 Hr'g Tr. 35.) With the benefit of hindsight and the many years of conversations intercepted pursuant to the Title III wiretaps, the Government now understands that at times, Defendant was the supplier and at times, he was supplied by others. (*Id*.) In any event, Defendant has not made a substantial preliminary showing that the statement was false.

### 4. *Defendant's Periods of Incarceration*

Another ground asserted by Defendant in support of his request for a *Franks* hearing is that the Government intentionally omitted from the Affidavits periods of time that Defendant was incarcerated during the relevant time frames, and that this intentional omission "misled the district judge" reviewing the Affidavits. (Def.'s Mot. 16-17.) Defendant was incarcerated between the dates of September 10, 1999 and May 25, 2000; March 22, 2001 and September 8, 2001; April 7, 2002 and January 3, 2003; and April 14, 2003 until the present. (*Id*.)

As the Government points out, the fact that Defendant was arrested or incarcerated was disclosed to the district court numerous times in each Affidavit. For example, in the Savage Title III Affidavit, reference to Defendant's incarceration was made seven different times:

(1)  On September 10, 1999, SAVAGE was arrested in Maple Shade, NJ on an arrest warrant issued by the Philadelphia County Court of Common Pleas on charges of criminal homicide.  (Savage Title III Affidavit 17.)

(2)  KABONI SAVAGE was arrested on the Philadelphia homicide warrant on September 10, 1999.  (*Id.*)

(3)  At the time of SAVAGE's arrest on September 10, 1999 . . . .  (*Id*. at 18.)

(4)  SAVAGE told COLEMAN and Westbrooke that:  "we know what we do for a living and when we get out, we'll start all over."  (*Id*. at 19.)

(5)  CI-1 advised that KABONI SAVAGE was incarcerated at the time [he provided information in December 1999].  (*Id*. at 23.)

(6)  In July 2000, CW-1 advised SSA Henry James Sweeny that "Bubbie" (GERALD THOMAS) hangs out at 3643 North Darien Street, the home of KABONI SAVAGE, who was a key distributor of cocaine for "Bubbie" before being arrested for murder.  SAVAGE was out on bail and living at 3643 North Darien Street, Philadelphia, PA on house arrest.  (*Id*. at 25.)

Although the exact duration of each incarceration was not disclosed to the district court, we are satisfied that this omission was not intentionally or recklessly made.  Each Affidavit made clear that Defendant was in an out of prison during the relevant time period.  Moreover, even if the precise time periods of incarceration had been disclosed, it was not "impossible" for Defendant to have remained involved in the drug activities of the organization while in Government custody.  It is not unusual for prisoners to remain active in their drug operations while incarcerated.  *See, e.g*., *Matsey v. Westmoreland Cnty*., 185 F. App'x 126, 128 (3d Cir. 2006) (discussing prison inmate "running a drug trafficking operation out of his prison cell"); *United States v. Blake*, 288 F. App'x 791, 794 (3d Cir. 2008) (citing examples of prisoners

orchestrating criminal activity while incarcerated).  Indeed, Special Agent Lewis testified that even during times of Defendant's incarceration, Defendant played a part in managing the activities of the drug enterprise.  (June 11 Hr'g Tr. 34, 125.)  Defendant has failed to make the preliminary substantial showing that his periods of incarceration were omitted from the Affidavits intentionally or with reckless disregard for the truth.[16]

5. *Information Provided by Eugene Coleman*

Defendant also contends that the Government improperly used stale information provided by Eugene Coleman in the Savage Title III Affidavit.  The information was provided to the affiant in September 1999 and submitted in an affidavit that was approved in March 2001, over eighteen months later.  (Def.'s Mot. 15.)

