**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(Philadelphia)**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **)** | **Criminal No. 2:07-cr-00550-RBS** |
| | **)** | |
| | **)** | |
| **v.** | **)** | |
| | **)** | |
| **KABONI SAVAGE,** | **)** | **Hon. Chad F. Kenney** |
| | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

---

### MOTION FOR DISCOVERY AND MEMORANDUM OF LAW

---

Kaboni Savage moves for discovery pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts, the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, and the Equal Protection and Due Process clauses of the Fifth Amendment. Mr. Savage seeks production of documents and electronic material, access to physical evidence, leave to conduct depositions, and subpoenas to third parties.

### I.   Introduction

The government says it turned over "literally every scrap of paper" from state files and that there was no information withheld from the defense. *See* Doc.1795, p.132–33. Yet Mr. Savage has identified numerous indications of missing information from state files. Many documents were disclosed with vital information—such as

identity—redacted. In some instances, evidence that would be expected is missing from disclosures.

Some of Mr. Savage's discovery requests could have been resolved without discovery litigation but the government has not been willing to assist Mr. Savage. For example, Mr. Savage sought to view a government trial exhibit that is in the sole possession of the government and was rebuffed after the prosecutor opined it was not relevant to any habeas claims. Doc.1747-35, Ex.275. Mr. Savage also sought the government's assistance recreating the pre-trial discovery. Habeas counsel does not receive a neatly packaged "file" in which to review. Instead, habeas counsel receives collections of material from various prior team members, most of which after it had been collected by appellate counsel. In the end, habeas counsel is still missing at least three discs of pre-trial discovery (disco batch #15, disk one of disco batch #16, and disco batch #20). Other than the 2005 drug trial discovery which was re-produced for this case in pre-trial discovery, none of the discovery was bates-stamped or indexed, so habeas counsel cannot be certain even now that the discovery batches turned over from prior counsel represent the complete batch as provided by the government before trial. When habeas counsel asked to have pre-trial discovery reproduced or for an index of material provided to the trial team, the prosecutor refused, providing only the cover letters that accompanied the pre-trial disclosures and which generally described the disclosures. The government's actions in this regard belie its claims that it has been overly generous in its discovery production.

Further, even if the federal prosecutors in this case have indeed been as forthcoming as they claim, some of the most important evidence in this case came not from federal investigations but from state authorities. Even if the federal prosecutors indeed turned over every single piece of information that was turned over to them from the Philadelphia Police Department and Philadelphia District Attorney's Office, there is no assurance that those agencies provided the federal prosecutors with everything. Indeed, there are obvious holes, as addressed below.

There are, of course, additional discovery requests for material that arose only with habeas litigation. All are discussed below.

## II.    Habeas Rule 6 affords discovery when good cause is shown

Mr. Savage seeks authorization to conduct discovery. *See* Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 6 ("Habeas Rule 6") ("A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law.") Habeas Rule 6 incorporates the Supreme Court's directive that a federal habeas corpus petitioner is "entitled to careful consideration and plenary processing of [his claims,] including full opportunity for presentation of the relevant facts." *Harris v. Nelson*, 394 U.S. 286, 298 (1969); *see also Blackledge v. Allison*, 431 U.S. 63, 82-83 (1977); Rules Governing Section 2254 Cases in the United

States District Courts, Advisory Committee Note to Rule 6 ("Subdivision (a) is consistent with *Harris v. Nelson*").[1]

Courts may authorize discovery "under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Habeas Rule 6(a). This broad discretion includes authorizing issuance of subpoenas to produce documents, information, or objects. *Payne v. Bell*, 89 F. Supp. 2d 967, 970, 971-76 (W.D. Tenn. 2000) (granting petitioner's requests to serve interrogatories on state, obtain documents in state's possession, and depose assistant district attorney: "Once good cause is shown [under Habeas Rule 6(a)], a habeas petitioner may avail himself of the discovery procedures permitted by the Federal Rules of Civil Procedure, including the use of interrogatories, depositions, document requests, and requests for tangible evidence."); *O'Neal v. Lampert*, 199 F.Supp.2d 1064, 1065 (D. Or. 2002) (granting motion for subpoenas to produce records under Habeas Rule 6); *In re Braxton*, 258 F.3d 250, 255 (4th Cir. 2001) (noting that district court granted petitioner's motion under Habeas Rule 6 for state production of physical evidence for purposes of DNA retesting); *Warden v. Gall,* 865 F.2d 786, 787 (6th Cir. 1989) (state police crime lab ordered to produce laboratory and field notes, and other

---

[1] The Advisory Committee Notes to the Rules Governing Section 2254 Cases in the United States District Courts are "fully applicable to discovery under [the analogous Rule] for Section 2255 motions." Advisory Committee Notes to Rule 6, Rules Governing Section 2255 Proceedings for the United States District Courts.

physical items); *Rice v. Black*, 112 F.R.D. 620, 625-26 (D. Neb. 1986) (granting motion for discovery of FBI records of audiotape analysis).[2]

Some courts have also recognized the ability to grant defendants the right to subpoena process post-conviction under Federal Rule of Criminal Procedure 17. *See United States v. Winner*, 641 F.2d 825 (10th Cir. 1981) (holding that as long as the threshold requirements are met, Rule 17 subpoenas are appropriate for post-conviction matters including sentencing and post-trial motions); *United States v. Krane*, 625 F.3d 568, 573 (9th Cir. 2010) (same). The Third Circuit has stated that "Rule 17 has no application in post-conviction proceedings." *United States v. Chew,* 284 F.3d 468, 470 (3rd Cir. 2002). In context, however, the Circuit was addressing whether a pro se defendant could invoke the Rule to obtain post-conviction subpoenas *as a matter of right* (as he could pretrial). Because Chew had filed an untimely § 2255 motion, the Circuit had no occasion to discuss whether he had established good cause to invoke the broad-ranging discovery and subpoena process ability under Habeas Rule 6(a). *See Chew* at 470-71.

Accordingly, this Court should grant Mr. Savage the ability to conduct a full range of discovery as permitted under Habeas Rule 6, including the ability to seek

---

[2] *See also Keeney v. Tamayo-Reyes*, 504 U.S. 1, 14-15 (1992) (O'Connor, J., dissenting) ("once a claim is properly before the district court ... a habeas petitioner [should be treated] ... like any civil litigant" for purposes of "right to a hearing [or, presumably, any other fact-development procedure] where [the procedure] is necessary to prove the facts supporting his claim").

and obtain subpoenas under the requirements of Federal Rule of Criminal Procedure 17 or Federal Rule of Civil Procedure 45.

According to the Supreme Court, "good cause" for discovery in habeas proceedings is established "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997). By contrast, the Supreme Court has indicated that such good cause is absent when the petitioner's allegations are patently frivolous—i.e., the product of "fantasy which has its basis in the paranoia of prison rather than fact." *Harris*, 394 U.S. at 300.

## III.    There is good cause to order discovery

### A. This Court should order discovery related to the VICAR murder counts.

Much of Mr. Savage's requested discovery supports claims of withheld exculpatory or impeaching evidence that should have been disclosed to permit Mr. Savage full cross-examination of each witness under the Sixth Amendment and a full investigation and defense presentation under the Fifth Amendment. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Bagley*, 473 U.S. 667 (1985).

For such claims to prevail, the withheld evidence must be material. "The [materiality] question is not whether the defendant would more likely than not have received a different verdict with the evidence…[but whether] the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678). The materiality

of withheld evidence is evaluated cumulatively. *Id.* at 436. Therefore, this Court should evaluate whether there is good cause to grant discovery cumulatively. That is, this Court should grant Mr. Savage the requested discovery where there is good cause to believe it could, cumulatively with other withheld evidence, meet the materiality threshold.

### 1.    Homicide files at the Philadelphia District Attorney's Office under their Open-File Discovery process

Prior to filing Mr. Savage's 2255 Motion, undersigned counsel requested to view select homicide files through the Philadelphia District Attorneys Office's (DAO) established Open-File Discovery policy. *See* Ex.1 (1/29/23 Letter to DAO); Ex.2 (DAO Open-File Discovery Policy).[3] The letter set out the specific reasons each homicide was directly relevant to Mr. Savage's case notwithstanding his status as a federal prisoner. *Id.* Although the federal prosecutor represented that the Homicide files were disclosed in their entirety, they also admitted to trial counsel that they did not control the Homicide files and were only provided information from the DAO. *See* 2/26/13 TT 269. As such, the federal prosecutors cannot know whether the Homicide files were comprehensively disclosed pre-trial or not.

---

[3] On information and belief, the DAO's Open-File review is a highly monitored, multi-step process; counsel are not permitted to scan or make their own copies of any documents or even to take notes. Requested papers are first reviewed by the DAO, - redacted and copies are produced to counsel at a later date. Counsel are required to adhere to strict rules about confidentiality and potential future disclosure, including disclosure to their clients.

Mr. Savage seeks an order directing that he be granted access to the following

Homicide files in the same manner in which the DAO grants state prisoners access.

1. All DAO files and the Philadelphia Police Department (PPD) H-file relating to the murder of **Kenneth Lassiter** (charged under the RICO indictment).

2. All DAO files and the PPD H-file relating to the murder of **Mansur Abdullah** aka Shafiq aka Shafeeq aka Robert Yates (charged under the RICO indictment).

3. All DAO files and the PPD H-file relating to the murder of **Ronald Walston**, aka Pumpkin (at Mr. Savage's federal capital trial, the government alleged that Carlton Brown's murder (charged in the federal indictment) was motive/retaliation for Walston's murder).

4. All DAO files and the PPD H-file relating to the murder of **Carlton Brown**, aka Mohammed aka Charlton Brown (charged under the RICO indictment).

5. All DAO files and the PPD H-file relating to the murder of **Mustafa Bey** (the prosecution alleged that Bey was killed in an attempt to shoot Mr. Savage's co-defendant turned cooperator Lamont Lewis in retaliation for the Brown murder).[4]

6. All DAO files and the PPD H-file relating to the murder of **Barry Parker** (charged under the RICO indictment).

7. All DAO files and the PPD H-file relating to the murder of **Tyrone Toliver** (charged under the RICO indictment).

8. All DAO files and the PPD H-file relating to the murder of **Kareem Bluntly** aka Brian Pride aka Bryant Pride (Bluntly was a crucial informant for the government against Mr. Savage).

9. All DAO files and the PPD H-file relating to the murder of **Tybius Flowers** (charged under the RICO indictment).

10. All DAO files and the PPD H-file relating to the murders of **Marcella Coleman, Sean Rodriguez, Tameka Nash, Khadijah Nash, Damir Jenkins,** and **Tajh Porchea** (charged under the RICO indictment).

