**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **KABONI SAVAGE,** | : | **NO. 07-cr-550-3** |
| **Defendant.** | : | |

# MEMORANDUM

**KENNEY, J.** **September 3, 2026**

In the early morning hours of October 9, 2004, four children and two adults were brutally murdered in a horrific firebombing of a federal witness' Philadelphia row house on North Sixth Street. The six people killed were all related to Eugene Coleman, a former drug dealer turned government cooperator who had been assisting the federal authorities with a drug trafficking case against Kaboni Savage, the kingpin of a regional drug enterprise in North Philadelphia. In maintaining and controlling his drug enterprise, Savage often resorted to violence, sometimes deadly, to intimidate those who dared to cross him. In October 2004, Savage turned his wrath on Coleman, who was a former subordinate in Savage's drug organization. Because Coleman was incarcerated at the time, Savage targeted Coleman's family members in retaliation for Coleman's decision to testify against Savage in an upcoming federal drug conspiracy trial. From behind bars, Savage directed his sister and another associate to firebomb Coleman's family home at a time when he knew Coleman's mother and brother would be in the house. Ultimately, six of Coleman's family members perished in the firebombing, including Coleman's infant son.

Savage and three of his associates were indicted and tried for each of their respective roles in the firebombing and/or various other murders perpetrated on behalf of the drug enterprise. The Government sought the death penalty against Savage. On May 13, 2013, following a three-month

jury trial, Savage was found guilty of all sixteen counts for which he was charged, which included the murders of twelve total individuals. Following the capital sentencing hearing, the jury voted to sentence Savage to death on May 31, 2013. The Third Circuit affirmed Savage's conviction and sentence in August 2020. In May 2023, Savage filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2255 (ECF No. 1746, the "Petition"), seeking to vacate his conviction and sentence for each of the sixteen counts. While the Petition remained pending, Savage's death sentence was commuted to life imprisonment by President Biden in December 2024. As a result, this is no longer a death penalty case.

Even after the commutation, however, Savage's habeas counsel have continued to brief the case as if Savage were still facing the death sentence. In addition to attacking every strategic and tactical decision that Savage's trial counsel and appellate counsel made over the course of their years-long representation of Savage, habeas counsel also challenge every other aspect of Savage's trial, from the jury selection process to the Government's disclosure of information to the District Court's rulings both before and during the trial. Following a thorough review of the claims in the Petition and a rigorous review of the record in this case, the Court finds that none of Savage's claims have merit because his counsel, the Government, and the District Court all worked diligently to safeguard Savage's constitutional right to a fair trial over the course of his lengthy jury trial. Therefore, for the reasons stated below, the Petition (ECF No. 1746) will be denied.

## I. <u>BACKGROUND</u>

The facts are drawn from the Third Circuit's summary of the case in its opinion affirming the jury's guilty verdict and sentence on direct appeal. *See United States v. Savage*, 970 F.3d 217, 232–35 (3d Cir. 2020). A longtime drug dealer in North Philadelphia, Kaboni Savage was the ringleader of a regional drug trafficking operation—called the Kaboni Savage Organization

("KSO") at trial by the prosecution—at the time that he was indicted for the offenses for which he was convicted in the underlying criminal action. *Id.* at 232. After spending his early drug trafficking career selling phencyclidine ("PCP"), marijuana, and crack cocaine, Savage started running his own drug selling business by the late 1990s. *Id.* He found particular success dealing crack cocaine when he learned to dilute the drug and recompress it to increase the quantity. *Id.*

Savage assembled a small army of loyal followers who helped grow the influence of the KSO and executed his orders without question or hesitation. *Id.* These followers included Eugene Coleman, Savage's "right-hand man," and "enforcers" Kareem Bluntly and Lamont Lewis. *Id.* As the leader of the KSO, Savage frequently resorted to violence to maintain his status and control of the North Philadelphia area. *Id.* The first murder in the underlying prosecution occurred in March 1998, when Savage was in the vicinity of competitor Tybius Flowers' drug corner. *Id.* Savage's car was accidentally bumped by a car being driven by Kenneth Lassiter, who had no connection to the KSO's drug trafficking operations. *Id.* Savage demanded that Lassiter pay for the damage to his car, but when Lassiter refused, Savage pulled out a gun and shot him dead. *Id.* Flowers witnessed the murder. *Id.* at 233.

The next murder occurred in September 2000, when Mansur Abdullah, a drug dealer who worked for Savage, was killed by Savage's enforcer, Kareem Bluntly. *Id.* Savage had come to suspect that Abdullah was overcharging him on cocaine and directed Bluntly to shoot Abdullah while accompanying him back to his home after receiving payment from Savage for a cocaine supply. *Id.* Coleman was then instructed to confirm that Abdullah was indeed dead. *Id.*

Carlton Brown was the next victim of Savage's violence. Although Brown was part of Savage's drug dealing circle, Savage believed that Brown had killed one of Savage's closest friends, Ronald Walston, so Savage instructed his other enforcer, Lamont Lewis, to kill Brown.

*Id.* Lewis did so. *Id.*

Lewis also killed Barry Parker at Savage's direction. *Id.* Parker was killed for attempting to take over the drug corner of Steven Northington, one of Savage's drug dealers and a co-defendant in the underlying prosecution. *Id.* On February 26, 2003, after receiving orders from Savage to "handle your business," Lewis and Northington left Savage's house and went to Parker's drug corner, whereupon Northington identified Parker and Lewis subsequently shot Parker several times in the chest, causing his death. *Id.* (record citation omitted).

Savage harbored a particular hatred for individuals he believed to be cooperating with law enforcement. In March 2003, Savage suspected that Tyrone Toliver, a friend of Coleman's, was a "snitch." *Id.* (record citation omitted). Toliver sought Savage out to obtain a supply of cocaine from Savage, who agreed to help and told Coleman to take Toliver to Coleman's apartment. *Id.* Bluntly showed up at the apartment shortly after and proceeded to shoot Toliver in the head, killing him. *Id.* Savage then instructed Bluntly and Coleman to dispose of Toliver's body. *Id.*

In 2004, Savage was prosecuted in state court for Lassiter's murder. *Id.* at 234. One of the key witnesses for the prosecution was Tybius Flowers, who saw the murder take place. *Id.* In the lead up to trial, Savage had Flowers murdered by his enforcers, and with no eyewitnesses at trial, Savage was acquitted of Lassiter's murder. *Id.* Although Savage was released for Lassiter's murder, he was arrested by federal authorities on drug trafficking charges one week later. *Id.* While detained, Savage was furious to learn that Coleman, who at this point was also in jail, was assisting the federal government. *Id.*

Through communications with his sister Kidada Savage,[1] who was also one of Savage's

[1] To differentiate between the two Savage siblings, the Court will refer to Kaboni Savage by his last name, Savage, and Kidada Savage by her first name, Kidada, throughout this Memorandum Opinion.

co-defendants in the underlying prosecution, Savage instructed Lewis to firebomb Coleman's family home in retaliation for Coleman's cooperation with the Government. *Id.* On the evening of October 8, 2004, Kidada drove Lewis to the block where Coleman lived and pointed out Coleman's house to Lewis. *Id.* Kidada and Lewis knew at the time that Coleman's mother and brother would be in the house that night. *Id.* At approximately 4:00 a.m. the following morning, Lewis and his cousin, Robert Merritt (who is another co-defendant in the underlying prosecution), filled two cannisters with gasoline, lit one, and threw both cans into Coleman's house after Lewis kicked in the front door. *Id.* This caused an explosion and the resulting fire killed all six occupants in the house at the time: Coleman's mother, Marcella Coleman; Coleman's 15-month-old son, Damir Jenkins; Coleman's twin brother's fifteen-year-old son, Sean Rodriguez; Coleman's sister's twelve-year-old son, Tajh Porchea; Coleman's cousin, Tameka Nash; and Tameka's ten-year-old daughter, Khadijah Nash. *Id.* at 235.

Upon completing the firebombing, Lewis called Kidada and left a message that Savage's order had been carried out. *Id.* Lewis later learned that four children had died in the fire and confronted Kidada about the children's deaths. *Id.* Recordings of Savage's prison conversations following the firebombing revealed that not only was Savage complicit in the firebombing but also that the resulting murders filled Savage with glee. *Id.* They also revealed further threats by Savage to kill other witnesses and their families. *Id.* Savage's continued threats were so troubling that in February 2007, the United States Attorney General authorized the Bureau of Prisons to impose Special Administrative Measures ("SAMs") to restrict Savage's communications with individuals outside of prison, in an effort to protect the public from Savage's penchant for violence. *Id.*

On May 9, 2012, a grand jury in the Eastern District of Pennsylvania returned the Fourth Superseding Indictment in this case, which charged Savage with one count of RICO conspiracy,

twelve counts of murder in aid of racketeering, one count of conspiracy to commit murder, one count of retaliation against a witness, and one count of using fire in the commission of a felony.[2] *Id.* Savage's trial began on February 4, 2013, following an extensive three-month voir dire and jury selection process. *Id.* at 236. On the fifty-fifth day of trial, the jury returned a verdict finding Savage guilty of all counts. *Id.* The penalty phase of Savage's trial then took seven more days, after which the jury unanimously voted to sentence Savage to death on each of the thirteen eligible counts. *Id.* Savage appealed his conviction and sentence to the Third Circuit, which affirmed his conviction and upheld his sentence of death. *Id.* at 232. Savage's petition for a writ of certiorari was denied by the United States Supreme Court. *Savage v. United States*, 142 S. Ct. 481 (Mem) (2021). On December 24, 2024, President Biden issued an executive grant of clemency, thereby commuting Savage's death sentence to life imprisonment without the possibility of parole. ECF No. 1783.

On May 15, 2023, Savage filed the instant Petition. ECF No. 1746. On November 6, 2025, the above-captioned case was reassigned from Judge Surrick to this Court. ECF No. 1787. After being ordered to do so, the Government filed its response to the Petition on December 19, 2025. ECF Nos. 1788, 1795. Savage filed a reply on February 13, 2026. ECF No. 1807. Accordingly, the Petition is ripe for adjudication.

## II. LEGAL STANDARD

An inmate in federal custody may challenge the validity of his sentence under 28 U.S.C. § 2255 by filing a petition for a writ of habeas corpus. *See Okereke v. United States*, 307 F.3d 117, 120 (3d Cir. 2002). Pursuant to 28 U.S.C. § 2255, a court may "vacate, set aside or correct" a

[2] A witness tampering count was later dismissed by the District Court before trial. *Savage*, 970 F.3d at 235 n.3.

sentence that "(1) was imposed in violation of the Constitution or laws of the United States; (2) was imposed by a court lacking jurisdiction; (3) was in excess of the maximum authorized by law; or (4) is otherwise subject to collateral attack." *United States v. Small*, 747 F. Supp. 3d 817, 821 (E.D. Pa. 2024) (first quoting 28 U.S.C. § 2255(a); then citing *United States v. Addonizio*, 442 U.S. 178, 180 n.1 (1979)). "A section 2255 petition is not a substitute for an appeal[,] nor may it be used to relitigate matters decided adversely on appeal." *Gov't of V.I. v. Nicholas*, 759 F.2d 1073, 1074 –75 (3d Cir. 1985) (citations omitted).

The court accepts the truth of the petitioner's allegations when reviewing a § 2255 motion unless those allegations are "clearly frivolous on the basis of the existing record." *United States v. Booth*, 432 F.3d 542, 545 (3d Cir. 2005) (citation omitted). A court is required to hold an evidentiary hearing when the "petition allege[s] any facts warranting relief under § 2255 that are not clearly resolved by the record." *United States v. Tolliver*, 800 F.3d 138, 141 (3d Cir. 2015) (quoting *Booth*, 432 F.3d at 546) (alteration in original). However, "bald assertions and conclusory allegations do not provide sufficient ground[s] . . . to require an evidentiary hearing." *United States v. Donahue*, 792 F. App'x 165, 168 (3d Cir. 2019) (citation omitted).

Claims for ineffective assistance of counsel are governed by the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (acknowledging that *Strickland* governs claims for ineffective assistance of counsel). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness" such that petitioner was effectively denied "counsel" as guaranteed by the Sixth Amendment, with reasonableness being judged by the professional norms prevailing at the time that counsel rendered assistance. *Strickland*, 466 U.S. at 688, 690. In evaluating the reasonableness of counsel's performance, courts

"must be highly deferential" and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. In evaluating the reasonableness of counsel's performance, courts "must be highly deferential" and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Under the second *Strickland* prong, a petitioner must demonstrate that counsel's errors were prejudicial—that is, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome." *Id.* at 694. Further, "[t]he effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial: 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989) (quoting *Strickland*, 466 U.S. at 696). In ruling on a § 2255 petition, the court may address the prejudice prong first "and reject an ineffectiveness claim solely on the ground that the defendant was not prejudiced." *Rolan v. Vaughn*, 445 F.3d 671, 678 (3d Cir. 2006).

For claims of prosecutorial misconduct "to merit a reversal, . . . [the] Court must find that it is more probable than not that the alleged misconduct influenced the jury's ultimate verdict." *United States v. Bates*, 46 F. App'x 104, 110 (3d Cir. 2002) (citations omitted). Relief for prosecutorial misconduct is appropriate "when the prosecutor's misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *United States v. Walker*, Nos. 94-488, 99-584, 2000 WL 378532, at *10 (E.D. Pa. Apr. 4, 2000) (citing *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). "[F]or due process to have been offended, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's

right to a fair trial." *Werts v. Vaughn*, 228 F.3d 178, 197–98 (3d Cir. 2000) (quoting *Greer v. Miller*, 483 U.S. 756, 765 (1987)).

## III. DISCUSSION

In his Petition, Savage raises thirty-one claims for relief, spanning five different categories: (1) four claims for denial of right to counsel; (2) eleven claims for ineffective assistance of trial counsel; (3) one claim for ineffective assistance of appellate counsel; (4) nine claims for prosecutorial misconduct; and (5) six claims for other constitutional or statutory violations. *See* ECF No. 1746. However, because eleven of the claims contain multiple sub-claims (and sometimes sub-sub-claims), the Petition actually raises a total of 161 claims. In crafting the 715-page Petition, Savage's habeas counsel appear to have taken a "throw-spaghetti-at-the-wall-and-see-what-sticks" approach (which, ironically, is what habeas counsel accuse Savage's trial counsel of doing in their trial preparation, *id.* at 556), arguing that Savage's trial and appellate counsel should not have employed the strategies that they did while simultaneously arguing that his counsel should have undertaken other tactics that they did not do. Rather than focusing their efforts on a select number of claims that may turn out to be meritorious, Savage's habeas counsel leave the Court to find a needle in a haystack that may entitle Savage to habeas relief. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). In reviewing the record in this case, however, the Court could not find such a needle. As such, Savage's Petition is denied in its entirety.

The Court will address each of the five categories of claims in turn.

### A. Denial of Right to Counsel Claims

#### 1. *Claim 1: Hand-off Between Tim Sullivan and William Purpura*

In Claim 1, Savage argues that he was denied his constitutional right to counsel when his

first learned counsel, Tim Sullivan, "abandoned" the case during jury selection and handed the case to his second learned counsel, William Purpura, "on the eve of trial knowing nothing about it." ECF No. 1746 at 42. In his direct appeal to the Third Circuit, Savage had already raised this claim, though couched in slightly different terms. Instead of arguing, as he does here, that his Sixth Amendment right to counsel was violated by his trial counsel's ineffectiveness in relation to the substitution of counsel, ECF No. 1807 at 6–10, Savage argued on direct appeal that "he was denied his Sixth Amendment right to counsel because the District Court waited until four days before voir dire began to substitute new lead counsel," *Savage*, 970 F.3d at 242. While the Third Circuit's opinion on direct appeal focused on the actions of the district court, the Third Circuit ultimately concluded that "Savage did not suffer a constructive denial of counsel" because "there was no structural error" despite the fact that Purpura was appointed to replace Sullivan as learned capital-qualified counsel shortly before Savage's trial began. *Id.* at 248. In so concluding, the Third Circuit explained that the following facts undermined Savage's claim for constructive denial of counsel:

> First, Purpura was an experienced capital-qualified counsel. Second, Purpura relied on his experience in representing to the District Court that he could get "up to speed" in time for trial. Third, neither Purpura nor Savage himself moved for a continuance or indicated that Purpura was unprepared to proceed to trial. Given that capital defense counsel are not, as a rule, timid creatures, we have every reason to believe that if Purpura thought he needed additional time to prepare, he would have moved for a continuance. Fourth, although Purpura was lead counsel and the only capital-qualified counsel, [Christian] Hoey had been a member of Savage's defense team for several years, and he remained on the team to assist Purpura in both preparing and trying the case. Fifth, it is reasonable for us to infer that Purpura inherited some work product from Sullivan and Hoey. Sixth, and most importantly, our careful examination of the record confirms that Purpura provided Savage with zealous representation throughout trial. In fact, it is unclear to us what more Purpura could have done had he requested and received additional time to prepare.

*Id.* at 248 (citations omitted).

In his Petition, Savage attempts to re-package his previously litigated constructive denial of counsel claim as an ineffective assistance of counsel claim, arguing that the claim before the

Third Circuit was based solely on the district court's actions (i.e., the "district court's repeated mishandling of Sullivan's withdrawal"), whereas the claim here is for ineffectiveness of trial counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), or *United States v. Cronic*, 466 U.S. 648 (1984). ECF No. 1807 at 7–8. However, both claims arise from the same underlying premise: that Savage suffered from a constructive denial of counsel because the substitution of new learned counsel occurred days before Savage's trial began such that Purpura was unprepared to take over for Sullivan as lead counsel. ECF No. 1746 at 42. It is this premise that the Third Circuit addressed at length in its opinion affirming Savage's conviction and sentence. *See Savage*, 970 F.3d at 244–48. In reaching its determination that there was no constructive denial of counsel, the Third Circuit conducted a *Cronic* analysis, recognizing that the "constructive denial of the assistance of counsel requires per se reversal." *Id.* at 244. Pursuant to *United States v. Cronic*, the actual prejudice prong of the *Strickland* standard for an ineffective assistance of counsel claim is presumed to be met in cases "in which the surrounding circumstances make it unlikely that the defendant could have received the effective assistance of counsel." 466 U.S. at 666. The Third Circuit cited this exact standard and proceeded to thoroughly evaluate the circumstances surrounding Purpura's substitution as lead counsel, *Savage*, 970 F.3d at 247–48, and only after a consideration of "all the attending circumstances" did the Third Circuit conclude that Savage suffered no constructive denial of counsel, *id.* at 248.

Because the Third Circuit has already addressed the circumstances surrounding the substitution of Savage's learned counsel in the lead-up to his trial, this Court will not rehash the Third Circuit's assessment. Savage's "now-presented outside-the-record evidence" fails to resuscitate his claim for constructive denial of counsel because the bar is high for establishing a *Cronic* claim and the new evidence that is being offered does not alter "the attending

circumstances" that the Third Circuit evaluated on direct appeal. ECF No. 1746 at 60–82; *Savage*, 970 F.3d at 248. In *Cronic,* the Supreme Court held that the facts of the case at hand—that respondent's newly appointed attorney was young, his principal practice was in real estate, that it was his first jury trial, and that he was only allowed 25 days for pretrial preparation for a $9.4 million mail fraud case—did not rise to the level of a constructive denial of counsel. 466 U.S. at 665–66. Here, Savage's replacement counsel, Purpura, was an experienced capital-qualified counsel, represented to the District Court that he could get "up to speed" in time for trial, inherited work product from Savage's prior counsel, Sullivan, and worked together with Hoey, who had been a member of Savage's defense team for several years. *Savage*, 970 F.3d at 248. If the circumstances in *Cronic* did not rise to the level of a constructive denial of counsel, then the circumstances surrounding the substitution of Savage's lead counsel certainly do not constitute a constructive denial of counsel, as the Third Circuit recognized. In any event, Sullivan and Purpura were brought on as experienced capital counsel primarily to prepare for Savage's capital sentencing, which is a moot issue at this juncture now that Savage's death sentence has been lifted. *See* ECF No. 1746 at 43. Hoey, who was a member of Savage's trial team and worked with both Sullivan and Purpura, "focused almost entirely on the guilt phase" and thus provided consistent representation for Savage, notwithstanding the substitution of his lead learned counsel. *Id.*

For the reasons stated, Claim 1 is denied. The Court will not presume actual prejudice resulting from Sullivan's transition of Savage's case to Purpura four days before the start of voir dire. Therefore, Savage can "make out a claim of ineffective assistance only by pointing to specific errors made by trial counsel" and a showing of actual prejudice. *Cronic*, 466 U.S at 666 & n.41.

**2. *Claim 2: Personal and Professional Conflicts of Sullivan and Purpura***

In Claim 2, Savage argues that he was denied his right to counsel because both Sullivan

and Purpura had personal and professional conflicts of interest that adversely affected their performance. ECF No. 1746 at 82–87. With respect to Sullivan, Savage contends that his magistrate judge selection in January 2011 presented "a conflict of interest between his personal interests and his duties towards Mr. Savage," *id.* at 83, while Purpura's conflict of interest resulted from his "wish[] to try a high-profile capital case," *id.* at 85. In advancing these arguments, Savage presents the opinion of an outside law professor, W. Bradley Wendel, who was retained by Savage's habeas counsel and has no connection to either Sullivan or Purpura or any other member of Savage's trial team. ECF No. 1747-13. Professor Wendel opines that both Sullivan and Purpura had personal interests that adversely affected their performance as Savage's counsel; he offers this opinion without having interviewed either Sullivan or Purpura, basing his conclusions on a small handful of materials provided to him by Savage's habeas counsel. *Id.* at 1. Thus, Professor Wendel's conclusions, along with Savage's arguments in the Petition that they purport to bolster, are mere speculations that do not hold any water.

As the Government points out in its response, Sullivan's appointment as a magistrate judge was contingent on the confirmation of a sitting magistrate judge to the district court bench and thus, "was anything but certain" "in the Fall of 2012, a Presidential election year, at a time when federal judicial confirmations typically become stalled and die on the vine," so "it was anything but certain that Sullivan would have to leave the case." ECF No. 1795 at 60, 61. Indeed, nearly two years passed from the time that Sullivan was selected as a magistrate judge in January 2011 to the time that he left the case in December 2012. Savage fails to explain in his Petition how "Sullivan's impending new job left him distracted and disengaged from his responsibilities in Mr. Savage's case" for a period of almost two years. ECF No. 1746 at 82. Savage points to how much Sullivan billed during this period ("over $150,000 (not including expenses) for his work between

January 2011 and May 2012" and $125,000 from June through December 2012), complaining that during this time, "he had done very little to guide and conduct the mitigation investigation that was his responsibility." *Id.* at 84. However, Sullivan's billing amounts represent approximately 1,571 hours of work that he expended on the case.[3] This suggests that contrary to Savage's assertions, Sullivan actually did a great deal of work on the case and was in fact not distracted from his responsibilities as Savage's attorney by his pending judicial appointment.

As to Purpura's alleged conflict of interest, Savage's claim is even more speculative, arguing that "Purpura knew his continued appointment required him to remain in the good graces of both Sullivan and the Court" and that "[e]ven after Sullivan left, Purpura had a professional interest in currying favor with him, as he became a judge in Purpura's home district." *Id.* at 85. These contentions are merely speculative and do not explain how these alleged conflicts adversely affected Purpura's performance as Savage's trial counsel. In fact, Savage represents that Purpura billed "more than $280,000 for a little more than 6 months of work (not including travel expenses and additional work following the death verdict)," *id.*; this amounts to approximately 1,600 hours of work.[4] The record also reflects that Purpura represented Savage zealously at trial and was fully involved in both the guilt and penalty phases. *See, e.g.*, TT 4/1/2013 at 224–76; TT 4/2/2013 at 10–222; TT 4/8/2013 at 91–155; TT 4/22/2013; TT 5/28/2013.

Savage has failed to show that Sullivan and Purpura had conflicts of interest that adversely affected their performance at all, much less that their performance was so impacted such that it amounted to a constructive denial of Savage's constitutional right to counsel. As such, Claim 2 is

[3] This calculation is based on Sullivan's billing rate of $175 per hour as CJA appointed learned counsel. ECF No. 1746 at 83.

[4] As with Sullivan, this calculation is based on Purpura's billing rate of $175 per hour as CJA appointed learned counsel. ECF No. 1746 at 83.

denied. The Court will not presume actual prejudice resulting from Sullivan's and Purpura's alleged conflicts of interest. To state a claim for Sullivan's and Purpura's ineffectiveness as trial counsel, Savage must show that actual prejudice resulted from their purported errors.

### 3. *Claim 3: Trial Counsel's Cooperation with Kidada Savage's Counsel*

In Claim 3, Savage argues that he was denied his right to counsel because his trial counsel cooperated with his sister's counsel and in doing so, made choices that were adverse to his own interests. ECF No. 1746 at 254–71. Savage's habeas counsel contend that his trial counsel could have pointed to Kidada and Lamont Lewis as the orchestrators of the firebombing, maintaining that Savage himself played no part in the firebombing and certainly did not order it. *Id.* at 256–57. This argument is disingenuous in light of all the evidence presented by the prosecution at trial inculpating Savage, including Lewis' testimony, the pre-firebombing recorded FDC phone calls between Savage, Kidada, and Lewis, and Savage's post-firebombing statements expressing his satisfaction with the deaths of the Coleman family members. *Savage*, 970 F.3d at 234–35.

Because Savage did not object at trial to the supposed cooperation between his counsel and Kidada's counsel, he must show that there existed an actual conflict of interest that negatively impacted his attorneys' performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980) ("[A] defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."). "An actual conflict of interest 'is evidenced if, during the course of the representation, the defendants' interests diverge with respect to a material factual or legal issue or to a course of action.'" *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir. 1988) (quoting *Sullivan v. Cuyler*, 723 F.2d 1077, 1086 (3d Cir. 1983)).

Savage cannot show that his and his sister's interests diverged in the lead-up to or during their trial. While Savage's habeas counsel propose now that his trial counsel should have defended

Savage at trial from the firebombing charge by pointing to Kidada's independent culpability, ECF No. 1746 at 265, nothing in Savage's Petition suggests that at the time of trial, Savage and his sister were not united in their defense and that Savage was even open to placing blame for the firebombing upon his sister in order to exonerate himself. Without sign-off from their client, Savage's attorneys' hands were tied in the defense they could put on at trial. In fact, nothing in the record even remotely indicates that Savage's interests were not aligned with his sister Kidada's interests. However, Kidada had indicated that she wanted to distance herself from her brother at trial. Kidada and co-defendant Northington filed motions to sever, seeking individual trials because they were each charged with only a subset of the crimes for which Savage was charged.[5] *United States v. Savage*, 85 F.4th 102, 118 (3d Cir. 2023) [hereinafter "*Savage II*"]. Savage, on the other hand, did not seek to sever his trial from Kidada's, only filing a motion to sever his trial from Northington on account of Northington's disruptive behavior in the courtroom. ECF No. 883. Savage's actions, or inaction in this case, therefore show that his interests did not diverge from Kidada's interests with respect to their joint defense at trial.

Savage's habeas counsel's exhortations to the contrary are without merit. First, habeas counsel argue that Savage's trial counsel should have cross-examined Larry Harcum because his testimony brought in unfavorable evidence against Savage. ECF No. 1746 at 257–58. Savage states, without support, that his trial counsel's "only reason not to undermine or impeach Harcum was to protect Kidada." *Id.* at 258. However, even though Harcum's direct examination was led by Kidada's attorneys, Harcum was still a defense witness, and Savage's trial counsel's decision not to cross-examine him represented a strategic choice to present a united front to the jury.

[5] Kidada and Northington's motions to sever were denied by the District Court. *Savage II*, 85 F.4th at 118. The Third Circuit held that the District Court did not abuse its discretion in denying the motions. *Id.*

Second, habeas counsel contend that Savage's defense was harmed by his trial counsel's reliance on Kidada's and Merritt's legal teams to review calls from Lewis for potential impeachment evidence. *Id.* at 262–63. In so arguing, however, Savage does not identify how his trial counsel's cross-examination of Lewis at trial was deficient or failed to adequately impeach Lewis with respect to the other murders for which Savage was charged. *See id.* As such, Savage cannot show that his trial counsel's decision to share discovery review responsibilities with his co-defendant's legal teams was anything other than a strategic organizational choice in light of the vast amount of discovery that needed to be reviewed.

Third, habeas counsel fault Savage's counsel for failing to follow up with a potential witness named Eric Johnson, who was interviewed by one of Kidada's attorneys. *Id.* at 264. However, the email provided by Savage to demonstrate the purported value of Johnson's testimony actually reveals that Johnson was very hesitant to speak to Kidada's attorneys at all and that the decision by Kidada's attorneys not to send other investigators to speak with Johnson was to avoid spooking him since he was "very paranoid" and "was very guarded with what and how he said things." ECF No. 1747-36 at 1. Further, Johnson had his own attorney and was on supervised release at the time of this interview, *see id.*, so the odds of Johnson even being willing to testify on Savage's behalf and not invoking the Fifth were low. The evidence put forward by habeas counsel indicates that Savage's trial counsel did not send investigators to speak with Johnson because Johnson himself did not want to talk to anyone else. *See id.* At any rate, the information that Kidada's attorneys did obtain from Johnson did not explain the basis of Johnson's assertion that Savage "was not involved in the bombing" or indicate whether Johnson's claim was credible. *See id.* Thus, all the circumstances surrounding Johnson's interview lead the Court to conclude that Savage's attorneys' decision not to follow up with Johnson was strategic, especially given the

limited amount of resources and time that they had to investigate other exculpatory evidence and witnesses who were better able to testify on Savage's behalf. And finally, any arguments regarding the adverse impact to Savage's counsel's performance during the penalty phase of the trial are moot now that Savage is no longer facing the death sentence.