---

[16] Defendant's two related arguments about the omitted periods of incarceration must also be rejected.  Defendant claims that Government misled the district court by stating in the Savage Title III Affidavit that Defendant controlled the drug sales at Eighth and Butler Streets with Tybius Flowers in December 1999 because Defendant was incarcerated at that time.  (Def.'s Mot. 14.)  As we previously noted, it was not implausible that Defendant maintained an active involvement in drug activities while he was incarcerated.  Defendant also argues that the Government misrepresented the composition of the Gerald Thomas Organization in the Savage Title III Affidavit by failing to disclose to the issuing judge that Defendant was incarcerated during two relevant periods of time:  September 10, 1999 to May 25, 2000; and March 22, 2001 to September 8, 2001.  (*Id*. at 16.)  In the Thomas Title III Affidavit, which was approved on September 26, 2000, the Gerald Thomas Organization was described as comprising four individuals not including Defendant.  (*Id*.) The Savage Title III Affidavit, which was approved on March 16, 2001, described the Gerald Thomas as a much larger entity, with Savage named as a member.  Defendant claims that it was "impossible" for him to have operated as a distributor for the Gerald Thomas Organization because he was incarcerated for a significant portion of the relevant time period.  Defendant's argument is problematic for two reasons.  First, Defendant was not incarcerated during the time period in between submission of the Gerald Thomas Title III Application and the Savage Title III Wiretap Application.  Thus, it was not misleading to suggest that Defendant was involved in drug activities during this time.  Second, even during the periods of his incarceration, it was not impossible for Defendant to have maintained involvement in the drug organization described in the Affidavits.

While it is true that stale information can undermine a finding of probable cause, "age alone . . . does not determine staleness." *United States v. Urban*, 404 F.3d 754, 774 (3d Cir. 2005) (quotation marks omitted).

> The determination of probable cause is not merely an exercise in counting the days or even months between the facts relied on and the issuance of the warrant. Rather we must also examine the nature of the crime and the type of evidence. Thus, where the facts adduced to support probable cause describe a course or pattern of ongoing and continuous criminality, the passage of time between the occurrence of the facts set forth in the affidavit and the submission of the affidavit itself loses significance.

*Id.* (internal citations and quotation marks omitted). Moreover, "[t]he liberal examination given staleness in a protracted criminal conduct case is even more defensible in wiretap cases than in ordinary wiretap cases than in ordinary warrant cases, since no tangible objects which can be quickly carried off are sought." *Tehfe*, 722 F.2d at 1119-20 (internal quotation marks omitted).

Even though the information provided by Coleman was over eighteen months old, it was not stale information that transformed the Government's use of it into an intentional or reckless misrepresentation. The Affidavit described "activity of a protracted and continuous nature" that involved numerous individuals engaging in a drug conspiracy that spanned many years. *United States v. Harris*, 482 F.2d 1115, 1119 (3d Cir. 1973) (observing that "[p]rotracted and continuous activity is inherent in a large-scale narcotics operation"). Under these circumstances, the Government's use of information provided by Coleman was completely proper. *See Urban*, 404 F.3d at 774-75 (finding that information over two years old was not stale where affidavit described continuous misconduct that began prior to the two-year old information). Moreover, the information provided by Coleman, which related to Savage's involvement in drug activities, was corroborated by five months of wiretap interceptions obtained pursuant to the prior Thomas Title III Order. (Gov't's Resp. 22; *see also* June 11 Hr'g Tr. 37.) Defendant's request for a

*Franks* hearing on the basis that stale information was used to draft the Savage Title III Affidavit is denied.

### 6. October 8, 2004 Telephone Call

Finally, Defendant argues that he is entitled to a *Franks* hearing as a result of mischaracterizations made in the Title III Affidavits about the contents of an October 8, 2004 telephone call. (Def.'s Supp. Mot. SHU 3-4; Def.'s Supp. Mot. Landline 3-4.) The call was initiated by Defendant from the FDC at approximately 8:30 p.m. (*Id*. at 3.) During the call, Defendant spoke with his mother, Barbara Savage, his sister, Kidada Savage, his girlfriend at the time, Crystal Copeland, and co-conspirator Lamont Lewis. The telephone call was recorded and transcribed. The call is described in four of the Title III Affidavits as follows:

> 94. On October 8, 2004, at approximately 8:30 p.m., in a recorded prison phone call, KABONI SAVAGE telephoned the home of his sister, KIDADA SAVAGE, and mother, BARBARA SAVAGE. Also present at the SAVAGE household at that time was SAVAGE's girlfriend, CRYSTAL COPELAND.