---

[4] Although not charged as a VICAR count, Bey's death was charged as overt act 24 to the RICO conspiracy charged in Count 1 of Mr. Savage's indictment.

When Mr. Savage requested access to these files directly from the DAO, they responded, through Assistant District Attorney Katherine Ernst, that though counsel's request did not "fall under" its policy because the DAO was not a named Respondent in Mr. Savage's habeas case, it would "of course" comply with "any court order you obtain." *See* Ex. 3 (K. Ernst Email to K. Bailey). Because a mechanism already exists for undersigned counsel to review these highly relevant files and because the DAO has offered to comply with an order from this Court, the Court should grant this request.

### a. The constitutional guarantees of Equal Protection and Due Process establish good cause to order access to the homicide files.

The DAO enacted its Open-File Discovery policy in 2020, granting "all criminal defendants" access to all investigative files irrespective of the perceived materiality of the evidence. *See* Ex. 2. The only reason proffered by the DAO that Mr. Savage is not similarly—and automatically—entitled to review the investigative files underlying his convictions under this policy is that the DAO is not a "named Respondent" in his habeas action. *See* Ex. 3. Yet the Third Circuit Court of Appeals has rejected this type of formalistic distinction in the context of *Brady* disclosures and the truth-seeking obligations of prosecutors, rationales specifically cited by the DAO policy.[5] *See United States v. Risha*, 445 F.3d 298, 305–06 (3d Cir. 2006) (citations

---

[5] *See* Ex. 2 (DAO citing, *inter alia,* "fairness," "error reduction" and "the pursuit of truth" as rationales and goals of its open file disclosure policy.)

omitted) ("imposing a rigid distinction between federal and state agencies which have cooperated intimately from the outset of an investigation would artificially contort the determination of what is mandated by due process"); *United States v. Perdomo*, 929 F.2d 967, 971 (3d Cir. 1991) (reiterating that the focus of *Brady* is on the prosecution team, which includes both investigative and prosecutorial personnel and that the "availability of information is not measured in terms of whether the information is easy or difficult to obtain but by whether the information is in the possession of some arm of the state").

The VICAR homicide counts were inextricably tied to Pennsylvania law and rested on evidence gathered and developed by state authorities over the course of more than a decade. Dozens of police officers testified against Mr. Savage, and pretrial motions cited extensively to the corresponding state prosecutions to supplement arguments both for and against the existence of the alleged conspiracy. That Mr. Savage's convictions were the result of a joint effort by state and federal authorities is a conclusion that cannot be credibly disputed. *See Ake v. Oklahoma*, 470 U.S. 68, 76 (1985) (when a State exacts its power on "an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense" under the Fourteenth Amendment.) That the DAO channeled its resources and power here into the hands of the U.S. Attorney's Office does not change the reality that the power of the Commonwealth was leveraged to obtain the convictions against Mr. Savage.

> **b.      The apparent missing information in these homicide files establishes good cause.**

10

Each of Mr. Savage's twelve homicide convictions began as a state-level case and was investigated by state agencies. *See* Doc.480 (Counts 2-7, 10-15). Many of these state homicide investigations lasted years; and the DAO formally tried Mr. Savage for one of these homicides and prosecuted Mr. Savage's federal co-defendants and alleged co-conspirators in other state trials.

To be sure, the government reviewed and turned over select documents from state files regarding the charged murders before Mr. Savage's trial. *See* Ex. 4 (Oct. 19, 2009, discovery letter for Batch 2); Ex. 5 (July 29, 2011, discovery letter for Batch 6)). Though the government maintained it had turned over every page of the files it had *viewed* in the murder cases, it also recognized that "it was apparent…that there were some things that should be in those files, but perhaps were not." 12/17/12 TT 172; Doc.795, p.3–4. Indeed, the material turned over by the United States Attorney's Office on its face does not appear to be the complete investigative or DAO files for these homicides. *See, e.g.*, Doc.1746, p.300–01 (explaining that while there are clearly two cell phones on Abdullah's body in crime scene photos, there is no documentation of those phones or any related investigation in pre-trial discovery, among other indications of missing evidence); *id.* at 319–20 (highlighting, among other things, the lack of any autopsy photos from the Toliver case); *see also id.* at 336–38, 359–63, 392–97, 409–11, 436–40.

Counsel for Mr. Savage is willing to do what remains of this review— safeguarding against any omissions flowing from "discretionary disclosure decisions" made by the DAO or the government in this enormous case, which involved multiple

11

homicides and thousands of discovery documents. Particularly where Mr. Savage was convicted pursuant to the testimony of highly interested cooperating witnesses, this Court should issue an order granting defense counsel permission to view these files for potential exculpatory or impeachment material.

Indeed, the DAO's open-file process and separate internal reviews by the DAO's Conviction Integrity Unit have revealed suppressed *Brady* evidence in multiple capital cases in recent years, even where the prosecution for years—and even decades—had maintained that it was meeting its obligations under *Brady* and had produced other types of discovery.

In the Lavar Brown case, post-conviction file review revealed that a witness initially implicated someone else, and then both the witness and the interviewing detective lied about the initial implication in trial. *See* Samantha Melamed, *Philly DA: Evidence hidden in 2003 case*, THE PHILADELPHIA INQUIRER, Nov. 15, 2021, at B1 (attached as Ex. 6). Importantly, the file review in that case included internal communications revealing the deception. *Id.*[6]

Still other capital cases have been reversed after DAO file reviews. *See, e.g.*, Samantha Melamed, *Justice…Three decades late*, PHILADELPHIA DAILY NEWS, Dec. 2, 2021, at A5 (describing the reversals of co-defendants Troy Coulston and Christopher

---

[6] The open file disclosure process in the Lavar Brown case also revealed certain suspect "policies" at play at the DAO in the 1990s and 2000s, including the routine nondisclosure of prior inconsistent statements by cooperating witnesses. Such suppression would be undeniably material in Mr. Savage's case.

Williams after the Conviction Integrity Unit's post-conviction review of the case file) (attached as Ex. 7). *See also Lazar v. Pennsylvania*, 2023 WL 2382812, *10-13 (E.D. Pa. March 6, 2023) (reversing non-capital conviction on post-conviction review due to suppression of multiple pieces of exculpatory evidence).

Especially where documents turned over prior to Mr. Savage's capital trial did not contain the type of documents discovered in these cases, and where the U.S. Attorney's Office represented that it turned over only the select material it received from the state files, undersigned counsel should be permitted to review the DAO files for Brady material, at no additional burden or cost to the United States Attorney's Office. Mr. Savage has been convicted of twelve homicides and is now serving a sentence of life in prison; review of these files is necessary to ensure these verdicts' reliability and that none were achieved through unconstitutional means.

2. **Law enforcement reports, 302s, and handwritten notes from each relevant witness interview which have not been previously disclosed.**

Although the government claims to have turned over all relevant 302s and interview reports, Mr. Savage has uncovered evidence of many federal law enforcement interviews for which no 302 or other report was disclosed. Each of the identified interviews were likely to include relevant information that should have been disclosed pre-trial. Several of these witnesses testified in trial, or their out-of-court statements were admitted in trial. For such witnesses, their prior inconsistent statements are exculpatory. *See, e.g.*, *United States v. Wali*, 860 F.2d 588, 591 (3d Cir. 1988). Further, evidence that, regardless of admissibility, may reasonably lead to other exculpatory evidence must be disclosed to the defense. *See, e.g.*, *Dennis v. Sec'y,*

13

*Pa. Dep't of Corr.*, 834 F.3d 263, 306–07 (3d Cir. 2016). At minimum, these missing reports undermine any conclusion that pre-trial discovery was comprehensive; they also may contain exculpatory evidence supporting Mr. Savage's prosecutorial misconduct, *Napue*, *Brady*, and IAC claims. *See also* Doc.1746, p.575–580. Even where no 302 was prepared, there are still likely to be notes, as required by FBI policy. *See* Doc.1747-12, Ex.13.

1. On October 13, 2004, Eugene Coleman said that he had been brought over to court for a proffer session with agents on October 8, 2004; no other documentation about the October 8, 2004 proffer was turned over. Doc.1747-48, Ex.392, p.5. To the extent that Coleman said anything inconsistent with his trial testimony, grand jury testimony, or other proffers, his statements on October 8, 2004, were impeachment evidence. Coleman was one of the two main cooperating witnesses against Mr. Savage at trial, his testimony was the only evidence of Mr. Savage's involvement in both Tyrone Toliver and Mansur Abdullah's murders, and much of his testimony on other matters was uncorroborated. Weighed against the import of Coleman's testimony and its lack of corroboration, any inconsistencies in Coleman's statements were important for the jury's consideration of his credibility.

2. Dawud Bey, Steven Northington, and Mr. Savage were all taken from their cells and interrogated by law enforcement on the same day, believed to be October 18, 2004. The government turned over notes from Dawud Bey's interrogation, which says simply "not the man that Kevin Lewis is making him

14

out to be." Ex. 8. Similarly, they turned over notes from Mr. Savage's interrogation that also amounted to a single sentence ("Hey I've been blamed for things before, I knew that family that ain't my thing"). Ex. 9. Mr. Savage recalls that this interrogation lasted about an hour and his retained attorney was not with him. Further, Mr. Savage and others were recorded talking about these interrogations on the recording devices placed in their cell plumbing. Gov. Tr. Ex.1L-278, 397. The proximity of these interviews to the Coleman fire makes it likely that they contained exculpatory statements denying involvement. Mr. Savage seeks any notes from Northington's interrogation, along with any reports, notes, or communications revealing the content of these interrogations.

3.  Al Shannon Muse, who was recorded in many conversations with Mr. Savage, was interrogated by Kevin Lewis on October 22, 2004. The only documentation of this is a footnote in a wiretap application. Doc.1747-48, Ex.391. This interrogation was clearly exculpatory as it apparently undermined Agent Kevin Lewis' interpretations of the recorded conversations between Mr. Savage and Muse, *see id.*, to which Agent Lewis testified and interpreted to the jury. *See, e.g.*, 2/21/13 TT 20—24, 71—72, 85—92. The import of this statement would have gone beyond the immediate exculpatory nature of Muse's contradiction—it would have shown the jury that Agent Lewis's slang or codeword interpretations were not to be trusted.

4. Calvin Davis met with police or FBI agents in late October or November 2004. Davis allegedly witnessed what Eugene Coleman said was a threat from Mr. Savage in the FDC basement, which Coleman testified about in trial. 3/25/13 TT 85–88. Yet, the government did not call Davis to testify, supporting the inference that Davis's statements did not corroborate Coleman's testimony.