In any event, as Kidada was only indicted for offenses related to the firebombing of the Coleman house, even if there was a conflict of interest caused by the cooperation between Savage's counsel and Kidada's counsel (and the Court finds no evidence of such conflict), the adverse impact would only pertain to Savage's conviction for the firebombing and would not reach his convictions for the other murders and RICO-related offenses. All of Savage's other murder convictions carried the same penalty as his conviction for the firebombing: he was sentenced to death for Counts Two through Seven. However, the Court does not need to entertain any arguments regarding how the supposed cooperation between Savage's and Kidada's legal teams impacted Savage's counsel's performance with respect to the six other murder counts. Because the Court finds that Savage has failed to establish that his and his sister's interests diverged either before and/or during their trial, the Court determines that there was no actual conflict arising from the teamwork between Savage's and Kidada's attorneys. As such, Claim 3 is denied.

#### 4. *Claim 4: Savage's "Inhumane and Tortuous" Pretrial Conditions*

In Claim 4, Savage argues that "[t]he government held Mr. Savage for more than two years prior to his trial under extraordinarily inhumane, degrading, and intrusive conditions," which "denied Mr. Savage his constitutional right to effectively consult with counsel and led to a fundamentally unfair trial." ECF No. 1746 at 462. The conditions complained about included "a filthy, dangerous facility under continuous solitary custody, with no contact with other inmates and almost no contact with his loved ones, with no access to fresh air, and with a light on in his

cell 24 hours a day." *Id.* at 463. Notably, however, Savage's habeas counsel conveniently omits the reasons why such restrictive measures were put in place for Savage's pretrial detention. As recounted by the Government in its response, the SAMs were imposed on Savage because allowing him to make unmonitored phone calls and interact with other inmates and friends/family carried an unreasonably high risk to the public after Savage voiced his approval of the deaths of the Coleman family and threatened to retaliate against more witnesses from behind bars. ECF No. 1795 at 63. The issue of the reasonableness of the SAMs occupied much of the District Court's time, and the record reflects that the District Court conducted multiple pretrial hearings and considered an abundance of evidence prior to maintaining the SAMs, making every effort to protect Savage's right to counsel. *See id.* at 64. The District Court confirmed that the SAMs were necessitated by Savage's own behavior:

> [T]he SAM was imposed because of the gravity of your instant offense, including conspiracy to manufacture and distribute cocaine, money laundering, threatening witnesses, and threatening to retaliate against witnesses. While in general population, you continued to threaten to kill federal agents, prison officials, witnesses and their families, as well as other hostile activity. The basis for the imposition of a SAM on you was directly related to your behavior and the substantial risk your communications or contacts with other persons pose.

*United States v. Savage*, No. 07-cr-550-03, 2010 WL 4236867, at *3 (E.D. Pa. Oct. 21, 2020) (citation omitted). The District Court even allowed Savage to be returned from MCC-Manhattan to FDC-Philadelphia, but Savage proved that he could not be trusted to remain in FDC by circumventing the SAMs' restrictions, making unmonitored phone calls to criminals and instructing his friends to disguise their mail as legal correspondence to avoid inspection by prison officials. *Id.*

Aside from failing to address the rationale behind the imposition of the SAMs, Savage's habeas counsel do not explain why Savage was unable to correspond with his attorneys by mail or

cite to any case law providing that criminal defendants' entitlement to private consultation with counsel must be face to face. *See* ECF No. 1746 at 261–64. Savage's SAMs were not unique, and district courts across the country have found that similar SAMs imposed on pre-trial detainees do not impair a defendant's ability to participate in the preparation of his own defense. *See, e.g., United States v. Ali*, 396 F. Supp. 2d 703, 704, 710 (E.D. Va. 2005) (finding that SAMs imposed on pretrial detainee indicted on terrorism-related charges did not interfere with his ability to aid his own defense even though the SAMs confined him to solitary confinement and restricted his access to phone calls and visitors); *United States v. Mohamed*, 103 F. Supp. 3d 281, 295 (E.D.N.Y. 2015) (finding that SAMs imposed on defendant indicted for murder of an internationally protected person were reasonable where the SAMs confined him to the Special Housing Unit at MCC-Manhattan, allowed for monitoring of attorney-client communications, and set restrictions on legal telephone calls); *United States v. Hashmi*, 621 F. Supp. 2d 76, 86 (S.D.N.Y. 2008) (holding that SAMs imposed on defendant charged with terrorist-related activities did not violate his right to counsel where the SAMs prevented him from speaking to anyone other than his attorney on the phone, required precleared translators, and allowed for the recording of conversations with other inmates).

A review of the SAMs imposed upon Savage establishes that the SAMs did not deny him his right to counsel as they provided for "legally privileged telephone calls" and the provision of documents by his attorneys. *See* ECF No. 137-4 at 5–7. During Savage's pretrial detention period, the District Court had addressed multiple times the reasonableness of the SAMs imposed on Savage, concluding that the SAMs did not interfere with Savage's right to counsel. *See* ECF Nos. 163, 360. However, the District Court did on occasion grant certain of Savage's requests to modify the SAMs, for example, by permitting court-appointed fact investigators to meet with Savage

without an attorney present and allowing fact investigators to disseminate the contents of his communications to other members of his defense team. ECF No. 360. This Court will not second-guess the District Court's prior rulings on the reasonableness of the SAMs, and finds that the SAMs were not so restrictive as to interfere with Savage's right to counsel and deny him the right to a fair trial. Accordingly, Claim 4 is denied.

### B. Ineffective Assistance of Trial Counsel Claims

#### 1. *Claim 5: Presentation of Penalty Phase of Trial*

Claim 5 and all its sub-claims are now moot since Savage's sentence of death has been commuted to life imprisonment.

#### 2. *Claim 6: Presentation of Guilt Phase of Trial*

In Claim 6, Savage argues that his trial counsel "were ineffective in the preparation for and presentation of the guilt/innocent phase of trial." ECF No. 1746 at 14. Rather than focusing this claim on a few errors that may actually present some merit, Savage essentially attempts to poke holes in every single thing that trial counsel did in investigating and defending his case at trial. The result is a collection of thirty-six sub-claims that are contradicted by the record, raise frivolous issues, and/or fail to demonstrate any prejudice suffered. The record reflects that Savage's trial counsel were meticulous in their preparation for trial and thoroughly challenged the Government's presentation of evidence and witnesses at trial, providing Savage with an excellent defense and leaving no stone unturned in their efforts to defend Savage in this complex and difficult case involving multiple capital murder charges. Certainly, trial counsel were anything but ineffective.

For the reasons stated at length below, the Court finds that Savage's claims for ineffective assistance of trial counsel are meritless. Claim 6 is denied. The Court will explain in sequence how each sub-claim falls short. Each sub-claim is recited verbatim from the Petition. ECF No. 1746 at

14–18.

**Claim 6A:** Trial Counsel were ineffective for failing to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. This failure deprived Mr. Savage of his right to counsel and his right to a fair trial under the Sixth Amendment. Mr. Savage was prejudiced by this failure. Had counsel investigated, they would have been able to both discredit the two primary government witnesses, Eugene Coleman and Lamont Lewis, and present testimony and evidence to show either that Mr. Savage was wholly uninvolved in each murder charged or that the government had not met its burden of proving each element of the charged offense beyond a reasonable doubt. *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989); *see also* ABA Guidelines 10.7, Commentary, p. 1019-1020.

Sub-claim 6A consists of 25 sub-sub-claims that attack every component of trial counsel's investigation and presentation of evidence for each count for which Savage was indicted. As explained in detail below, none of the sub-claims raise credible arguments that trial counsel's performance fell below an objective standard of reasonableness or that Savage was prejudiced by counsel's purported deficient performance.

**Claim 6A(1):** Counsel were ineffective for failing to investigate and impeach Eugene Coleman.

Savage first faults his trial counsel for inadequately investigating KSO associate turned Government witness Eugene Coleman and ineffectively impeaching him at trial. ECF No. 1746 at 15, 273, 280–81. However, the record reflects that trial counsel conducted a thorough cross-examination of Coleman, spanning four of the five days of Coleman's testimony. *See* TT 3/19/2013 at 74–263; TT 3/20/2013; TT 3/21/2013 at 3–53; TT 3/25/13 at 86–158. Savage's trial counsel questioned Coleman about, among other things, his credibility, his prior inconsistent statements, his motives for testifying against Savage, and his own conduct and culpability in the charged offenses. *See id.* The wide-ranging topics covered during Coleman's cross-examination demonstrate that trial counsel exhaustively investigated Coleman and were well prepared to impeach him at trial. The specific complaints that Savage makes about trial counsel's efforts to undermine discrete portions of Coleman's testimony are addressed in the remaining sub-claims of

Claim 6A, primarily in Claims 6A(3)(i) and 6A(3)(ii). The Court finds that Savage's trial counsel's performance in mounting a defense against Eugene Coleman's testimony for the prosecution did not constitute ineffective assistance of counsel.

**Claim 6A(2):** Counsel were ineffective for failing to investigate and impeach Lamont Lewis.

As he does with respect to his trial counsel's efforts in investigating and impeaching Eugene Coleman in the above sub-claim, Savage makes the same argument regarding trial counsel's performance as to the Government's other main witness, Lamont Lewis, who was another key KSO member. ECF No. 1746 at 15, 273, 278, 327. Just as with trial counsel's cross-examination of Coleman, their cross-examination of Lewis was both thorough and competently executed over the nearly three days that Lewis spent on the witness stand. *See* TT 4/1/2013 at 224–76; TT 4/2/2013; TT 4/3/2013. The particulars of Lewis' testimony that Savage argues should have been attacked concerning each of the murder charges that Lewis pinned on Savage are discussed in the remaining sub-claims of Claim 6A. Viewing the trial record as a whole, the Court finds that Savage's trial counsel were not ineffective in their investigation and impeachment of Lamont Lewis.

**Claim 6A(2)(i):** Counsel ineffectively investigated and presented the jail calls of L. Lewis as impeachment evidence.

One of the particulars of Lewis' testimony that Savage contends his trial counsel failed to investigate and raise at trial were Lewis' jail calls, which, according to Savage, contained useful impeachment evidence that Lewis was lying on the stand about his involvement, and therefore, Savage's involvement, in the charged crimes. ECF No. 1746 at 332, 360, 379–84. This claim is simply untrue. During their cross-examination of Lewis, Savage's trial counsel made effective use of Lewis' jail calls, questioning Lewis about statements he made in those calls in which he denied his participation in the crimes and claimed to his family that the Government was pressuring him

to admit wrongdoing that he did not commit. TT 4/2/2013 at 160–70. That Lewis gave credible explanations for those statements does not mean that trial counsel's questioning on this topic was ineffective. The Court further addresses the futility of Savage's arguments regarding the impeachment value of Lewis' jail calls in its discussions of sub-claims 6A(3)(iii) and 6A(3)(vii). For the reasons stated, this sub-claim is meritless.

**Claim 6A(2)(ii):** Counsel ineffectively investigated and presented evidence of L. Lewis's drug use and failed to hire an expert to assist in impeaching L. Lewis's ability to remember the night of the arson.

Another particular of Lewis' testimony that Savage argues went unaddressed by his trial counsel was Lewis' drug use and its impact on his ability to remember the events surrounding the firebombing. ECF No. 1746 at 564–66. Specifically, Savage contends that his trial counsel should have hired an expert to impeach Lewis' ability to remember the night of the firebombing, stating that "[a]n expert witness could have explained to the jury that people 'who struggle with PCP abuse suffer changes to their brain structure, which lead to memory problems, trouble with concentration and perception, and difficulty with judgment. These issues can persist even after they have detoxed from the drug.'" *Id.* at 565 (citation omitted). However, Savage fails to explain what specifically in Lewis' testimony about the night of the firebombing would have been undermined by his use of PCP and an expert's presentation about the use. And, even if Lewis' alleged use of PCP, which Lewis specifically denied using the night of the firebombing, affected his memory of the events of that night, it would have had no impact on Lewis' testimony that he committed the firebombing at Savage's behest. The fact that Savage ordered Lewis to carry out the firebombing is the lynchpin tying Savage to the murders of the Coleman family members, not the sequence of events that took place the night of the firebombing, so Lewis' memory of that night is inconsequential to Savage's convictions for the murders. Besides, Lewis admitted on the

stand to his extensive use of PCP, and Savage's trial counsel thoroughly explored this topic in their cross-examination of Lewis. TT 4/2/2013 at 50, 297–98. Thus, an expert witness on the effects of PCP would have been unlikely to alter the outcome of the trial. This sub-claim fails.

**<u>Claim 6A(3):</u>** Counsel were ineffective for failing to individually investigate and present a defense to each murder.

Savage argues that his trial counsel failed to present a defense to each separate murder charge. ECF No. 1746 at 15. In so arguing, Savage offers alternative theories of third-party involvement in each of the murders that are unsupported by the evidence. Savage's proposed individual defenses are explored at length in the twelve sub-sub-claims of this sub-claim. For the reasons set forth below, this sub-claim is without merit and fails to establish ineffective assistance of counsel.

**<u>Claim 6A(3)(i):</u>** Counsel were ineffective for failing to investigate, impeach, or call witnesses who had knowledge and information that could have undermined the government's theory, evidence, or witnesses surrounding the Abdullah murder. Furthermore, they were ineffective for failing to investigate and present an affirmative defense that Mr. Savage was uninvolved in this murder.

In his Petition, Savage concocts a baseless theory that "Bluntly killed Abdullah of his own volition" and presents this story as the truth of what happened. ECF No. 1746 at 282. According to Savage, Abdullah had enlisted Bluntly's help to retaliate against some burglars who had robbed him but upon learning the identity of the burglars, Bluntly ended up shooting Abdullah instead. *Id.* In this version of events, Coleman's testimony that Savage had ordered Abdullah's death over a drug dispute was untrue because "Mr. Savage was not involved and did not know what happened until days or weeks later, when Bluntly admitted to Mr. Savage what he had done." *Id.* Notably, Savage provides no support for his story of what happened, a story that conveniently absolves him of all responsibility. The only individuals involved in Abdullah's murder are Coleman, Bluntly, Abdullah, and Savage. Abdullah, the victim, was obviously dead at the time of Savage's trial.

Bluntly also was dead at the time of trial. The only two individuals with firsthand knowledge of Abdullah's death who could speak to what happened at the time of trial were Coleman and Savage himself. Savage did not testify in his own defense, so Savage's attorneys were left to contend with Coleman's account of Abdullah's murder.

Of course, Savage claims that Coleman lied on the stand about the sequence of events leading up to and immediately after Abdullah's murder. *See* ECF No. 1746 at 284. To recap, Coleman testified that Savage had Abdullah killed because Abdullah was overcharging Savage for cocaine. *See Savage*, 970 F.3d at 233. The night of the murder, Abdullah arrived at Savage's house to pick up money that Savage owed him for a cocaine deal. After giving him the money, Savage instructed Bluntly to ride with him. Twenty minutes later, Savage told Coleman to pick up Bluntly from a phone booth at 9th and Tioga. When doing so, Coleman noticed that Bluntly was holding the money that Savage had given to Abdullah. After the two men returned to Savage's house, Savage directed Coleman to return to the murder scene to see if Abdullah was actually dead. Upon his arrival, Coleman looked inside the car and saw Abdullah "keeled over." Coleman then returned to Savage's place and reported that Abdullah was dead. At that point, Savage told Bluntly to move the body, and Bluntly called David Morris ("Shotty") to undertake the task. Later that night, Coleman paid Morris $1,000 from Savage to move the body.

The "smoking gun" that Savage claims discredits Coleman's entire testimony and proves that Coleman was lying is a report from a crime scene investigator that Savage's habeas counsel retained for purposes of filing this Petition. ECF No. 1747-10. In his report, the crime scene investigator concludes that based on the bloodstain patterns depicted in the crime scene photographs, Abdullah "was shot while seated in the driver's seat of the vehicle" and "beyond movement of the victim from an upright to a recumbent or prone position, movement of the victim,

such as placing the victim in the passenger seat area, did not occur." *Id.* at 13, 16. Because, according to the report, Abdullah was shot while he was sitting in the driver's seat and the bloodstain patterns show that he was not subsequently moved to another seat or that someone sat on top of him to drive the car, Savage argues that this proves that Abdullah's body was not moved from the location of the murder to a different location, thus discrediting Coleman's account of the murder. ECF No. 1746 at 284.

There are several problems with this argument. First, Coleman's "testimony that the car with Abdullah's body was driven through urban streets and parked in a different location after Abdullah was shot" was not "[p]ivotal to Coleman's story." *Id.* The most critical part of Coleman's testimony linking Savage to Abdullah's murder was the lead-up to the murder: Savage's motivation for killing Abdullah and Savage's instruction to Bluntly to execute the murder. Arguments about whether or how Abdullah's body was moved after he was already dead are irrelevant to whether Savage ordered his death. During the trial, Savage's attorneys thoroughly tested Coleman's version of events on cross-examination to raise doubts about his credibility. TT 3/20/2013 at 217–25, 257–77; TT 3/25/2013 at 99–130. That the jury chose to believe Coleman's testimony and convict Savage for Abdullah's murder despite the defense's efforts to discredit Coleman highlights the strength of the prosecution's case against Savage.

Second, the crime scene investigator retained by Savage's habeas counsel never examined the crime scene or Abdullah's body himself. ECF No. 1747-10 at 3. He relied upon photographs of the crime scene to conduct his analysis, *id.*, thus severely limiting the accuracy of his conclusions, which would have been rigorously challenged by the prosecution on cross-examination at trial. The prosecution would have likely responded by producing its own expert on bloodstain pattern analysis to counter the defense theory that Abdullah's body could not have been

moved. In that scenario, presenting a crime scene investigator could have caused more harm than good, so that "[e]ven if it had been apparent that expert blood testimony could support [Savage's] defense, it would be reasonable to conclude that a competent attorney might elect not to use it." *Harrington v. Richter*, 562 U.S. 86, 108 (2011). Additionally, "there was the possibility that expert testimony could shift attention to esoteric matters of forensic science, distract the jury from whether [Coleman] was telling the truth, or transform the case into a battle of the experts." *Id.* at 108–09. As such, trial counsel's decision not to call a crime scene investigator regarding the minor detail of whether it was possible for Abduallah's body to be moved was a reasonable one.

Third, even accepting the correctness of the Crime Scene Analysis Report (ECF No. 1747-10) for the purposes of evaluating this Petition, the fact that Abdullah was shot in the driver's seat and was not moved to the passenger seat does not preclude the possibility that someone drove the car to a secondary location. Looking at the crime scene photos, one could conclude that a perpetrator may have sat carefully in the remaining seat space in front of Abdullah's torso on the driver's seat or pushed his body slightly upwards to make room for sitting in the driver's seat. *See* ECF No. 1747-10 at 9. The drive from the murder location to the secondary location where Abdullah was found spans a distance of approximately 0.9 miles and took FBI Special Agent Kevin Lewis approximately 2 minutes and 30 seconds to traverse. *Id.* at 12. Given that the drive between the two locations was relatively short, it was entirely plausible for a perpetrator to make that drive. Thus, the crime scene investigator's report does not definitively discredit Coleman's account of the cover-up following Abduallah's murder.

Fourth, the report may actually undermine Savage's theory that Bluntly killed Abdullah of his own accord and tried to set his body on fire, all while remaining in one location. If Bluntly had shot Abdullah while Abdullah was sitting in the driver's seat, why did Bluntly then move

Abdullah's body from an upright position to a supine position (as the report claims was done)? Why did Bluntly not just set the body on fire without further touching the body and risking leaving behind incriminating evidence? The way Abdullah's body was found, laying across both front seats of the car, suggests that his body was moved for some other purpose than just to facilitate lighting it on fire, such as driving the car to another location. For these reasons, the Court finds that Savage's trial counsel were not deficient for failing to hire a crime scene expert to review Abdullah's murder.

Next, Savage argues that the investigation of additional witnesses would have contradicted Coleman's account of Abdullah's murder and bolstered Savage's theory that Abdullah's murder was related to a prior robbery. ECF No. 1746 at 290–99. However, the witnesses mentioned in the Petition as being in the area where Abdullah's car was found did not actually see Bluntly shoot Abdullah in that location. *Id.* at 291. And further evidence of the robbery would have been tangential to the murder. *Id.* at 292. In any event, Savage's counsel did bring up the robbery during their cross-examination of Coleman. TT 05/17/2013 at 259–60. The phone call that Savage insists his trial counsel should have brought in to prove his innocence through witness Paul Daniels would not have been admitted as evidence because the statements by Daniels and the other phone call participant regarding what Savage and Bluntly told them are all inadmissible hearsay. *See* ECF No. 1746 at 295–97. Moreover, none of the statements from the phone call even mentions Abdullah by name, nickname, or otherwise, so it is a stretch for Savage to argue that the statements demonstrate that Bluntly confessed to killing Abdullah without Savage's knowledge. *See id.* The ex post facto interpretations of the phone call statements that the Petition puts forward are nothing more than mere speculation.

The Court finds that Savage's trial counsel were not ineffective for their investigation and

presentation at trial relating to Abdullah's murder.

**<u>Claim 6A(3)(ii):</u>** Counsel were ineffective for failing to investigate, impeach, cross-examine, or call witnesses who had knowledge and information that could have undermined the government's theory, evidence, or witnesses surrounding the Toliver Murder. Furthermore, they were ineffective for failing to investigate and present an affirmative defense that Mr. Savage was uninvolved in this murder.

For the murder of Tyrone Toliver, Savage yet again blames the killing on someone else, this time on Coleman. ECF No. 1746 at 310, 312. Unable to come up with a plausible motive for why Coleman would have wanted to kill Toliver, Savage offers the best motive that he could muster—that Coleman wanted revenge after Toliver slapped him in the face during an argument. *Id.* at 315. Meanwhile, at trial, the prosecution presented ample evidence that Coleman and Toliver were close friends. TT 3/18/2013 at 216–21, 236–37; TT 3/19/2013 at 29, 144–47; TT 3/20/2013 at 50. Besides, at trial, Savage's counsel did attempt to highlight discord between Coleman and Toliver before Toliver's death by stressing that Toliver had "messed up" Coleman's money multiple times. TT 3/20/2013 at 45–51. Now, Savage tries to concoct yet another thin motive for Coleman in the Petition. *See* ECF No. 1746 at 313–18. Like the motive presented by Savage's trial counsel during their cross-examination of Coleman, the motive offered in the Petition is weak and there is no reasonable probability that presenting that motive to the jury would have altered the outcome of Savage's trial.

Savage makes a big fuss about one witness in particular, Mario Melendez, Coleman's landlord. *Id.* at 310–12. Savage claims that Melendez's testimony would have discredited Coleman's account of Toliver's murder because Melendez's affidavit contradicts Coleman's testimony that Melendez rented a portion of the property to Savage, that Melendez kept personal items in the basement, that Coleman recompressed cocaine for Melendez, and that Melendez met up with Coleman on the street later in the night after Toliver was killed. *Id.* Critically, however,

Melendez's entire affidavit has nothing whatsoever to do with Toliver's murder—Melendez had no information about who killed Toliver or when and where the murder took place. *See* ECF No. 1747-21. Savage's trial counsel did not investigate Melendez because Melendez had no knowledge of Toliver's murder and would have therefore been useless for Savage's defense. The other witnesses mentioned (Chester Brame, Latonya Lewis, Marlin Meachum, and Eric Johnson) similarly have no firsthand knowledge of Toliver's death and would have been of no use for Savage's defense. *See* ECF No. 1746 at 314–18. Some of the witnesses, as the Government points out, would have almost certainly refused to testify on Savage's behalf, opting to invoke the Fifth. ECF No. 1795 at 72. For these reasons, the Court finds that Savage's trial counsel were not ineffective for their investigation and presentation at trial relating to Toliver's murder.

**Claim 6A(3)(iii):** Counsel were ineffective for failing to investigate, impeach, cross-examine, or call witnesses who had knowledge and information that could have undermined the government's theory, evidence, or witnesses surrounding the Parker Murder. Furthermore, they were ineffective for failing to investigate and present an affirmative defense that Mr. Savage was uninvolved in this murder.

For the murder of Barry Parker, Savage advances a theory that Lamont Lewis was actually not the killer and that some other person killed Parker, as further discussed below. In support of this theory, Savage offers a recorded conversation between Lewis and a friend that took place while Lewis was in jail in 2008, five years before Savage's trial. ECF No. 1746 at 328; *see* ECF No. 1747-48 at 44–51. Savage claims that, in this conversation, Lewis admits to falsifying the connection between Parker's murder and Savage, but the conversation contains no such admission. *See* ECF No. 1747-48 at 44–51. Neither Lewis nor his friend identifies Parker or Savage, by name or otherwise, in the conversation, and the conversation occurred in 2008, years before Lewis pleaded guilty to Parker's murder. As the Government points out, it is hardly surprising to find that Lewis denied any wrongdoing on his part during a phone call from jail on what he knew was

a recorded line. *See* ECF No. 1795 at 73. Additionally, the forensic evidence in the case corroborated Lewis' account of the murder, *see* TT 3/13/2013 at 81–91, 114–21, further strengthening the credibility of Lewis' testimony regarding Parker's murder.

**<u>Claim 6A(3)(iv):</u>** Counsel were ineffective for failing to investigate and present a theory of defense that Lamont Lewis did not shoot Barry Parker.

Savage claims that another "Lamont," Lamont Russell, was actually Parker's murderer. ECF No. 1746 at 330–32. In putting forward this theory, Savage fails to lay any foundation for Lamont Russell's involvement or offer any motive explaining why Russell wanted to kill Parker. The only item that Savage provides in support of this theory is a police note indicating that a Tammy Parker called the police and left a message on June 8, 2005 stating, "Shooter is Lamont from 9th and Pike." *Id.* at 331; *see* ECF No. 1747-45 at 17. Savage does not provide any further description of who Tammy Parker is, how she knows who the murderer is, whether she was an eyewitness, and, most importantly, whether it was even possible for his trial counsel at the time to track her down and interview her. Without this information, Savage cannot show that his trial counsel failed to act reasonably in not presenting a defense theory of an alternative shooter, especially in light of Lewis' confession to the murder, Coleman's corroborating testimony, and the forensic evidence that matched Lewis' account of the shooting.

**<u>Claim 6A(3)(v):</u>** Counsel were ineffective for failing to investigate and present a theory of defense that the murder of Barry Parker was unrelated to the drug conspiracy.

Savage faults his trial counsel for not presenting evidence that Parker's murder was unrelated to drug activity, ECF No. 1746 at 337–39, but then acknowledges that this evidence was introduced at trial during the defense's cross-examination of Parker's brother, who testified that Parker was not selling drugs when he was killed, *id.* at 338. That Savage would have preferred his attorneys to track down a few more witnesses to say the exact same thing—that Parker was not

dealing drugs at the time of his death—does not mean that counsel's performance was so ineffective as to fall below an objective standard of reasonableness. Besides, Savage offers no other plausible reason for Parker's murder beyond a speculative statement that "Northington and Parker had fought . . . because Northington was pursuing an inappropriate relationship with an underage relative of Parker's." *Id.* at 337. Savage provides no support whatsoever for this piece of gossip, just vaguely claiming that counsel would have discovered this information had they investigated. As such, this claim is groundless.

**Claim 6A(3)(vi):** Counsel were ineffective for failing to investigate the murder of Carlton Brown. Without investigation, they were unable to make a strategic decision about what theory of defense to pursue and could not impeach, cross-examine, or call witnesses who had knowledge and information that could have undermined the government's theory and evidence. Additionally, due to their errors, they were unable to present a persuasive affirmative defense that Mr. Savage was uninvolved in this murder.

Savage argues that his trial counsel botched his defense for Carlton Brown's murder at trial, contending that "[c]ounsel had a plethora of choices to defend this murder: the only two testifying witnesses were not credible (L. Lewis and Coleman); Mr. Savage did not have a motive to kill Brown; L. Lewis had a strong independent motive to kill Brown; and that someone other than Lamont Lewis killed Carlton Brown." ECF No.1746 at 355. As with nearly every other claim in his Petition, Savage proposes witnesses and supposed evidence that he claims would have resulted in a not guilty verdict on this count, if only his trial counsel had been competent enough to investigate these witnesses and pieces of evidence. *Id.* at 348–49, 352, 354, 356–58. In particular, Savage faults trial counsel for failing to consider the possibility that someone other than Lamont Lewis killed Brown. *Id.* at 355–62. Such a defense, however, would have been inconsistent with his trial counsel's carefully crafted strategy for the entire trial, which was to portray Lewis as "the villain and an unstoppable killer" who committed all these murders of his own volition. ECF No. 1746 at 350; *see* TT 2/4/2013 at 145–53.