> 96. KABONI SAVAGE spoke with KIDADA SAVAGE, who indicated she would be seeing "Mont" that evening. KABONI SAVAGE instructed KIDADA to "tell him to get that done, man." While KABONI SAVAGE was speaking with CRYSTAL COPELAND, the doorbell to the house rang in the background. SAVAGE asked COPELAND, "Who's that?" COPELAND responded, "That's Mont." SAVAGE asked, "Poppy-eye? Put him on the phone." An individual, who has since been identified as LAMONT LEWIS, then got on the phone and spoke with SAVAGE. SAVAGE told LEWIS that he is like family, that LEWIS is the only person he can trust "with that." SAVAGE told LEWIS that when KIDADA "told you what I said when you told her that, I said, he's right, he's dead, he's dead, he's dead like a mother fucker." SAVAGE told LEWIS that KIDADA would explain everything and that "you're going to feel it when she says it – cause your [sic] gonna understand." SAVAGE told LEWIS "I need it, I need it, I need it." LEWIS told SAVAGE, "I'm with you man." SAVAGE also told LEWIS that he had something else for LEWIS to do, and that he would pass the details of what else he needed to do when "Da" (KIDADA) visits on Wednesday. Based on a review of this call in context of the other evidence described herein, and based upon my experience and training, I believe that this call relates to SAVAGE's attempt to arrange and setup the arson/murder described above, which occurred approximately 8 ½ hours later.

(Legal Line Title III Affidavit 46-47.)[17]

Defendant contends that the line "he's dead, he's dead, he's dead like a mother fucker" was an inaccurate representation of the conversation and that Defendant instead told Lewis, "he did, he did, he did." (Def.'s Supp. Mot. SHU 3; Def.'s Supp. Mot. Landline 3.) In support of this alternative version, Defendant supplied the Court with an audio recording and transcript of the telephone call. Defendant argues that the Government "intentionally, and/or with reckless disregard for the truth, grossly misquoted and distorted the critical October 8, 2004 telephone call to a reviewing judge in the hopes that the judge would meet their objective—to intercept Kaboni and Kidada Savage discussing their role in the North 6th Street arson." (Def.'s Supp. Br. 4.) Defendant asserts that this type of mischaracterization "amounts to an egregious act by the Government," represents the "kind of manipulation that shocks the conscience," and demands that any evidence obtained pursuant to approval of these Affidavits be suppressed. (*Id.*) Defendant also argues that the manner in which Special Agent Lewis "transposed various portions of the telephone call to run them consecutively within the affidavit when they clearly did not appear that way in the telephone transcripts" was misleading. (*Id.* at 5-6.) Specifically, Defendant contends that the phrase "I need it, I need it, I need it," which followed "he's dead, he's dead, he's dead," created the impression that Defendant was sending a clear directive to Lewis to commit the arson murders, but that the actual transcript created a "vastly different" story of the conversation. (*Id.* at 6.)

At the June 11 hearing, Special Agent Lewis testified that the objective for intercepting communications in 2004 was to obtain information about the murders of the Coleman family and

---

[17] The same paragraphs are contained in the SHU Visiting Room Title III Affidavit, the SHU Cell Block Title III Affidavit, and the Kidada Title III Affidavit.

Defendant's efforts to intimidate witnesses generally. (June 11 Hr'g Tr. 78.) Special Agent Lewis also testified that he did not remember whether or not he actually listened to the telephone call before preparing the SHU Visiting Room Affidavit, which was the first Affidavit prepared after the telephone call took place. (*Id*. at 83.) He may have relied on a transcript of the call prepared by his partner. (*Id*.) Special Agent Lewis had personally listened to the call several times after submitting the SHU Visiting Room Affidavit, and continued to believe that Defendant stated "he's dead, he's dead, he's dead." (*Id*. at 125) His belief stemmed in part from the context of the conversation, which occurred less than ten hours before the arson murders, and which was preceded by other intercepted incriminating telephone calls between Defendant and Kidada Savage concerning Eugene Coleman and Lamont Lewis. (*Id*. at 134-35.) It was not until counsel for Defendant had produced an alternative transcription of the telephone call did Special Agent Lewis realize that the line "he's dead, he's dead, he's dead" may actually have been inaccurately quoted. (*Id*. at 137.) Special Agent Lewis now understands, after having confirmed with Lamont Lewis, that Defendant actually said "he did, he did, he did" and not "he's dead, he's dead, he's dead." (*Id*. at 98-99, 134.) Lamont Lewis also confirmed that when Defendant stated "I need it, I need it, I need it," he was actually referring to Lamont Lewis smacking him on the head because Lamont Lewis had warned Defendant that Kareem Bluntly and Eugene Coleman would cooperate. Defendant did not state "I need it" in reference to Lamont Lewis committing the arson murders.