5. Chad Johnson met with Agent Kevin Lewis and talked about it on one of the recordings from Mr. Savage's prison cell, no documentation of such interactions was produced.

6. Jerry Hampton met with Agent Kevin Lewis after getting arrested on a federal case in a different district, no documentation was produced.

7. While the government successfully portrayed Mr. Savage as a well-known and ruthless kingpin and presented cooperating witnesses who described him as such, they apparently suppressed statements by others who contradicted that portrayal. In addition to an October 2004 interrogation for which no report was disclosed, Dawud Bey, who met with habeas investigators, says he was interrogated by Agent Kevin Lewis four more times: at the federal building in 2006; at FCI Schuykill; while in Florida; and while at a halfway house. While Agent Kevin Lewis admitted there were no 302 reports for two of these interrogations, he did not disavow the existence of notes or other memorialization of the content of those two meetings, *see* 3/12/13 TT 88–91, and there should be reports or at least notes from the other two. Additionally, Rodney Veney was interrogated by federal agents multiple times, where he

16

was asked specifically about Mr. Savage and their interactions. Rashan Wright was brought in repeatedly while awaiting trial on state charges and interrogated about Mr. Savage. Doc.1747-23, Ex.29 at ¶14–15. No documentation of these interviews were disclosed. Witnesses contradicting the government's portrayal of Mr. Savage would have made the jury less likely to believe Mr. Savage had the power to order murders or orchestrate a deadly firebombing in the manner argued by the government.

8. Mr. Savage was interrogated in April 2003, April 2004, and June 2009; no record of these were turned over. While Mr. Savage's own statements are subject to different discovery rules than for statements of witnesses, there is no doubt that at least under Federal Rule of Criminal Procedure 16(1)(B)(ii), any reports of these interviews should have been disclosed. For this reason, regardless of the substance of these statements, these reports should be turned over now as evidence that the government's claims of comprehensive disclosure are false and to corroborate the existence of a variety of withheld reports.

9. Bienvenido Morales testified about being interviewed twice before October of 2004; no documentation from such interviews were disclosed. *See* 4/8/13 TT 252.

10. Michael Crosby testified about being interviewed multiple times in 2004 for which no documentation was disclosed; Crosby apparently made exculpatory statements contradicting his trial testimony in these interviews. *See* 4/4/13 TT 177; *see also* 04-2006-01, Application for an Order Authorizing the Continued

17

Intercepting of Oral Communications (first extension), p.61. While defense counsel requested any reports or notes from those interviews during trial, the request was never resolved. *See id.*

11. Craig Oliver met with Agent Kevin Lewis and admitted to additional, related crimes but for which no documentation was disclosed. *See* 3/11/13 TT 84–89.

12. Agent Kevin Lewis testified that he interviewed Lamont Lewis approximately 15 times between 2005 and trial. 3/12/13 TT 92. The government turned over eight 302 reports, and Mr. Savage seeks any reports or notes from the other instances.

13. David Morris was interviewed in 2003 by the FBI about the Abdullah murder, discussed in more detail in Section III(A)(6), below.

14. Samuel Rosado was interviewed numerous times by Agent Kevin Lewis about the Lassiter murder, discussed in more detail in Section III(A)(11), below.

15. Sherman Newton was interrogated about Lassiter's murder, discussed in more detail in Section III(A)(11), below.

16. Robert Merritt made various statements about the Coleman house fire, discussed in more detail in Section III(A)(10), below.

17. Lamont Lewis was interrogated on November 2, 2004, discussed in more detail in Section III(A)(10), below.

18. The government turned over a folder of 302s from Lamont Smith in discovery batch 24. One file was labeled "302_07.19.06" but the document was a report from January 26, 2006, that did not involve Lamont Smith. See Section

III(A)(6) *infra.* If there was a meeting with Lamont Smith on July 19, 2006, Mr. Savage seeks the 302 and any notes or other reports.

19. Lamont Lewis made statements to federal agents that someone other than Mr. Savage was responsible for the Coleman house arson, discussed in more detail in Section III(A)(10), below.

20. Kendall Northington was interrogated by Agent Kevin Lewis after he was arrested with a gun, a gas can, rope, discussed in more detail in Section III(A)(10), below.

If there were no reports or notes from these interviews, Mr. Savage seeks depositions with the agents or prosecutors who were present for the interviews to substantiate his claim that the FBI failed to follow established report-writing procedures and trial counsel should have worked with an FBI expert to  expose this pattern of failing to record and share evidence which would have undermined the integrity of the FBI's investigation. See Doc.1756, p.546–49. There are additional indications of police interviews for which no report was disclosed, but for which there is no evidence that federal authorities were present. These instances are discussed in the relevant sections below and highlight the need for review of the state homicide files.

### 3.    File in FBI case 88A-PH-86083

The FBI maintained various files related to Mr. Savage, material from which were provided in pre-trial discovery. One 302 referenced FBI case 88A-PH-86083, which was described as a fugitive investigation "to locate and apprehend Kaboni Savage, who was wanted for murder." Ex. 10. No other material from FBI case 88A-

PH-86083 was turned over to the defense. Although Mr. Savage does not have further information about the contents of this file, given the length and scope of the investigation leading up to this trial it is a near certainty that the file contains information relevant to this trial.

### 4.      Recorded statements between Mr. Savage and Lamont Smith

Mr. Savage seeks copies of any recordings between Lamont Smith and Mr. Savage. Smith met with Mr. Savage in April of 2004, during the short period of time after Mr. Savage was released from state custody but before being picked up by federal authorities on the federal drug case. Smith initiated the meeting after they had been in only minimal contact in recent years. Mr. Savage made exculpatory statements to Smith that day. At that point, Smith was a well-established federal informant and had been providing federal agents information about Mr. Savage since September of 2002. Smith was also wearing recording devices and recording meetings and phone calls with various people by then. Smith recorded a call with co-defendant Steven Northington asking about Tybius Flower's murder, for which the FBI was also investigating Mr. Savage. Smith continued to wear a wire and record conversations with a variety people while informing for federal agents after that meeting. The following year, in the weeks after the Coleman house fire, Smith wore a wire and initiated conversations with Kidada Savage and Lamont Lewis. *See* Gov. Tr. Ex. 1D, 4/10/13 TT 3; 4/11/13 TT 5–6. Smith was clearly a go-to informant for the FBI's investigation into Mr. Savage, making it unlikely that Smith initiated a meeting with Mr. Savage in this time period without wearing a recording device.

### 5.    Cell Site Data

Mr. Savage seeks access to cell site data in the government's possession, including an opportunity to inspect and copy Government's Trial Exhibits 166 and 167, which have not been turned over but are in the government's possession. *See* Ex. 11; Doc.1747-35, Ex.275. The government used cell site location data in trial, for multiple VICAR counts. *See* Gov't Tr. Exs. 813, 814, 815, 948, 949, 950. FBI Agent David Magnusen testified about cell site locations and showed the jury maps based on his analysis of the cell site data. *See* Govt Tr. Ex. 816. But the defense never had the information necessary to evaluate the accuracy of Agent Magnusen's testimony and maps. *See* Doc.1747-14, Ex.15 (Email From Art Hively dated 3.29.2023). Art Hively, Senior Digital Forensics Examiner explains that in order to map the cell site data a forensic examiner would need the cell tower data, tower location data, and a cell site key—none of which Mr. Savage has access to. *Id.* Government's Trial Exhibits 813–15 and 948–50 reveal that the government was provided this information before trial: this data is referenced in the court orders and referenced in written communications about the rest of the cell phone data. *See id.*

### 6.    Mansur Abdullah's murder

Mansur Abdullah was found dead with gunshot wounds at 12:30 am on September 6, 2000, in a smoldering car. Eugene Coleman offered the only evidence connecting Mr. Savage to the murder. He testified that Mr. Savage told Kareem Bluntly to shoot Abdullah, that Coleman later saw Abdullah's body in the car at a different location than where it was found, and that Mr. Savage later had David Morris move the car with Abdullah's body and light it on fire.

21

Mr. Savage seeks access to cell phones, call log information, any cell phone company data, and evidence logs about Abdullah's cell phones, including the ability to turn on the phones and forensically examine them or manually examine them in a black box. Abdullah's body was found with two cell phones—one in his hand and one clipped to his waistband. Doc.1747-23, Exs.41, 42. Another phone was found with its box in the car. Ex. 12. The information from the cell phones is important for several reasons, most importantly because Mr. Savage expects they will show Abdullah made and received phone calls after Coleman claims he was dead. Coleman testified that Abdullah was shot in one location, that Coleman saw his dead body at dusk, and that later the car was moved and attempted to be set on fire. 3/18/13 TT 171–75; 3/20/13 TT 258. The first responders found the smoldering car after midnight—about five hours after dusk. 2/27/13 TT 281–84. If the cell phones show what Mr. Savage expects—that Abdullah was using his phone until shortly before midnight— Coleman's testimony about this murder would be fully impeached, leaving no evidence at all connecting Mr. Savage to this murder.

There is reason to believe the cell phones will reflect such phone calls, as two witnesses have reported to habeas investigators that they spoke with Abdullah that night after dark. Handwritten notes from the police investigation further suggest that Abdullah's co-worker Jonathon Ford was with him that night until 11 p.m. when Abdullah received a phone call and left the car lot where they both worked. Ex. 13.

The Homicide file discovery provided pre-trial did not include any information about these cell phones from the days leading up to or the day of Abdullah's murder.

Yet reports showed that state law enforcement did seek and obtain such information—Abdullah's employer "provided copies of the decedent's Nex Tel phone invoices so that any calls the decedent made or relieved could be checked." Ex. 14. But these were not disclosed, nor were any records from the other phones. The only phone records provided in discovery were found within the car and thus obviously did not include call logs from the day of Abdullah's murder.

Records reflect Abdullah's phone numbers as 267-228-1370, 267-228-1371, 267-228-0872, 385-2145, and/or 484-686-0258. Mr. Savage also seeks any evidence about these phone numbers from the relevant time frame in the government's possession.

Next, Mr. Savage seeks the identities of confidential informants who provided the FBI exculpatory information about Abdullah's murder. In the alternative, Mr. Savage asks the Court to hold *in camera* questioning to determine if these witnesses could have provided exculpatory testimony or investigative leads for the defense. An unnamed source told the FBI in an interview on September 8, 2000, that shortly before his death Abdullah had been robbed of $40,000, and Abdullah had been threatening the robbers. *See* Ex. 15; Doc.1747-24, Ex.55. Another unnamed source interviewed on October 5, 2000, said the same thing but claimed to have knowledge that Lamont Smith and "Boo" were the robbers who were responsible for Abdullah's murder. Doc.1747-24, Ex.52. The government also withheld the name of a source who told the FBI in an interview on August 8, 2002, that Bluntly had been "asking around if anybody wants somebody murdered." Doc.1747-24, Ex.53. The source said Bluntly

23

was advertising that "he will carry out the murder for money or break someone's legs, whatever is needed." *Id*. This evidence is exculpatory and material, as it shows Bluntly was an independent actor, who could have been contracted by either party in Abdullah's robbery dispute, not an agent of Mr. Savage, but Mr. Savage was denied the opportunity to pursue this lead or present this witness at trial.