Viewed through the lens of counsel's trial strategy, counsel's decision not to investigate and present evidence that someone else murdered Brown was not incompetence but a deliberate decision to pursue a different defense. Today, with the benefit of hindsight, Savage may wish that his counsel had pursued another defense strategy at trial, but just because a defense attorney's chosen strategy to defend his client at trial did not ultimately lead to his client's acquittal does not mean that the strategy was unreasonable in the first place. Here, trial counsel's strategy of characterizing Lewis as an "unstoppable killer" provided them with a throughline for the whole trial. Because Lewis had admitted to committing eleven murders, *see Savage*, 970 F.3d at 306, Savage's counsel had their work cut out for them in preparing Savage's defense. They had to thread the needle between discrediting Lewis' testimony connecting Savage to each of the murders and making Lewis out to be a self-motivated killer who committed each of the murders on his own. This strategy provided cohesion for all of the counts: rather than cherry picking which of the murder counts they would try to pin on Lewis alone and which they would argue were not committed by Lewis at all, counsel decided to attribute all of the eleven murders to Lewis. Precisely because Lewis had already confessed to the murders, counsel's strategy to maintain that Lewis did in fact commit all the murders had the effect of building credibility with the jury. Had counsel presented evidence that someone other than Lewis committed each of the murders, as Savage now claims they should have done, in the face of Lewis' confessions to the contrary, the defense would have destroyed its credibility with the jury by presenting weak theories of alternative murderers.

Savage's argument that trial counsel should have pursued and presented a multitude of differing, and sometimes conflicting, affirmative defenses flies in the face of common sense. For a defense theory to be effective, and maintain credibility with the jury, counsel needed to present

a single, cohesive theory that would work to defend against each of the counts charged against Savage. Had trial counsel followed the proposals in the Petition and presented every vaguely possible defense for Brown's murder—including that Lewis both had an independent motive to kill Brown and actually did not kill Brown—the jury would have found the defense to be scattershot and disorganized. Rather than sowing more seeds of reasonable doubt, Savage's multi-pronged defense approach would have weakened his case by leading the jury to conclude that the defense had no strong counter to the prosecution's case and so was pursuing a throw-mud-at-the-wall-and-see-what-sticks strategy, much like Savage is pursuing in this Petition. A scattered, ununified defense would have done Savage more harm than good, as the jury would have been more prone to believe the Government's single, unified theory of the case over Savage's attempts to point the jury into a million different directions. For these reasons, the Court finds that Savage's trial counsel were not ineffective for their investigation and presentation at trial relating to Brown's murder.

**Claim 6A(3)(vii):** Counsel were ineffective for failing to investigate, impeach, cross-examine, or call witnesses who had knowledge and information that could have undermined the government's theory, evidence, or witnesses surrounding the arson murders. Furthermore, they were ineffective for failing to investigate and present an affirmative defense that Mr. Savage was uninvolved in this murder.

For the Coleman family murders, Savage argues that his trial counsel failed to effectively impeach Lewis' credibility regarding the October 8, 2004 phone call between Savage and Lewis, interview witnesses Lewis allegedly spoke with after committing the arson, and use Lewis' jailhouse recordings to argue that Lewis did not commit the arson. ECF No. 1746 at 367–89. None of these arguments have merit. Savage contends that "Lewis's testimony about the phone call that took place on October 8, 2004, was the single most important piece of evidence in this case. The government introduced nothing else to connect Mr. Savage to the arson that occurred that night."

*Id.* at 369. This is blatantly false. As the Government notes, numerous threats and cell bug admissions by Savage both before and after the firebombing directly tied Savage to the horrendous crime. *See* ECF No. 1795 at 76; TT 4/29/2013 at 9–11; TT 4/30/2013 at 4–5, 8–19, 25, 36–50. Savage argues that nothing he stated in the call itself was incriminating, but that would be true only if the call is taken out of context. With the context of Lewis' testimony, one could see that Savage was speaking in code on the call, which Savage knew was being recorded, while conveying his true message through his sister Kidada. In any case, the jury had the opportunity to review the call for itself and reach its own conclusions about its incriminating nature. Savage offers an alternative explanation for the contents of the call, which is discussed below.

As to the importance of potential witnesses Clayton Adams and Eric Johnson, Adams and Johnson were both represented by their own counsel, so it was likely that Adams would have refused to speak to Savage's counsel and/or testify on Savage's behalf and Johnson's reasons for refusing to talk were discussed previously, *see supra* Section III.A.3. As for Savage's argument that trial counsel should have utilized Lewis' jailhouse recordings to show that Lewis did not commit the firebombing, this fails for at least two reasons. First, it would have directly contradicted counsel's well-developed theory of the case, that Lewis was a violent killer who committed all these murders without direction from Savage. As discussed previously, Savage's trial counsel pursued a cohesive defense theory at trial that pinned the blame for most of the murder charges on Lewis. This was a reasonable strategic choice at the time, and this strategy still passes the test of time even though the jury did not buy the defense's theory when weighed against the mountain of evidence that these murders were perpetrated by Lewis at the direction of Savage quarterbacking the enterprise. And so, any arguments by Savage in the Petition that his trial counsel were ineffective for failing to pursue something that would have undermined their defense theory are

without merit. Second, it is unsurprising that Lewis denied committing the firebombing in jailhouse recordings pre-dating his decision to cooperate with the Government, so those recordings have limited value for Savage's defense in any case.

In his attempt to discredit Lewis' testimony at trial, Savage puts forward a rather preposterous argument, one of many disingenuous arguments throughout the Petition. Savage contends that "contrary to what the government presented, L. Lewis was just a business associate of Mr. Savage and not a friend." ECF No. 1746 at 377. While claiming that Lewis "was insignificant in Kaboni's life," *id.* at 378 (record citation omitted), Savage in the same breath states with a straight face that the October 8, 2004 call entails Savage asking Lewis, who is apparently not even his friend, to "look out for his mom while he's in jail," *id.* at 371 (record citation omitted). Viewed together, these assertions make no logical sense. Why would Savage ask someone who is simply a business associate to look after his mother while he's in prison? That Savage proffers both of these claims as fact places doubt upon both statements, and the Court will not credit either one. The Petition is littered with similar kinds of contradicting, circular arguments. For the reasons discussed, the Court finds that Savage's trial counsel were not ineffective for their investigation and presentation at trial relating to the arson murders.

**<u>Claim 6A(3)(viii):</u>** Counsel were ineffective for failing to investigate and present a defense to the inculpatory phone calls introduced by the government between Kaboni and Kidada Savage as a defense to the arson murders.

Savage offers a creative, albeit far-fetched, explanation for the October 8, 2004 call. Rather than asking Lewis to firebomb the Coleman's home, Savage states that he was actually asking Lewis to collect debts for him. ECF No. 1746 at 386. The problem with Savage's explanation is that the only participants in the inculpatory phone calls at issue were Savage, Kidada, and Lewis. The three participants are the only individuals who know for a fact what was discussed in those

calls. Out of the three participants, Lewis was the only one who testified at trial. Savage and Kidada chose not to testify in their defense, and because they made that choice, they were unable to counter Lewis' explanation of the calls and tell the jury their version of what the calls meant. Any testimony from outside witnesses would not have provided a definite explanation for what was discussed on the calls between Savage, Kidada, and Lewis; it would have just been pure speculation. Besides, the alternative explanation that Savage is now pushing was actually referred to at trial, as even Savage acknowledges:

> For example, the government introduced a recording from the FDC visiting room on December 22, 2004, where Mr. Savage discussed with his mother and sister about how they were struggling to pay for the lawyer and how Mr. Savage had been unable to get people to collect debts for him. The government also introduced a recording of Mr. Savage complaining to Dawud Bey that his mom and sister had not gotten jobs and were unable to support themselves. . . . Crystal Copeland, Mr. Savage's fiancée at the time of trial, even testified that Mr. Savage would constantly call people and ask them to collect money for him.

*Id.* at 388 (citations omitted). This shows that the jury did hear Savage's proffered alternative explanation even if Savage's trial counsel did not discuss it explicitly. In any case, counsel's failure to present an affirmative defense to the inculpatory phone calls did not prejudice Savage given the mountain of evidence that the Government presented against him on the arson murder counts, including post-firebombing recordings of Savage reacting with delight to the murders and offensive comments he made about the dead victims. *See* TT 4/30/2013 at 36–42. A weak explanation that Savage was simply asking Lewis to collect debts for him on the calls would not have sufficed to raise any reasonable doubt that Savage did not order the firebombing in light of all of the evidence against him.

**<u>Claim 6A(3)(ix):</u>** Counsel were ineffective for failing to investigate, impeach, cross-examine, or call witnesses who had knowledge and information that could have undermined the government's theory, evidence, investigation, or witnesses surrounding the Lassiter Murder.

For the Lassiter murder, Savage does not offer any theories that someone else besides him

killed Lassiter. The bulk of Savage's complaints about his trial counsel's performance relating to Lassiter's murder is that they failed to effectively argue that the murder was unrelated to drug dealing and Savage's racketeering enterprise but was instead a crime of road rage. *See* ECF No. 1746 at 400–09. These complaints are discussed below.

**Claim 6A(3)(x):** Due to lack of investigation, counsel were ineffective in presenting a defense that the Lassiter murder was not for the purpose of maintaining and increasing position in an enterprise engaged in racketeering activity.

Despite Savage's many grievances about his trial counsel's performance, they did in fact argue extensively at trial, and before trial, that Lassiter's murder was unrelated to any drug activities. For example, before trial, counsel filed a motion in limine to preclude Lamont Lewis' testimony connecting Lassiter's murder to Savage's drug dealing, ECF No. 839, but the District Court denied this motion, ECF No. 956. Savage's counsel even attempted to sever the Lassiter murder count from the other counts charged against Savage for this very reason. *See* ECF No. 383. In their motion to sever counts, trial counsel argued that "counsel anticipates that the government will present evidence that, in general, will suggest that Mr. Savage murdered Kenneth Lassiter because Lassiter bumped into Mr. Savage's car while parking his own car. There is no indication that this alleged murder 'maintain[ed] or increase[ed]' Mr. Savage's position in the alleged racketeering enterprise." *Id.* at 3 (alterations in original). The District Court denied Savage's motion to sever counts, finding that "Savage committed various overt acts in furtherance of the KSO conspiracy and its objectives. In furtherance of the conspiracy, Savage 'shot and killed, and caused the murder of, Kenneth Lassiter . . . .'" ECF No. 846 at 39; ECF No. 847. Savage cannot fault his trial counsel for being ineffective in presenting a defense that Lassiter's murder was unconnected to the racketeering enterprise simply because he was disappointed with the outcome of counsel's representation. That the District Court, and ultimately, the jury, refused to credit his

trial counsel's account of the Lassiter murder does not mean that his counsel's performance fell below an objective standard of reasonableness.

Habeas counsel suggest that trial counsel should have used the statement of Tybius Flowers to impeach Lewis' testimony that Lassiter's murder was related to Savage's drug activities. ECF No. 1746 at 404. However, Savage was being charged with Flowers' murder on the eve of his state trial for Lassiter's murder, which would explain why Savage's trial counsel may have been wary about using Flowers' statement as part of Savage's defense to Lassiter's murder. Also, in his statement, Flowers affirms that Savage killed Lassiter, and Savage's counsel may have wanted to avoid endorsing a statement maintaining that their client was Lassiter's murderer. As for Savage's arguments in support of this sub-claim that primarily involve the subjects of other sub-claims (i.e., Lewis and Savage's conversations in the CFCF gym and the court-offered continuance to speak with Jonathan Baker), those will be discussed in the relevant sub-claims below.

**Claim 6A(3)(xi):** Counsel were ineffective for failing to investigate, impeach, or call witnesses who had knowledge and information that could have undermined the government's, evidence, or witnesses surrounding the Flowers murder. Furthermore, they were ineffective for failing to investigate and present an affirmative defense that Mr. Savage was uninvolved in this murder.

For the murder of Tybius Flowers, Savage argues that his trial counsel failed to effectively challenge the Government's case that Savage had Flowers killed to prevent Flowers from testifying against Savage in his state trial for Lassiter's murder. ECF No. 1746 at 419. At trial, the Government presented evidence that co-defendant Northington killed Flowers upon direction from Savage. *Id.* at 418. Savage argues that trial counsel should have done a better job of impeaching the jailhouse informants used by the Government to prove that Savage was behind Flowers' murder. *Id.* at 421–26. First, Savage asserts that "[c]ounsel failed to investigate and impeach jailhouse informants Artavius Coleman and Bienvenido Morales," but also states that "Artavius

did not implicate Mr. Savage" and Morales' testimony "was primarily offered to corroborate Artavius's story" that Northington confessed to killing Flowers. *Id.* at 425, 426. Since Artavius' and Morales' testimonies did not tie Savage to Flowers' murder, it's hard to see how counsel's failure to effectively impeach them prejudiced Savage's defense on this count. The arguments about the CFCF gym conversations between Savage and the informants are addressed below when discussing the relevant sub-claim.

Savage further faults counsel for failing to adequately investigate and present alternative theories to counter the Government's case on this count. ECF No. 1746 at 430. In so arguing, Savage puts forward Dawud Bey as a plausible third-party suspect for Flowers' murder. *Id.* at 430–32. However, the only motive that Savage offers for Bey is that Bey "would have wanted to demonstrate to an up-and-comer like Mr. Savage his import and influence in the Philadelphia drug community." *Id.* at 431. Savage presents no factual basis for whether or how Bey learned that Flowers was cooperating with the police. *See id.* at 432. All in all, this is a very weak alternative theory, and Savage's trial counsel likely did not present this theory at trial so as to not lose credibility with the jury. In the same vein, the fact that trial counsel did not pursue this theory did not prejudice Savage given the lack of evidence there was to show that Bey was actually Flowers' killer.

In any event, the defense that Savage's counsel did mount at trial was objectively reasonable, as recounted by Savage himself:

> The defense presented evidence that Mr. Savage knew Flowers had given a statement four years before trial and argued that there was no reason for Mr. Savage to wait four years to kill Flowers if he knew he planned to testify. Northington's defense questioned the integrity of the police investigation. They offered evidence that two outgoing calls were made from Flowers' phone after he was killed and pointed out that the police never investigated to whom those calls were placed.

*Id.* at 421 (record citations omitted). In their defense, trial counsel attempted to minimize the

significance of the timing of Flowers' murder as emphasized by the prosecution and raise reasonable doubt that the murderer was someone else who was never investigated. These are appropriate defense strategies and do not rise to the level of unconstitutional ineffectiveness. For the reasons discussed, the Court finds that Savage's trial counsel were not ineffective for their investigation and presentation at trial relating to Flowers' murder.

**Claim 6A(3)(xii):** Counsel were ineffective for failing to investigate the gun connected to the murder of Flowers.

Savage's argument in this sub-claim is both logically and factually nonsensical. Savage attempts to make out a convoluted association between Dawud Bey and a Philadelphia police officer named Jerome Eaddy. ECF No. 1746 at 432–33. To what end is anyone's guess. Savage claims, without citing any support, that "[t]hrough investigation, counsel would have found and presented witnesses to testify about police-issued firearms ending up in the community. In the early 2000s, in Philadelphia, for example, it was not uncommon for Philadelphia police officers to sell their service weapons to friends or associates and then report them stolen." *Id.* Savage then proceeds to claim, again with no support, that "counsel could have presented evidence that Bey may have known Jerome Eaddy, the police officer who lost his service weapon that was later used to murder Flowers." *Id.* at 433. Setting aside Savage's fanciful theory that Bey and Eaddy were somehow aware of each other through Bey's involvement in the music business, it is unclear how such a connection, if it even existed, would have "raised suspicion about Bey's motive and capabilities" and in turn "effectively rais[ed] reasonable doubt about Mr. Savage's involvement." *Id.* Savage makes no effort whatsoever to clarify these points. Accordingly, this bizarre sub-claim has no merit.

**Claim 6A(4):** Counsel were ineffective for failing to investigate the feasibility of inculpatory conversations alleged to have happened in the CFCF gym.

At trial, Lewis and a few of Savage's other jail mates testified that Savage made

incriminating statements to them regarding some of the murders for which he was indicted and ultimately convicted. Savage argues that his trial counsel failed to investigate the credibility of the testimonies of two of his former jail mates (Lewis and Michael Cosby) and as a result of the lack of investigation, failed to effectively impeach their testimonies by showing that it would have been impossible for Savage to converse with either Lewis or Cosby while detained at CFCF. *See* ECF No. 1746 at 403–04, 422–25. The factual basis for this claim is a declaration from Frank Thompson, who alleges he was Savage's cellmate at CFCF in 2003 and 2004. ECF No. 1747-23 at 1. Thompson states that he and Savage were housed on C side and "[t]here was never a time when C side and D side shared the same space in the gym." *Id.* As to Lewis' housing status at CFCF, the Petition does not provide any support for Savage's contention that Lewis was held on D side. *See* ECF No. 1746 at 403, 423. As for Cosby, while he testified that he was housed on D side, *id.* at 422, Thompson's declaration still fails to show that Cosby was lying about interacting with Savage in the CFCF gym. As the Government's response points out, Savage does admit that inmates at CFCF often communicated through the windows between the two sides of the gymnasium. ECF No. 1795 at 79; *see* ECF No. 1746 at 403. Thompson's declaration confirms this: "When one side had the gym, the only way to speak to someone on the other side was to crowd around one of the closed windows and yell through them." ECF No. 1747-23 at 1. And though Thompson states that he never saw Savage yell through the windows to someone on the other side, *id.*, he does not state that he was at CFCF the entire time that Savage was there or that he observed Savage's every move. Thompson also does not confirm that Savage was housed on C side for the entirety of his time at CFCF. Thompson's declaration, then, provides little support for this claim.

Moreover, while Savage argues that counsel could have obtained information about the

separation of the two housing units at CFCF through the testimonies of the corrections officers who ran the C side and D side gyms, Albert Swindle and Joseph Painter, ECF No. 1746 at 403–04, the Petition does not include any factual statements from either of them to support Savage's claim that it was physically impossible for him to have spoken to Lewis and Cosby during their time at CFCF. Savage also does not provide any of his CFCF housing records to confirm that he was housed on C side. Instead, Savage relies on speculative, conclusory allegations to contradict Lewis' and Cosby's testimonies regarding their respective conversations with Savage at CFCF. Such allegations are insufficient to maintain a claim for habeas relief on this issue.

**Claim 6A(5):** Trial counsel were ineffective in handling Kevin Lewis's testimony objections, cross-examination, and impeachment.

Savage argues that his trial counsel were ineffective in their cross-examinations of Kevin Lewis,[6] an FBI agent who investigated the charges against Savage. ECF No. 1746 at 561–64. Yet, as the Government points out in its response (ECF No. 1795 at 80), defense counsel cross-examined Kevin Lewis over multiple days, on numerous topics, including his various investigations, the use of government informants, the circumstances surrounding Lamont Lewis' and Eugene Coleman's arrests and eventual cooperation, the use of wiretaps in the case, the reporting of information in FBI 302 reports, Savage's associates and their drug dealing activities, and each of the murders listed in the operative indictment. *See, e.g.*, TT 2/7/2013 at 79–225; TT 2/11/2013 at 3–156. The record reflects that trial counsel's cross-examinations of Kevin Lewis were substantial and comprehensive. The Petition focuses on a few specific instances where Savage found his counsel lacking but fails to make out why those minor instances were significant or how counsel's failure to pursue those lines of questioning prejudiced him at trial. Savage only

[6] To avoid confusion, the Court will refer to Kevin Lewis by his full name throughout this Memorandum Opinion.

makes the conclusory allegation that "[h]ad counsel effectively cross-examined Kevin Lewis, there is a reasonable probability of a different outcome." ECF No. 1746 at 564. This is woefully insufficient for making out a claim for ineffective assistance of counsel.

**Claim 6A(6):** Counsel were ineffective for failing to investigate Kareem Bluntly.

Savage claims that in their defense of the Abdullah murder, trial counsel failed to investigate Bluntly's friends and associates to show the jury that Bluntly was violent, unpredictable, and did not act as Savage's agent. ECF No. 1746 at 288–89. Savage rattles off a list of names of people that he claims would have testified to Bluntly's violent nature, including Frank Thompson, Vincent Crews, Rasheen Braddock, Chester Brame, and Rashan Wright. *Id.* at 288. Of these names, Savage provides declarations from only Thompson and Wright in support of his Petition. ECF No. 1747-23 at 1–2, 8–10. However, while both Thompson and Wright claim that Bluntly had a reputation as a killer and acted independently of Savage, neither explains in his respective declaration how he knows these assertions to be true. And even if Thompson and Wright had testified at trial, statements that Bluntly had made to them about people he had killed would have been inadmissible hearsay. In any case, trial counsel did argue at trial that Savage did not order Bluntly to kill anyone on his behalf and that Bluntly acted on his own. *See* TT 2/4/2013 at 143–44, 178–83; TT 3/20/2013 at 22–27, 50–51, 68–69, 257–68. This argument did not succeed in light of the overwhelming evidence to the contrary, and counsel could not have investigated Bluntly himself as Bluntly was long dead by the time Savage was indicted in this case. *See* ECF No. 1795 at 82. For these reasons, Savage cannot show that trial counsel's failure to investigate Bluntly's friends prejudiced him at trial, and as a result, this sub-claim fails.

**Claim 6A(7):** Counsel were ineffective for failing to investigate Dawud Bey.

The Petition references two instances where Savage's trial counsel were supposedly

ineffective for failing to investigate Dawud Bey, in relation to Savage's convictions for the firebombing murders and Tybius Flowers' murder. ECF No. 1746 at 367, 418. As to the firebombing murders, the Petition does not explain Bey's association with the firebombing and/or why it was important for counsel to investigate Bey for those charges. As to Flowers' murder, Savage attempts to frame Bey as Flowers' murderer. This argument has been discussed extensively in relation to Claim 6A(3)(xi). The Petition offers no additional avenues for investigating Bey. This sub-claim is without merit.

**Claim 6A(8):** Counsel were ineffective for failing to investigate Mr. Savage's associates and friends. Counsel was further ineffective for failing to use information from this investigation to develop and present evidence that Mr. Savage was not a "gang" or "organized crime" leader.

In this sub-claim, Savage argues, without factual support, that "the government's portrayal of Mr. Savage was exaggerated and at many times wholly false. Kaboni Savage was not the child and witness killer portrayed by the government. Although he distributed drugs, he never led a drug organization, and never ordered others to kill." ECF No. 1746 at 272. Because the Petition is not organized chronologically by claim, the alleged facts that provide the foundation for this claim are scattered throughout Section VII of the Petition and portions of Section X. *See id.* at 271, 552, 561. Because there is no clear header or other indication in the Petition signaling where Savage explicitly lays out the merits of this claim, the Court is left to dig for any substance to this claim throughout long sections of the Petition. In doing so, the Court relies upon the Government's response to identify the "associates and friends" that Savage purports his counsel had failed to investigate. *See* ECF No. 1795 at 83. Among that group includes Raymond "Manny" Wilmore, Eric Johnson, and Calvin "Cheesesteak" Davis. *Id.* Counsel's investigative efforts relating to Eric Johnson have already been discussed extensively in various prior claims. As for Wilmore and Davis, Savage fails to explain how any potential testimony from either of them (assuming they

would have agreed to testify in the first place) would have shown that Savage was not the leader of a violent drug organization. Accordingly, this sub-claim fails.

**Claim 6A(9):** Counsel were ineffective for failing to investigate and present evidence to separate Mr. Savage from illegal and dangerous activities committed not by Mr. Savage, but by friends of Mr. Savage, including but not limited to Gerald Thomas and Kareem Bluntly.

Like the previous sub-claim, the alleged factual support for this sub-claim is provided throughout Section VII of the Petition. ECF No. 1746 at 271. The Court has already parsed through Section VII to evaluate each of the above sub-claims relating to the murder charges brought against Savage, and in doing so, has addressed Savage's argument that Kareem Bluntly is a violent individual who killed Abdullah without orders from Savage. As for Gerald Thomas, the Petition fails to clearly state which of the murders for which Savage was charged that Savage is now arguing that Thomas was actually responsible for. In any case, Savage's counsel at trial did in fact attempt to pin responsibility for Savage's crimes upon other individuals, including Bluntly and Thomas. *See* TT 2/4/2013 at 171–77, 206–08, 220–21; TT 3/20/2013 at 223–30, 257–68. That counsel were unsuccessful in their efforts does not mean that their strategy was ineffective or objectively unreasonable; it simply means that the evidence presented by the prosecution showing that Savage directed Bluntly's and Thomas' actions was overwhelming. Consequently, this sub-claim is meritless.

**Claim 6A(10):** Counsel were ineffective for failing to develop a theory of defense for each murder charged and the trial as a whole based on a complete investigation. Counsel did not present an individual theory for each murder, and instead frequently reference an entirely unrelated drug conspiracy. This was due to their lack of understanding of the facts, not any strategic decisions.

This sub-claim is largely repetitive of sub-claim 6A(3), which argues that counsel were ineffective for failing to individually investigate and present a defense to each murder. Savage's grievances regarding how his trial counsel handled the defense to each murder charge at trial have been discussed at length above in each of the sub-sub-claims to sub-claim 6(A)(3). Contrary to

Savage's claim here, trial counsel did present a unified defense theory for each of the murders to which Lamont Lewis confessed to committing, which was that Lewis was a vicious killer who acted independently of Savage. This defense strategy has also been addressed above. As for the remaining murder charges, Savage's counsel intentionally chose to attack the prosecution's case by discrediting the prosecution's witnesses and evidence to create reasonable doubt that the Government has proven its case. This is a perfectly reasonable defense strategy, and the fact that counsel did not attempt to find any third-party suspects for the murder charges does not mean that counsel failed to mount a satisfactory defense to each of the charges at trial. This sub-claim is false.

**Claim 6A(11):** Counsel were ineffective when they agreed not to question government witnesses about information that undermined the integrity of the investigations and did not investigate or present evidence that undermined the integrity of the investigations.

This sub-claim is not referenced at all in the Petition aside from appearing in the list of claims set out in the beginning. ECF No. 1746 at 17. In any event, the assertions in this claim are demonstrably untrue. Savage's trial counsel did their best to undermine the integrity of the Government's investigation, especially through the multiple cross-examinations of FBI agent Kevin Lewis. *See, e.g.*, TT 2/7/2013 at 79–225; TT 2/11/2013 at 3–156; TT 2/12/2013 at 107–26. And, as the Government points out in its response, the evidence at trial showed that the FBI conducted a meticulous and thorough years-long investigation in this case. *See* TT 2/5/2013 at 74–198; TT 2/6/2013 at 6–187; TT 2/7/2013 at 3–79. This sub-claim is meritless.

**Claim 6B:** Trial Counsel were ineffective for failing to file an estoppel motion to prevent the government from arguing Toliver's murder was related to the drug conspiracy. *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000).

Savage contends that had his trial counsel filed an estoppel motion to prevent the Government from presenting evidence that Toliver's murder was connected to a RICO enterprise,

then the charge against Savage for ordering Toliver's murder would have been dismissed. ECF No. 1746 at 318–21. This argument is wrong. A review of the relevant case law reveals that Savage misunderstands the doctrine of judicial estoppel. While Savage cites *New Hampshire v. Maine* in support of his position, the Supreme Court in that case clearly stated that the three factors Savage enumerates "do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel" and that "[a]dditional considerations may inform the doctrine's application in specific factual contexts." 532 U.S. 742, 751 (2001). Even looking at the factors considered in *New Hampshire*, the third factor ("whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped") was not satisfied in this case because Savage was not precluded from countering the Government's position by presenting evidence that Toliver's murder was unrelated to drug dealing activities. *See id.* Thus, Savage did not suffer any unfair detriment from the Government asserting that Toliver's murder was connected to Savage's drug organization.

Moreover, Savage fails to take into account the reason why the Government changed its stance regarding Toliver's murder since the 2005 drug conspiracy trial. The Third Circuit has held that "[j]udicial estoppel is only appropriate when the inconsistent positions are tantamount to a knowing misrepresentation to or even fraud on the court." *Fahie v. Virgin Islands*, 858 F.3d 162, 171 (3d Cir. 2017) (quoting *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 324 (3d Cir. 2003)); *see also Carrasca v. Pomeroy*, 313 F.3d 828, 835 (3d Cir. 2002) ("[I]t has been established that judicial estoppel can be imposed only if: '(1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position *in bad faith*, i.e., in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to

address the affront to the court's authority or integrity.'" (quoting *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 777–78 (3d Cir. 2001)) (emphasis added)). Savage cannot show that the Government changed its position regarding Toliver's murder in bad faith. As the Government points out in its response, at the time of the 2005 drug trial, "[t]he Toliver murder was largely unsolved and uncharged," ECF No. 1795 at 85, but by the time Savage was indicted for Toliver's murder in 2009, extensive investigation and previously unearthed evidence had revealed that Toliver's murder was actually connected to Savage's drug enterprise, thereby prompting the Government to assert as such at Savage's 2013 trial. Savage does not acknowledge the reason behind the Government's seemingly contrary position at all, although his trial counsel had recognized it as a precaution against filing an estoppel motion. *See* ECF No. 1747-35 at 49 ("I believe the simple response from the [Government] is to claim that additional evidence arose since the 2005 trial which now supports the position that Coleman is now credible.").

Because the Government did not change its position regarding Toliver's murder in bad faith, Savage cannot show that an estoppel motion would have succeeded and therefore that trial counsel were ineffective for not filing an estoppel motion. This claim is denied.

**Claim 6C:** Trial Counsel were ineffective for failing to hire experts to support defenses at the guilt/innocence phase of trial. *Hinton v. Alabama*, 571 U.S. 263, 272-73 (2014); *Ake v. Oklahoma*, 470 U.S. 68 (1985); ABA Guidelines 5.1, 10.7.