Upon review of the telephone call, the associated transcripts, and after hearing Special Agent Lewis's credible testimony during the June 11 hearing, we are satisfied that the content of the October 8, 2004 telephone call was not misquoted or mischaracterized with the intent to mislead the authorizing judge, or with reckless disregard for the truth. Special Agent Lewis

listened to the telephone conversation on several occasions and believed, with confirmation from his partner, that Defendant said "he's dead, he's dead, he's dead." At worst, Special Agent Lewis's inaccurate recitation of the call excerpt was negligent, which is not enough to make out a substantial preliminary showing. *See Yusuf*, 461 F.3d at 383 (proof that a false statement was negligently or innocently made in a wiretap affidavit is insufficient to meet the burden for obtaining a *Franks* hearing). Defendant has offered nothing to suggest that Special Agent Lewis included the inaccurate statement knowingly and intentionally, or with reckless disregard for the truth. Defendant has also not offered any evidence showing that Special Agent Lewis intentionally or recklessly placed the statement "I need it, I need it, I need it" in the Affidavits to create a false impression about Defendant's solicitation of Lamont Lewis to commit the arson murders. Without such offer of proof, Defendant cannot sustain his burden under *Franks*. *See Heilman*, 377 F. App'x at 180-81 (finding that affiant's false statement contained in Title III Affidavit was insufficient to meet substantial preliminary showing absent proof that statement was made knowingly, intentionally, or with reckless disregard for the truth).[18]

---

[18] In Defendant's Supplemental Brief, he requests that the Court suppress all interceptions obtained pursuant to the Title III Orders as a result of the false statements contained in the Affidavit. Defendant's request erroneously assumes that Defendant had successfully made a preliminary substantial showing under *Franks*, and that the June 11, 2012 suppression hearing was in fact a *Franks* hearing. The Court held hearings on June 11 and 12, 2012 in order to permit argument and the presentation of evidence with respect to the numerous pretrial motions that had been filed by Defendants. Special Agent Lewis testified at that hearing and was subject to cross examination concerning preparation of the Title III Affidavits. Although the hearing was evidentiary, it was not a *Franks* hearing. The Court has never ruled that Defendant made a substantial preliminary showing that he was entitled to a *Franks* hearing.

In any event, even if we were to excuse Defendant's error and entertain the argument that he met his preliminary burden, he still fails to prove by a preponderance of the evidence: (1) that Special Agent Lewis "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood" in applying for a Title III Affidavit; and (2) "that such statements or omissions were material, or necessary, to the probable cause determination." *Yusuf*, 461 F.3d at 383 (citing *Mulvihill*, 113 F.3d at 399). Defendant's request that the interceptions be suppressed is denied.

Even if one were to find that the inaccuracies contained in the 2004 Title III Affidavits were knowingly or recklessly made, the statements were not necessary to a finding of probable cause.  If the falsely quoted portions are removed, the Affidavits nevertheless establish the requisite probable cause to believe that Defendant had committed or was about to commit criminal offenses.  The other incriminating portions of the October 8th call and the context of that call in relation to when the arson murder took place, together with other evidence of threats made to Coleman and his family contained in the Affidavits, support a finding of probable cause. (*See* SHU Visiting Room Title III Affidavit 18-25.)  Accordingly, Defendant has failed to make a preliminary substantial showing that he is entitled to a *Franks* hearing.[19]

---

[19] Defendant also requests a *Franks* hearing with respect to alleged false statements and omissions contained in the Title III Affidavits that relate to the necessity requirement.  (Def.'s Br. 13.)  As noted above, to make a showing of necessity, an application for Title III interception must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  Defendant does not provide any examples of alleged false statements or omissions that relate to the Government's showing of necessity.  *See Heilman*, 377 F. App'x at 177 (finding defendant failed to meet the minimum threshold for a *Franks* hearing when defendant did not offer any examples of material misrepresentations or omissions in affidavit).  Accordingly, Defendant's request for a *Franks* hearing on this basis must be denied.

## III.    CONCLUSION

For the foregoing reasons, Defendant Kaboni Savage's Motion to Suppress Intercepted Wire and Oral Communications, Supplemental Motion to Suppress Intercepted Wire and Oral Communications and Request for a Franks Hearing – SHU, and Supplemental Motion to Suppress Intercepted Wire and Oral Communications and Request for Franks Hearing – Landline are denied.

An appropriate Order has been entered.


BY THE COURT:


_____

**R. BARCLAY SURRICK, J.**