The identities of these informants help establish Mr. Savage's *Brady* allegations. Their identities are further necessary to establish the ineffectiveness of prior counsel for failing to pursue this information before trial. Mr. Savage's attorneys sought to identify the witness in the October 5, 2000, interview before trial, and the trial court concluded there was good cause to believe the witness had exculpatory information and ruled that it would conduct an *in camera* interview with the informant. Doc.1009 at 9--10 (identified as "Request Twelve of Exhibit D"). But there is no further information indicating whether this interview ever happened. If it did, Mr. Savage seeks the transcript of the *in camera* processing to determine if it includes exculpatory information (even if the witness's name is redacted). If the witness was not produced, Mr. Savage is entitled to discovery on why they were not produced and what steps were taken to produce them.

Mr. Savage also seeks all reports or notes from law enforcement interviews with David Morris. Coleman testified that Mr. Savage and Bluntly had Morris retrieve the car with Abdullah's body in it, drive it to a new location, and set the car on fire. 3/18/13 TT 173–76. Morris not only denies this, but says he was interviewed in 2003 by the FBI and denied it then as well. There is no such statement in pre-trial

24

discovery. The government acknowledges the existence of this interview, claiming in its 2255 Response that Morris could not have been an exculpatory witness for the defense because "a prior admission would have impeached him to the significant detriment of Savage's defense," claiming that "Morris' only account of what occurred was fully disclosed in discovery, on July 29, 2011, in Discovery Batch #6/Disk 1/Abdullah PPD Murder file." Doc.1795, p.69. But that discovery production contains no statement from David Morris, nor is there a statement from David Morris anywhere else in the discovery. The government should turn over any statement it has from David Morris.

### 7.    Tyrone Toliver's murder

Tyrone Toliver was shot and killed on March 14, 2003, inside Eugene Coleman's apartment on Palmetto Street. Eugene Coleman testified that Kareem Bluntly shot Toliver on Mr. Savage's order, and that Coleman's involvement was limited to witnessing the shooting and helping to move the body after. But Coleman was convicted of Toliver's murder in state court. *See* Doc.1807-1, Ex.400, 401. The government downplays that state conviction, claiming that Toliver's murder was a cold case that was "unsolved and uncharged" before the federal investigation. Doc.1795, p.84, 132–33. They claim an "errant entry" on a police form is the only evidence that Coleman was the shooter. *Id*.

Mr. Savage seeks any evidence the government has indicating this is a typo or otherwise "errant" and depositions with the living investigating state authorities (the authoring detective, Thomas Augustine, is deceased). The police form in question is a criminal complaint, signed under oath by Det. Thomas Augustine, accusing

Coleman of causing Toliver's death "by producing a firearm, without a license to carry, and firing at decedent." Doc.1807-1, Ex.400. Coleman pled nolo contendere to a lesser murder charge—third degree—but notably the DAO did not change his charge to something other than murder. Doc.1807-1, Ex.401. Further, the DAO marked the Toliver murder as cleared as soon as Coleman was arrested. Doc.1807-1, Ex.402.

Mr. Savage also seeks depositions with the district attorney's office as to any decisions made about exonerating or not exonerating Coleman for the Toliver murder after federal investigators apparently came to the conclusion that Coleman did not shoot Toliver.

Next, Mr. Savage seeks any information in the government's possession about the following telephone numbers in 2004: 267-496-5704, 267-467-3266, 215-588-1614, 267-496-2243, 267-253-4492, 215-869-9210, 215-324-304, 267-307-3897, and 215-426-0263. Coleman's cell phone records show that his phone was in contact with each of these numbers the night of Toliver's murder. *See* Kaboni Savage Trial Ex. 350. Information about these phone numbers, such as subscriber information or toll records, would either corroborate or impeach Coleman's testimony about Toliver's murder, but none were provided in discovery. Coleman's explanation of some of the surveillance video from that night relied on a phone call he claims to have received from his landlord, Mario Melendez. *See* Doc. 1746, p. 308–09. But Melendez told habeas investigators that Coleman's testimony about him from that night was a lie, and evidence that Coleman did not receive a call from Melendez that night would not

26

only bolster Melendez's recent statements but unravel Coleman's entire Toliver story. *See id.* Such evidence would establish Mr. Savage's *Brady/Giglio*, *Napue*, and IAC claims. *See id.*

Relatedly, the government provided an index of 29 phone numbers for which it gathered toll records and PEN register data, but the actual records were not provided in discovery. *See* Ex. 16. The numbers listed include at least two that appeared on Coleman's cell phone records from the night of Toliver's murder. *See* Kaboni Savage Tr. Ex. 350. These records may be in the boxes AUSA Troyer has identified as containing cell phone data but has denied habeas counsel access to. Mr. Savage seeks access to the records for all 29 phone numbers, but particularly for those reflected in Coleman's records from March 14, 2003.

Mr. Savage next seeks any record of communication between state and federal authorities about Bluntly's May 2003 questioning about the Toliver murder. Agent Lewis obtained a warrant to search Bluntly's house for evidence related to Toliver's shooting, including clothing with blood, carpet fibers, fingerprints, or other trace evidence, personal hygiene items with Bluntly's DNA, and firearms. Ex. 17. When the FBI executed this Toliver-murder-based search warrant, Agent Lewis claimed he chose not to ask Bluntly any questions about Toliver's murder and instead put him in a car to be interviewed at the police station. 3/26/13 TT 62, 74. There are no known reports, notes, or memos from Bluntly's interview with detectives that day, but Bluntly was released and not charged with Toliver's murder after that interrogation. Certainly Agent Lewis, who was actively investigating the Toliver murder at the

27

time, asked state detectives what Bluntly said in that interrogation. Bluntly had previously been an informant for Agent Lewis, further bolstering the likelihood that Agent Lewis asked about the substance of Bluntly's interrogation. *See* Ex. 17. Any notes or written communication revealing the substance of Bluntly's statements are likely exculpatory and contradict Coleman's testimony since whatever Bluntly said resulted in his release from custody instead of a murder charge. In addition to any written communications or notes about any communications, Mr. Savage seeks depositions with Philadelphia Police Detective Anthony Tomaino, who Agent Lewis identified as the other primary detective in the Toliver investigation, (3/26/13 TT 87), about Bluntly's interrogation, and Agent Kevin Lewis about what he learned about the interrogation.

Mr. Savage also seeks information about any testing conducted on the items seized in the search of Bluntly's home. *See* Ex. 18. Mr. Savage seeks information on whether any testing such as DNA was conducted and the results. Any evidence that Bluntly's DNA was *not* connected to the Toliver murder scene impeaches Coleman's testimony. If the items were not tested, Mr. Savage seeks to depose Agent Lewis as to why they were not tested, and whether Bluntly's statements influenced the decision not to test the seized items.

The lack of any reports or notes about Bluntly's May 2003 interrogation further undermines any conclusion that Toliver's state homicide file was fully disclosed pre-trial, and supports Mr. Savage's request to access it directly from the District Attorney's Office.

Mr. Savage also seeks copies of photographs that would have been expected to be within the state homicide file but were not provided in federal discovery, including from Toliver's autopsy and of the crime scene investigator's processing of the carpet in the Palmetto Street apartment crime scene. *See* 2/7/13 TT 123–27. He seeks access to physical evidence including Toliver's clothing if it still exists, and if it does not exist he seeks information about what happened to it including evidence and property logs. He additionally seeks information on any testing conducted on material gathered in the Palmetto Street search, including on the apparent blood spatter on pants. *See* Ex. 19.

The Philadelphia Police Department's "Homicide Information White Paper" for the Toliver murder investigation says that, as of April 1, 2003, "According to Homicide Interviews EUGENE COLEMAN (PPN 697717) was the last person seen with TOLIVER before he disappeared on March 14, 2003." Ex. 20. But the government turned over no reports of interviews with witnesses who said this. Mr. Savage seeks information including any reports or notes on the interviews referred to in this report.

The first record of Coleman telling law enforcement that Mr. Savage was involved in Toliver's murder was in his grand jury testimony in 2008—five years after he was first questioned about the murder and claimed that Bluntly had shot Toliver, three years after Coleman pled nolo contendere to shooting Toliver himself, three years after testifying against Mr. Savage and others in the 2005 drug conspiracy trial, and after almost two dozen law enforcement interviews. Coleman Grand Jury

Testimony, 7/16/2008, p.28–34. Although there is no record of Coleman blaming Mr. Savage for Toliver's murder before that testimony, somehow the prosecutor knew to ask Coleman questions leading to this revelation. Mr. Savage seeks discovery, including depositions, about when Coleman first said this, under what circumstances, and whether any promises were made or implied at that time.

Mr. Savage also seeks depositions regarding the break in Coleman's April 17, 2003, interrogation. *See* Doc.1746, p.585–87. Mr. Coleman's initial statement was clearly contradicted by the surveillance video. A break was called in which Coleman was shown the video, and when the statement resumed he changed his statement to match the video. *Id.* Doc.1747-23, Ex.40. Mr. Savage is entitled to know what was said during this break.

At trial, the government claimed Mr. Savage rented half of the Palmetto Street apartment and functionally controlled it, though Coleman lived in it. *See, e.g.*, 3/18/12 TT 227. The Palmetto Street apartment was the scene of the Toliver murder, and Mr. Savage's purported control over it was central to Coleman's story about Toliver's murder. During the Toliver murder investigation, PPD agents interviewed Maribel Deyne, whose name was on the Palmetto Street apartment lease. *See* Ex. 21 (Oscar Francis's FBI 302, reporting Francis said "his wife was taken to the Philadelphia Police Homicide Unit" after the murder)). Pre-trial discovery included no reports or notes from this interview, though her insight into who was using that apartment is clearly material and potentially exculpatory. Mr. Savage seeks any reports and handwritten notes from any interview with Deyne.