Savage argues that his trial counsel should have hired expert witnesses to opine on the topics addressed in the three sub-claims below. For the reasons stated below, this claim is denied.

**Claim 6C(1):** Counsel were ineffective for failing to hire a crime scene investigator. Testimony from such an expert would have proven that Coleman fabricated his testimony about Abdullah's murder.

The merits of this sub-claim have been addressed at length in the Court's discussion of Claim 6A(3)(i) above. In short, Savage cannot show that hiring a crime scene investigator would

have allowed the defense to definitively discredit Coleman's account of the cover-up following Abdullah's murder and may have even undermined the defense theory that Kareem Bluntly killed Abdullah on his own. Thus, counsel were not ineffective for failing to hire a crime scene investigator to analyze Abdullah's murder.

**<u>Claim 6C(2):</u>** Counsel were ineffective for failing to hire a digital forensics examiner to independently analyze the cell cite [sic] data presented by the government and to request the data necessary for this analysis.

Savage argues that his trial counsel should have hired a digital forensics examiner to analyze the cell site data presented by the Government at trial to show that Northington and Tillman were in the area where Flowers was shot shortly before the shooting took place. ECF No. 1746 at 437–39. The digital forensic examiner engaged by habeas counsel identified a list of documents/data needed for him to be able to perform an independent cell site analysis but did not explain why an independent analysis was necessary in the first place or how cell site analysis could differ depending on who was doing the analysis. *See* ECF No. 1747-14. Because the Petition fails to elaborate on the value of an independent cell site analysis, Savage cannot show that his trial counsel erred by not hiring a digital forensics examiner or that the failure to do so prejudiced him at trial. Further, as the Government explains in its response, "[t]he cell site data presented at trial had little or no impact on Savage's defense" because "[t]hat data mostly implicated Steven Northington as to the Flowers murder." ECF No. 1795 at 87. The cell site data has no bearing on whether Savage ordered Northington to kill Flowers, so on this basis also, Savage cannot show that the lack of a digital forensics examiner prejudiced him at trial.

**<u>Claim 6C(3):</u>** Counsel were ineffective for failing to utilize an expert on FBI policy and procedure to challenge the testimony of Kevin Lewis.

The final expert that Savage argues his trial counsel should have hired was a so-called FBI policies expert to opine on the alleged deficiencies in FBI case agent Kevin Lewis' investigation

in the underlying prosecution. ECF No. 1746 at 557–61. To that end, habeas counsel engaged John Sommercamp, a retired FBI agent, to review the trial record to poke holes in Kevin Lewis' investigation. In his report, the most egregious examples of Kevin Lewis' "deviations from FBI policy" that Sommercamp could note are minor procedural failures to document the existence of the lack of evidence and certain conversations with inconsequential witnesses. *See generally* ECF No. 1747-12. Sommercamp does not bring up any deviations from standard FBI procedures regarding Kevin Lewis' investigations into Lamont Lewis or Eugene Coleman or any other witness who provided substantial testimony against Savage at trial. Sommercamp also does not suggest that Kevin Lewis mishandled evidence that was presented against Savage at trial. In any event, the minor procedural deviations that Sommercamp highlights were also brought up by Savage's counsel at trial in their cross-examinations of Kevin Lewis. *See* TT 2/7/2013 at 103, 128–31, 137, 145–46, 152–54, 173–76. As such, hiring an FBI policy expert would have been superfluous and resulted in cumulative testimony. And Sommercamp's qualifications as an FBI policy expert aside, there is no reasonable likelihood that the conclusions reached in his report would have caused the jury to return not guilty verdicts for any of the charges against Savage in light of the overwhelming evidence against him presented by the Government at trial. As such, Savage cannot show that the failure to hire an FBI policy expert prejudiced him at trial.

**Claim 6D:** Trial counsel were ineffective for failing to vigorously pursue the names of confidential informants who could have provided valuable investigative leads or exculpatory testimony. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989).

In this sub-claim, Savage argues that his trial counsel failed to vigorously pursue the names of confidential informants who could have provided exculpatory information relating to Savage's involvement in the Abdullah murder. ECF No. 1746 at 281, 301–03. This is false. Prior to trial, Savage's counsel filed a motion to compel production of *Brady, Giglio,* and *Napue* discovery,

including the names of confidential informants or sources who provided information to FBI agents throughout the Government's investigation into Savage's criminal activity. ECF No. 753. In his Petition, Savage references the District Court's ruling on this motion without acknowledging that his trial counsel filed the motion in the first place. ECF No. 1746 at 302. In their motion, trial counsel sought disclosure of the identities of confidential informants mentioned in fifteen different FBI 302 reports. ECF No. 1009 at 3. At hearings conducted by the District Court subsequent to the filing of the motion to compel, trial counsel explained how six of the confidential informants could prove useful to Savage's defense. *Id.* at 6. Upon consideration of trial counsel's arguments, the District Court rejected all but one of the requests for disclosure. *Id.* at 7–11.

For the single request that was not outright rejected, the District Court recognized that while Savage had established a specific need for disclosure, it was "not clear from the [FBI] Report what if any information the informant has, nor does the Report identify the source of his apparent knowledge." *Id.* at 9. In lieu of ordering the Government to disclose the identity of this particular informant directly to Savage, the District Court opted to first hold an *in camera* interview with the informant to determine if the informant had any relevant knowledge of the Abdullah murder that may be useful to Savage prior to disclosing the informant's identity to Savage. *Id.* at 10. This informant is the first of three confidential sources that Savage now faults his trial counsel for failing to pursue in the Petition. ECF No. 1746 at 301. Habeas counsel note that the District Court decided to hold an *in camera* interview with this first informant. Habeas counsel then argues, "Discovery is required to determine if the government produced this witness for an *in camera* interview." *Id.* at 302. However, habeas counsel, understandably, must have forgotten in their multiple, minute, and thorough dissections of the District Court record, that the District Court did in fact conduct the *in camera* interview and afterwards issued an Order denying Savage's motion to compel,

finding:

> The informant had no personal knowledge regarding the [Abdullah] murder. The informant advised that his statement that appears in the FBI 302 Report was simply 'the word on the street,' and he could not attribute this rumor to any particular individual. Moreover, he had no knowledge as to the truth of the rumor. The informant's limited information about the murder would be of no value to the defense.

ECF No. 1050 at 1 n.1. Because the District Court concluded that this informant had no basis for his belief that other individuals were responsible for Abdullah's murder, trial counsel and appellate counsel were not ineffective for failing to seek a transcript of the *in camera* interview. There was no argument to be made by either trial or appellate counsel about the evidentiary value of this informant's testimony to Savage's defense because the informant contributed nothing of substance to the investigation. Habeas counsel's attempt to impugn trial counsel's efforts to obtain the identity of this first informant fails.

As for the other two informants that Savage argues his trial counsel should have pursued, neither of these informants would have added any value to Savage's defense. One of the informants told the FBI that Kareem Bluntly was advertising that he could be hired to murder people for money. ECF No. 1746 at 302. Savage claims that "[t]his evidence is exculpatory and material, as it shows Bluntly was an independent actor, not an agent of Mr. Savage." *Id.* However, just because Bluntly allegedly offered himself to others as a hired gun did not mean that he did not also work as a hired gun for Savage. In fact, this evidence might have swayed the jury towards believing that Bluntly killed Abdullah on Savage's behalf because Bluntly bragged about killing people for money. If trial counsel had actually pursued this particular informant and presented this individual's testimony at trial that Bluntly was advertising his assassin services, then habeas counsel may now very well be arguing that trial counsel were ineffective for chasing down this lead.

The other informant told the FBI that Abdullah was spreading the word that he was going to hunt down the people who robbed him. *Id.* at 302–03. The source also "speculates that the initial robbers from several weeks ago caught up to Abdullah first and murdered him." ECF No. 1747-24 at 10. The information provided by this informant barely adds any value to Savage's defense as trial counsel did bring up the fact that Abdullah had been robbed prior to his death during their cross-examination of Eugene Coleman. TT 3/20/2013 at 259–61. Besides, the informant's mere speculation that the robbers were involved in Abdullah's death would not have been admissible at trial anyway. Trial counsel were not ineffective for failing to pursue the identity of this particular informant.

In sum, the record reflects that Savage's trial counsel did vigorously pursue the names of confidential informants interviewed as part of the FBI's investigation into the crimes committed by Savage. Habeas counsel cannot show otherwise. This claim fails on the merits.

**Claim 6E:** Trial Counsel were ineffective for failing to accept the Court offered continuance to talk to Jonathan Baker. *Grant v. Lockett*, 709 F.3d 224, 234 (3d Cir. 2013).

Savage argues that his trial counsel should have accepted a brief continuance from the District Court to speak with Johnathan Baker, an eyewitness to Lassiter's murder who testified for the prosecution at Savage's trial. ECF No. 1746 at 405–08. During Baker's testimony, the Government disclosed a previously withheld FBI report indicating that Baker was incarcerated at the time of Savage's state trial for Lassiter's murder despite the ADA's prior statement that Baker was "unavailable" to testify at the state trial. *See id.* at 405–06. In the withheld FBI report, Kevin Lewis stated that Baker told him that during Baker's incarceration in early 2004, "a man came to his cell and told him not to talk to detectives about the shooting at 8th and Butler." *Id.* at 406; *see* ECF No. 1747-24 at 35–36. The Government moved to admit this statement as a co-conspirator statement. ECF No. 1746 at 406. The Defense objected and requested that Baker's testimony be

stricken entirely due to government misconduct. *Id.* Instead, the District Court offered the defense a short continuance so that defense counsel could review the FBI report, investigate the allegation, and interview Baker if needed. *Id.* Savage's attorneys declined the continuance, determining, correctly, that it would be futile since Baker would in all likelihood refuse to speak with them. *Id.*

Savage's trial counsel made the right call, as the Government confirms in its response that "Defense counsel's request to speak to Baker was dutifully conveyed to Baker by the prosecutors, and Baker declined to speak with them, as is his right." ECF No. 1795 at 88. Now, Savage notes that Baker was willing to meet with Savage's habeas counsel for an interview, but nowhere in Baker's declaration that was submitted along with the Petition does Baker state that he was willing to meet with Savage's trial counsel at the time of the trial, *see* ECF No. 1747-23 at 3–4, and the Government affirms that Baker in fact was unwilling to meet with Savage's trial counsel. In any case, the information that Baker shared with Savage's habeas counsel would have added little value, if any, to Savage's defense at trial. There is certainly not a reasonable probability that it would have changed the outcome of the proceeding. In his declaration, Baker shares his opinion that Lassiter's murder had nothing to do with selling drugs, but he has no basis for this opinion as he did not know Savage and could only speculate as to Savage's motivation for the shooting. *See id.* at 3. As to Baker's statement that he did not know Savage nor the man who warned him not to speak to detectives about the shooting, Baker actually states in his declaration, "*aside from this comment* I had no idea if he was an associate of Kaboni's," *id.* at 4 (emphasis added), so contrary to habeas counsel's position, this information would not have supported Savage's trial counsel's argument that the man's threat was not a co-conspirator statement since Baker implies that the man's "comment" signifies that he was an associate of Savage's.

Based on the foregoing, Savage cannot show that he was prejudiced by his trial counsel's

decision to not accept a continuance in order to attempt to speak with Baker in the middle of the trial. This claim fails on the merits.

**Claim 6F:** Trial Counsel were ineffective for failing to prepare witnesses before calling them to testify in the defense case. *Abdul-Salaam v. Sec'y of Penn. Dep't of Corr.*, 895 F.3d 254, 268 (3d Cir. 2018).

Savage faults his trial counsel for underpreparing defense witnesses before calling them to testify in his defense at trial. ECF No. 1746 at 552–56. In particular, Savage names three unprepared witnesses who testified for the defense: Maggie Jimenez, Tyrone Beal, and Stephen Robinson. *Id.* However, although Savage attempts to explain what would have been different in each of these witnesses' testimonies had his trial counsel been able to meet with them prior to trial, he fails to demonstrate how these differences would have contributed meaningfully to his defense in any of the charges against him. For example, he does not clarify how Maggie Jimenez's account of the firebombing absolves him of his involvement in the crime. *Id.* at 553–54. As for Tyrone Beal, Savage contends that Beal could have provided evidence that Gerald Thomas committed illegal acts attributed to Savage but does not detail what these acts were. *Id.* at 554. And as for Stephen Robinson, Savage does not establish that Robinson even had personal knowledge of Lamont Lewis' drug use. *Id.* at 555. Savage's proposal that his trial counsel should have questioned Robinson about being a suspect himself in Carlton Brown's murder would have undoubtedly been met with hostility by Robinson. Also, and most importantly, Savage fails to show that these witnesses were amenable to meeting with defense counsel to prepare for their testimonies in the first place. Given the complexity and subject matter of this case, trial counsel did the best they could to prepare Savage's defense. They cannot be faulted for underpreparing defense witnesses when the witnesses were unwilling to cooperate with them. Savage cannot show that he was prejudiced by his trial counsel's actions with respect to the preparation of witnesses, and as such,

this claim fails.

**Claim 6G:** Trial Counsel were ineffective for failing to object to inadmissible evidence during the guilt/innocence phase of trial.

Savage argues that his trial counsel failed to object to testimony and evidence that violated the Sixth Amendment's confrontation clause, noting the two specific instances discussed below. ECF No. 1746 at 549.

**Claim 6G(1):** Counsel were ineffective for failing to argue that the confrontation clause of the Sixth Amendment precluded the admission of the autopsy reports for Abdullah and Parker through the testimony of Dr. Preston, who had not authored said reports. *Crawford v. Washington*, 541 U.S. 51, 52 (2004).

First, Savage argues that his trial counsel should have objected to the admission of the autopsy reports for Abdullah and Parker because the testifying expert, Dr. Bennett G. Preston, did not author the reports. ECF No. 1746 at 549–51. Although Dr. Preston did not personally write the reports himself, he did, however, supervise the forensic fellows who conducted the autopsies and wrote the reports. ECF No. 1795 at 90. As part of his supervision, Dr. Preston worked closely with the fellows who performed the autopsies, reviewed their findings, edited the reports, and approved the final reports. *See* TT 03/13/2013 at 58–59. The autopsy reports in question could not have been finalized without Dr. Preston's sign-off. During the trial, Dr. Preston explained his supervision process as follows:

> I was assigned the case with [the fellow], and we would go over the – all the injuries that we saw. And she would do the autopsy . . . . But we would go over all the findings and we would go over the report and everything like that, and I would look over the report. Anything I did not like I would have her change it. And we let the fellows write the reports the way they wanted to write them, as long they had the important information down. They have to develop their own style, but I would go over everything with her and make sure everything was right.

*Id.* Dr. Preston's testimony reveals that he was intimately involved with the autopsies of Abdullah and Parker and was personally familiar with the autopsy reports. Thus, Dr. Preston was not just

some "scientist [who] work[ed] in the same forensic laboratory" as the doctors who wrote the reports, ECF No. 1746 at 550, so there were no confrontation clause concerns to raise. Cases in which autopsy reports were excluded on confrontation clause grounds involved situations where the testifying expert played no role in the underlying autopsy at all. *See, e.g.*, *United States v. Williams*, 740 F. Supp. 2d 4, 6, 10 (D.D.C. 2010) (excluding autopsy report from evidence where the prosecution sought to introduce report through "a medical examiner who was not present at the autopsy of [victim's] body"); *Ganthier v. Superintendent, Green Haven Corr. Facility*, No. 23-cv-414, 2025 WL 2452386, at *6 (E.D.N.Y. Aug. 26, 2025) (finding violation of confrontation clause where the testifying expert "had neither attended nor performed the autopsy"), *appeal filed*, No. 25-2258 (2d Cir. Sept. 26, 2025).

When the Government introduced into evidence the autopsy reports of Abdullah and Parker at trial, the Defense did not object to their admission. TT 03/13/2013 at 69, 88. Defense counsel's failure to object was not ineffective assistance as Savage now contends, *see* ECF No. 1746 at 551, but rather was a strategic decision as evidenced by the trial record. Savage's attorneys cross-examined Dr. Preston on both autopsy reports, clarifying certain issues regarding gunshot wounds to the victims' heads. TT 03/13/2013 at 95–104. Because Savage's trial counsel intended to make use of the autopsy reports as part of their defense case, they had no reason to object to the reports' admission into evidence. This was a reasonable choice on their part that the Court will not second guess ex post facto. *See United States v. Williams*, 403 F. App'x 707, 709 (3d Cir. 2010) (concluding that "an attorney's decision to . . . waive his client's confrontation rights is a legitimate trial tactic and part of a prudent trial strategy as long as the decision does not constitute ineffective assistance of counsel"); *United States v. Plitman*, 194 F.3d 59, 64 (2d Cir. 1999) ("[D]efense counsel may waive a defendant's Sixth Amendment right to confrontation where the decision is

one of trial tactics or strategy that might be considered sound.").

At any rate, Savage cannot show that trial counsel's decision to not raise any confrontation clause objections to the admission of the autopsy reports prejudiced him at trial because the causes of death for Abdullah and Parker were not in dispute. *See Williams v. Superintendent, GHCF*, No. 23-cv-5595, 2025 WL 3039845, at *12 (E.D.N.Y. Oct. 31, 2025) (finding that admission of autopsy report was erroneous but constituted harmless error where "the only issue at trial was the identity of the shooter—which the autopsy report did not address"). Savage fails to explain how the exclusion of the autopsy reports would have changed the outcome of the trial, making only the conclusory statement that "preclusion of this evidence would have made a different result in counts 3 and 5 at least reasonably possible." ECF No. 1746 at 551. For the reasons stated, Savage is not entitled to relief on this sub-claim.

**Claim 6G(2):** Counsel were ineffective for failing to argue that the confrontation clause of the Sixth Amendment precluded the admission of Jorge Reyes's grand jury testimony.

Second, Savage argues that his trial counsel should have objected to the admission of Jorge Reyes' grand jury testimony because Reyes did not testify at trial, even though it was his co-defendant Robert Merritt who sought to introduce Reyes' grand jury testimony into evidence. ECF No. 1746 at 551–52. The Government actually objected to the admission of Reyes' testimony, arguing it was unreliable hearsay. ECF No. 1795 at 91. Merritt's counsel wanted the jury to hear Reyes' account of the firebombing because Reyes contradicted aspects of Lamont Lewis' testimony of the firebombing. For example, Reyes recalled hearing eight to ten gunshots before the firebombing took place, TT 04/24/2013 at 51, whereas Lewis testified that he only fired two warning shots, TT 4/1/2013 at 215–16. Hence, the record indicates that Savage's trial counsel did not object to the admission of Reyes' testimony because it served to discredit Lewis' account of the firebombing. Additionally, it was in Savage's best interest to present a united front with his

co-defendants, and his attorneys certainly knew that objecting to the admission of Reyes' testimony would show discord among the four defendants and weaken Savage's own defense. Taking into consideration all these factors, trial counsel made an informed, tactical decision not to object to their colleagues' introduction of Reyes' account.

Savage argues that Reyes' statement that he was fearful of testifying in open court unfairly prejudiced Savage at trial, especially because Savage was accused of retaliating against witnesses. ECF No. 1746 at 551–52. This argument fails because Reyes did not know who was behind the firebombing and as such, his fear of retaliation could not have been specifically tied to a fear of Savage or Savage's associates. *See* TT 04/24/2013 at 59. Thus, Savage cannot show that the admission of Reyes' grand jury testimony prejudiced him at trial. This sub-claim lacks merit.

**3. *Claim 7: Failure to Request a Continuance of Trial***

In Claim 7, Savage argues that his trial counsel should have sought a continuance for the trial from the District Court because they were unprepared to try the case at the time of trial. ECF No. 1746 at 89–91. However, the record conclusively demonstrates that Savage's trial counsel were fully prepared for trial and confirmed as such to the District Court. The premise of this claim—that trial counsel were unprepared to defend Savage at the time of trial—also provided part of the basis for Claims 1 and 2, which assert that Savage suffered a constructive denial of counsel due to the transition of the lead counsel role from Sullivan to Purpura shortly before voir dire began and Sullivan being distracted by his pending magistrate judge appointment during his representation of Savage. The Court has already evaluated those claims and found them to be meritless, finding that both Sullivan and Purpura had worked tirelessly on this case, expending well over a thousand hours each in preparing Savage's defense. *See supra* Section III.A.2.

On direct appeal, the Third Circuit had also addressed the question of Purpura's readiness

to try the case after his appointment as new lead counsel, concluding that Purpura accurately represented to the District Court that he would be prepared to try the case without any continuances. The Third Circuit methodically laid out the facts demonstrating Purpura's readiness for trial as follows:

> First, Purpura was an experienced capital-qualified counsel. Second, Purpura relied on his experience in representing to the District Court that he could get "up to speed" in time for trial. Third, neither Purpura nor Savage himself moved for a continuance or indicated that Purpura was unprepared to proceed to trial. Given that capital defense counsel are not, as a rule, timid creatures, we have every reason to believe that if Purpura thought he needed additional time to prepare, he would have moved for a continuance. Fourth, although Purpura was lead counsel and the only capital-qualified counsel, Hoey had been a member of Savage's defense team for several years, and he remained on the team to assist Purpura in both preparing and trying the case. Fifth, it is reasonable for us to infer that Purpura inherited some work product from Sullivan and Hoey. **Sixth, and most importantly, our careful examination of the record confirms that Purpura provided Savage with zealous representation throughout trial. In fact, it is unclear to us what more Purpura could have done had he requested and received additional time to prepare.**

*Savage*, 970 F.3d at 248 (citations omitted) (emphasis added). Thus, the record establishes that Savage's counsel did not request a continuance of trial because they did not need one. Had trial counsel sought a continuance despite being prepared to go to trial, they would have been disingenuous.

The case cited by Savage in support of his argument that trial counsel's failure to seek a continuance constitutes ineffective assistance of counsel, *Code v. Montgomery*, 799 F.2d 1481 (11th Cir. 1986), is inapposite. ECF No. 1746 at 89. In that case, a state defendant's court-appointed counsel first met with him only three days prior to trial and the attorney's entire "trial preparation primarily consisted of calling [the defendant's] mother and suggesting that she attend the upcoming trial." *Code*, 799 F.2d at 1482. Defending against an armed robbery charge, Code's sole defense was an alibi defense and there was at least one alibi witness that was willing to testify

on Code's behalf at trial. *Id.* at 1485. Code's attorney did not investigate potential alibi witnesses aside from Code's mother, who did not know Code's whereabouts the day of the robbery, and no defense witnesses aside from Code appeared for trial. *Id.* at 1483, 1485. Under these circumstances, the court held that "[b]ecause Code relied entirely on an alibi defense, competent counsel would have moved for a continuance when *no* alibi witnesses other than the defendant appeared on the day of the trial." *Id.* at 1485. The failure to move for a continuance prejudiced Code because "he had a substantial alibi defense and but for his attorney's deficient performance, he would have presented it." *Id.* The court granted Code habeas relief because Code demonstrated that his attorney's failure to seek a continuance prevented him from receiving a fair trial. *Id.*

Here, Savage's trial counsel prepared for over three years for his trial and put on a robust defense at trial. As just one of many examples, Savage's counsel conducted thorough cross-examinations of Eugene Coleman and Lamont Lewis, attacking their recollections of the various murders for which Savage had been charged and impeaching their credibility by questioning their motives for cooperating with the Government. TT 3/19/2013 at 74–262; TT 3/20/2013 at 7–296; TT 3/21/2013 at 3–53; TT 4/1/2013 at 224–76; TT 4/2/2013 at 10–222. Savage fails to explain what his trial counsel could have done with the extra time provided by a continuance that would have had a reasonable probability of producing a different outcome. Because Savage's trial counsel were prepared for trial and did not need a continuance, their failure to seek one did not prejudice Savage and did not constitute ineffective assistance of counsel. Claim 7 is denied.

#### 4. ***Claim 8: Failure to Seek Severance of Savage's Case***

In Claim 8, Savage argues that his trial counsel were ineffective for failing to move to sever his case from his co-defendants for trial, noting that all of his co-defendants had sought to sever their trials from Savage's. ECF No. 1746 at 91–93. Unlike his three co-defendants, who were each

indicted for only a subset of all the charges listed in the Fourth Superseding Indictment, Savage was indicted for *all* of the charges brought to trial. *See* ECF No. 1795 at 14–15. As such, there was less of a reason for Savage to seek to sever his trial from his co-defendants, whereas his co-defendants were highly incentivized to sever their trials from Savage's, especially Kidada Savage, who were not facing the death penalty. Besides, because each of his co-defendants had already moved to sever their trials from Savage's, *see* ECF Nos. 363, 367, 433, a motion by Savage to sever his trial would have been redundant and his attorneys had better things to do to prepare for his defense than waste their time on a pointless motion. Indeed, the record reflects that trial counsel's failure to seek severance of Savage's trial was not an oversight, as counsel did file motions to sever when appropriate for Savage's defense. Trial counsel ended up filing two motions to sever: one motion to sever the counts charged against Savage into three separate groups, ECF No. 383, and one motion to sever Savage's trial from co-defendant Northington following Northington's disruptive behavior in the courtroom, ECF No. 883. The District Court ended up denying both motions to sever, finding, respectively, that all the counts concern murders that were committed in furtherance of the KSO's goals, as previously discussed when the Court addressed Claim 6A(3)(x), *see* ECF No. 846 at 39–42, and that concern about Northington's future behavior in the jury's presence was pure speculation and does not demonstrate prejudice to Savage, ECF No. 986.

The District Court also denied the motions by Savage's co-defendants to sever their trials from Savage's, holding that the seventeen counts listed in the operative indictment are manageable and that because "the jury will be instructed to give separate consideration to each charge against each Defendant," the jury will be able to compartmentalize the evidence and make individualized findings of guilt for each defendant with respect to each count in the indictment. ECF No. 846 at

15–16. On direct appeal, the Third Circuit affirmed the District Court's denial of the motions to sever, concluding that the verdicts showed that "the jury thoughtfully differentiated the crimes committed by the defendants, yielding some not-guilty verdicts and, in Northington's case, sparing his life." *Savage II*, 85 F.4th at 119–20.

Given that the District Court denied the motions to sever filed by each of his co-defendants and that the Third Circuit affirmed the District Court's ruling, any motion filed by Savage to sever his trial from his co-defendants would have undoubtedly also been denied by the District Court and the denial affirmed on appeal. Accordingly, Savage cannot show that his trial counsel's failure to seek severance of his case prejudiced him in any way. Thus, Claim 8 is denied.

#### 5. *Claim 9: Failure to Challenge Savage's "Inhumane" Pre-Trial Conditions*

In Claim 9, Savage rehashes Claim 4, which asserts that the "inhumane" and "degrading" conditions in which the Government held him prior to his trial denied him "his constitutional right to effectively consult with counsel and led to a fundamentally unfair trial." ECF No. 1746 at 462. This time, however, Savage argues that his attorneys provided him with ineffective assistance of counsel by failing to challenge his "inhumane" pre-trial conditions. *Id.* at 464–67. The Court has already addressed the reasonableness of the SAMs imposed on Savage in its discussion of Claim 4, finding that not only were the SAMs not unique to Savage but that they were also more than reasonable and put in place due to Savage's own actions and efforts to circumvent the restrictions imposed on his outside communications. *See supra* Section III.A.4. Thus, the Court has already concluded that the SAMs imposed on Savage did not deny him his constitutional right to counsel since they provided Savage with avenues for communication that he was able to use to consult with his counsel and review legal documents that he received from his attorneys. *See id.*

In any case, Savage's trial counsel did, contrary to Savage's claims in the Petition,

challenge Savage's conditions of confinement under the SAMs before the District Court, not once but on multiple occasions, as reflected by the record. In July 2010, counsel moved the District Court to lift and strike all SAMs imposed on Savage. ECF No. 137. In October 2010, the District Court held a hearing on the motion and heard argument from Savage's counsel detailing their objections to the SAMs. ECF No. 161. Following the hearing, the District Court denied Savage's motion to strike the SAMs. ECF No. 162. Then, in December 2011, counsel again moved for relief from the SAMs, arguing that they were interfering with Savage's ability to assist in his own defense. ECF No. 347. The District Court again denied the relief requested, except that it allowed Savage to meet with fact investigators without requiring the presence of his counsel and allowed the fact investigators to disseminate the contents of Savage's communications with his defense team. ECF No. 360. Hence, the record proves that trial counsel did in fact vigorously challenge Savage's pre-trial conditions but ultimately, their efforts were largely unsuccessful. Further efforts would have been likely met with the same result, and trial counsel were prudent to expend their resources elsewhere in their preparation for Savage's defense. Accordingly, Claim 9 is denied.

#### 6. *Claim 10: Presentation at the Authorization Hearing*

Claim 6 is now moot since Savage's sentence of death has been commuted to life imprisonment.

#### 7. *Claim 11: Savage's Leg Restraints During Trial*

In Claim 11, Savage complains that his trial counsel failed to make a reasonable objection to the use of leg restraints during trial. ECF No. 1746 at 690–93. This is demonstrably false, as acknowledged even by Savage himself in the Petition, which points out that trial counsel "repeatedly objected to the use of restraints and shackles even when there was no jury present." *Id.* at 691 (citing TT 11/16/2010 at 6–7; TT 4/14/2011 at 4–6; TT 7/6/2011 at 6–8; TT 6/5/2009 at

3; ECF No. 347). In addition, "[r]ight before voir dire started[,] Mr. Hoey joined an objection to the use of leg restraints." *Id.* at 692 (citing TT 11/5/2012 at 4). Thus, the record reflects that Savage's trial counsel did lodge reasonable objections to the use of leg restraints during trial and so, were not ineffective in this matter.