30

Mr. Savage also seeks the handwritten notes from any interviews with Daren Blackwell. Blackwell first told law enforcement that he saw Coleman with a gun on the day of Toliver's murder—contradicting Coleman's testimony that he did not have a gun that day. Doc.1747-48, Ex.395; 3/19/13 TT 159–60. Blackwell changed that detail, telling the FBI in 2011 that he actually did not see Coleman with a gun on the day of Toliver's murder. *See* Doc.1747-48, Ex.395. Agent Lewis was questioned about this second interview, and he remembered that the interview was "not short." 3/11/13 TT 96. Yet the 302 has just two sentences purporting to describe this interview. Doc.1747-48, Ex.395. The notes from this interview are material and exculpatory.

Mario Melendez—a key witness in the Toliver murder who contradicts much of Coleman's testimony but did not testify in trial—says he was subpoenaed to the grand jury, was not interviewed by law enforcement, and was later sent back without testifying. Doc.1747-21, Ex.24. Mr. Savage seeks information from the U.S. Attorney's Office as to whether Melendez was subpoenaed to the grand jury, whether he ever testified before the grand jury or was ever interviewed related to Mr. Savage, Coleman, the Palmetto Street Apartment, or the Toliver murder. Any statement from Melendez is material and potentially exculpatory. Further, any government decision *not* to interview Melendez when he was in their custody is exculpatory information as it raises the inference that they chose not to interview him to avoid having evidence that contradicted Coleman's story.

Mr. Savage seeks the full cooperation file for Toliver from both the Philadelphia Police Department and the FBI. In pre-trial discovery the government

provided some documents relating to Toliver's cooperation, but other discovery makes plain that other potentially exculpatory documents exist.

Toliver's cooperation against others makes it less likely that Mr. Savage was responsible for his murder. According to Coleman, Mr. Savage ordered Toliver killed not because Toliver cooperated against Mr. Savage, or anyone in his circle, but simply out of an indiscriminate hatred for anyone cooperating with the government. *See* 3/18/13 TT 222; 3/19/13 TT 19–20. Mr. Savage did not work with Toliver and would have had no particular risk from Toliver's cooperation. Coleman, on the other hand, described Toliver as his "partner" in the drug business. *See* 11/09/05 TT 273 (04CR269 (EDPA) Doc.863). Alternatively, anyone who felt specific risk from Toliver's cooperation had a motive to hire a freelancer like Kareem Bluntly to kill Toliver.

Evidence indicates Toliver's cooperation was significantly more extensive than has been thus far revealed. In his sworn affidavit seeking a search warrant to search Kareem Bluntly's home, FBI Agent Kevin Lewis revealed that Toliver had been arrested on February 14, 2003, only a month before his murder, in an extensive drug investigation which found "distribution quantities of cocaine" and a firearm. Ex. 17, at 24. No information about this arrest, the "extensive operation" behind it, or Toliver's cooperation as a result of it was provided in pretrial discovery, despite its proximity to his murder and the implications on a motive for Coleman if the drug arrest involved their joint operation.

In the same affidavit Agent Lewis states that Toliver had provided witness statements in connection with "several homicide investigations" and that Toliver

later told a state prosecutor that he wouldn't testify in one because "he feared for his life." *Id.* at 24. In pre-trial discovery, the government only provided information regarding one homicide in which Toliver gave a statement, the murder of Harry Shaw, someone with no connection to Mr. Savage. Shaw was killed in 1999, almost four years before Toliver's own murder and the case was closed with a guilty plea in 2001.

Indications of Toliver's more extensive cooperation also include an FBI 302 report from April 9, 2002, with Toliver labeled as a source in which he provided information to FBI Agents Edward Gallant and Roland Swanson about a shootout. Ex. 22. There is no other discovery about Toliver cooperating with these agents. Mr. Savage requests all documentation of any cooperation Toliver had with these or other federal agents.

Next, Mr. Savage asserts that his trial counsel was ineffective for failing to file an estoppel motion based on the federal government's directly contrary positions taken in the 2005 and 2013 trial regarding Toliver's murder. Doc.1746, p.315–18. In 2005 the federal government argued that the murder was not related to the drug conspiracy, to limit the cross-examination of Coleman by defense counsel. Doc.1747-35, Ex.267. In 2013 the federal government claimed the opposite and successfully convicted Mr. Savage on the element of the charge that required that the murder was committed for the purpose of maintaining or increasing position in the racketeering enterprise. Mr. Savage seeks any evidence that caused the federal prosecutor in the 2005 trial, Mark Ehlers, to assert that the murder was unrelated to the drug

33

conspiracy, including a deposition with Ehlers.

The government responds to this IAC claim by saying that the evidence in the Toliver murder changed between the state prosecution of Coleman in 2003–2005 and the capital trial in 2013. Doc.1795, p.84. Certainly, Coleman changed his story. Before 2008 he blamed Bluntly for killing Toliver, in 2008 he added in for the first time an accusation that Mr. Savage ordered Bluntly to do so. Other than this single change to Coleman's story, the government shows no other evidence that changed the factual circumstances. Mr. Savage seeks a discovery order for any evidence that the government claims changed the circumstances so much that Ehlers cannot be held to his 2005 position.

### 8.    Barry Parker's murder

Barry Parker was shot on February 26, 2003, while standing on the street. State authorities prosecuted Northington for Parker's murder on the theory that Northington orchestrated the shooting but did not actually commit it. Eugene Coleman testified in the state trial that Northington had someone named Kev shoot Parker because he was encroaching on Northington's drug territory, and said that Northington said after the shooting that he did not intend for Parker to die in the attack. In the federal trial, Lamont Lewis claimed he was the shooter, and Coleman attempted to downplay his previous statements about the shooter's identity to avoid contradicting Lamont Lewis.

Mr. Savage seeks any statement from Lamont Lewis where he denied involvement in the Parker murder or said he thought someone else was responsible for Parker's murder. Any such statement would, at minimum, impeach his trial

34

testimony and support Mr. Savage's misconduct claims; it would also support Mr. Savage's IAC claims. There is reason to believe such statements exist but were not disclosed because L. Lewis told a friend that he told law enforcement and prosecutors who he thought killed Parker, and that he was not involved. Doc.1747-48, Ex.381.

Further, the government denies that L. Lewis was pressured to take the blame for Parker's murder, Doc.1795, p.73, so Mr. Savage seeks interrogatories to determine who had pretrial conversations with L. Lewis and depositions of people involved in those conversations because such discovery is necessary to resolve this factual dispute.

Mr. Savage seeks discovery from Parker's arrests and any evidence, including reports, indicating that Parker was working as a confidential informant, witness, or otherwise providing information to law enforcement. Barry Parker was arrested on January 6, 2003, at 7th and Pike, less than two months before his murder and only three months after his release from federal custody. He was under supervised release, but apparently not violated for the arrest, indicating he may have been cooperating. Information about this arrest should be turned over because if it confirms that Parker was operating at 7th and Pike it would impeach several government witnesses, including Lamont Lewis's and Coleman's claims that Mr. Savage had Parker killed because he was encroaching on Northington's drug business at the corner where Parker was killed—Franklin and Luzerne. This evidence would establish a *Brady/Giglio*, *Napue*, and IAC violation. Further, evidence that Parker was operating at 7th and Pike would mean other drug dealers from that area had a motive

35

to kill him, and evidence that he was cooperating with law enforcement would mean others at risk from his cooperation likewise had a motive to kill him—all exculpatory information Mr. Savage could have used in trial to lessen the likelihood that the jury believed he was responsible for Parker's murder.

Next, in pretrial discovery batch 24, the government provided a disc with a folder labeled "Lamont Smith" which contains 302 reports from an unidentified source. Mr. Savage seeks clarification on whether the unidentified source in each document is Lamont Smith, or whether the folder also contains 302 reports from other sources that simply pertain to Lamont Smith. This information is necessary to corroborate habeas investigation and support Mr. Savage's claim that there was evidence of an alternative suspect responsible for Parker's murder. *See* Doc.1746, p.317–29.

In pretrial discovery the government provided a document containing various tips received by the Philadelphia Police Department while investigating Parker's murder. One of them, addressed to Officer Hawkins on June 18, 2005, was from Tammy Parker, Barry Parker's sister, and simply says "Shooter is Lamont 9th + Pike." Ex. 29. Mr. Savage has shown in his 2255 that the Lamont at "9th + Pike" was Lamont Russell (aka Lamont Smith) *not* Lamont Lewis. Doc.1746, p.327. As a result, this note is itself exculpatory and any documentation about the response to this note, including whether the call was returned, and whether or not this investigative lead was pursued by law enforcement (and why) is also exculpatory and should be turned over. In addition, because there is evidence of law enforcement mistaking Lamont

Russell for Lamont Lewis in other reports (*see* Ex. 30), any evidence that that PPD or the FBI misunderstood this note to be referring to Lamont Lewis is exculpatory and must be turned over because it affects the credibility of the investigation and suggests an avenue by which Lamont Lewis became a suspect for a murder he did not commit.

### 9.    Carlton Brown's murder

The government convicted Mr. Savage of paying Lamont Lewis to kill Carlton Brown in retaliation for the murder of Ronald "Pumpkin" Walston. Because the government's theory rested on this retaliation theory, any evidence that Brown did not kill Walston, or any evidence that Brown was killed for any reason other than retaliation, is exculpatory.

The conviction on this count was based almost entirely on L. Lewis's testimony. Mr. Savage argues in his 2255 motion that trial counsel could have shown he was not involved in Brown's murder if they had reasonably investigated, and that the government committed misconduct by, among other things, withholding exculpatory evidence about Brown's murder. Doc.1746, p.338–64. The discovery requested helps prove Mr. Savage's constitutional claims.

First, in addition to an order granting Mr. Savage access to the state homicide file, Mr. Savage seeks the ability to turn on the cell phone seized from Brown's body and forensically examine it or manually examine it in a black box.

Mr. Savage also requests a copy of the state's homicide file in Walston's murder. *See supra.* The government argues in the 2255 Response that evidence about Walston's murder is irrelevant because Mr. Savage was not accused of killing Walston. Doc.1795, p.144. But the relevance is clear—the government has always

alleged that Mr. Savage was retaliating against Walston's murder. *See* Doc.1746, p.340–43. Any investigative leads showing Brown may not have killed Walston are exculpatory.

Walston's homicide file is likely to reveal such information. For example, Brown's sister Theresa had children with and was engaged to Walston at the time of his death. Doc.1747-24, Ex.65. Gerald Thomas prohibited her from going into Walston's apartment and retrieving her belongings after Walston's death, saying Walston owed Thomas a drug debt. *Id.* State authorities certainly investigated this, and any evidence that *Thomas* murdered Walston makes it less likely that Mr. Savage orchestrated *Brown*'s murder as retaliation for Walston's murder. Mr. Savage is entitled to all investigative materials into Thomas's involvement in Walston's murder.