Savage also argues that the District Court failed to conduct the "close judicial scrutiny" required to determine whether the use of restraints was necessary during trial. *Id.* However, the record leading up to trial contains the District Court's reasoning for why leg restraints were necessary to protect court officials, testifying witnesses, the jurors, and members of the public during trial. In the District Court's Memorandum Opinion denying most of the relief requested relating to the SAMs imposed on Savage, the District Court explained that "[t]he Government's objective in requiring [Savage] to remain shackled during visits with his defense team is to protect prison staff, other inmates and [Savage's] attorneys and investigators." ECF No. 359 at 9. This security measure was put in place as a result of Savage's own actions, including his numerous threats to kill witnesses and their families, corrections officers, FBI agents, and BOP staff, and his attempts to communicate these threats through various methods, such as the telephone, written correspondence, personal prison contacts, visiting rooms, and messages left in prison books. *Id.* at 8–9 & n.8. The District Court's reasoning for keeping Savage shackled during visits with his attorneys extends even more so to restraining Savage during trial, where even more people are present, including witnesses testifying against Savage that he had previously threatened. Hence, the District Court had ample reason to take safety precautions to protect witnesses, prosecutors, courtroom staff, the Marshals, jurors, and members of the public during Savage's trial.

The use of leg restraints is perfectly permissible for maintaining courtroom security and order during a criminal trial. "A district court retains 'reasonable discretion' to determine whether

or not to physically restrain a criminal defendant." *United States v. Durham*, 287 F.3d 1297, 1303 (11th Cir. 2002) (citation omitted). The district court judge "is ultimately responsible for ensuring 'the safe, reasonable and orderly progress of trial,' and shackling or otherwise restraining a criminal defendant may occasionally be the only way to achieve this goal." *Id.* (citation omitted). Because "[t]rial judges are to be accorded reasonable discretion to balance the interests involved and to decide which measures are necessary to ensure the security of the courtroom," *id.* at 1304, this Court will not second guess the District Court's decision to order Savage and his male co-defendants to wear leg restraints during the trial.

In any event, Savage cannot show that his leg restraints prejudiced him during the trial or contributed to his verdicts in any way because the restraints were kept out of view of the jury. During the trial, opaque cloth curtains reaching the floor covered the front and both sides of all counsels' tables, both prosecution and defense, thus preventing the jury from seeing the male defendants' leg restraints. *See* ECF No. 1795 at 95. Savage now claims that "the sound of clanking chains could be heard when any defendant moved" but provides no evidence indicating that the jury heard or was otherwise aware of the leg restraints. ECF No. 1746 at 690. Habeas counsel argue that trial counsel should have asked the District Court to employ less prejudicial methods of restraint such as a stun belt. *Id.* at 692. Yet, courts have held that "[a] stun belt seemingly poses a far more substantial risk of interfering with a defendant's Sixth Amendment right to confer with counsel than do leg shackles[,]" and that "[i]f seen, the [stun] belt may be even more prejudicial than handcuffs or leg irons because it implies that unique force is necessary to control the defendant." *Durham*, 287 F.3d at 1305 (cleaned up). So, given habeas counsel's proclivity for finding fault with trial counsel's every action, had Savage's trial counsel advocated for a different type of restraint such as a stun belt, habeas counsel would likely now be arguing that trial counsel

were ineffective for failing to object to the use of the stun belt.

For the reasons stated, Claim 11 is denied.

### 8. *Claim 12: Prejudicial Evidence*

In Claim 12, Savage argues that his trial counsel were ineffective for failing to object to and for eliciting prejudicial evidence during both phases of trial. ECF No. 1746 at 19. Specifically, Savage identifies fives instances where prejudicial evidence was brought against him. The Court will address each of these sub-claims in turn. For the reasons discussed below, Claim 12 is denied.

**<u>Claim 12A:</u>** Counsel were ineffective for failing to properly challenge the admissibility of the recordings from Mr. Savage's prison cell at the Federal Detention Center.

In this sub-claim, Savage argues that his trial counsel failed to object to improper propensity evidence that was presented at trial, consisting primarily of recordings of Savage's conversations with fellow inmates while incarcerated at the FDC. ECF No. 1746 at 523–35. According to Savage, these inflammatory statements were simply him "ranting and venting about wanting to commit acts of violence or describing violent dreams" and "had [no] relevance to the case except to show that Mr. Savage was a bad person with a bad character." *Id.* at 525. Savage argues that because such statements were not relevant to prove his culpability for the charges against him, "[t]he jury never should have heard inflammatory statements where Mr. Savage did not admit any culpability, did not communicate a threat, or otherwise make any materially relevant incriminating admission." *Id.* at 524. Savage faults his trial counsel for not making "contemporaneous objections or requests for contemporaneous limiting instructions when any of these statements were played for the jury." *Id.* at 526.

However, there are two key issues with Savage's arguments in this sub-claim. First, Savage's trial counsel did object to the admission of his FDC recordings before the start of trial in several motions to suppress and motions in limine. *See, e.g.*, ECF Nos. 386, 393, 500, 568, 805,

1012. In an effort to preclude the FDC recordings, Savage's trial counsel attacked them from multiple angles: In addition to arguing that Savage's statements in the recordings were overly prejudicial, counsel also argued that they were unlawfully intercepted (ECF Nos. 386, 500, 568) and questioned their authenticity (ECF No. 393). In one motion in limine, trial counsel made the exact same arguments that habeas counsel make in the Petition regarding the unfairly prejudicial nature of the statements. ECF No. 805. For example, trial counsel argued that "[a]t best, these types of statements indicate Mr. Savage's displeasure with government cooperators, a feeling that is shared by many federal criminal defendants," and that "[t]he vast majority of these statements are so outlandish that they are devoid of probative value." *Id.* at 1, 5. Thus, the record reflects that trial counsel more than sufficiently challenged the admission of Savage's FDC recordings as unfairly prejudicial and irrelevant to proving his culpability.

Second, even if trial counsel had made contemporaneous objections to the admissibility of the FDC recordings on the grounds that they were improper propensity evidence, the District Court would have overruled those objections, as demonstrated by its denial of counsel's motion in limine. The District Court did not view Savage's statements in the recordings as improper character evidence, finding that they "may be relevant in establishing [Savage's] intent, planning, knowledge, motive, absence of mistake, and in rebuttal to Defendant's anticipated defense that such threats were harmless venting." ECF No. 1016 at 5. As to the statements' prejudicial nature, the District Court stated that "[b]ased on the charges in the Indictment, we cannot say that the evidence celebrating an informant's death, and [Savage's] threats to kill 'crackers,' to harm witnesses, to attack the prison warden, and to assault the child of a witness are uniquely prejudicial." *Id.* at 9. The District Court properly regarded the FDC recordings as more probative than prejudicial and would have overruled any objections to their admissibility, and as such,

Savage cannot demonstrate prejudice resulting from his trial counsel's failure to renew their objections to the recordings when they were admitted at trial.

**Claim 12B:** Counsel were ineffective for eliciting and failing to object to evidence that witnesses were in the witness protection program. *United States v. Vastola*, 899 F.2d 211, 236 (3d. Cir. 1990).

Savage complains that his trial counsel did not object to the admission of evidence relating to certain witnesses' participation in the witness protection program. ECF No. 1746 at 546–49. Savage argues in his Petition that "[e]vidence that a witness has participated in a witness protection program is prejudicial when there is any possibility the jury will infer that the defendant is the reason for the participation." *Id.* at 546. The Petition then states that "[a]t least six major witnesses testified that they were in or had previously been in a witness protection program" and that "[t]here was testimony that the witnesses' participation in the program was the direct result of actions or threats of Mr. Savage." *Id.* at 547. However, beyond this conclusory statement, Savage fails to identify which of his "actions or threats" that the witnesses had testified about when explaining why they were in a witness protection program, so it is not evident to the Court that the jury would have inferred that Savage was the primary reason for these witnesses' participation in these programs.

In any case, "[t]he Government may appropriately introduce evidence of their witnesses' participation in the Witness Protection Program in order to counter any inference of improper motivation or bias and, under some circumstances, may present this evidence on direct examination in anticipation of a defense attack upon the witnesses' credibility." *United States v. Melia*, 691 F.2d 672, 675 (4th Cir. 1982). Criminal defendants will often elicit testimony about a government witness' participation in a witness protection program in order to impeach the witness' credibility and show the jury that the witness received substantial benefits from the government

on account of his/her cooperation. *See United States v. Martino*, 648 F.2d 367, 388 (5th Cir. 1981) (recognizing that "the defendant should be permitted to show that a witness, while in the [witness protection] program, received substantial benefits" because "[s]uch information is relevant in the ultimate determination of the witness's credibility"); *United States v. Tarantino*, 846 F.2d 1384, 1407 (D.C. Cir. 1988) ("[A] defendant must be given a reasonable opportunity to cross-examine a government witness as to any agreement with the prosecution." (citations omitted)). Thus, as the Government astutely points out in its response (ECF No. 1795 at 97), had Savage's trial counsel objected to the admission of evidence about witnesses' participation in the witness protection program entirely, habeas counsel would now be bringing a claim that trial counsel were ineffective for *not* cross-examining the witnesses on the benefits received from their participation in the program. Ultimately, whether to elicit testimony about participation in a witness protection program is a strategic decision left to the sound discretion of trial counsel.

Additionally, Savage cannot show that evidence about certain witnesses' participation in the witness protection program prejudiced him when the Government presented ample evidence of death threats that he made against witnesses, potential witnesses, and their families. Examples of such threats were recited by the Third Circuit in its opinion affirming Savage's conviction and sentence. *Savage*, 970 F.3d at 291–93. In fact, "[i]n 2011, prison guards searching Savage's cell discovered Savage had somehow obtained confidential prison records revealing information about potential government witnesses in BOP custody, including some of the ones who entered Witness Protection." *Id.* at 292. Once evidence of Savage's death threats was admitted at trial, "the fact of [a witness'] entry to the witness protection program was relevant to lend credibility to [the witness'] fear." *United States v. Lehr*, 562 F. Supp. 366, 375 n.10 (E.D. Pa. 1983) (citation omitted). Based on the evidence presented at trial of all the threats that Savage made against

various individuals, Savage cannot demonstrate prejudice resulting from his trial counsel's failure to object to evidence concerning witnesses' participation in the witness protection program.

**Claim 12C:** Counsel were ineffective for failing to challenge inadmissible and pervasive evidence concerning family pets that had been burned in the house fire.

Savage argues that his trial counsel were ineffective for failing to object to the admission of prejudicial evidence, including photographs, relating to the deaths of the three Coleman family pets, which included a dog, a cat, and a turtle. ECF No. 1746 at 535–40. Savage argues that in particular, the prosecution harped on the death of the family dog, which was still alive in a cage downstairs when the firefighters entered the house, during both the guilt phase and the penalty phase of the trial. *Id.* at 536. Because Savage is no longer facing a death sentence, the Court will decline to address whether evidence of the deaths of the pets was probative of the aggravating factor that the arson murders were committed in a cruel, heinous, and depraved manner. As to the guilt phase, the Court finds that evidence concerning the death of the family dog, including crime scene photographs and the firefighter's emotional testimony, was not unfairly prejudicial in light of the fact that six people, including four children, were killed in the firebombing and Savage does not claim that the admission of evidence relating to the deaths of the six people was unfairly prejudicial to Savage during the guilt phase of the trial. Evidence of the deaths of pets, including photographs, is not more prejudicial than evidence of the deaths of people, especially the deaths of young children. Thus, Savage cannot show that trial counsel's failure to object to the admission of evidence and photographs relating to the deaths of the Coleman family pets prejudiced him at trial.

**Claim 12D:** Counsel were ineffective for failing to challenge or ameliorate the use of the name "Kaboni Savage Organization" during trial.

In this sub-claim, Savage argues that his trial counsel failed to object to the prosecution's

use of the name "Kaboni Savage Organization" at trial to describe the racketeering enterprise that Savage was charged with leading. ECF No. 1746 at 540–45. Savage contends that the term "Kaboni Savage Organization" prejudiced him at trial because it was a made-up name that was created by the FBI for use over the course of their investigation, but the jury was never informed that the name was not used by Savage or his associates and "was not in itself evidence of the existence of an organization or evidence that Mr. Savage was the leader." *Id.* at 541. Savage now complains that trial counsel failed to challenge or ameliorate the prosecution's use of this name, but that is simply not true. During opening statements, Savage's counsel told the jury multiple times that the "Kaboni Savage Organization" did not exist because there was no racketeering enterprise at all and that Savage certainly was not the leader of any such enterprise. A few examples from defense counsel's opening statement refuting the existence of the "Kaboni Savage Organization" are recited below:

- "I counted during the government's opening how many times they used the word 'entity' or 'enterprise' or the 'Kaboni Savage Organization.' And I stopped counting. After an hour, I reached 30 or 40 different times. Just because the government told you today that an organization or an enterprise existed absolutely means nothing. We intend to demonstrate that today and over the next several months. The fact that Mr. Savage is indicted today means nothing." TT 2/04/2013at 142.
- "There was no allegiance. There was no swearing to be allegiant to the Kaboni Savage Organization because . . . it didn't exist[.]" TT 2/04/2013 at 162.
- "It's important now because it shows unequivocally that there was no organization, that there was no group of people operating with each other, with business agreements and structures and business models, agreeing in fact to be allegiant to each other, advancing the

interests of enterprises through agreements and handshakes and business opportunities. None of that stuff was occurring." TT 2/04/2013 at 177–78.

- "What does that tell you? Well, it tells you that people are dealing drugs, including him. But it tells you that there is no organization. That this is what's called a buyer-seller relationship. That people buy cocaine when other people have it and if they don't have it, they are not allegiant to people who don't have it." TT 2/04/2013 at 185.

These statements show that Savage's trial counsel did make efforts to disrupt the connection that use of the term "Kaboni Savage Organization" implied the existence of such an organization.

In any case, even if the prosecution's use of the name "Kaboni Savage Organization" was improper, Savage suffered no prejudice at trial because the Government introduced overwhelming evidence that a criminal racketeering enterprise existed and that this enterprise was led by Kaboni Savage. Thus, "[o]n this record," the Court "cannot see how the naming of the enterprise possibly could have influenced the outcome of this case." *United States v. Vastola*, 899 F.2d 211, 232 (3d Cir. 1990) (explaining that "[w]hile the co-conspirators did not specifically refer to the enterprise as the 'Vastola Organization,' the record clearly shows that Vastola was in charge"), *vacated in part on other grounds*, 497 U.S. 1001 (1990); *see also United States v. Lawson*, 535 F.3d 434, 442–43 (6th Cir. 2008) (holding that although the jury should not have been permitted to hear that the defendant's nickname was 'Psycho,' "any error in this regard was harmless because, given the weight of evidence against [the defendant], the outcome of trial would not have been any different if the evidence had not been admitted" (citation omitted)). Here, in light of the abundance of evidence against Savage establishing that he was the leader of a drug dealing enterprise, the Court finds that there is no reasonable probability that preventing the prosecution's use of the name "Kaboni Savage Organization" would have resulted in a different outcome at trial.

**<u>Claim 12E:</u>** Counsel were ineffective for unnecessarily injecting racial prejudice into the trial by repeating a racial slur at trial.

Savage claims that he was prejudiced at trial when his trial counsel repeated a particular racial slur in the context of reciting a quote when cross-examining Lamont Lewis. ECF No. 1746 at 556–57. This argument, however, falls apart when considering that some of the evidence introduced at trial was replete with racial slurs, uttered entirely by Savage and his co-defendants, so much so that, as the Government points out in its response, potential jurors were forewarned about the pervasive use of racial expletives during the trial. *See* ECF No. 1795 at 101. Potential jurors who would not be able to remain fair and impartial after being exposed to such racial slurs were weeded out during the jury selection process by the following question in the Juror Questionnaire:

> During the trial, numerous tape recorded conversations may be introduced which include crude language, explicit profanities, racial epithets and other derogatory statements. Many of these conversations will be played aloud at trial. Is there anything about you or your background which would affect your ability to listen to these conversations and to make an impartial decision about this case?

Thus, in the context of the entire trial, this sub-claim has no teeth.

**9. *Claim 13: Jury Selection Issues***

Claim 13 consists of ten sub-claims challenging how Savage's trial counsel handled various issues during the jury selection process, critiquing both actions that trial counsel did and did not do. ECF No. 1746 at 19–20. The jury selection process in this case was a comprehensive process that spanned four months. ECF No. 1795 at 102. More than one thousand people completed the extensive juror questionnaire, which covered all relevant issues relating to the case, including views on the death penalty, media coverage of the case, and the anonymous nature of the jury. *Id.* Potential jurors who were not automatically disqualified based on their questionnaire responses were then subject to individual voir dire by counsel for both sides. The result of this arduous voir

dire process was a racially balanced jury that was composed of ten white jurors, two black jurors and six alternates—five white and one black. *Savage*, 970 F.3d at 236. "The jury went on to find Savage guilty as charged." *Id.* at 266.

The prosecution, defense counsel for all defendants, and the District Court were all meticulous about protecting each defendant's constitutional right to a fair and impartial jury during the four-month jury selection process. The result of all of their efforts was precisely that: an unbiassed, racially balanced jury that Savage now complains of in the following ten sub-claims, all of which are without merit. The Court will address each sub-claim in turn.

**Claim 13A:** Counsel were ineffective for failing to rehabilitate jurors deemed to have anti-death penalty views and for failing to object to the Court striking jurors for cause where there was not sufficient evidence that the juror was unwilling and unable to follow the law with respect to capital punishment. *Szuchon v. Lehman*, 273 F.3d 299, 330 (3d Cir. 2001); *Gray v. Mississippi*, 481 U.S. 648, 662-63 (1987).

This sub-claim concerns the alleged exclusion of jurors who oppose the death penalty, as Savage argues that his trial counsel did not attempt to rehabilitate jurors with anti-death penalty views by asking them whether they could set aside their personal beliefs on the death penalty to perform their duty as jurors in accordance with the law. ECF No. 1746 at 471–78. According to Savage, such a violation of *Witherspoon v. Illinois*, 391 U.S. 510 (1968), mandates a reversal of his death sentences. *Id.* at 475. Since Savage's death sentences have been commuted to life sentences, this sub-claim is now moot. As to whether the allegations in this sub-claim have any impact on the guilt phase of Savage's trial, the Supreme Court in *Witherspoon v. Illinois* held that while the exclusion of jurors who "voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction" violates the Sixth Amendment's requirement of impartiality with respect to the imposition of a death sentence, the exclusion of these same jurors does not impact the jury's determination of a defendant's guilt. 391 U.S. at 516–

18, 522 (rejecting the premise that "the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction"); *see also Lockhart v. McCree*, 476 U.S. 162, 183 (1986) (declining to extend the application of *Witherspoon* "outside the special context of capital sentencing"). As such, this sub-claim is not applicable to any issues of jury impartiality alleged with respect to the guilt phase of the trial.

**Claim 13B:** Counsel were ineffective for failing to adequately question jurors who could not meaningfully consider a life sentence and failing to move to excuse these jurors for cause.

This sub-claim appears to be a reprise of the above sub-claim. While sub-claim 13A focuses on the exclusion of anti-death penalty jurors, this sub-claim concerns trial counsel's alleged failure to exclude pro-death penalty jurors. ECF No. 1746 at 479–82. For the reasons discussed above, this sub-claim does not involve issues relating to the guilt phase of the trial and is now moot.

**Claim 13C:** Counsel were ineffective for failing to question all potential jurors on racial bias. *Ham v. South Carolina*, 409 U.S. 524 (1973).

In this sub-claim, Savage argues that his trial counsel were constitutionally ineffective when they failed to question all potential jurors on racial bias. ECF No. 1746 at 484–92. However, as the Government points out in its response, there was no need for defense counsel to question each and every potential juror regarding whether he/she was racially biased against black individuals because all potential jurors were required to complete a comprehensive juror questionnaire, which contained questions assessing each juror's racial bias. *See* ECF No. 1795 at 107–08. Potential jurors who were found to be racially prejudiced against black individuals were dismissed even before they reached the voir dire stage, saving all Parties time and effort. As stated above, voir dire in this case was an extensive process that lasted four months. Had Savage's trial counsel done as habeas counsel now suggest and questioned *all* potential jurors on the issue of

racial bias instead of relying on the answers in the juror questionnaire, there is no telling how much longer voir dire would have stretched. Through the juror questionnaire process, potential jurors with racial bias were already weeded out, and so, there was less of a need to question the remaining potential jurors regarding their racial bias. Trial counsel were entitled to use their discretion during the voir dire process and that discretion will not be second guessed.

As for Juror 551, the only juror complained of who was actually seated on the jury, Savage fails to show that this juror harbored racial bias. The only fact that Savage identifies in the Petition as demonstrative of Juror 551's racism is that this juror "said in his questionnaire that he thought African-Americans were more likely to be involved with crimes than other groups, explaining 'higher [percentage] in prison than population in general.'" ECF No. 1746 at 484 (record citation omitted). This observation by Juror 551, however, does not even remotely suggest that Juror 551 believed that *Savage* was more likely to commit crimes or act violently simply because he is black. *See id.* at 485. The Court rejects Savage's attempt to devise an inference of racism on the basis of nothing more than a juror's statistical observation.

**Claim 13D:** Counsel were ineffective for failing to raise challenges pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1996) when the government struck jurors 20, 263, and 364 because of their race.

In this sub-claim, Savage argues that his trial counsel failed to raise *Batson* challenges to the Government's peremptory striking of three jurors, which Savage alleges occurred due to their race. ECF No. 1746 at 492–95. In selecting jurors for a criminal trial, the prosecution is prohibited from discriminating against any potential juror on the basis of race, and a defendant's complaint that the prosecution struck a potential juror from serving on the jury because of his/her race is known as a *Batson* challenge. *See Batson v. Kentucky*, 476 U.S. 79 (1986). In *Batson*, the Supreme Court provided a three-step process for determining when a strike is racially discriminatory:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Foster v. Chatman*, 578 U.S. 488, 499–500 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 476–77 (2008)). In raising *Batson* challenges to the Government's striking of Jurors 20, 263, and 364, Savage only addresses the first step, contending that these jurors were struck because they were black. ECF No. 1746 at 493–95. Savage does not address the Government's proffered race-neutral reasons for striking these jurors, which is fatal to his claim that the Government purposefully discriminated against them on account of their race.

The Court will briefly address the reasons that each of these three jurors were struck to show why any *Batson* challenges raised by Savage's trial counsel would have failed. With respect to Juror 364, one of Savage's co-defendants did raise a *Batson* challenge, and the District Court found that the Government's race-neutral reasons for excluding her were credible. *See* ECF No. 1795 at 110. These reasons were that Juror 364 did not support the death penalty, had a son who had been involved in a shooting incident and became emotional when questioned about it, and had a boyfriend whom she visited in prison. *Id.* The Third Circuit affirmed the District Court's denial of the defense's *Batson* challenge regarding Juror 364. *Savage II*, 85 F.4th at 132.

Juror 20 was a 68-year-old black man who lived in North Philadelphia, the area that was home to the defendants in this case and where almost all of the crimes listed in the operative indictment took place. ECF No. 1795 at 108. This juror noted in his juror questionnaire that his opinion of the case was tainted by media coverage and he separately expressed concern about his ability to sit through the trial given his age, health, and the anticipated length of the trial. *Id.* These were all credible race-neutral reasons for the Government's exercise of a peremptory strike against

Juror 20. In fact, the Third Circuit, in addressing Savage's *Batson* challenge regarding a different juror, stated that the Government's concern about that juror's safety due to her North Philadelphia residence was a valid concern. *Savage*, 970 F.3d at 270. In striking Juror 20, the Government likely had similar concerns about Juror 20's safety.

Juror 263 was a young, black woman who was a victim of abuse. ECF No. 1795 at 109. In her juror questionnaire, she indicated that she strongly believed in the death penalty and would not be able to consider a life sentence for a person found guilty of a capital offense. *Id.* Juror 263's inability to vote for a life sentence disqualified her from sitting on the jury and is a race-neutral reason for striking her. Like Juror 263, Juror 20 was also "very pro-death penalty," ECF No. 1746 at 494, so had Savage's trial counsel actually raised *Batson* challenges and succeeded in seating these two pro-death penalty jurors, habeas counsel would no doubt be bringing ineffective assistance claims for trial counsel's failure to excuse these two jurors for cause (see sub-claim 13B). For the reasons stated, this sub-claim fails on the merits.

**Claim 13E:** Counsel were ineffective for rehabilitating and keeping a pro-death penalty, objectively adverse juror, Juror 2, because of her race. *Hughes v. United States*, 258 F.3d 453, 462 (6th Cir. 2001).

In this sub-claim, Savage now faults his trial counsel for rehabilitating and seating a black juror with supposedly pro-death penalty views, which is the exact opposite of the position he takes in the above sub-claim. ECF No. 1746 at 495–501. Savage is correct in noting that Juror 2 indicated that she supported the death penalty, particularly when children are the victims, in her responses to the juror questionnaire. *Id.* at 495. Despite her initial pro-death penalty stance, however, Juror 2 affirmed throughout the voir dire process that she was capable of being open-minded and fair. What Savage now characterizes as "textbook rehabilitation questions" by his trial counsel were actually part of an effective strategy to proactively exclude strong pro-death penalty jurors. *See id.*

at 497. As the Government explains in its response:

> Savage's trial counsel employed an extremely effective strategy by which they would take apparently government-oriented jurors and 'push them over the edge' by presenting the facts in such a way as to get them to disqualify themselves by saying that they could not meaningfully consider a life sentence. This strategy effectively eliminated numerous jurors who may have been more inclined to impose the death penalty.

ECF No. 1795 at 103. Trial counsel utilized this strategy in their questioning of Juror 2, and the "textbook rehabilitation questions" were actually designed to "push her over the edge" by first presenting the aggravated facts in the case and then asking her if she could "*still* keep a fair and open mind" when deciding between the death penalty and life imprisonment. *See* ECF No. 1746 at 497. It was in spite of trial counsel's efforts, not because of them, that Juror 2 was seated on the jury because she proved herself to be a fair and impartial juror, affirming over twenty times during her voir dire that she could meaningfully consider mitigating circumstances and vote for a sentence of life imprisonment over imposing the death penalty. ECF No. 1795 at 111. Thus, Savage's trial counsel were not ineffective for failing to keep Juror 2 off the jury.

In any case, any prejudice suffered by Savage as a result of seating Juror 2 on the jury is now gone since Savage is no longer facing the death sentence. As explained in the discussion of sub-claim 13A above, the inclusion or exclusion of pro-death penalty jurors has no impact on the validity of the jury's verdicts in the guilt phase. In fact, the Third Circuit rejected Kidada Savage's argument that she was prejudiced by the fact that she was tried by a death-qualified jury even though she herself was not facing the death penalty. *Savage II*, 85 F.4th at 120. The Court recites the Third Circuit's cogent explanation as it is applicable here: "A death-penalty-qualified juror, like any other, is expected to follow the court's instructions, presume every defendant is innocent until proven guilty, and not vote to convict except upon proof beyond a reasonable doubt. The jurors here clearly did so." *Id.*

**<u>Claim 13F:</u>** Counsel were ineffective for asking voir dire questions that primed the jury to misapply the aggravators at sentencing.

This sub-claim concerns trial counsel's alleged improper voir dire questions that Savage contends primed the jury to misapply the aggravators during the sentencing phase of his trial. ECF No. 1746 at 501–03. Because Savage's death sentence has been commuted to life imprisonment, this sub-claim is now moot.

**<u>Claim 13G:</u>** Counsel were ineffective for failing to reasonably challenge the government's motion for an anonymous jury, failing to take any steps to minimize the prejudicial impact of the Court's anonymous jury order, and failing to request an instruction minimizing the impact of the anonymous jury on Mr. Savage's due process rights.

In this sub-claim, Savage argues that his trial counsel's failure to challenge the Government's motion for an anonymous jury and to minimize the prejudicial impact of an anonymous jury constituted ineffective assistance of counsel. ECF No. 1746 at 503–17. However, this claim fails on the merits because trial counsel did attempt to challenge the Government's request for an anonymous jury in clever ways and further efforts would have been unsuccessful, the District Court already took adequate steps to minimize any prejudicial impact of an anonymous jury on the defendants' constitutional rights to a fair and impartial jury, and Savage's trial counsel cleverly exploited the anonymity order to his advantage to exclude jurors who were viewed as unfavorable to the defense.