Mr. Savage also seeks a copy of the state's homicide file for Mustafa Bey, *see supra*, which the government likewise argues is irrelevant. Doc.1795, p.144. L. Lewis testified in trial that Mustafa Bey was killed while attempting to murder L. Lewis as retaliation for killing Brown, and was thus corroboration that L. Lewis did, in fact, kill Brown. 4/1/13 TT 151–54. The state's investigation into this shooting is likely to reveal that Bey's motivation for trying to kill L. Lewis was unrelated to Brown's death, which in turn undermines L. Lewis's false claim otherwise in trial.

The Court should also order the government to turn over any statement by Euguene Coleman denying knowledge of who killed Brown. While Coleman's testimony on this count was limited—only saying he heard Mr. Savage comment that

Brown was a "done deal"—any denial of knowledge is contradictory and impeaching. *See* 3/18/13 TT 195–96. The topic of Brown's murder is absent from all the 302s from Coleman's law enforcement interviews that were disclosed pretrial. Mr. Savage also seeks to depose Agent Kevin Lewis on whether Coleman was ever asked about Brown's murder and any statement he made.

Next, the government disclosed L. Lewis's recorded jail calls, in many he tells family and friends about letters he is sending. L. Lewis is recorded saying he was not involved in Brown's murder and that the prosecutors were asking him to lie and say he was. *See, e.g.*, Doc.1747-48, Ex.376, 377. He likely said the same thing in his letters. Mr. Savage seeks disclosure of all of L. Lewis's letters or emails during the pre-trial period, or at minimum any where he denies killing Brown or talks about being pressured by the government to say he killed Brown or implicate Mr. Savage.

Lamont Lewis also changed a pivotal detail between his proffer with law enforcement and his trial testimony. In his proffer he said he talked to Mr. Savage at his house the night Walston was murdered. Doc.1747-47, Ex.366. This would have been impossible as Mr. Savage was in jail and not released on house arrest until the day after Walston's murder. L. Lewis changed this detail in trial, saying he talked to Mr. Savage at his house the day after Walston's death. 4/1/13 TT 137. Mr. Savage is entitled to discovery, including depositions, about any discussion between L. Lewis and law enforcement about this detail between his proffer and testimony.

Mr. Savage seeks a complete copy of the transcripts from each of the three state trials where Lamont Lewis was tried and ultimately acquitted of Carlton Brown's

murder (Trial 1: April 17, 2006–April 26, 2006; Trial 2: October 3, 2006–October 11, 2006; Trial 3: April 10, 2007–April 13, 2007). Mr. Savage also seeks any other transcripts from this case in the government's possession, such as pre-trial hearing transcripts. Contrary to the government's claim in its 2255 Response, Doc.1795, p.136–37, the government only turned over partial copies of these transcripts in pre-trial discovery, in Batch #2 on October 19, 2009.

For Trial 1, they turned over transcripts for the first three days of trial (April 19, 20, 21 of 2006). According to the minute orders, evidence continued on April 22 and April 24, and a mistrial was declared on April 26. Ex. 23. The government did not turn over any transcripts from April 22 through April 26. Notably, the state court introduced the entire transcript from Trial 1 as a court exhibit during Trial 2. (10/5/06 transcript, p. 3). Habeas counsel sought a copy of the court file from this case and was provided a 134-page file, which did not include this court exhibit or any other transcripts. As a court exhibit, it should be in the state prosecutor's files, so Mr. Savage seeks an order for the DAO to produce this if the federal prosecutors do not have it.

For Trial 2, the government turned over transcripts for the first two days of trial (October 4, 5 of 2006). But for the third day of trial (October 6, 2006), they turned over only pages 57–116 in one electronic file, and pages 102–124 in a separate file, which collectively covered the State's rebuttal argument and the court's instructions to the jury. The missing pages appear to include live testimony, the State's closing argument, the defense closing argument, and the jury's questions and discussions of

being deadlocked.

For Trial 3, they turned over just four pages, an excerpt of one witness's testimony on April 11, 2007.

For clarity, a chart of what was turned over and what was not turned over:

| | Trial Date | Substance | Turned over in pre-trial discovery? |
|---|---|---|---|
| 1 | Apr. 19, 2006 | Openings & Evidence | Yes |
| 1 | Apr. 20, 2006 | Evidence | Yes |
| 1 | Apr. 21, 2006 | Evidence | Yes |
| 1 | **Apr. 22, 2006** | Evidence | No |
| 1 | **Apr. 24, 2006** | Evidence, Jury Charge, & Closings | No |
| 1 | **Apr. 26, 2006** | Mistrial/hung jury | No |
| 2 | Oct. 4, 2006 | Openings & Evidence | Yes |
| 2 | Oct. 5, 2006 | Evidence | Yes |
| 2 | **Oct. 6, 2006** | Evidence, Jury Charge, & Closings | Only State's rebuttal argument & jury charge |
| 2 | **Oct. 10, 2006** | Mistrial/hung jury | No |
| 3 | **Apr. 10, 2007** | Openings & Evidence | No |
| 3 | **Apr. 11, 2007** | Evidence | Only four pages |
| 3 | **Apr. 12, 2007** | Jury Charge, & Closings | No |
| 3 | **Apr. 13, 2007** | Jury Verdict | No |

It is unclear when, if ever, trial counsel reviewed these partial transcripts, but they did not seek to order these transcripts from the state court until July of 2012. *See* Doc.1747-35, Ex.273 (team emails about ordering transcripts). By that time, the court reporter had left and the recordings of the trial were missing. *See* Ex. 24.

This evidence is relevant because some of the missing transcripts include prior statements of witnesses who testified in Mr. Savage's capital trial and thus may reveal Rule 16, *Brady*, or *Jenck*'s violations. The failure to timely obtain these transcripts from the state court is also alleged as a deficient act by trial counsel—the

content of these transcripts are necessary to establish the prejudice from that deficiency.

### 10.    Coleman house fire

In the early morning hours of October 9, 2004, the Coleman family home was set on fire, killing all six inhabitants. Lamont Lewis testified that he set the fire after Mr. Savage asked him to, via a message sent through his sister Kidada Savage. Eugene Coleman, who was incarcerated and not in the home at the time of the fire, was testifying against a number of people in the federal drug trial including Mr. Savage.

Mr. Savage seeks discovery about the conversation between Lamont Lewis and law enforcement during the break in his May 18, 2011, grand jury testimony. Doc.1747-36, Ex.295 (relevant excerpt of grand jury testimony); 4/2/13 TT 17–18. L. Lewis testified before the grand jury that Kidada asked him to set fire to the Coleman house in the middle of the night because no one would be there at that time. *See id.*, *see also* 4/1/13 TT 200–01; 4/2/13 TT 15–18; 4/3/13 TT 15–18. But after he conferred with the government during a 45-minute break in the grand jury testimony, he changed his story to say that Kidada told him Coleman's mother and brother might be home. *Id.* In trial he went even further, claiming Kidada told him the middle of the night was "when everybody is in the house." 4/1/13 TT 200. Lamont Lewis testified that he met with both Agent Kevin Lewis and Prosecutor David Troyer during the 45-minute break in grand jury proceedings, describing them as "my agents, my prosecutors," but L. Lewis did not provide details on the content of that conversation. 4/2/13 TT 17–18. Mr. Savage seeks discovery on whether anyone else met with them

42

during the break, copies of any notes taken during that conversation, along with depositions on the specifics of that conversation with all parties present for this conversation, including Prosecutor David Troyer and Agent Kevin Lewis. *See also* Doc.1746, p.583–84.

There is also an indication that Lamont Lewis told law enforcement that someone other than Mr. Savage was responsible the Coleman house arson. If so, he directly contradicted his trial testimony that Mr. Savage hired him to set the fire. L. Lewis was recorded telling his friend Ant Walker that he told law enforcement who was responsible for an unnamed murder or murders, but that they came back and insisted that L. Lewis claim responsibility. Doc.1747-48, Ex.381. Other than this recorded jail call referring to the conversation, the government did not disclose anything about this conversation between L. Lewis and law enforcement. There is good cause to order this disclosure because it could have been used to impeach L. Lewis, should have been disclosed pre-trial, and may open new investigative leads.

Next, Mr. Savage seeks a copy of a wiretap recording from a conversation with Lamont Smith, Lamont Lewis, and Anthony Walthour on October 28, 2004. Doc.1747-24, Ex.59. The recording was turned over to defense counsel during trial. 4/10/13 TT 3–6; 4/11/13 TT 5–6. However, this recording was never turned over to habeas counsel and was apparently lost by trial counsel after its disclosure. Mr. Savage argues in his 2255 Motion that counsel should have used this recording for impeachment since in it L. Lewis apparently said that Mr. Savage was not involved in the Coleman house fire. Doc.1746, p.375. It is necessary to prove this IAC claim.

Mr. Savage also seeks evidence on whether Dawud Bey and Al-Shannon Muse worked for or with the government in 2004 or 2005 or were granted any government benefit when they were housed near Mr. Savage and recorded talking with Mr. Savage about numerous inculpatory topics. *See* Doc.1746, p.395–96. Neither were charged with crimes based on these recordings—even though Bey admitted to a murder in them. Bey also got a notably favorable plea deal in the drug conspiracy case at the same time that he was housed next to Mr. Savage and being recorded making such inculpatory statements. All of this is a strong indication that this evidence exists. Though the government claims Bey and Muse were not working with law enforcement, the government also falsely claimed that Kareem Bluntly was not cooperating with law enforcement when their own discovery showed he was. Section III(A)(7); Doc.1795, p.76. Such evidence would have been a basis to suppress the admissibility of the highly-prejudicial recordings, so there is good cause to order its production.

Co-defendant Robert Merritt was convicted of helping L. Lewis set the fire, based on Lamont Lewis's testimony. Merritt, however, had told agents a different version of events from that night, which federal authorities rejected as untrue. *See* 9/19/2014 Sidebar Conference (under seal). Mr. Savage has only been provided limited reports about any such statements. Mr. Savage seeks all 302s, reports, handwritten notes, or other documentation about any statements Merritt made that contradict L. Lewis's testimony, along with a deposition with Agent Kevin Lewis who was present for Merritt's statements.

Kendall Northington was questioned by Agent Kevin Lewis about his arrest with Steven Northington while in a car with a gun, gas can, rope, and latex gloves—the government claimed at trial they were headed together to burn the Coleman house, on Mr. Savage's instructions, when they were arrested. 4/9/13 TT 125–57. Kendall Northington met with a habeas investigator and said he told Agent Lewis there was no firebombing plan and he denied any involvement. This was never revealed to the defense, though at trial it could have been used to dismantle the chained inferences that Kendall and Steven Northington were involved in the arson which implied Mr. Savage was involved which corroborated Lamont Lewis's claim that Mr. Savage orchestrated it.