The District Court properly granted the Government's motion for an anonymous jury in this case and laid out its reasoning as follows:

> We agree with the Government and Savage that an anonymous jury and heightened jury security measures are necessary. During the 2005 drug trial of Savage and Northington in this District, Judge McLaughlin determined that the use of an anonymous jury panel and heightened jury security was appropriate based upon evidence of Defendants' history of violence and intimidation of witnesses. *See United States v. Savage*, No. 04-269, at ECF No. 616 (E.D. Pa. filed Sept. 26, 2005). Trial in the instant case presents the same need for heightened security measures. The Indictment is replete with examples of threats, intimidation and violence

> against Government witnesses and their families by Defendants. Jurors also have been the subject of such tactics. While housed at the Federal Detention Center ("FDC") in Philadelphia, Savage "plotted to obtain the addresses and telephone numbers of the jurors in his 2005 federal jury trial." (Gov't's Mot. App. A. at 9.) The evidence establishes a dangerousness and a "willingness and ability to interfere with the judicial process" on the part of Defendant. *United States v. Byers*, 603 F. Supp. 2d 826, 830 (D. Md. 2009) (granting Government's request for an anonymous jury panel where the defendant's conduct, which included murdering government witnesses, showed his willingness and ability to interfere with the judicial process).

ECF No. 601 at 5 (footnote omitted). In making the decision to empanel an anonymous jury, the District Court considered the following required factors, which all weighed in favor of ordering jury anonymity: "(1) pretrial publicity from prior related cases that may contribute to juror apprehension; (2) any history of violence by the defendant; (3) the severity of the charges facing the defendant; and (4) any claims that the defendant previously intimidated witnesses." *United States v. Stewart*, 325 F. Supp. 2d 474, 498 (D. Del. 2004) (citations omitted). Each of these four factors having been met in this case, the District Court appropriately exercised its discretion in granting the Government's motion.

In the Petition, Savage argues that jury anonymity was not necessary in this case because he "was under SAMs restrictions by the time of his capital trial that severely limited his ability to even communicate with the outside world, let alone track down and influence or intimidate a juror." ECF No. 1746 at 504. However, as discussed previously when addressing Savage's claims in the Petition challenging the SAMs, Savage was constantly trying to circumvent the restrictions imposed on him while he was detained prior to trial in this case. *See supra* Section III.A.4. Savage's proven inability to abide by court-mandated restrictions, coupled with his past threats against jurors, reinforces the District Court's conclusion that an anonymous jury was absolutely necessary in this case. The threats and actions by the other three co-defendants in the case, as summarized in detail by the Government, *see* ECF No. 1795 at 116–17, also contributed to the

necessity of an anonymous jury.

Savage argues that the "anonymous jury violated [his] Fifth and Sixth Amendment rights, and infected every stage of his trial," faulting his trial counsel for not objecting to the empaneling of an anonymous jury, but does not explain how trial counsel could have attacked the Government's motion or how the District Court's consideration of the jury anonymity factors was flawed. ECF No. 1746 at 505. Rather than challenging the Government's request for an anonymous jury head-on, Savage's trial counsel prudently recognized that such a challenge would have been a losing battle and concentrated their efforts on trying to obtain smaller wins elsewhere. First, trial counsel brought to the District Court's attention the untimeliness of the Government's motion, ECF No. 446, and second, trial counsel moved for a sequestered jury to guarantee that the four defendants, including Savage, have a fair trial with an impartial jury, ECF No. 476. The District Court denied the request for a fully-sequestered jury, finding that "[t]he burdens placed on a fully-sequestered jury outweigh the concerns raised by Savage" and noting that proper instructions to the jury to avoid publicity and media accounts of the case were sufficient to ensure that the defendants will receive a fair trial. ECF No. 601 at 7, 8. Further attempts by trial counsel to challenge the jury anonymity order would have been likewise unsuccessful, especially considering that the Third Circuit had upheld the district court's use of an anonymous jury in Savage's 2005 federal drug trial upon receipt of evidence of credible threats by Savage against jurors and witnesses. *See United States v. Walker*, 392 F. App'x 919, 924–25 (3d Cir. 2010).

Next, Savage complains that his trial counsel failed to minimize the prejudicial impact that the anonymous jury had on his trial. ECF No. 1746 at 506–10. However, the District Court had already taken steps to minimize any prejudicial impact from the anonymous jury order through the written instructions in the juror questionnaire that all potential jurors were required to complete.

In *Walker*, the Third Circuit cautioned that when empaneling an anonymous jury, a district court should dispel "any possible inference of defendants' guilt arising from the use of an anonymous jury." 392 F. App'x at 925 (citation omitted). In Savage's 2005 federal drug trial, this was accomplished by the district court supplying the following neutral reason for why the jurors' identities were kept anonymous: "These steps are taken to protect your privacy and to aid in your work as jurors. I have done this to ensure that both sides will receive a fair trial in this case, as is both sides' right." *Id.* (record citation omitted). Here, in this case, the juror questionnaire provided a similarly neutral explanation to potential jurors about the reason for the jury's anonymity:

> To protect your rights of privacy and to assist you in discharging your responsibility as jurors fairly and impartially, you are part of an anonymous group of potential jurors. This means that although your identity is known to limited members of the staff of the Clerk of the Court, your name and address have not been and will not be disclosed to the judge, to the attorneys for the government or the attorneys for the defendants.

ECF No. 1795 at 119. This explanation was sufficient to dispel any inferences by potential jurors that the real reason for the jury's anonymity was that the defendants were guilty of the crimes for which they were charged. In fact, Savage can point to only one example of a potential juror, who ultimately was not seated on the jury, assuming that the anonymity order was put in place to protect the jury's safety. ECF No. 1746 at 506.

Despite Savage's insistence that his trial counsel should have advocated for a minimizing instruction reminding the jurors that the status of the jury's anonymity has no bearing on the presumption of innocence, such an instruction would have done more harm than good. *See id.* at 508. By reading such an instruction to the jurors or otherwise conducting voir dire on the impact of the jury's anonymity, as Savage also suggests, *id.*, the District Court would have been calling further unnecessary attention to the fact that the jury was anonymous, thus potentially raising alarm bells for some jurors that the anonymous jury order was a result of the defendants' actions rather

than the neutral reason conveyed in the juror questionnaire.

Finally, because Savage's attorneys used the anonymous jury order to his advantage during the jury selection process, Savage cannot now complain that he was prejudiced by having an anonymous jury. As Savage acknowledges in the Petition, his defense team "decided that some jurors had bad death penalty attitudes and we didn't want them. They had provided specific questionnaire answers that could have allowed them to be identified. We asked [the] court to excuse them out of concerns for anonymity." *Id.* at 513 (record citation omitted). Thus, trial counsel's strategy with respect to the anonymity requirement shows that Savage actually benefitted from the use of an anonymous jury, as his attorneys were able to use the breach of anonymity as a cover for dismissing jurors unfavorable to the defense instead of expending their limited peremptory challenges. Rather than prejudicing Savage, the anonymous jury order ended up proving advantageous to Savage's jury selection strategy. That the jury still found Savage guilty beyond a reasonable doubt based on the evidence presented at trial does not signify that the use of an anonymous jury prejudiced Savage after all. For the reasons stated, this sub-claim fails.

**<u>Claim 13H:</u>** Counsel were ineffective for not challenging how the anonymization of the jury impacted Mr. Savage's right to full and fair voir dire.

This sub-claim is a continuation of the above sub-claim. Savage argues that the application of juror anonymity in this case deprived him of his right to a full and fair voir dire. ECF No. 1746 at 511–16. Savage complains that "both the defense and prosecution played fast and loose with the 'anonymity requirement' for unconstitutional purposes." *Id.* at 515. As explained above, Savage's counsel took full advantage of the need for an anonymous jury and effectively employed a strategy of weeding out undesirable jurors by arguing that their anonymity had been compromised. Besides the fact that Savage did not complain about the anonymous nature of the jury when it was benefiting him, Savage was not in any way deprived of a full and fair voir dire. When considering

the Government's motion for an anonymous jury, the District Court found that "the practice of withholding jurors' names, addresses and places of employment does not deprive the defense of the information it needs to conduct an effective *voir dire* and exercise its peremptory challenges." ECF No. 601 at 5 (quoting *Stewart*, 325 F. Supp. 2d at 499). In this case, the four-month jury selection process was painstakingly comprehensive: prospective jurors first filled out a nearly 60-page juror questionnaire that contained questions about various non-identifying factors of their personal lives and beliefs, followed by individual voir dire for jurors who were not automatically disqualified based on their questionnaire answers. *See* ECF No. 1795 at 120. The Court finds that the exhaustive voir dire process, in which Savage's counsel were active participants, was more than sufficient to ensure that the use of an anonymous jury did not adversely affect Savage's right to a full and fair voir dire.

**<u>Claim 13I:</u>** Counsel were ineffective for failing to present available evidence to support a fair cross-section motion and for failing to seek the necessary discovery or obtain court-granted discovery for jury composition issues. *Taylor v. Louisiana*, 419 U.S. 522 (1975); *Garcia-Dorantes v. Warren*, 801 F.3d 584, 593 (6th Cir. 2015).

In this sub-claim, Savage argues that his trial counsel failed to adequately support with available evidence their motion that the qualified jury wheel underrepresented potential black jurors and as such violated his constitutional and statutory rights to be tried by a jury drawn from a fair cross-section of the community. ECF No. 1746 at 517–22. On direct appeal, Savage's appellate counsel raised a fair cross-section claim and the Third Circuit denied the claim, finding that Savage failed to make out a prima facie showing of a fair cross-section violation. *Savage*, 970 F.3d at 255–62. To establish a fair cross-section violation, Savage must demonstrate that (1) a distinctive group in the community (2) was not fairly and reasonably represented among potential jurors compared with its representation in the community (3) due to "systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979). The Third

Circuit held that Savage had only managed to satisfy the first prong, concluding that he failed to demonstrate unfair and unreasonable representation of Blacks on the qualified jury wheel (prong two) and failed to show that any underrepresentation was because of systematic exclusion (prong three). *Savage*, 970 F.3d at 254.

Savage now contends that both trial counsel and appellate counsel should have presented additional evidence to establish the second and third prongs. ECF No. 1746 at 518. This evidence was that the underrepresentation of black jurors had persisted for at least two past jury wheels, the 2007 qualified wheel, which was 9.07% black, and the 2009 wheel, which was 9.46% black. *Id.* Savage argues that this evidence reflects a historical trend of underrepresentation and would suffice to satisfy the remaining two prongs because the "'magnitude of a disparity' depends, in part, on the length of time it has existed." *Id.* (citing *Ramseur v. Byer*, 983 F.2d 1215, 1233 (3d Cir. 1992)). However, even according to the case cited by Savage, *Ramseur v. Byer*, the data presented in the Petition would fail to demonstrate unfair and unreasonable representation, and systematic exclusion. In *Ramseur*, the Third Circuit held that data over only a two-year period did not "convincingly demonstrate that the representation of African-Americans on jury pools was unfair or unreasonable." 983 F.2d at 1235. The Court in *Ramseur* also explained that "the selection process was facially neutral and included names from both the voter registration and DMV lists." *Id.* The numbers in *Ramseur* were comparable to the numbers here, with slightly higher absolute disparities (14.1% and 14.6% compared to 8.45% here) and slightly lower comparative disparities (39.3% and 40.1% compared to 50.24% here). *Id.* at 1231; *Savage*, 970 F.3d at 256.

Thus, even if Savage had presented data concerning the 2007 and 2009 qualified wheels, the District Court and the Third Circuit would have still found against him on both the second and third prongs. Even with evidence from a greater length of time, the absolute and comparative

disparities in this case "are insufficient to show unfair and unreasonable representation under *Duren*." *Savage*, 970 F.3d at 257. Savage's failure to satisfy the second prong would doom any fair cross-section claim despite any speculative assumptions that historical data would reveal the existence of systematic exclusion under the third prong. *See* ECF No. 1746 at 519. Next, Savage tries to argue that counsel should have presented evidence that Hispanics were also underrepresented on the qualified wheel. Such a claim would have likewise been rejected, as the numbers reveal that the absolute disparities (around 3%) and comparative disparities (around 49–57%) are similar to the disparities for black jurors that the Third Circuit found failed to meet the second *Duren* prong.

Additionally, Savage cannot show that he was prejudiced by these so-called errors by his trial counsel because the overwhelming evidence presented against him at trial establishes that there is no reasonable probability that a "properly selected jury" would have been less likely to convict him for the charges in the operative indictment. *See* ECF No. 1746 at 521. Therefore, for the reasons stated, this sub-claim fails.

**Claim 13J:** Trial counsel were ineffective for failing to adequately support their motion to change venue, failing to renew their motion after the trial date was set, and failing to adequately voir dire on jurors' exposure to pre-trial publicity.

In this sub-claim, Savage argues that his trial counsel, despite having filed a motion to change venue prior to trial, were nonetheless ineffective for not adequately supporting the motion, not renewing the motion, and not conducting sufficient voir dire concerning jurors' exposure to media coverage of the case. ECF No. 1746 at 689–90. In denying Savage's motion to change venue, the District Court conducted a thorough analysis of the four *Skilling* factors (size and characteristics of the community, general content of the news coverage, timing of the media coverage relative to the commencement of trial, and whether there was any media interference

with actual courtroom proceedings) and concluded that each of the four factors weighed against a finding that prejudice may be presumed based upon pretrial publicity. ECF No. 538 at 6–14; *see Skilling v. United States*, 561 U.S. 358, 377–78 (2010). Contrary to Savage's contention, any efforts to renew the motion closer to the trial date to include more recent news articles would not have swayed the District Court's decision to deny the motion given that all the other *Skilling* factors still weighed against a presumption of prejudice. Trial counsel had better things to do to prepare for Savage's defense than renew a meritless motion.

Savage's contention that trial counsel failed to effectively voir dire potential jurors on their pretrial media exposure to the case is false because all potential jurors were thoroughly vetted regarding their media exposure during the jury selection process. The juror questionnaire included multiple questions about jurors' exposure to publicity surrounding the case. ECF No. 1795 at 122. These questions asked jurors whether they had "read, seen, or heard any news stories" about the case, or had ever discussed the case with anyone; "what stands out most in [their] mind about what [they] have read, seen, heard or learned" about the case; and "what opinions and feelings, if any, do [they] have about the case." *Id.* During individual voir dire, counsel for both sides had the opportunity to ask follow-up questions to any juror on this topic. Savage complains that his trial counsel "failed to probe the concerning statements made in Juror 68's questionnaire remembering the case in the news" but her answers during voir dire clearly indicated that "she did not remember the details of the news stories." ECF No. 1746 at 690. What more was trial counsel supposed to do, short of accusing Juror 68 of lying on the stand? Savage offers no solutions in his Petition.

The District Court properly denied Savage's motion to change venue, and trial counsel were not ineffective for deciding not to renew the motion. This sub-claim lacks merit.

**10. *Claim 14: Improper Jury Instructions***

In Claim 14, Savage argues that his trial counsel were ineffective for failing to object to unconstitutional or improper jury instructions and for failing to request instructions on lesser included offenses. ECF No. 1746 at 20. Savage takes issue with the jury instructions addressing reasonable doubt; this is the subject of Claim 29A and will be discussed later. *See infra* Section III.E.4. As to Savage's contention that the jury instructions did not include instructions on lesser included offenses, Savage provides no legal support for his contention that he was entitled to instructions on alleged "lesser included" offenses. *See* ECF No. 1795 at 122–23. In any case, Savage cannot show that the lack of instructions on lesser included offenses prejudiced him because considering the overwhelming evidence presented by the prosecution at trial, the jury properly convicted him on the charges against him in the operative indictment. The exclusion of lesser included offenses in the jury instructions is also the focus of Claim 29B and will be discussed in greater detail later. *See infra* Section III.E.4. For the reasons stated in the Court's discussion of Claims 29A and 29B, Claim 14 is denied.

**11. *Claim 15: Failure to Preserve Issues for Appeal***

Claim 15 appears to be a catch-all for any remaining ineffective assistance of trial counsel claims Savage wishes to muster. In this claim, Savage argues that his trial counsel unreasonably failed to preserve many of the issues raised on direct appeal by his appellate counsel. ECF No. 1746 at 703–05. All of the issues he lists in his Petition were considered and ultimately rejected by the Third Circuit, thus proving that they were not meritorious issues. Nonetheless, Savage contends, without providing any support, that he would have likely prevailed on some of these claims on direct appeal had trial counsel preserved the claims and thereby allowed the Third Circuit to review them under a standard of review other than plain error review. *Id.* at 705. In so arguing,

however, Savage does not identify which claims he would have prevailed on, explain what standard of review the Third Circuit would have applied to said claims, or state why he would have prevailed under a different standard of review. Claim 15 is woefully deficient and is denied.

**C. Ineffective Assistance of Appellate Counsel Claims**

The third category of claims in the Petition asserts that Savage's appellate counsel were ineffective for failing to raise or support fourteen meritorious issues on direct appeal before the Third Circuit. ECF No. 1746 at 20–22. Ineffective assistance of appellate counsel claims are governed by the same *Strickland* standard that governs ineffective assistance of trial counsel claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002). "The two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), applies to a defendant's claim that his appellate counsel was ineffective." *Id.* First, the petitioner must show that his appellate counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Second, he must show that there is a reasonable probability "that his appeal would have prevailed had counsel's performance satisfied constitutional requirements." *Cross*, 308 F.3d at 315 (citation omitted).

On direct appeal, Savage was excellently represented by a team of experienced attorneys from the federal capital habeas section of the Federal Defender's Office in Albany, New York, and the Gibbons law firm based in Newark, New Jersey. ECF No. 1795 at 123. Together, this appellate team presented thirteen substantive claims before the Third Circuit and filed two briefs (one opening brief and one reply brief) totaling over 500 pages. *See United States v. Savage*, No. 14-9003 (3d Cir. Oct. 1, 2014), opening brief filed Oct. 28, 2018, reply brief filed Sept. 9, 2019. The Third Circuit carefully considered all thirteen claims brought before it and denied every claim. *Savage*, 970 F.3d at 316. Savage's appellate counsel raised those thirteen claims on appeal because

they were the strongest arguments that Savage had for reversing his convictions and sentences. That the thirteen claims turned out to be unsuccessful does not mean that appellate counsel were ineffective in their representation of Savage.

Habeas counsel fault appellate counsel for failing to raise twelve additional issues on appeal. Upon review, the Court finds that these twelve issues are all meritless and so, appellate counsel were not ineffective for not presenting them on direct appeal. Habeas counsel also allege that appellate counsel failed to adequately support and/or argue two of the claims that were raised on appeal, but the supplemental arguments proposed by habeas counsel are likewise meritless and would not have altered the outcome of the appeal. In deciding which claims to raise on an appeal, appellate counsel "has no duty to raise every non-frivolous issue that could be raised." *Lynch v. Dolce*, 789 F.3d 303, 311 (2d Cir. 2015) (citation omitted); *see Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996) ("[T]he process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." (quoting *Smith v. Murray*, 477 U.S. 527, 536 (1986)) (internal quotations omitted)). Here, Savage's appellate counsel carefully selected the thirteen claims that were most likely to succeed on appeal and fully briefed and argued those claims before the Third Circuit. Appellate counsel's decision not to raise additional, weaker claims and arguments does not signify that appellate counsel were deficient in their representation of Savage. *See Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.").

The Court finds that appellate counsel competently represented Savage on his direct appeal by presenting strong, substantive arguments to the Third Circuit laying out why Savage was

entitled to relief on his convictions and sentences. Claim 16 and its fourteen sub-claims are denied. The Court will address each sub-claim in turn.

**Claim 16A:** Appellate counsel were ineffective to the extent their presentation precluded the consideration of any issue in post-conviction proceedings.

This sub-claim appears to be a catch-all for anything in the Petition that would be precluded by the claims raised by appellate counsel on direct appeal. ECF No. 1746 at 93–95. Savage recognizes that "[t]he issues raised in this instant motion with respect to Mr. Savage's counsel are separate from those raised on appeal," but "to the extent that anything in this motion could be precluded by the claims raised by appellate counsel, Mr. Savage maintains that appellate counsel was ineffective." *Id.* at 93, 94. Savage asserts this catch-all claim but does not even attempt to identify which of his claims in the Petition might be precluded by claims that were raised on his appeal. The Court will not embark on a truffle hunting exercise to seek out claims that may fall within this sub-claim. *See Dunkel*, 927 F.2d at 956. As such, this sub-claim lacks merit.

**Claim 16B:** Appellate counsel were ineffective for not raising the constitutional violations caused by Mr. Savage's inhumane pretrial conditions on appeal.

In this sub-claim, Savage repeats the arguments he made in Claims 4 and 9, this time complaining that his appellate counsel failed to raise the issue of his restrictive pre-trial conditions on appeal. *Id.* at 467. For the reasons stated in the Court's discussion of Claim 4, arguments that Savage's pre-trial conditions harmed his ability to prepare for his defense are without merit, and as such, pursuing this issue on appeal would have been futile. *See supra* Section III.A.4. The Court also notes that Savage's appellate counsel did file a motion in July 2015 with the Third Circuit to lift or modify the SAMs imposed on Savage, which the Third Circuit denied. *See United States v. Savage*, No. 14-9003 (3d Cir. Oct. 1, 2014), motion filed July 20, 2015. This further proves that any additional attempts by appellate counsel to pursue this issue would have been a waste of time.

This sub-claim fails.

**Claim 16C:** Appellate counsel were ineffective for failing to raise jury selection errors on appeal. Appellate counsel erred by not arguing that dismissing jurors who expressed that they may be against the death penalty without further inquiry violated *Witherspoon v. Illinois*, 391 U.S. 510 (1968); by failing to argue that racially-biased jurors should have been dismissed for cause; by failing to appeal the Court's denial of a challenge brought pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1996) regarding the government striking Juror 364; failing to appeal the anonymous jury order; and for failing to challenge the excusal of jurors for revealing identity information.

In this sub-claim, Savage argues that his appellate counsel were ineffective for failing to raise various jury selection issues on appeal, specified above. ECF No. 1746 at 471, 484, 503. All of these jury selection issues were discussed by the Court when addressing Claim 13 and were all found to be meritless. *See supra* Section III.B.9. Because these jury selection issues lack merit, appellate counsel were not ineffective for declining to raise them on appeal as doing so would have been futile. Moreover, appellate counsel did raise two stronger jury selection claims on appeal, a fair cross-section violation and a *Batson* challenge to the Government's peremptory striking of Juror 185. *Savage*, 970 F.3d at 252–53, 262–66. These claims were ultimately rejected by the Third Circuit. *Id.* Savage's co-defendant Northington appealed the District Court's denial of the defense's *Batson* challenge to the Government's striking of Juror 364, which Savage identifies as a viable issue in this sub-claim. *Savage II*, 85 F.4th at 131–32. The Third Circuit denied Northington's claim and held that the District Court did not clearly err in overruling the *Batson* challenge as to Juror 364, *id.* at 132, definitively proving that one of the jury selection issues that Savage faults his appellate counsel for not raising on appeal would have been unsuccessful. For the reasons stated, this sub-claim fails.

**Claim 16D:** Appellate counsel were ineffective for failing to cite to record evidence supporting fair cross section claim.

This sub-claim repeats the arguments made in Claim 13I. In its discussion of Claim 13I, the Court concluded that even had counsel cited the additional evidence and data that habeas

counsel now recommend, the fair cross-section claim presented on appeal would still have been rejected because the Third Circuit's analysis of that claim did not depend on the additional evidence. *See supra* Section III.B.9. As such, appellate counsel's performance with regard to the fair cross-section claim was not deficient, and any failure on their part to present the additional evidence and data did not prejudice Savage because the claim would still have been unsuccessful. This sub-claim is meritless.

**Claim 16E:** Appellate counsel were ineffective for failing to appeal the admission of the recordings from Mr. Savage's prison cell at the Federal Detention Center.

This sub-claim repeats the arguments made in Claim 12A. ECF No. 1746 at 523. When Savage's trial counsel sought to suppress statements from Savage's FDC recordings, the District Court properly denied the motions to suppress. In its discussion of Claim 12A, this Court explained why further attempts by trial counsel to prevent the jury from hearing the FDC recordings would have been similarly unsuccessful. *See supra* Section III.B.8. For the same reasons stated in the Court's analysis of Claim 12A, any appeals by Savage's appellate counsel to challenge the admission of the FDC recordings at trial would have been futile. Thus, this sub-claim fails.

**Claim 16F:** Appellate counsel were ineffective for failing to raise on appeal that it was prejudicial and improper for the government to use the name "Kaboni Savage Organization" at trial.

This sub-claim repeats the arguments made in Claim 12D. ECF No. 1746 at 540. Savage's trial counsel did not object to the Government's use of the term "Kaboni Savage Organization" during the trial, and this Court found that trial counsel did actually refute the existence of the "Kaboni Savage Organization" and that the Government's use of the term throughout trial did not prejudice Savage in light of the overwhelming evidence presented against him at trial. *See supra* Section III.B.8. The Government's use of the name "Kaboni Savage Organization" was not improper and as such, any claim by appellate counsel objecting to its use would have been rejected

on appeal, especially under a plain error standard of review since trial counsel did not lodge any objections to the name during trial. This sub-claim is meritless.

**Claim 16G:** Appellate counsel were ineffective for failing to raise on appeal the lack of disclosure of the names of confidential informants that could have provided valuable investigative leads or exculpatory testimony.

This sub-claim rehashes arguments made in support of Claim 6D. ECF No. 1746 at 271. In its discussion of Claim 6D, the Court addressed at length Savage's arguments concerning his trial counsel's failure to obtain the names of confidential informants, ultimately concluding that Claim 6D is meritless. *See supra* Section III.B.2. For the reasons stated in the Court's discussion of Claim 6D, arguments concerning the disclosure of confidential informants are baseless, and as such, appellate counsel cannot be faulted for declining to pursue this issue on appeal. This sub-claim fails.

**Claim 16H:** Appellate counsel were ineffective for failing to raise available meritorious objections to the propriety of the aggravating factors found by the jury.

This sub-claim is now moot since Savage's death sentence has been commuted to life imprisonment.

**Claim 16I:** Appellate Counsel were ineffective for failing to appeal the denial of Mr. Savage's motion to dismiss the death penalty under *Ring v. Arizona*, 536 U.S. 584 (2002).

This sub-claim is now moot since Savage's death sentence has been commuted to life imprisonment.

**Claim 16J:** Appellate Counsel were ineffective for failing to appeal the denial of Mr. Savage's change of venue motion.

This sub-claim repeats the arguments made in support of Claim 13J. ECF No. 1746 at 683. While addressing Claim 13J, this Court discussed at length the District Court's decision to deny Savage's motion to change venue prior to trial, finding that the denial of the motion was appropriate and that any further efforts by Savage's trial counsel to renew the motion would have

been futile. *See supra* Section III.B.9. Thus, for the reasons stated in the Court's discussion of Claim 13J, appellate counsel were not ineffective for declining to appeal the denial of Savage's change of venue motion, which would have certainly been rejected by the Third Circuit. Besides, appellate counsel brought a vicinage argument on direct appeal, arguing that Savage was statutorily entitled to a jury drawn from Philadelphia County, the county of the offense. *Savage*, 970 F.3d at 250. Although the vicinage claim was ultimately denied by the Third Circuit, *id.* at 252, an appeal of the denial of Savage's change of venue motion would have been inconsistent with the vicinage claim and would have undermined appellate counsel's overall strategy on appeal. This sub-claim is meritless.

**Claim 16K:** Appellate counsel were ineffective for failing to appeal unconstitutional, improper, or missing jury instructions given at trial.

This sub-claim repeats arguments made in Claims 14 and 29. ECF No. 1746 at 696. For the reasons stated in the Court's discussion of those claims, *see supra* Section III.B.10 & *infra* Section III.E.4, the jury instructions in this case were constitutional, proper, and complete. In any case, appellate counsel did advance claims pertaining to the jury instructions on appeal, arguing that the District Court erroneously instructed the jury on the doctrine of transferred intent, "and thereby impermissibly 'gave jurors permission to "transfer"—or more accurately, to multiply—Savage's alleged intent that Lamont would kill Marcella Coleman . . . to the other arson victims, including the children.'" *Savage*, 970 F.3d at 273 (record citation omitted). Appellate counsel thoroughly briefed and argued this claim but were ultimately unsuccessful in persuading the Third Circuit to find that the jury instructions on transferred intent were incorrect. *Id.* at 283. Further arguments concerning the jury instructions by appellate counsel would have been similarly fruitless, and so, this sub-claim fails.

**Claim 16L:** Appellate Counsel ineffectively failed to appeal the denial of a double jeopardy motion.

In this sub-claim, Savage argues that his appellate counsel failed to appeal the District Court's denial of a double jeopardy motion, which argued that his prior federal conviction for drug conspiracy in 2005 involved the same offense that was a part of his RICO conspiracy charge in this case. ECF No. 1746 at 701–03. However, the District Court properly denied the double jeopardy motion because RICO conspiracy has entirely different elements than the Title 21 drug charges that were brought against Savage in his 2005 federal trial. *See* ECF No. 1795 at 129. The use of evidence from the 2005 drug case as RICO predicate evidence against Savage in this case, a RICO conspiracy case, was completely proper and lawful. *See United States v. Pungitore*, 910 F.2d 1084, 1107 (3d Cir. 1990). Thus, appellate counsel were not deficient for declining to pursue this losing claim on appeal. This sub-claim fails.

**Claim 16M:** Appellate counsel were ineffective for failing to appeal the denial of suppression motions developed by trial counsel based on the trial record.

In this sub-claim, Savage argues that his appellate counsel were ineffective for not appealing the District Court's denials of various suppression motions brought by his trial counsel prior to and during trial. ECF No. 1746 at 672–73. While Savage lists the numerous suppression motions that were filed by his trial counsel, *see id.*, he does not identify which motions were wrongfully denied by the District Court or articulate the grounds on which they were wrongfully denied. As such, Savage cannot make out a claim for ineffective assistance of appellate counsel for failing to appeal these denials. This sub-claim is meritless.