Next, Mr. Savage seeks all documents and material related to the FBI's investigation into the Lewis-Merrit family's arson habits and practice. In July of 2007, the FBI had an unnamed person, believed to be a cousin, wear a wire while meeting with Robert Merritt Sr. (who is Merritt's father and Lamont Lewis's uncle). *See* Ex. 25. They discussed previous arsons, revealing both that the family was known for committing insurance-fraud and related arsons, and that the FBI was actively investigating them for such practices. Evidence that the Lewis-Merritt family were in the arson business is exculpatory because makes it more likely that they instigated the Coleman house fire and less likely that Mr. Savage—who had never been involved in any kind of arson or related activity—ordered Lamont Lewis specifically to firebomb the Coleman house.

Mr. Savage also seeks the identities of a number of people who provided law

enforcement relevant information. Mr. Savage argued in his 2255 motion that counsel was ineffective for not vigorously pursuing the identities of confidential informants who could have provided valuable investigative leads or exculpatory testimony. Mr. Savage similarly argued the identities of the confidential informants are exculpatory and were unconstitutionally withheld. The identities of the informants are necessary to establish each of these claims, and any claimed safety concerns by the government about releasing their identities have now dissipated. Though the government claims the case did not "rely" on confidential informants, (Doc.1795, p.87), pretrial discovery is replete with information provided by confidential informants whose identities were never revealed to the defense.

A confidential informant in a July 2, 2004, report apparently knew intimate details about Mr. Savage's litigation plans and his family's payment to his lawyer in the first federal drug trial, so this confidential informant was someone apparently close to Mr. Savage. Ex. 26 (July 2, 2004 302). This meeting took place while Coleman was cooperating against a number of people in the drug trial, but before the Coleman house fire. If this person is as close to Mr. Savage as it appears they would be, then it undermines the government's theory that Mr. Savage and the people closest to him were orchestrating retaliation against Coleman. Instead, it supports the idea that L. Lewis committed the arson with others against whom Coleman was cooperating, or even on his own. Counsel did not request this information so it is relevant not only for *Brady* claims, but also for IAC claims.

Additionally, witnesses have disclosed to habeas investigators that federal law

46

enforcement continued to investigate the Coleman house fire after Mr. Savage's 2013 capital trial. Mr. Savage seeks an order directing the government to disclose any post-trial investigation that is exculpatory or impeaching of any evidence presented at trial or any information disclosed pre-trial. *See, e.g., Thomas v. Goldsmith*, 979 F.2d 746, 749-50 (9th Cir. 1992), *Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997) (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987)).

### 11.    Lassiter's murder

Kenneth Lassiter was shot and killed on March 19, 1998, after he crashed his car into another car on 8th and Butler streets. Witnesses described that they heard or saw Lassiter's car hit another car, saw Lassiter arguing with the person whose car he hit, and then saw that person shoot Lassiter. Mr. Savage was charged and tried for Lassiter's murder in state court and was acquitted. He was charged with Lassiter's murder again in this case and convicted.

Samuel Rosado testified that he saw Mr. Savage shoot Lassiter. 2/27/13 TT 134. But on the day of the shooting Rosado said he was inside his house and did not see the shooting. 3/11/13 TT 114–15. Rosado testified that he initially denied seeing the shooting, met with Kevin Lewis four to five times, and that he changed his story after agents threatened to involve his mentally disabled brother. 2/27/13 TT 137, 170. Mr. Savage seeks any notes from these meetings, along with a deposition with Agent Lewis about these meetings.

Samuel Rosado also testified that as soon as he saw the shooting he pushed a child named "Little Kyle" out of the way. 2/27/13 TT 131–35. No one in the neighborhood has yet been able to identify Little Kyle, and neighborhood residents

47

expressed doubt that anyone with that name lived in the area at that time. Mr. Savage seeks any evidence in the government's possession as to the identity of Little Kyle. If the government has not identified Little Kyle, Mr. Savage is entitled to discovery on the investigation taken to identify him. Evidence that the government tried and failed to identify Little Kyle is impeachment evidence and could establish a *Napue* claim.

Sherman Newton was interrogated about Lassiter's murder and whether he disposed of a gun for Mr. Savage by Agent Kevin Lewis. Doc.1747-23, Ex.28. Mr. Newton met with habeas investigators and reported that Agent Lewis's interview lasted hours, that Agent Lewis was accompanied by another federal agent and a police detective, and that Newton denied ever disposing of a gun. There are no reports from law enforcement's interview of Mr. Newton in pretrial discovery. Mr. Newton's statements denying disposing of a gun directly contradicted Coleman's statements to law enforcement at the time and should have been disclosed before trial so that counsel could have used them to impeach Coleman and show the jury that the government was ignoring leads that pointed away from Mr. Savage in its investigation.

Mr. Savage seeks a subpoena for all housing records from Curran Fromhold Correctional Facility CFCF for 2003 through March 2004, including names of all inmates and housing block assignments. There is good cause for this disclosure for two reasons. First, Lamont Lewis testified that Mr. Savage confessed to the Lassiter murder, including the only evidence of motive, while they were housed at CFCF. *See*

48

Doc.1746, p.398–99; 4/1/13 TT 127–28, 230. Mr. Savage denies this and maintains the conversation could not have happened as he testified because they were in different housing units making it impossible for them to have a private conversation in the gym. Mr. Savage alleged both ineffective assistance of counsel and government misconduct claims related to this. *See* Doc.1746, p.399–400, 441–42. Second, Johnathan Baker testified that shortly before Flowers was killed in March 2004 he was in CFCF and an unknown person told him not to testify in the Lassiter state trial. 2/27/13 TT 31. Mr. Savage alleges both government misconduct in not turning over this discovery before trial, and ineffective assistance of counsel from not investigating this statement. Doc.1746, p.402–05, 410. It was introduced as a co-conspirator statement and housing records are material to show whether anyone who was part of the conspiracy was housed in the same unit with Baker at that time.

In response to Mr. Savage's argument that defense counsel was ineffective for failing to interview Johnathan Baker, the government said that "Defense counsel's request to speak to Baker was dutifully conveyed to Baker by the prosecutors, and Baker declined to speak with them, as is his right." Doc.1795, p.87. There is nothing in the record or in the material habeas counsel has gathered about this. Mr. Savage seeks discovery on any such communication between the prosecutors and Baker, and the prosecutors and defense counsel, including the date, specific prosecutors involved, and method of communication. Mr. Savage further requests information on why prosecutors were communicating with Baker about defense investigation when Baker was not in witness protection.

Like all of the other murder counts, Mr. Savage seeks access to the H-file directly from the state authorities. There is evidence that the H-file, as produced in discovery by the federal prosecutors, was not complete. A report shows that the homicide division commanding officer requested all "radio tapes, telephone and radio transmittals" pertaining to the Lassiter shooting on the same day as the shooting. Ex. 27. These recordings were not turned over in discovery, nor were any reports describing the contents of these recordings. The crime scene photos provided in discovery are poor quality, black-and-white photocopies that make it impossible to evaluate the extent of any damage from the car accident. Ex. 28. The H-file used to prosecute the case in state court is believed to contain better quality copies of the photos from the original case investigation or even the original negatives.

### 12.    Tybius Flowers' murder

Tybius "Tibby" Flowers was shot multiple times in his car on March 1, 2004. Although Mr. Savage was incarcerated at the time, the government argued that he arranged to have Steven Northington kill Flowers so that Flowers could not testify against Mr. Savage at the upcoming state trial for the murder of Kenneth Lassiter.

Mr. Savage seeks any evidence that phone number 267-304-8069 belonged to or was associated with John Tillman. Cell site data showed this phone number was in the vicinity of Flowers' murder, and Tillman visited Mr. Savage a few days before the murder. The government claimed this number was Tillman's, and used these facts as circumstantial evidence that Mr. Savage instructed Tillman, with Steven Northington, to kill Flowers. *See, e.g.*, 3/27/13 TT 60–61, 5/3/13 TT 57, Gov. Tr. Ex. 851. However, there was no evidence in the record or in pre-trial discovery connecting

50

this phone number to Tillman. A lack of evidence tying this number to Tillman establishes Mr. Savage's *Napue* claim and related IAC claim.

Similarly, Mr. Savage requests the results of the government's subpoena for cell site data for another number, 215-873-1156, which was actually associated with Tillman. *See* Doc.1747-24, Ex.57, p.8, 12. Though subpoenaed by the government, they were never disclosed to Mr. Savage. Cell site records for a phone that was tied to Tillman could show that he was not in the vicinity of the Flowers murder, or show that he was not using both numbers—making it less likely that 267-304-8069 belonged to him.

The government also obtained cell site data for 267-978-9685, a phone associated with Franklin Allen, which was not turned over in pre-trial discovery. (See Order, *In the Matter of the Application of the U.S. for an Order Authorizing Release of Cell Site Information*, Dock. No 04-203-M, EDPA, filed Mar. 8, 2004 (sealed)). According to reports, Allen was aware that Flowers was cooperating with law enforcement and talked with others about his cooperation. Mr. Savage seeks these records.

Mr. Savage seeks information about witness interviews which he has reason to believe occurred but for which no reports were provided, including John Tillman's interview with Kevin Lewis where he denied involvement in Flowers' murder and explained he was under a curfew at that time (Doc. 1746, p.438), and all relevant statements with Tybius Flowers before his death including any where he communicated that he would not testify in the Lassiter state trial.

51

Next, Mr. Savage seeks any reports or notes from a March 3, 2004, meeting between Agent Lewis, Detective Zielinski of the Philadelphia Police Department, and an unidentified cooperating witness, where the cooperating witness said he was warned that Flowers was cooperating with law enforcement. This meeting is mentioned in an Application for an Order authorizing disclosure of cell phone information from April 16, 2004. Doc.1747-24 at p.10. Mr. Savage seeks to know the specifics of the warning, what the witness understood Flowers to be cooperating about, any further details about this warning, and who this witness communicated the warning to. This is potentially exculpatory because the government's theory at trial was that Mr. Savage learned Flowers was testifying against him when the witness list came out shortly before trial, making the timing of Flowers' murder just before his expected testimony circumstantial evidence of Mr. Savage's involvement. If Flowers' expected testimony had been well-known before then the timing of his death is no longer circumstantial evidence of Mr. Savage's involvement. Further, if Flowers was known to be cooperating in *other* cases, it supports Mr. Savage's defense that others had equal or greater motive to kill Flowers in the particular timeframe.