**Claim 16N:** Appellate counsel were ineffective for failing to raise prosecutorial misconduct on direct appeal.

In this sub-claim, Savage repeats the arguments that are made in Claims 17 through 25. ECF No. 1746 at 566. The Court addresses the arguments made in those claims at length in the

next Section. *See infra* Section III.D. For the reasons stated in the Court's discussion of Claims 17 through 25, there was no prosecutorial misconduct in this case, and accordingly, appellate counsel were not deficient for declining to pursue frivolous claims alleging prosecutorial misconduct on appeal. This sub-claim fails.

**D. Prosecutorial Misconduct Claims**

The next category of claims centers around the Government's alleged misconduct both before and during the trial. ECF No. 1746 at 22–25. Savage lodges a whole host of complaints against the Government, asserting that it violated his constitutional rights in a multitude of ways that rendered his convictions and sentences unlawful. Reading Savage's allegations in the Petition, one would think that the Government's investigation and presentation at trial in this case were the sloppiest, most disorganized prosecution in the history of federal criminal actions. This could not be further from the truth, as the record reflects that the Government's investigation and preparation for this trial were meticulous, thorough, and fully compliant with its constitutional obligations to ensure that Savage and his co-defendants received a fair and impartial trial comporting with due process. Savage's claims to the contrary are based on pure speculation and completely devoid of merit. The Court will address each claim in turn.

**1. *Claim 17: Failure to Comply with* Brady *Obligations***

Savage's first claim for prosecutorial misconduct asserts eleven instances where the Government supposedly failed to comply with its obligations under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), to disclose favorable evidence to the defense. None of the eleven claims is supported by evidence that the Government withheld information from Savage's team. As such, Claim 17 and its sub-claims are denied. The Court will address each sub-claim in turn.

**Claim 17A:** The government violated the Due Process Clause of the Fifth Amendment by failing to disclose evidence about witnesses' communication, cooperation, or agreements with the FBI.

This evidence was material to numerous counts in the indictment, either as to guilt or for impeachment. *Brady*, 373 U.S. at 87. Suppressed evidence includes, but is not limited to, information about Eugene Coleman's credibility, information about Eugene Coleman's cooperation with the FBI, information about Kareem Bluntly's cooperation with the FBI, information about Lamont Lewis's credibility, information about Lamont Lewis's cooperation with the FBI, information about other witnesses or victims' cooperation with the FBI, and the existence, identity, and information provided by confidential witnesses and informants.

In this sub-claim, Savage contends that the Government failed to disclose evidence about witnesses' communications and cooperation with the FBI, including information pertaining to Eugene Coleman, Lamont Lewis, and Kareem Bluntly. ECF No. 1746 at 22. However, the Government has confirmed that it disclosed all *Brady*, *Giglio*, and *Jencks* materials concerning cooperating witnesses Eugene Coleman and Lamont Lewis. ECF No. 1795 at 134. Indeed, Savage's trial counsel relied upon many of these materials to cross-examine Coleman and Lewis, for example, by impeaching them with their prior inconsistent statements. TT 3/19/2013 at 100–10, 133–45, 175–83, 210–18, 245–62; TT 3/20/2013 at 10–37, 66–68, 91–99, 151–66, 231–40, 275–90; TT 4/1/2013 at 273–75; TT 4/2/2013 at 14–27. Trial counsel's cross-examinations of Coleman and Lewis spanned several days each and were more than comprehensive. As to Kareem Bluntly, he was killed in a drug deal that was unrelated to this case and never cooperated with the FBI, so there is no material for the Government to disclose relating to Bluntly's cooperation. ECF No. 1795 at 135. Savage's claim about the withholding of information concerning confidential witnesses and informants was addressed at length in the Court's discussion of Claim 6D and was found to be meritless. *See supra* Section III.B.2. Savage provides no support beyond speculative statements and affidavits for his assertion that the Government suppressed evidence about confidential informants or other witnesses' cooperation with the FBI. As such, this sub-claim is baseless.

**Claim 17B:** The government violated the Due Process Clause of the Fifth Amendment by failing to disclose evidence that is material either to guilt or impeachment for Count 3 of the indictment

**(Abdullah Murder)**. *Brady*, 373 U.S. at 87. This evidence includes, but is not limited to, accounts of Mr. Abdullah's murder given to law enforcement that conflicted with Eugene Coleman's account; the identity of confidential informants who had relevant information about the events surrounding Mr. Abdullah's murder; information about Kareem Bluntly's cooperation with the FBI; Abdullah's cell phones, and other exculpatory or impeaching evidence or facts surrounding the information about or the circumstances of Abdullah's murder.

In this sub-claim, Savage contends that the Government failed to disclose various pieces of evidence relating to the murder of Mansur Abdullah. ECF No. 1746 at 281. The Government has confirmed that it disclosed all evidence in its possession concerning Abdullah's murder, and as such, there were no *Brady* violations as to information about Abdullah's murder. ECF No. 1795 at 135. Savage's assertions that certain materials were suppressed, such as a 2003 interview with David Morris (who Eugene Coleman had testified was the individual who helped move the car with Abdullah's body) and phone records of two cellphones that purportedly belonged to Abdullah, are made in the Petition without any proof or support as to the existence of these materials. *See* ECF No. 1746 at 303–05. The Court previously addressed at length the issues raised by Savage relating to the prosecution's account of Abdullah's murder in its discussion of Claim 6A(3)(i). *See supra* Section III.B.2. For the reasons stated therein, and because Savage has failed to show that the Government suppressed information concerning the Abdullah murder, this sub-claim fails.

**Claim 17C:** The government violated the Due Process Clause of the Fifth Amendment by failing to disclose evidence that is material either to guilt or impeachment for Count 6 of the indictment **(Toliver Murder)**. *Brady*, 373 U.S. at 87. This evidence includes, but is not limited to, evidence from the Toliver Murder H-file that showed Eugene Coleman fired the shot that killed Toliver, and other exculpatory or impeaching facts surrounding the facts of Toliver's murder.

In this sub-claim, Savage contends that the Government failed to disclose certain pieces of evidence relating to the murder of Tyrone Toliver. ECF No. 1746 at 322. However, the Government has confirmed that it disclosed all evidence in its possession concerning Toliver's murder, including everything that was in the Philadelphia police department's homicide file for

the murder. ECF No. 1795 at 135. Savage does not provide any support in the Petition for his claim that exculpatory or impeaching materials in the police or FBI's files relating to his lack of involvement in Toliver's murder were not turned over to his trial counsel. *See* ECF No. 1746 at 322–23. The Court previously addressed at length the issues raised by Savage relating to the prosecution's presentation of Toliver's murder in its discussion of Claim 6A(3)(ii). *See supra* Section III.B.2. For the reasons stated therein, and because Savage has failed to show that the Government suppressed any information concerning the Toliver murder, this sub-claim fails.

**Claim 17D:** The government violated the Due Process Clause of the Fifth Amendment by failing to disclose evidence that is material either to guilt or impeachment for Count 3 of the indictment **(Parker Murder)**. *Brady*, 373 U.S. at 87. This evidence includes, but is not limited to, conversations L. Lewis had with government agents, and information about the identity of or information provided by confidential informants.

In this sub-claim, Savage contends that the Government failed to disclose evidence relating to the murder of Barry Parker. ECF No. 1746 at 339–41. However, the Government has confirmed that it disclosed all evidence in its possession concerning Parker's murder, including all trial transcripts of Steven Northington's state court trial for Parker's murder. ECF No. 1795 at 136. Savage argues that the Government did not turn over recordings of Lamont Lewis' jail calls in which Lewis allegedly stated that prosecutors instructed him to confess to crimes he did not commit. ECF No. 1746 at 339–40. The call transcript that Savage points to does not actually prove that Lewis lied on the stand during Savage's trial and falsely confessed to crimes he did not commit, and nowhere on the call does Lewis identify the real culprits of the crimes. *See* ECF No. 1747-48 at 44–51. In any case, the Government disclosed all *Jencks* materials and reports of interviews with Lewis. ECF No. 1795 at 136. In the face of Lewis' confession that he shot Parker, which was corroborated at trial by the forensic evidence surrounding Parker's murder, any failure by the Government to disclose exculpatory information (which did not occur) would not have

influenced the jury's verdict on the Parker murder. The Court previously addressed at length the issues raised by Savage relating to the prosecution of Parker's murder in its discussion of Claims 6A(3)(iii), (iv), and (v). *See supra* Section III.B.2. For the reasons stated therein, and because Savage has failed to show that the Government suppressed any exculpatory information concerning the Parker murder, this sub-claim fails.

**Claim 17E:** The government violated the Due Process Clause of the Fifth Amendment by failing to disclose evidence that is material either to guilt or impeachment for Count 4 of the indictment **(Brown Murder)**. *Brady*, 373 U.S. at 87. This evidence includes, but is not limited to, evidence that shows Gerald Thomas was involved in the murders of Ronald Walston or Carlton Brown, evidence contained in the Philadelphia Police "H-files", and verbal statements given to law enforcement by Eugene Coleman.

In this sub-claim, Savage contends that the Government failed to disclose certain pieces of evidence relating to the murder of Carlton Brown. ECF No. 1746 at 362–67. However, the Government has confirmed that it did not withhold any *Brady* or *Giglio* materials concerning Brown's murder, turned over all reports of interviews with Eugene Coleman, and all trial transcripts of Lamont Lewis' state court trial for Brown's murder. ECF No. 1795 at 137. There was no evidence pointing to Gerald Thomas as Brown's murderer, and Savage does not provide any support in the Petition for this claim. *See* ECF No. 1746 at 362–67. The Court previously addressed at length the issues raised by Savage relating to the prosecution's presentation of Brown's murder at trial in its discussion of Claim 6A(3)(vi). *See supra* Section III.B.2. For the reasons stated therein, and because Savage has failed to show that the Government suppressed any information concerning the Brown murder, this sub-claim fails.

**Claim 17F:** The government violated the Due Process Clause of the Fifth Amendment by failing to disclose evidence that is material either to guilt or impeachment for Counts 9-17 of the indictment **(Arson Murders)**. *Brady*, 373 U.S. at 87. This evidence includes, but is not limited to, statements made by L. Lewis, information provided to the government by L. Lewis, the content of conversations between the government and L. Lewis, evidence that others conspired with L. Lewis to commit this arson, and evidence that Dawud Bey and Al-Shannon Muse were acting as government agents.

In this sub-claim, Savage contends that the Government failed to disclose exculpatory evidence relating to Savage's involvement in the Coleman family murders. ECF No. 1746 at 395–400. The Government has confirmed that it disclosed all evidence in its possession concerning the firebombing of the Coleman family home, including all interview reports of Lamont Lewis and the entirety of the Philadelphia police department's homicide file of the Coleman murders. ECF No. 1795 at 138. Savage offers no support for his assertions in the Petition that Dawud Bey and Al-Shannon Muse were offered benefits by the Government to speak with Savage at the FDC and that other people were involved in the commission of the firebombing. *See* ECF No. 1746 at 398–400. The Government has since confirmed that Dawud Bey and Al-Shannon Muse did not serve as government informants and were not offered any benefits to talk to Savage. ECF No. 1795 at 138. The Government has also affirmed that it has not suppressed any evidence indicating that individuals other than Lewis, Savage, Kidada Savage, and Robert Merritt were involved in the firebombing because no such evidence exists. *Id.* at 138–39. The Government's response shows that Savage's allegations are nothing more than baseless speculation. The Court previously addressed at length the issues raised by Savage relating to the prosecution of the Coleman family murders in its discussion of Claims 6A(3)(vii) and (viii). *See supra* Section III.B.2. For the reasons stated therein, and because Savage has failed to show that the Government suppressed information concerning the firebombing, this sub-claim fails.

**Claim 17G:** The government violated the Due Process Clause of the Fifth Amendment by failing to disclose evidence that is material either to guilt or impeachment for Count 5 of the indictment **(Lassiter Murder)**. *Brady*, 373 U.S. at 87. This evidence includes, but is not limited to, any undisclosed statement, whether verbal or written, indicating that this shooting was not for the purposes of maintaining or increasing position in an enterprise engaged in racketeering activity, evidence that the conversation between Mr. Savage and L. Lewis in the CFCF gym could not have occurred, and other exculpatory or impeaching evidence contained in the Philadelphia Police "H-files" or elsewhere.

In this sub-claim, Savage contends that the Government failed to disclose various pieces of evidence relating to the murder of Kenneth Lassiter. ECF No. 1746 at 412–14. However, the Government has confirmed that it disclosed all evidence in its possession concerning Lassiter's murder, including the FBI 302 report of Sam Rosado's interview and the trial transcripts of Savage's state court trial for Lassiter's murder. ECF No. 1795 at 139–41. Savage's assertion that the Government suppressed Rosado's denials that he witnessed the murder, *see* ECF No. 1746 at 413, is clearly false because Rosado was cross-examined at trial regarding his prior denials, TT 02/27/2013 at 166–81. The Court previously addressed at length the issues raised by Savage relating to the prosecution's presentation of Lassiter's murder at trial in its discussion of Claims 6A(3)(ix) and (x). *See supra* Section III.B.2. For the reasons stated therein, and because Savage has failed to show that the Government suppressed information concerning the Lassiter murder, this sub-claim fails.

**Claim 17H:** The government violated the Due Process Clause of the Fifth Amendment by failing to disclose evidence that is material either to guilt or impeachment for Count 7 of the indictment **(Flowers Murder)**. *Brady*, 373 U.S. at 87. This evidence includes, but is not limited to, evidence contained in the Philadelphia Police "H-files", verbal statement made to law enforcement by Mary Phy, verbal statement made by Flowers to K. Lewis, evidence of Dawud Bey's involvement in Flowers' murder or promises made to Dawud Bey, and CFCF housing records for Michael Crosby.

In this sub-claim, Savage contends that the Government failed to disclose evidence relating to the murder of Tybius Flowers. ECF No. 1746 at 439–43. However, the Government has confirmed that it disclosed all evidence in its possession concerning Flowers' murder, including all statements by and interview reports of Mary Phy and evidence of Dawud Bey's involvement in Flowers' murder. ECF No. 1795 at 142. As for Savage's claim that the cell site data from the night of Flowers' murder was not turned over to habeas counsel, the data was presented at trial and defense counsel cross-examined the testifying expert witness extensively about the cell site records. TT 3/28/2013 at 116–247. As the Court explained when it addressed Claim 6C(2), the cell

site data does nothing to further Savage's claim that he is entitled to habeas relief. *See supra* Section III.B.2. Additionally, the Court addressed at length the issues raised by Savage relating to the prosecution's presentation of Flowers' murder at trial in its discussion of Claims 6A(3)(xi) and (xii). *See id.* For the reasons stated therein, and because Savage has failed to show that the Government suppressed any information concerning the Flowers murder, this sub-claim fails.

**<u>Claim 17I:</u>** The government violated the Due Process Clause of the Fifth Amendment by failing to disclose the audio of phone calls made from Paul Daniels, Gerald Thomas, and Oscar Francis to 215-229-0169 (the Darien Street Landline) while they were held in FDC in May and June 2004.

In this sub-claim, Savage contends that the Government failed to disclose the audio recordings of three phone calls from May and June 2004 made to the Savage family home's landline. ECF No. 1746 at 573–74. However, the Government has stated that it did not provide these recordings to the defense in discovery because it did not have them. ECF No. 1795 at 143. The Government further confirmed that it turned over all discovery from Savage's 2005 federal drug case, consisting of over 2,000 documents. *Id.* In any case, Savage does not even attempt to specify what the calls would have revealed or how any information from the calls would have been useful to his defense. *See* ECF No. 1746 at 573–74. Therefore, this sub-claim is meritless.

**<u>Claim 17J:</u>** The government violated the Due Process Clause of the Fifth Amendment by failing to disclose information about Peter Bistrian's cooperation with law enforcement and affirmatively made arguments to the court they knew were false, and failed to correct the presentation of false evidence, in violation of *Brady*, 373 U.S. 83, *Giglio v. United States*, 405 U.S. 150, 153 (1972), and *Napue v. Illinois,* 360 U.S. 264, 264 (1959).

In this sub-claim, Savage contends that the Government failed to disclose information about Peter Bistrian, an inmate who was housed at the FDC at the time that Savage was also there, and his alleged cooperation with the FBI. ECF No. 1746 at 567–73. Savage attempts to support his claim that Bistrian was working as a government informant with outside evidence from Bistrian's 2019 civil trial relating to an incident that occurred while he was jailed at the FDC. *Id.*

at 570–71. At Bistrian's trial, FDC officials testified that the FBI was purportedly guiding Bistrian's actions with regard to delivering notes from Savage and his associates. *Id.* at 571. However, the FDC officials had no actual knowledge of the FBI's operations and directives and were merely speculating as to what the FBI may or may not have requested of Bistrian. In its response, the Government definitively confirmed that Bistrian was not cooperating with law enforcement and that the FBI never even spoke to Bistrian. ECF No. 1795 at 143–44. As such, there was no Government misconduct with regard to Peter Bistrian's actions. This sub-claim fails.

**Claim 17K:** The government violated the Due Process Clause of the Fifth Amendment by failing to disclose the content of the reverse proffer made to co-defendant turned key cooperating witness, Lamont Lewis.

In the final sub-claim of Claim 17, Savage argues that the Government failed to disclose the contents of the reverse proffer made by the Government to Lamont Lewis before Lewis agreed to cooperate in this case. ECF No. 1746 at 604–10. As the Government clarifies in its response, a reverse proffer "[does] not involve the subject (in this case, Lamont Lewis) speaking at all, or providing any information." ECF No. 1795 at 144. During a reverse proffer, the government shares evidence it possesses against a criminal defendant to show the strength of the prosecution's case against him/her in an effort to convince the defendant to plead guilty and/or cooperate with the government. The defendant often does not speak at all or provide any information during a reverse proffer meeting. Here, the Government has confirmed that during Lewis' reverse proffer, the Government made no promises or offers to Lewis and Lewis did not make any statements either, so there was nothing to disclose to Savage's defense team concerning the contents of Lewis' reverse proffer. *Id.* Savage provides no case law or legal support for his position that the contents of a cooperating defendant's reverse proffer must be disclosed to his co-defendants. Reverse proffers are common occurrences and do not involve the creation of *Brady*, *Giglio*, or *Jencks*

materials that must be disclosed. This sub-claim is meritless.

### 2. *Claim 18: Presenting Evidence that Created False Impressions*

In Claim 18, Savage asserts seven instances where the Government allegedly created false impressions through its presentation of evidence at trial, leading to Savage's convictions and sentences. ECF No. 1746 at 24. Claim 18 and its sub-claims are baseless and as such, are denied. The Court will address each sub-claim in turn.

**Claim 18A:** The government violated the Fifth Amendment's due process guarantee by presenting evidence that created a false impression that was used to secure a conviction for the Toliver murder. This includes, but is not limited to, evidence that Coleman was in the drug business with Mario Melendez, evidence that the guns at Palmetto Street belonged to Mario Melendez, evidence surrounding whether Mr. Toliver had previously been to Palmetto Street, and evidence that the government, either state or federal, did not have jurisdiction, power, or authority, to arrest Kareem Bluntly for the murder of Toliver.

Savage argues that the Government presented misleading evidence at trial to secure his conviction for Toliver's murder. ECF No. 1746 at 323. This claim is plainly false. Evidence relating to Mario Melendez and Toliver's connection to Palmetto Street was fully disclosed to Savage's counsel before trial. ECF No. 1795 at 146. The Toliver murder has been addressed at length by the Court in its discussion of Claim 6A(3)(ii). *See supra* Section III.B.2. In any case, none of the so-called false impressions raised by Savage, had they been corrected as Savage proposes, would have impacted the jury's verdict on the Toliver murder. As such, this sub-claim is meritless.

**Claim 18B:** The government violated the Fifth Amendment's due process guarantee by presenting evidence that created a false impression that was used to secure a conviction for the Lassiter murder. This includes, but is not limited to Lamont Lewis's testimony that a drug corner gets shut down when there is a murder and L. Lewis's testimony that Mr. Savage killed Lassiter because he did not like Flowers.

Savage argues that the Government presented misleading evidence at trial to secure his conviction for Lassiter's murder. ECF No. 1746 at 400. However, the two false impressions that

Savage points to—Lewis' testimony that a drug corner gets shut down when there is a murder and that Savage did not like Flowers—were well supported by evidence in the record. TT 2/26/2013 at 253, 257; TT 3/18/2013 at 88–89; TT 4/1/2013 at 127, 128. Thus, the Government did not create any false impressions during its presentation of the Lassiter murder at trial. This sub-claim fails.

**Claim 18C:** The government violated the Fifth Amendment's due process guarantee by presenting evidence that created a false impression that was used to secure a conviction for the Flowers murder. This includes, but is not limited to evidence that Mr. Savage had conversations concerning Flowers with L. Lewis and Michael Crosby in the gym at CFCF and evidence that the pre-paid cell phone with the number 267-304-8069 belonged to John Tillman.

Savage argues that the Government presented misleading evidence at trial to secure his conviction for Flowers' murder. ECF No. 1746 at 418. Specifically, Savage contends that the Government's presented evidence gave the false impression that Savage had conversations with Lamont Lewis and Michael Crosby in the CFCF gym and that a pre-paid cell phone belonged to John Tillman. These contentions are baseless. Savage's claims about the feasibility of the CFCF gym conversations have been addressed at length by the Court in its discussion of Claim 6A(4). *See supra* Section III.B.2. As for the cell phone number, whether or not the phone belonged to Tillman has no impact on the strength of the Government's case against Savage for Flowers' murder. The Flowers murder was discussed in detail by the Court in addressing Claim 6A(3)(xi). *See id.* For the reasons stated, this sub-claim is meritless.

**Claim 18D:** The government violated Mr. Savage's rights under the Fifth and Eighth Amendments by presenting evidence and argument that Mr. Savage would be a future danger that it knew or should have known was false and misleading.

Since Savage's death sentence has been commuted to life imprisonment, this sub-claim is now moot.

**Claim 18E:** The government violated Mr. Savage's rights under the Fifth and Eighth Amendments by misleading the jury about Mr. Savage's possession of unauthorized paperwork in March 2011.

This sub-claim pertains to the Government's future dangerousness argument during the

penalty phase, and since Savage's death sentence has been commuted to life imprisonment, this sub-claim is now moot.

**<u>Claim 18F:</u>** The government violated Mr. Savage's rights under the Fifth and Eighth Amendments by mischaracterizing Mr. Savage's misuse of phone calls at FDC in 2012.

This sub-claim pertains to the Government's future dangerousness argument during the penalty phase, and since Savage's death sentence has been commuted to life imprisonment, this sub-claim is now moot.

**<u>Claim 18G:</u>** The government violated Mr. Savage's rights under the Fifth and Eighth Amendments by suppressing favorable, exculpatory evidence that there was no such organization known as the "Kaboni Savage Organization" and by presenting false and misleading testimony that an organization went by this name during both phases of trial.

This sub-claim repeats the arguments made in Claims 12D and 16F and is similarly frivolous. The record reflects that the Government presented overwhelming evidence of the existence of a racketeering enterprise led by Savage for the purpose of selling drugs, regardless of what name it actually went by, if any. *See, e.g.*, TT 2/5/2013 at 79–198; TT 2/6/2013; TT 3/19/2013; TT 4/1/2013. Savage's trial counsel did their best to counter the Government's evidence and refute the existence of a drug dealing organization led by Savage. *See* TT 4/30/2013 at 58–184; TT 5/1/2013 at 3–70. The Government's use of the term "Kaboni Savage Organization" was not false or misleading, as explained by the Court in its discussion of Claim 12D. *See supra* Section III.B.8. For the reasons stated therein, this sub-claim fails.

### 3. *Claim 19: Reliance on Eugene Coleman*

In Claim 19, Savage argues that the Government violated due process "by relying solely on the statement of a single informant, Eugene Coleman, and purposefully refraining from investigation to avoid coming into possession of evidence that may have weakened its case." ECF No. 1746 at 25. This conclusory assertion flatly disregards the overwhelming evidence against

Savage for every charge against him, including testimony from numerous witnesses, forensic evidence, and recordings of his own words, all reflected in the trial record. The evidence presented against Savage at trial corroborated Coleman's testimony. Besides being unsubstantiated, Claim 19 also fails to specify what portions of the trial or Savage's convictions it is attacking. It certainly fails to state a due process violation. Claim 19 is denied.

#### 4. ***Claim 20: FBI Misconduct and Intimidation***

In Claim 20, Savage accuses FBI and other law enforcement officials of interfering with and intimidating witnesses that provided statements or testified against him at trial. ECF No. 1746 at 25, 615–19. Specifically, Savage identifies two detectives who were involved in the investigations of a few of the murders charged against him in this case—Detective Thomas Augustine, who took part in the investigations of Lassiter's and Toliver's murders, and Detective Kenneth Rossiter, who was involved in the firebombing investigation—and asserts that both left the police force after committing some type of misconduct. *Id.* at 616–17. However, the misconduct alleged against each detective was entirely unrelated to any of the investigations in this case. Savage provides news articles showing that Detective Augustine retired from the force after testing positive for cocaine during a random drug screening and that after his retirement, there were allegations that he had coerced confessions and witness testimonies during his career. ECF No. 1747-36 at 242–47. Vague, unverified allegations of witness coercion from news articles, however, do not lend credible support for Savage's contention that Detective Augustine coerced any witnesses in this case. With respect to Detective Rossiter, Savage provides a news article about the detective's lawsuit against the City of Philadelphia for unlawful termination and points to a single fact from the article stating that in March 2012, Rossiter was charged with "conduct unbecoming" for violating departmental policy by making a false entry in a department record. *Id.*

at 238–41. Again, this vague accusation of misconduct offers no support to Savage's claim that his trial counsel should have raised the issue of Rossiter's misconduct at trial, ECF No. 1746 at 617, as Savage offers no evidence linking Rossiter's misconduct to the firebombing investigation in this case.

Next, Savage argues that two Philadelphia police officers, Detective Carlos Perez and Officer Carlos Cruz, improperly harassed Corey Williams, a witness for the Lassiter murder, in order to influence his testimony. *Id.* at 617–19. Savage provides no support whatsoever for his accusations against Perez and Cruz in the Petition. In any case, Corey Williams did not even testify at Savage's trial so it is hard to fathom how any improper attempts to intimidate Williams and influence his testimony (if that even occurred) had any impact on the outcome of Savage's trial verdicts. *See id.* at 619. At trial, the Government presented multiple eyewitness testimony and evidence against Savage, so the outcome of his conviction for Lassiter's murder would have remained the same, regardless of whether Williams had testified at trial.

All in all, Savage provides no credible proof for his claim that FBI agents and law enforcement officers interfered with and intimidated witnesses in this case. Thus, Claim 20 is denied.

### 5. *Claim 21: Kevin Lewis' Testimony and Investigation*

In Claim 21, Savage impugns the integrity of FBI case agent Kevin Lewis' investigation in this case, alleging that Kevin Lewis failed to disclose various information to the defense about his meetings with witnesses, improperly influenced a number of testifying witnesses, and gave misleading testimony during his own testimony at trial. ECF No. 1746 at 578–603. None of these contentions hold water. Savage's arguments that Kevin Lewis' investigation was compromised by several instances of deviations from FBI policy were addressed and refuted by the Court in its

discussion of Claim 6C(3). *See supra* Section III.B.2. In any case, Savage fails to explain how information about Kevin Lewis' meetings and interrogations with witnesses that was allegedly not disclosed to his attorneys would have been useful to his defense beyond making the conclusory statement that "the information was exculpatory and material." ECF No. 1746 at 582–83.

As to Savage's claim that Kevin Lewis improperly influenced the testimony of several witnesses who testified against Savage at trial (namely, Lamont Lewis, Eugene Coleman, Sam Rosado, Mary Phy, and Daren Blackwell), Savage provides no support for his accusation that Kevin Lewis pressured these witnesses into changing their testimonies to incriminate Savage other than making the obvious observation that after Kevin Lewis spoke with each witness at some point in time, the witness ended up correcting his or her earlier statement. *Id.* at 586–97. That is not evidence of improper coercion or influence—that is simply evidence of an FBI agent doing his job, which is to interrogate witnesses to get to the truth about what happened. At any rate, all of these witnesses that Savage complains about were all cross-examined at trial about their prior statements and any inconsistencies between the previous statement and their trial testimony, showing both that Savage's current theory about Kevin Lewis' undue influence is false and that Savage was not prejudiced by these witnesses' supposedly changing stories since they were impeached with their prior statements.

Finally, Savage's argument that Kevin Lewis' own testimony at trial was false or misleading rings hollow. *See id.* at 597–603. The Government properly presented and admitted Kevin Lewis' testimony at trial and the pieces of evidence that were introduced through his testimony. The District Court made appropriate rulings on the defense's objections during Kevin Lewis' testimony. As to Kevin Lewis' testimony about the "coded" meaning of words and phrases used by Savage and his associates, *id.* at 598–600, the District Court permitted the testimony as

lay opinion evidence and instructed the jury on the appropriate weight to give lay opinion evidence as opposed to expert opinion evidence, *Savage*, 970 F.3d at 283. The Third Circuit held that the District Court's jury instruction on lay opinion evidence did not give undue weight to Kevin Lewis' testimony and was not erroneous. *Id.* at 288.