### B.      This Court should grant discovery regarding case-related communications with the Court that are not in the record

Mr. Savage presents several claims that involve written communications with the Court that do not appear in the record and that counsel have been otherwise unable to obtain. The Court should grant discovery so that Mr. Savage may obtain this information from the Court or from the prosecution, which would have received copies of these communications.

As alleged throughout the factual basis, Doc.1746 p.39–77, Mr. Sullivan's communication about his impending Magistrate Judge position (or lack thereof) are relevant to the claims regarding the Sixth Amendment implications of the last-minute substitution of counsel. Post-conviction counsel have obtained a smattering of emails between Sullivan and the Court regarding this matter (*see, e.g.*, Doc.1747-31, Ex.174; Doc.1747-34, Ex.244), but the available record demonstrates there were other communications that are not available. *See, e.g.*, Doc.1746, p.58 (emails referring to deputy clerk's communications in June 2012 about judge's willingness to appoint additional counsel); *Id.* at 61 (referring to off-the-record discussion on October 22). Mr. Savage seeks discovery from the Court and prosecution regarding those and any other off-the-record communications regarding the substitution of counsel.

Mr. Savage's claim in his 2255 that he was held in inhumane conditions and that his counsel failed to effectively challenge his conditions also involves documents missing from the record which have been unavailable to post-conviction counsel. *See* Doc.1746, p.443–63. In January 2010, Mr. Sullivan referred to multiple pro se requests regarding his condition of confinement (and a resulting chambers conference) which are not part of the record. Doc.1746, p.450. Another off-the-record discussion was held between the parties and court prior to a February 18, 2010 hearing. *Id.* at 451. Mr. Hoey wrote a letter to the Court on April 8, 2011 raising "material issues relating to Mr. Savage's confinement" which is not part of the record. *Id.* at 454; 4/14/11 TT 3–4. Mr. Savage sent a letter to the Court dated December 9, 2010, describing the inhumane conditions in which he was being held. That letter,

referenced in a later letter, was not docketed. *See* Doc.1746, p.454, n.130. The parties and court had yet another off-the-record conversation prior to an October 14, 2011 hearing. *Id.* at 455.   Mr. Savage seeks copies of these documents or any other information about the off-the-record communications that remain in the Court's or prosecution's possession.

### C.     The Court should order discovery related to Mr. Savage's *Batson* claim[7]

Mr. Savage argues in his 2255 that the government used peremptory strikes to remove Jurors 20 (Black man), 185 (Black woman), 263 (Black woman), and 364 (Black woman) on account of their race. Doc.1746, p.489–92. He also argued trial counsel was deficient for not preserving objections to each of these illegal juror excusals. *Id.* While one of Mr. Savage's co-defendants sought *Batson*-related discovery during trial, they did so preemptively before voir dire had begun and for that reason it was denied. *See* Doc.944. While *Batson* objections were made during trial, *see, e.g.*, Doc.788, discovery was never requested pursuant to those objections.

Mr. Savage appealed the district court's denial of his *Batson* challenge as to Juror 364, and the Third Circuit held that the district court's factual finding that the government credibly gave race-neutral reasons for her excusal was not in error.

---

[7] Mr. Savage previously filed a motion for limited disclosure of the jurors' identifies, and a motion for fair cross-section discovery. Doc.1738, 1763. This Court denied all pending motions as moot and requested Mr. Savage re-file such motions. Those motions are being re-filed, separately, as they request disclosure of information from the Court and not the Government or other parties.

*United States v. Savage*, 970 F.3d 217, 262–72 (3d Cir. 2020). That finding, of course, was based only on the record. Mr. Savage now seeks extra-record material that would go directly to that credibility finding, and to the government's reasons for excusing the other jurors not addressed on direct appeal. There is good cause to order this material because it goes directly to the government's intent in their exercise of the peremptory strikes—necessary for establishing the alleged constitutional violations. Mr. Savage seeks production of all notes (including memorandums, spreadsheets, or the like) made by each of the prosecutors and their agents during voir dire, and about any of the jury questionnaires. The Supreme Court recognizes that jury strike patterns in other cases can establish discriminatory intent in *Batson* claims. *See, e.g.*, *Miller-El v. Dretke*, 545 U.S. 231 (2005). To that end, Mr. Savage seeks a list of all federal murder cases David Troyer, John Gallagher, or Steven Miller have tried, with identification of any such trials where the defense raised a *Batson* challenge.

Mr. Savage also seeks all training manuals on jury selection and the use of peremptory strikes from the Eastern District of Pennsylvania United States Attorney's Office in use during the ten years before and after this trial.

> **D.    This Court should order discovery related to other prosecutorial misconduct claims not already addressed**

Mr. Savage alleges in his 2255 that prison inmates operating as government agents violated his Sixth Amendment rights by eliciting incriminating information from him. *See* Doc.1746, p.564–70, *see also id*. at p.395—96, 572–74. While the government denies that it instructed any inmates to elicit information from Mr. Savage, Mr. Savage presented evidence in his 2255 undermining this denial,

55

including testimony from jailhouse informant Peter Bistrian's civil lawsuit that SIS Officer William Jezior was orchestrating at least some of these conversations under direction from FBI Agent Kevin Lewis.

Mr. Savage seeks a copy of all discovery produced in Peter Bistrian's civil trial, in case 08-cv-03010-CMR. Although Bistrian was used as a witness against Mr. Savage for sentencing purposes, the information from his civil suit informs the chain-of-command in the prison and the FBI's involvement in its related operations. It is thus necessary to establish his claims regarding other witnesses including Al Shannon Muse, Dawud Bey, Michael Crosby, Bienvenido Morales, and Artavius Coleman and is relevant because it undermines the government's claim that it was not involved with instructing inmates to elicit information from him. Mr. Savage further seeks depositions with SIS Officer William Jezior and Agent Kevin Lewis as to Officer Jezior's interactions with and instructions to Al Shannon Muse and Dawud Bey, any discussions between any jail personnel and federal law enforcement agents about inmate placement and instructions to inmates to elicit information from Mr. Savage; and any benefits offered or conferred to Al Shannon Muse or Dawud Bey at the time of the jail cell recordings, after the recordings, or related to the recordings.

Mr. Savage next seeks audio recordings of three calls made from Paul Daniels, Gerald Thomas, and Oscar Francis from FDC to the Savage family landline phone in May and June of 2004. *See* Doc.1746, p.570–71. There is good cause to order production of these recordings because they may support Mr. Savage's claims that

56

the government withheld evidence showing that he was not in charge of the drug conspiracy and that others had motive and opportunity to retaliate against Coleman.

Mr. Savage also seeks any exculpatory evidence from polygraphs given to all relevant witnesses who were in the Witness Security Program. *See* Doc.1746, p.571.

Mr. Savage seeks discovery related to Lamont Lewis's reverse proffer with Agent Kevin Lewis and others in 2008. *See* Doc.1756, p.601–07. Mr. Savage maintains that Lamont Lewis molded his testimony off of information that was provided to him in that proffer session and at other times, including falsely confessing to multiple murders in order to reduce his sentence down to just 480 months despite his responsibility for many VICAR death-penalty-qualifying murders. The government claims there were no reports or notes taken during the proffer session and that Lamont Lewis did not make any statements during the session. Mr. Savage seeks discovery about what was said *to* Lamont Lewis, including any notes, outlines, plans, or written communications about the content of the proffer session, and depositions with the parties present as to the content of the information given to Lamont Lewis in the proffer session. There is good cause to produce this evidence because it may show that Lamont Lewis was given sufficient information to mold his testimony accordingly and that the government withheld such evidence in violation of *Brady*.

Mr. Savage next seeks on order disclosing the personnel files for four detectives who were involved in various investigations against Mr. Savage and who were, at later points, found to be in violation of the law and their ethical duties. *See* Doc.1746,

p.612–14. Philadelphia Police Detective Thomas Augustine was the lead detective on both the Toliver and Lassiter homicides. He was dismissed from duty for using cocaine and later faced "scrutiny ... amid repeated allegations that he coerced or forged confessions and witness testimony." Doc.1747-36, Ex.291.

Philadelphia Police Detective Kenneth Rossiter investigated the Coleman house fire. He was charged with "conduct unbecoming," alleging he falsified a record. *See* Doc.1747-36, Ex.289. Philadelphia Police Detective Edward Rocks, who investigated Toliver murder and interrogated Coleman, faced misconduct allegations. *See, e.g., Ogrod v. City of Philadelphia*, 598 F. Supp. 3d 253, 266 (E.D. Pa. 2022)). Philadelphia Police Detective Anthony Tomaino, who questioned Coleman and Bluntly, has faced allegations of misconduct, including misrepresenting witness statements to secure a wrongful conviction in a murder case. *See generally Wright v. City of Philadelphia et al*, 2:16-cv-5020 (EDPA).

Additionally, each of these detectives were involved in taking Coleman's statement about Toliver's murder, and Mr. Savage has a number of claims related to this particular statement. For this reason, the Court should also order production of the personnel file and any disciplinary records for the fourth detective involved in taking that statement, James Burke.

Alternatively, Mr. Savage asks this Court to conduct an *in camera* review of their personnel files for exculpatory or impeaching evidence. Exculpatory or impeaching evidence would establish or support Mr. Savage's *Brady/Giglio* or *Napue* claims

58

## IV.    Conclusion

Mr. Savage has good cause for each item of discovery requested, individually or cumulatively. Mr. Savage requests that this Court grant him authority to conduct discovery as set out in this motion.

Respectfully Submitted,

*/s/ Bridget L. Kennedy*
Bridget L. Kennedy
OH Bar 100802
Assistant Federal Public Defender
bridget_kennedy@fd.org
(614)-469-4141

*/s/ Natalie Olmstead*
Natalie Olmstead
OH Bar 85977
Chief, Capital Habeas Unit
Natalie_olmstead@fd.org
(614)-469-4141

Office of the Federal Public Defender
Southern District of Ohio
10 West Broad Street, Suite 1020
Columbus, OH 43215

*/s/ Ryan Norwood*
Ryan Norwood
PA Bar 332919
Assistant Federal Public Defender
Office of the Federal Public Defender
District of Nevada
411 E. Bonneville St.
Las Vegas, NV 89101
ryan_norwood@fd.org
(702) 388-6577

ATTORNEYS FOR KABONI SAVAGE

59

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed electronically through the ECF

system and notice sent to counsel of record for all parties on June 4, 2026.


*/s/ Natalie Olmstead*
Natalie Olmstead
OH Bar 85977
Chief, Capital Habeas Unit
Office of the Federal Public Defender
Southern District of Ohio
10 West Broad Street, Suite 1020
Columbus, OH 43215
Natalie_olmstead@fd.org
(614)-469-4141

ATTORNEY FOR KABONI SAVAGE