For the reasons stated, Kevin Lewis' investigation and trial testimony did not violate Savage's due process rights. Claim 21 is denied.

**6. *Claim 22: Presentation of Prejudicial Information***

In Claim 22, Savage argues that the Government presented prejudicial arguments and information during the trial, including improper vouching for prosecution witnesses, making sympathy-based appeals during opening and closing arguments, and failing to disclose information about polygraph tests for witnesses participating in the witness protection program. ECF No. 1746 at 575, 567, 610, 620. Savage states that "[f]rom the start of trial, the government vouched for its witnesses, priming the jurors to give greater credence to their testimony and improperly influencing their opinions of the witnesses' character or credibility." *Id.* at 611. In order for there to be improper vouching, "(1) the prosecutor must assure the jury that the testimony of a Government witness is credible; and (2) this assurance [must be] based on either the prosecutor's personal knowledge, or other information not contained in the record." *United States v. Weekes*, 224 F. App'x 200, 204 (3d Cir. 2007) (alteration in original) (citation omitted). Here, however, in none of the statements that Savage offers as examples of the Government's purportedly improper vouching was the Government providing its personal opinion about a witness' credibility. Rather, the Government's comments on certain witnesses' credibility were based in fact and supported by evidence or testimony that was admitted at trial. Thus, the Government's opening and closing statements "invited the jury to draw an inference from the witness' testimony and did not constitute

impermissible vouching." *Id.*

Next, Savage asserts that the Government made inappropriate appeals to sympathy during its closing argument. ECF No. 1746 at 620–26. While the Government did speak about each of the victims of the murders that Savage and his associates committed, the language that was used was factual and based on evidence that had been presented at trial. During its closing, the Government quoted Savage's own recorded words, which were often crude and cruel. The defense did not object to any of the prosecutors' comments made during closing statements. In any case, even if the Government's comments had crossed the line into improper sympathy appeals, this does not automatically warrant habeas relief. The Supreme Court has recognized that when it comes to closing arguments, it "is not enough that the prosecutors' remarks were undesirable or even universally condemned"—"[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citations omitted). Here, the Government's remarks in its closing statement did not deprive Savage of a fair trial since they "did not manipulate or misstate the evidence." *Id.* at 182. In addition, "the [District] Court also instructed the jury at the close of the case that the comments of counsel, such as closing arguments, are not evidence." *Savage II*, 85 F.4th at 125; *see Darden*, 477 U.S. at 182 (concluding that petitioner's trial was not fundamentally unfair and noting that "[t]he trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence"). Considering the District Court's instruction to the jury and the overwhelming evidence that was presented at trial against Savage, this Court finds that any improper comments in the Government's closing argument did not deprive Savage of his constitutional right to a fair trial.

Finally, with respect to Savage's argument that the Government violated *Brady* by not disclosing polygraph information for witnesses other than Lamont Lewis, Savage provides no case law or legal support for his position that the Government was required to turn over this information to the defense. ECF No. 1746 at 575. As such, for the reasons stated, Claim 22 is denied.

**7. *Claim 23: Misconduct During the Penalty Phase***

Since Savage's death sentence has been commuted to life imprisonment, this claim is now moot.

**8. *Claim 24: Striking of Jurors Based on Race***

In Claim 24, Savage repeats the arguments that he made in support of Claim 13D, contending that "[t]he prosecution struck African-American and Hispanic potential jurors in a non-race-neutral matter, while accepting similarly-situated white jurors in violation of the Fifth, Sixth, and Eighth Amendments." ECF No. 1746 at 492. Potential jurors that Savage alleges were improperly struck on the basis of race include Jurors 364, 263, and 20. Defendant Northington's *Batson* challenge to the Government's striking of Juror 364 was denied by the District Court and then affirmed by the Third Circuit on appeal. *Savage II*, 85 F.4th at 131–32. As for Jurors 263 and 20, the Government had race-neutral reasons for striking them, which were addressed in the Court's discussion of Claim 13D. *See supra* Section III.B.9. For the reasons stated therein, Savage cannot show that the Government struck Jurors 364, 263, and 20 on account of their race. Thus, Claim 24 is denied.

**9. *Claim 25: Selective Prosecution on the Basis of Race***

In Claim 25, Savage argues that his race influenced the Government's decision to seek the death penalty against him. ECF No. 1746 at 641. Since Savage's death sentence has been commuted to life imprisonment, this claim is now moot.

### E. Other Constitutional or Statutory Violations

The final category of claims is a collection of miscellaneous issues that are mostly repackaged versions of prior claims made throughout the Petition. None of the issues entitles Savage to habeas relief. The Court will address each claim in turn.

#### 1. *Claim 26: Jury Selection Issues Revisited*

Claim 26 consists of six sub-claims that together assert that "Mr. Savage was denied his right to a fair and impartial jury in violation of the Fifth, Sixth, and Eighth Amendments." ECF No. 1746 at 26. Each of the six sub-claims relies upon allegations and arguments that were made in support of Claim 13, which attacked trial counsel's performance during jury selection. Just as the Court has ruled that Claim 13 and its sub-claims are without merit, the Court also finds that Claim 26 and its sub-claims are fruitless. Claim 26 is denied. The Court will briefly address each sub-claim in turn.

**Claim 26A:** Jurors were excused for expressing anti-death penalty views in violation of Mr. Savages Fifth and Sixth Amendment rights.

This sub-claim repeats the arguments made in Claim 13A, and for the reasons stated in the Court's discussion of Claim 13A, this sub-claim is now moot given that Savage is no longer facing the death penalty. *See supra* Section III.B.9.

**Claim 26B:** The Court improperly limited Mr. Savage's Fifth, Sixth, and Eighth Amendment right to inquire whether jurors hold the "belief that death should be imposed *ipso facto* upon conviction of a capital offense."

This sub-claim concerns the District Court's alleged limitations on defense counsel's ability to ask life-qualifying questions to jurors during voir dire. ECF No. 1746 at 482–84. Since Savage's death sentence has been commuted to life imprisonment, this sub-claim is now moot.

**Claim 26C:** The Court failed to dismiss jurors who expressed an indication of racial bias in violation of the Sixth Amendment.

This sub-claim repeats the arguments made in Claim 13C, which were addressed in detail

in the Court's discussion of Claim 13C. *See supra* Section III.B.9. For the reasons stated therein, the District Court did not err in failing to dismiss jurors who supposedly expressed an indication of racial bias. This sub-claim is meritless.

**Claim 26D:** The Court's anonymous jury order violated Mr. Savage's constitutional rights under the Fifth and Sixth Amendments and the continuation of that order is independently violating his rights.

This sub-claim revisits the arguments made in Claim 13G, which the Court addressed at length in its discussion of Claim 13G. *See supra* Section III.B.9. For the reasons stated therein, the District Court's anonymous jury order did not violate Savage's constitutional right to a fair and impartial jury. This sub-claim fails.

**Claim 26E:** The anonymization of the jury as applied infected Mr. Savage's right to full voir dire.

This sub-claim repeats the arguments made in both Claims 13G and 13H, which the Court addressed extensively in its discussion of Claims 13G and 13H. *See supra* Section III.B.9. For the reasons stated therein, the District Court's anonymous jury order did not deprive Savage of his right to a full and fair voir dire. This sub-claim is meritless.

**Claim 26F:** The Court improperly dismissed jurors for revealing identifying information in violation of the Sixth Amendment.

This sub-claim is a continuation of the above sub-claim and has also been previously addressed in the Court's discussion of Claim 13H. *See supra* Section III.B.9. For the reasons stated therein, the District Court did not improperly dismiss jurors who shared compromising personal information with the Parties. Indeed, the request to dismiss such jurors came from *the defense,* which employed an effective strategy of proactively excluding pro-death penalty jurors by arguing to the District Court that they had revealed identifying information about themselves. Savage cannot now complain that the District Court's decision to grant defense counsel's request was improper. This sub-claim is baseless.

### 2. *Claim 27: Improper District Court Rulings*

In Claim 27, Savage alleges six instances where the District Court improperly admitted testimony or evidence at trial or made erroneous evidentiary rulings. ECF No. 1746 at 26–27. Most of the challenged rulings have already been addressed by the Court in reviewing earlier claims. The District Court's evidentiary rulings during the trial were decided correctly, and this Court will not second guess them in hindsight. Claim 27 and its sub-claims are devoid of merit and are denied. The Court will briefly address each sub-claim in turn.

**Claim 27A:** The admission of the recordings from Mr. Savage's prison cell at the Federal Detention Center was fundamentally unfair in violation of due process of law. *Michelson v. United States*, 335 U.S. 469, 475-76 (1948); *United States v. Caldwell*, 760 F.3d 267, 274 (3d Cir. 2014).

The District Court did not err in allowing the admission of Savage's FDC recordings, finding them to be more probative than prejudicial. This Court addressed the premise of this sub-claim in its discussion of Claim 12A. *See supra* Section III.B.8. For the reasons stated therein, this sub-claim fails.

**Claim 27B:** The admission of the autopsy reports for the autopsies performed on Mansur Abdullah and Barry Parker violated Mr. Savage's Sixth Amendment right to confront witnesses against him. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009).

This sub-claim rehashes the arguments made in Claim 6G(1), which the Court addressed extensively in its discussion of Claim 6G(1). *See supra* Section III.B.2. For the reasons stated therein, the admission of the autopsy reports for Abdullah and Parker did not violate Savage's constitutional right to confront witnesses against him and in any case, had no impact on the outcome of the trial. This sub-claim is meritless.

**Claim 27C:** The admission of Jorge Reyes's grand jury testimony violated Mr. Savage's Sixth Amendment right to confront witnesses against him. *Crawford v. Washington*, 541 U.S. 51, 52 (2004).

This sub-claim repeats the arguments made in Claim 6G(2), which the Court addressed

extensively in its discussion of Claim 6G(2). *See supra* Section III.B.2. For the reasons stated therein, the admission of Jorge Reyes' grand jury testimony, upon the request of a co-defendant, did not violate Savage's constitutional right to confront witnesses against him. The District Court admitted Reyes' testimony over the Government's objection. Savage posed no objection to its admission at trial. This sub-claim is meritless.

**Claim 27D:** The exposure to prejudicial media biased Mr. Savage's jury, and the Court's denial of his request to change venue, violated his right to due process under the Fifth Amendment, a fair trial under the Sixth Amendment, and to be free from cruel and unusual punishment under the Eighth Amendment. *Irvin v. Dowd*, 366 U.S. 717 (1961).

This sub-claim is a repackaging of Claim 13J, which the Court addressed extensively in Section III.B.9. For the reasons stated therein, the District Court's denial of Savage's motion to change venue did not violate his constitutional right to a fair trial. The juror questionnaire that every potential juror was required to complete specifically addressed media coverage of the case and asked jurors to indicate if they have consumed any media concerning the case and what they remember hearing or reading about the case. *See* ECF No. 1795 at 157–58. Jurors who answered affirmatively regarding media exposure to the case were then subjected to individual voir dire to test what they remembered and thought about the case. *Id.* Indeed, the record reflects that no one seated on the jury claimed that they were influenced by media coverage or were unable to be impartial. *Id.* This sub-claim has no merit.

**Claim 27E:** The use of restraints during trial violated Mr. Savage's right to a fair trial and his rights under the Fifth, Sixth, and Eighth Amendments. *Holbrook v. Flynn,* 475 U.S. 560 (1986).

This sub-claim is a repeat of Claim 11, which the Court addressed at length in Section III.B.7. For the reasons stated therein, the use of leg restraints did not violate Savage's constitutional right to a fair trial. The leg restraints were kept hidden from the jury at all times during the trial, and Savage can point to no evidence showing that the jury was ever aware of his

leg restraints. This sub-claim fails.

**Claim 27F:** The predicate crimes as charged and for which Mr. Savage was convicted in counts 11-15 were not recognized crimes under Pennsylvania law, denying Mr. Savage due process. *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019).

In this sub-claim, Savage devises a novel argument that the predicate crimes for which he was convicted in Counts 11 through 15 are not recognized crimes under Pennsylvania law. ECF No. 1746 at 693–95. Savage is correct that the Government cited a violation of Pennsylvania law as the predicate act in the operative indictment, and pursuant to 18 U.S.C. § 1959, the conduct charged must be defined by Pennsylvania law. *Id.* at 693; *Savage*, 970 F.3d at 274 ("Notably, in Savage's case, the District Court's instruction on the elements of 'murder' tracked Pennsylvania law because murder under Pennsylvania law was the predicate act charged[.]"); ECF No. 480 at 48–52.

Savage then attempts to re-raise an issue that he litigated and lost on direct appeal—that the predicate act of first-degree murder via transferred intent is not a recognized crime under Pennsylvania law. ECF No. 1746 at 694. Savage makes the following argument in support of his position:

> Pennsylvania has never brought first degree murder charges under a transferred intent theory for crimes as attenuated as the Coleman family murders in Counts 11-15. Under Pennsylvania state law, transferred intent for first degree murder has never been applied for accomplice liability where the defendant is *not present* at the crime scene; and where the defendant does not attempt to or actually pull the trigger.

*Id.* at 695. However, the two cases that he cites as support for this argument do not state that accomplice liability for first-degree murder via transferred intent is not a recognized crime under Pennsylvania law. *See id.* This argument, moreover, sidesteps what actually constitutes first-degree murder and accomplice liability under Pennsylvania law. Section 2502(a) of Title 18, Pennsylvania Consolidated Statutes Annotated states that "[a] criminal homicide constitutes murder of the first

degree when it is committed by an intentional killing." 18 Pa. Cons. Stat. Ann. § 2502(a). Section 306 of Title 18, Pennsylvania Consolidated Statutes Annotated states that "[a] person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both," and further provides that "[a] person is legally accountable for the conduct of another person when . . . he is an accomplice of such other person in the commission of the offense." *Id.* § 306(a), (b)(3). According to Pennsylvania law, "[a] person is an accomplice of another person in the commission of an offense if . . . with the intent of promoting or facilitating the commission of the offense, he . . . solicits such other person to commit it." *Id.* § 306(c). Thus, the conduct that Savage was charged with and convicted of committing in Counts 11 through 15 were precisely the crimes that are defined in Sections 2502(a) and 306 of Title 18, Pennsylvania Consolidated Statutes Annotated.

Savage was convicted of first-degree murder for the Coleman family murders because he was found guilty of soliciting Lamont Lewis and Kidada Savage to carry out the firebombing with the intent of causing the death of Marcella Coleman. Savage's intent to kill Marcella Coleman was transferred to the other firebombing victims through the doctrine of transferred intent. On direct appeal, Savage challenged the definition of transferred intent that was provided to the jury by the District Court, but the Third Circuit rejected his challenge, finding that the District Court did not err in instructing the jury that:

> [T]he government may prove the fourth and fifth elements of the offense charged in Counts 11 through 15 by proving that on October 9, 2004, Defendants Kaboni Savage, Robert Merritt and Kidada Savage *specifically intended to cause the death of Marcella Coleman* for the purpose of maintaining or increasing their position in the enterprise, and then willfully set the fire that killed Tameka Nash, Sean Anthony Rodriguez, Tajh Porchea, Khadijah Nash and Damir Jenkins, as well as Marcella Coleman. *So the intent to kill Marcella Coleman is transferred to the other victims.*

*Savage*, 970 F.3d at 272–73 (record citation omitted). Therefore, the predicate crimes specified in

Counts 11 through 15 of the operative indictment are clearly recognized crimes under Pennsylvania law. And, because Savage was properly charged with and convicted of first-degree murder in Counts 11 through 15, this sub-claim is meritless.

**3. *Claim 28: Capital Aggravating Circumstances***

Since Savage's death sentence has been commuted to life imprisonment, this claim is now moot.

**4. *Claim 29: Improper Jury Instructions***

In Claim 29, Savage raises two errors in the jury instructions that he claims renders his convictions and sentences unconstitutional. Savage's arguments are unavailing, as the District Court gave jury instructions that were proper and complied with constitutional requirements. As such, Claim 29 and its two sub-claims are denied. The Court will address each sub-claim in turn.

**Claim 29A:** The non-pattern reasonable doubt instruction, combined with other instructions, lessened the government's burden of proof, and shifted a burden to the defense in violation of the Fifth and Eighth Amendments.

In this sub-claim, Savage complains about specific words or phrases that appeared in the jury instruction for reasonable doubt that he claims lowered the Government's burden of proof. ECF No. 1746 at 696–700. When evaluating jury instructions for accuracy, "[t]he language used in the instruction must be examined 'in its totality' so as to determine 'whether the instructions correctly captured the applicable legal concepts.'" *Moore v. Rivello*, No. 20-cv-838, 2022 WL 1749250, at *7 (E.D. Pa. May 31, 2022) (quoting *Baxter v. Superintendent Coal Twp. SCI*, 998 F.3d 542, 548 (3d. Cir. 2021)). "No 'particular sentence or paragraph' should be assessed 'in isolation.'" *Id.* (quoting *United States v. Thayer*, 201 F.3d 214, 221 (3d Cir. 1999)). Accordingly, the Court will review the District Court's jury instruction on reasonable doubt in its entirety.

At the conclusion of the trial, the District Court gave the following jury instruction on

reasonable doubt:

> Ladies and gentlemen, proof beyond a reasonable doubt does not mean proof beyond all possible doubt or proof to a mathematical certainty. Possible doubts or based on conjecture or speculation or hunch are not reasonable doubts. A reasonable doubt is a fair doubt based on reason, based on logic, based upon common sense, based upon your life experience. It is a doubt that an ordinary reasonable person has after carefully weighing all of the evidence, and it is a doubt of the sort that would cause a reasonable person to hesitate in a matter of importance where his or her own affairs are concerned. A reasonable doubt may arise out of the evidence or out of the lack of evidence with respect to some element of the crime charged.

TT 5/6/2013 at 9–10. The District Court's jury instruction for reasonable doubt was modeled after the Third Circuit's Model Criminal Instructions and was virtually identical to the model instruction for reasonable doubt, with a few minor inconsequential changes. *See* Third Circuit Model Crim. Jury Instruction § 3.06 (2024). Taken as a whole, this Court finds that the District Court's jury instruction in this case correctly conveyed the concept of reasonable doubt to the jury. *See Laird v. Horn*, 159 F. Supp. 2d 58, 91 (E.D. Pa. 2001) ("Provided that the trial court instructs the jury on the necessity of finding guilt beyond a reasonable doubt, the federal Constitution does not require that particular words be used in advising a jury of the prosecution's burden of proof."). Savage's objections to certain choices of words used in the District Court's jury instruction fail to demonstrate that the instruction in its entirety incorrectly educated the jury as to the reasonable doubt standard. As such, this sub-claim fails.

**<u>Claim 29B:</u>** Mr. Savage's convictions on Counts 2-7 and 10-16 violated the Fifth, Sixth, and Eighth Amendments because this Court failed to instruct the jury on all offenses for which Mr. Savage could have been convicted based on the evidence at trial, including attempts and lesser-included offenses.

In this sub-claim, Savage argues that the District Court should have instructed the jury on attempts and lesser-included offenses, including third-degree murder, for Counts 2 through 7 and Counts 10 through 16. ECF No. 1746 at 700–01. This argument is specious. "A jury instruction

must contain a lesser included offense *only if* the evidence adduced at trial could support a guilty verdict on either charge." *Gov't of V.I. v. Knight*, 989 F.2d 619, 632 (3d Cir. 1993) (emphasis added) (citation omitted). The Third Circuit has held that district courts "need not instruct the jury on a lesser-included offense unless . . . a jury could rationally find the defendant guilty of the lesser offense and not the greater." *United States v. Concepcion*, 169 F.4th 135, 137 (3d Cir. 2026) (citation omitted). Hence, district courts are only required to instruct the jury on a lesser-included offense "when proof on the element that differentiates the two offenses is sufficiently in dispute to necessitate the instruction." *Id.* (internal quotations and citation omitted).

Here, there was no sufficient dispute about whether Savage had the requisite *mens rea* for first-degree murder (a specific intent to kill that is willful, deliberate, and premeditated) versus for third-degree murder (malice, as shown by an extreme recklessness and a conscious disregard for human life). In his Petition, Savage does not explain how he could have been convicted of third-degree murder or attempted murder based on the evidence presented at trial. *See* ECF No. 1746 at 700–01. Indeed, as the Government points out in its response, "[t]he murders of everyone except Lassiter were all contract murders, ordered by Savage, and were thus all premeditated." ECF No. 1795 at 161. Likewise, because all twelve victims in this case were actually murdered, it would have been nonsensical to instruct the jury as to the offense of attempted murder. Because the evidence introduced at trial could not have supported a guilty verdict for any attempts or lesser-included offenses, the District Court was not required to instruct the jury on such offenses. *See Concepcion*, 169 F.4th at 138 ("It is up to the district court to determine whether, given the evidence presented at trial, a jury could rationally convict on the lesser offense but acquit on the greater."). Accordingly, this sub-claim is meritless.

#### 5. *Claim 30: Constitutionality of Death Sentences*

Since Savage's death sentence has been commuted to life imprisonment, Claim 30 and its sub-claims are now moot.

#### 6. *Claim 31: Effect of Cumulative Errors*

In his final claim, Savage argues that the cumulative effect of all of the errors that occurred throughout his trial prejudiced him and requires that his convictions and sentences be vacated, regardless of whether the effect of each individual deficiency entitles him to habeas relief. ECF No. 1746 at 712–13. Because the Court has found that all of Savage's previous claims are meritless, it consequently finds that there was no cumulative error that affected the trial and the resulting jury verdicts. Claim 31 is denied.

### F. The Four Motions for Discovery Are Denied

In addition to the Petition, Savage has filed four separate motions for discovery that he claims will support his habeas Petition: (1) a sixty-page motion for discovery into every murder charge for which he was convicted, seeking production of documents, electronic materials, access to physical evidence, and leave to conduct depositions and subpoena third parties (ECF No. 1808); (2) a motion for discovery relating to jury composition claims, seeking access to historical data to re-litigate his failed fair cross-section claim (ECF No. 1811); (3) a motion for limited disclosure of juror identities and leave to contact jurors (ECF No. 1812); and (4) a motion for exculpatory and impeachment information that Savage claims the Government had failed to disclose (ECF No. 1817). Taken together, these "discovery" motions do not seek discovery. They seek to embark on an outrageous fishing expedition—rather than concentrating their discovery efforts on a select few issues that may be potentially meritorious, habeas counsel are seeking broad, wide-ranging discovery into every little thing that was reviewed and turned over to trial counsel, and more,

searching the seabed to turn over every last shell to see if anything remotely relevant exists under it. Based on the sheer amount of information requested in the discovery motions, one would think that habeas counsel are planning to re-try the entire case and re-litigate the appeal from scratch. This is patently not allowed on a habeas petition, and Savage has not shown a need for such expansive discovery otherwise.

"Habeas petitioners are not entitled to discovery as a matter of ordinary course." *United States v. Spann*, No. 04-cr-758, 2009 WL 2018508, at *5 (E.D. Pa. July 9, 2009) (citing *Bracy v. Gramley*, 520 U.S. 899, 904 (1997)). Indeed, the Supreme Court has held that "the 'broad discovery provisions' of the Federal Rules of Civil Procedure did not apply in habeas proceedings." *Bracy*, 520 U.S. at 904 (quoting *Harris v. Nelson*, 394 U.S. 286, 295 (1969)). Instead, Rule 6(a) of the Rules Governing § 2255 Cases states that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the principles and practices of law." Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 6(a). To demonstrate good cause, "the petitioner must provide specific allegations from which the court may determine whether granting the request would enable the petitioner to demonstrate he or she is entitled to relief." *Spann*, 2009 WL 2018508, at *5. Savage has failed to make a showing of good cause with respect to all four of his discovery motions.

In the sixty-page motion for discovery, habeas counsel seek discovery of all files from the state authorities and the Government relating to each murder charged against Savage, and even some murders that did not involve Savage at all and for which he was not indicted, communications between counsel and the District Court, extra-record materials concerning Savage's *Batson* challenges, and personnel files for detectives involved in investigations against Savage who were

not alleged to have engaged in misconduct during said investigations. ECF No. 1808 at 8, 52–57. This motion in essence calls for a full investigation of the methods and practices of the U.S. Attorney, the District Court, and court administration in a situation where there is not even an indication of a puff of smoke of questionable practices, let alone a fire. In making these discovery requests, habeas counsel repeat many of the allegations and arguments that are presented in the Petition, which this Court has already addressed at length when evaluating each of the claims and sub-claims raised in the Petition. After a thorough review of the entire Petition and the existing record in this case, the Court has determined that all thirty-one claims raised in the Petition are meritless. The comprehensive motion for discovery (ECF No. 1808) fails to explain how further discovery will show that Savage is entitled to habeas relief beyond rehashing the same contentions that failed to persuade the Court to grant any of the claims raised in the Petition. As such, further discovery is unwarranted. *See Spann*, 2009 WL 2018508, at *5 (finding discovery unnecessary upon finding the § 2255 petition meritless); *Hamani v. United States*, No. 06-cv-5179, 2008 WL 5075795, at *5 (D.N.J. Nov. 24, 2008) ("[A] habeas petitioner is not entitled to discovery if his habeas petition is without merit." (citation omitted)).

Next, in the motion for discovery relating to jury composition claims, habeas counsel seek historical data relating to master and qualified juror lists in this district. ECF No. 1811 at 13–14. Although the District Court had previously granted Savage access to some of this data after reviewing his fair cross-section motion, this decision was made in March 2013, while the jury trial was still underway. *See* ECF No. 1136. At the post-conviction stage, Savage is in a much different posture than when he was still a criminal defendant and entitled to a more lenient standard of discovery. *See id.* at 5 ("A defendant 'need only allege that he is preparing a motion to challenge the jury selection process' in order to 'avail himself of the right of access to jury selection

records.'" (quoting *United States v. Royal*, 100 F.3d 1019, 1025 (1st Cir. 1996))). At the present moment, Savage's fair cross-section challenge has already been defeated on direct appeal, and as explained in the Court's discussion of Claim 13I, Savage cannot show that he is likely to prevail on a renewed fair cross-section claim if he had access to additional historical data. *See supra* Section III.B.9. Even in its previous decision granting discovery, the District Court was suspicious of the motives behind the defendants' requests, and now that the death penalty is no longer on the table for Savage, the concern that he is pursuing a witch hunt is even greater. *See* ECF No. 1136 at 10 ("The Court is concerned that Defendant has embarked on a fishing expedition in his request to inspect documents that contain millions of names and addresses. However, the qualitative difference of death from all other punishments requires such deference."). Thus, further discovery into historical juror data is unjustified.

In the motion for limited disclosure of juror identities and leave to contact jurors, habeas counsel brazenly request permission to contact the jurors who tried this case in order to investigate potential juror misconduct. ECF No. 1812. In making this request to lift the District Court's anonymous jury order, habeas counsel provide not one iota of evidence suggesting that there was any sort of juror misconduct or improper influence that occurred during the jury selection process or the trial. *See id.* As such, habeas counsel have certainly failed to demonstrate good cause to break the District Court's promise to the individuals who served on the jury that their identities "have not been and will not be disclosed to the judge, to the attorneys for the government or the attorneys for the defendants." ECF No. 1819 at 1. Therefore, the Court will not disclose juror identities to Savage's habeas counsel.

Finally, in the motion for exculpatory and impeachment information, habeas counsel "requests that the Government conduct a review of the entire law enforcement file and the files of

related cases, including that of any federal, state, or local agency that participated in the investigation and prosecution(s) of Kaboni Savage, and disclose any exculpatory or impeachment information[.]" ECF No. 1817 at 6. Notwithstanding Savage's speculative accusations, the Government has consistently represented that it thoroughly combed through the extensive record in this case and turned over to the defense all *Brady*, *Giglio*, and *Jencks* materials in fulfilment of its constitutional disclosure obligations. ECF No. 1822. And, as this Court has explained in its discussion of Claims 17 through 25, all of Savage's prosecutorial misconduct claims are devoid of merit and accordingly, further discovery into these issues is unnecessary. *See supra* Section III.D.

For the reasons stated, Savage's four discovery motions (ECF Nos. 1808, 1811, 1812, 1817) are all denied.

**G. No Evidentiary Hearing Is Required**

If a § 2255 "motion and the files and records of the case conclusively show" that the petitioner is not entitled to relief, then the district court is not required to hold an evidentiary hearing. 28 U.S.C. § 2255; *see also United States v. Booth*, 432 F.3d 542, 545–46 (3d Cir. 2005); *United States v. McCoy*, 410 F.3d 124, 131 (3d Cir. 2005). "The decision to hold a hearing is wholly within the discretion of the district court." *Eckenberger v. United States*, No. 1:17-cr-00118-1, 2022 WL 609208, at *5 (M.D. Pa. 2022) (citing *Gov't of V.I. v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989)). When deciding whether to hold an evidentiary hearing, "a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). Here, for the reasons discussed when addressing the claims in the Petition, the existing record conclusively establishes that Savage is not entitled to any habeas relief. Therefore, an evidentiary hearing is not warranted in this case.

## IV. CONCLUSION

For the foregoing reasons, the Court will deny Kaboni Savage's Petition for a Writ of Habeas Corpus (ECF No. 1746). No certificate of appealability will issue because Savage has not made a substantial showing of the denial of a constitutional right under 28 U.S.C. § 2253(c)(2).

An appropriate Order will follow.

**BY THE COURT:**

**/s/ Chad F. Kenney**

**CHAD F. KENNEY, JUDGE**